**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: 22-cv-20712-RKA

PENINSULA PETROLEUM LIMITED,

                Plaintiff,

v.

CI INTERNATIONAL FUELS LLC,

                Defendant.

_____/

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT'S MOTION**
**TO DISMISS PLAINTIFF'S VERIFIED COMPLAINT (ECF 26)**

Plaintiff, Peninsula Petroleum Limited ("Peninsula" or "Plaintiff"), by and through its undersigned counsel, respectfully submits this memorandum of law in opposition to Defendant CI International Fuels LLC's ("Defendant" or "CI Int'l") Motion to Dismiss Plaintiff's Verified Complaint pursuant to Federal Rules of Civil Procedure 12(b)(3) (ECF 26 and 26-1; collectively "Defendant's Motion"). For the reasons stated below, Defendant's Motion should be denied in its entirety.

## PRELIMINARY STATEMENT

Defendant erroneously contends that the "Governing Law and Arbitration" clause of the Master Sale and Purchase Agreement (*ECF. 1-2:* "Master Agreement") is an all-or-nothing proposition requiring "any claims and/or disputes" to be resolved in arbitration. (*ECF 26-1:* "Moving Memo." pg. 2.) This is a material misrepresentation of the plain language of the Master Agreement, which clearly draws a distinction between a claim and a dispute. (*Compare* Master Agreement, § 11.1 vs. 11.2.) The narrow arbitration provision (Section 11.2) includes disputes but by omission excludes claims.

This matter involves a liquidated claim – that is, a claim to recover a specific amount of money that had been previously agreed upon as owed by CI Int'l – not a dispute between the parties. The distinction between the two cannot be overemphasized.

And despite the single throw-away line in its Preliminary Statement that "Defendant indeed disputes the validity and existence of the debt" (Moving Memo. pg. 1), Defendant's Motion is devoid of any evidence to this effect. Indeed, Defendant studiously avoids asserting any such purported fact because it cannot do so.

CI Int'l's conduct in the months leading up to this lawsuit, as set forth in the Declarations of Mauricio Perez Grosso and Gabriela Sanchez Urzais, establish that it *agreed* upon a sum that it

owed Peninsula that it has since failed to pay. Peninsula has made a demand for money due. Peninsula has an uncontroverted right to this money. Peninsula has a liquidated claim.

Likewise, Defendant's Motion falls woefully short of demonstrating to this Court that any of the factors necessary to establish a dismissal for *forum non conveniens* have been met. Instead, Defendant offers a series of conclusory statements in support of its argument that both private and public interest factors warrant dismissal, whereas the supporting documents submitted herewith (and attached to the Verified Complaint) show a much stronger tie to this jurisdiction than what Defendant would like this Court to believe. Indeed, Florida is Defendant's home state: its place of incorporation, and where it is registered to do business, such registration listing its Florida address as its principal address.

This liquidated claim was rightfully and properly brought by Peninsula in Florida against Defendant, a limited liability company incorporated in this very jurisdiction, and is therefore rightfully before the United States District Court for the Southern District of Florida. Defendant's Motion should be denied.

Lastly, the Court may look outside the pleadings to decide whether venue is proper. "If there are disputed facts relevant to the venue determination, it may be appropriate for the district court to hold an evidentiary hearing before resolving the Rule 12(b)(3) motion." *Allied Dynamics Corp. v. Kennametal, Inc.*, 965 F.Supp.2d 276, 288 (E.D.N.Y. 2013). It is submitted that any issues that the Court may identify should be resolved at an evidentiary hearing.

# I.   SUMMARY OF THE FACTS AND PROCEDURAL POSTURE

## A.  Facts concerning Plaintiff's liquidated claim.

The facts of this matter, established by Plaintiff's Verified Complaint and uncontradicted by the Declaration of Jaime Ochoa, the Manager of CI Int'l (ECF 26-2: "Ochoa Decl."), are relatively straightforward. On or about October 26, 2020, the parties entered into the Master Agreement, whereby Peninsula agreed to sell and CI Int'l agreed to purchase marine fuel. (ECF 1: Verified Cmplt. ¶¶ 16-17; Ochoa Decl. ¶ 6.) On December 3, 2020, Peninsula sold and delivered to CI Int'l a total cargo of approximately 15,000 MT of oil pursuant to three Cargo Recaps of 5,000 MT each, and two weeks later, issued three pro-forma invoices, each for USD 2,025,000.00 (subject to a slight downward adjustment to reflect the actual total discharge volume of 14.969,728 metric tons, such that the third invoice was only for 4969.728 metric tons), which were paid. (Verified Cmplt. ¶¶ 21-23.)

Price-adjusted invoices and payments were sent and made, respectively, over the ensuing 5 months for, in the aggregate, 6,000 of the 15,000 MT, at which point, by mid-May 2021, market prices concerning marine fuel had gone significantly up. (*Id.* ¶¶ 23-27.) Peninsula demanded that the parties agree upon the price adjustment for the balance of the oil (roundly in the amount of 9,000 MT), that had not yet been lifted by CI Int'l, in order for CI Int'l to pay the difference it owed. (*Id.* ¶ 27.)

On June 7 and 8, 2021, Mauricio Perez Grosso of Peninsula exchanged "What'sApp" messages with Mr. Ochoa, in which they agreed to adjusted pricing for 1000 MT. (Grosso Decl. ¶ 4.) On June 15, 2021, they spoke about resolving the price adjustment for the remaining 8000 MT. (*Id.* ¶ 5; Exhibit 1 thereto.) Mr. Grosso then sent Mr. Ochoa an email memorializing their discussion and presenting two options for resolving the remaining price-adjustment. (*Id.*; Ex. 1.) They spoke again on June 16 or 17, 2021, and agreed on option one. (*Id.*; Ex. 1.) Mr. Grosso sent

3

Mr. Ochoa another email memorializing their discussion and again accepting option one, in writing, together with calculations and due dates, promising to send invoices in furtherance of their agreement. (*Id.*; Exhibit 1.) He did so on June 22, 2021, sending five corresponding invoices. (*Id.*; Exhibit 1.) CI Int'l never paid the agreed-upon invoices (totaling $1,545,293.56). (*Id.*)

Mr. Ochoa, himself, has confirmed in his declaration that he has authority to take legal action for CI Int'l. (Ochoa Decl. ¶ 3.) This is plainly substantiated by his agreement for CI Int'l to pay $1,545,293.56 to Peninsula to resolve the matter of the price adjustment.

Once CI Int'l was in default in paying four of the five invoices, it reached out again to Peninsula with a proposed "payment plan agreement". (Grosso Decl. ¶ 7.). The proposed agreement sought to resolve the payment of the $1,545,293.56, together with accrued interest, via payment installments. (*Id.* ¶¶ 7-9; Exhibit 2.) To be clear, CI Int'l included or adopted whereas clauses that expressly acknowledged the debt owed by reason of its failure to pay the five invoices within the specified due dates (and calculated owed interest for the four invoices that were past due). (*Id.* ¶ 10; Ex. 2.) The parties went back and forth with proposed revisions but did not make a new agreement. (*Id.* ¶ 11.)

As a result of Peninsula thereafter sending default notices, Gabriela Sanchez Urzais, senior legal associate affiliated with Peninsula, began dealing with Willingthon Perinan, representing CI Int'l. (Urzais Decl. ¶ 4.) On October 5, 2021, Mr. Perinan sent an email (prefaced by various legal caveats) seeking a new repayment schedule for the $1,545,293.56. The parties spoke and continued to email but to no avail. (*Id.* ¶ 4-6; Exhibit 1 thereto.) CI Int'l never paid the amount owed. (*Id.*)

Indeed, CI Int'l has failed to make a single payment, forcing Peninsula to commence this litigation against it for its liquidated claim. Mr. Ochoa states nothing to the contrary.

HAMILTON, MILLER & BIRTHISEL LLP
150 SOUTHEAST SECOND AVENUE, SUITE 1200   MIAMI, FLORIDA 33131   TELEPHONE: 305-379-3686   FACSIMILE: 305-379-3690

**B. Facts concerning Defendant's presence in this District and the convenience of this venue.**

First and foremost, Defendant is incorporated under the laws of Florida, is registered and has an active status with the Florida Division of Corporations, and has listed its "principal address" as located in North Bay Village, Florida. (ECF 1-1: Ex. 1 to Verified Cmplt. - Florida Division of Corporations materials, registration details, certificate of status and amendment to articles of organization.) Mr. Ochoa and Maria M. Roa are listed as 100% members, and list the same North Bay Village address as their own. (*Id.*) The foregoing stands uncontested.

Mr. Ochoa asserts that Defendant "does not have any assets, employees, premises or any other sort of infrastructure or operations conducted in Florida or elsewhere in the United States." (Ochoa Decl. at 9.) Leaving aside the ambiguity and conclusory nature of that statement, it does not appear to be true that Defendant has no office and conducts no operations in Florida.

Mr. Ochoa states that he and Maria M. Roa (who own 100% of the membership interests in Defendant) both reside in Colombia. (Ochoa Decl. ¶¶4-5.) Significantly, however, Mr. Ochoa *does not deny* – as alleged in the Verified Complaint (¶¶ 10-13) – that he also resides and is domiciled in Florida, at 7900 Harbor Island Drive, Unit 615, in North Bay Village. Both facts can be true, as one can maintain more than one residence.

The Detailed Report of the Miami-Dade County Office of the Property Appraiser shows that this address is in fact a two-bedroom, two-bathroom condominium zoned "multi-family" with primary land use "residential" owned by Maria M. Roa. (Exhibit 1 to Johnson Declaration.)

Moreover, Mr. Ochoa has admitted that CI Int'l's purpose is to make and take payments in the United States (Ochoa Decl. ¶ 2.). Thus, despite his claim that CI Int'l has no assets or other infrastructure in Florida, presumably it has a bank account. CI Int'l has also issued invoices to Peninsula from a Florida address. (Urzais Decl. ¶ 7.)

**C.  Operative Terms of Relevant Contracts – Master Agreement and Pledge Agreement**

CI Int'l falsely contends that the "Governing Law and Arbitration" clause of the Master Agreement provides that "any claims and/or disputes" shall be arbitrated. (Moving Memo. pg. 2.) CI Int'l is correct in relying on the entirety of that clause. However, upon close scrutiny, it says something entirely and materially different.

The section entitled "11 Governing Law and Arbitration" is subdivided into two subsections.

Clause 11.1 provide as follows:

> The construction, validity and performance of this Master Sale and Purchase Agreement and/or any Cargo Recap and/or any Bunker Recap and **any dispute or claim** arising out of or in connection with this Master Sale and Purchase Agreement and/or any Cargo Recap and/or any Bunker Recap and their subject matter or formation (**including non-contractual disputes or claims**) shall be governed by and construed in accordance with English law to the exclusion of any other law which may be imputed in accordance with choice of law rules applicable in any jurisdiction. (emphasis added.)

Clause 11.2 provides as follows:

> 11.2 **Any dispute** arising out of or in connection with this Master Sale and Purchase Agreement and/or any Cargo Recap and/or any Bunker Recap, **including any question regarding their existence, validity or termination**, shall be referred to and finally resolved by arbitration under the LCIA Riles, which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The seat, or legal place, of arbitration shall be London, England. The language to be used in the arbitral proceedings shall be English. (emphasis added).

As set forth more fully below in the Argument section, these provisions must be compared and contrasted in order to determine the scope of the arbitration provision. It is clear that the governing law clause recognizes a distinction between disputes and claims, and is intended to cover both. It is also clear that it is even broader than that, extending beyond the contract itself, to "non-contractual disputes or claims". Contrariwise, the arbitration clause is far more narrow in its scope,

**HAMILTON, MILLER & BIRTHISEL** LLP
150 SOUTHEAST SECOND AVENUE, SUITE 1200   MIAMI, FLORIDA 33131   TELEPHONE: 305-379-3686   FACSIMILE: 305-379-3690

and is limited to disputes alone. There was an obvious and intentional drafting decision to exclude many types of matters from arbitration, *to wit*, contractual and non-contractual claims arising out of the Master Agreement. The liquidated claim presently before this Court is one such matter excluded from arbitration.

CI Int'l correctly contends that the BP Oil Limited General Terms and Conditions ("BP GTC") are incorporated into the Master Agreement. (Moving Memo. at 2.) However, that is irrelevant. No claim before this Court has arisen thereunder.

The Pledge Agreement has an applicable law and jurisdiction clause, which provides that the parties submit to the jurisdiction of Colombia. (ECF 1-3: Pledge Agreement, § 8.11.). However, it is not an exclusive jurisdiction provision. In any event, as set forth in the Verified Complaint (¶¶ 49-62), a security interest was granted over "Assets": broadly defined to encompass not just the cargoes of marine fuel themselves that were sold and delivered to CI Int'l but also any proceeds or other assets derived from them. That may include any monies that CI Int'l has received or may receive in respect of that marine fuel, subjecting it to the security interest that Peninsula is seeking to enforce. That may include proceeds that have flowed into and are now assets of CI Int'l located in Florida.

Lastly, the Guarantee issued by C.I. International Fuels SAS – specifically referenced in the Verified Complaint (¶ 18) – is not before the Court because it is not at issue.

## II.      LEGAL STANDARD

A motion that seeks dismissal based on a forum selection clause and choice of law principles is properly before the court as a Fed. R. Civ. P. 12(b)(3) motion to dismiss. *See Wai v. Rainbow Holdings*, 315 F.Supp.2d 1261, 1267-68 (S.D. Fla.); *citing Webster v. Royal Caribbean Cruises, Ltd.*, 124 F.Supp.2d 1317 (S.D. Fla. 2000) and *Lipcon v. Underwriters at Lloyd's London*, 148 F.3d 1285, 1290 (11th Cir. 1998). "On a motion to dismiss based on improper venue, the

plaintiff has the burden of showing that venue in the forum is proper." *Id.* at 1268 (internal citations omitted). "The court must accept all allegations of the complaint as true, unless contradicted by the defendants' affidavits, and when an allegation is so challenged the court may examine facts outside of the complaint to determine whether venue is proper….The court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Id.* (internal citations omitted). That is, "[w]hen those facts [in a plaintiff's complaint] are contradicted by the defendant's affidavits, *the court must resolve such conflicts in favor of the plaintiff.*" *Whitham v. JetCard Plus, Inc.*, 34 F.Supp.3d 1257, 1259 (S.D. Fla. 2014) (citing *Wai*, 315 F.Supp.2d at 1268).

In considering a motion for dismissal on grounds of *forum non conveniens*, the court must consider all relevant factors of private interest, weighing in the balance a strong presumption against disturbing a plaintiffs' initial forum choice. *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1100 (11th Cir. 2004); quoting *La Seguridad v. Transytur Line*, 707 F.2d 1304, 1307 (11th Cir. 1983). Unless the  balance is "*strongly in favor of the defendant*," the plaintiff's choice of forum should rarely be disturbed. *Id.*; quoting *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501, 508 (1947) (superseded by statute on other grounds).

"If there are disputed facts relevant to the venue determination, it may be appropriate for the district court to hold an evidentiary hearing before resolving the Rule 12(b)(3) motion. *See New Moon Shipping,* 121 F.3d at 29 ('A disputed fact may be resolved in a manner adverse to the plaintiff only after an evidentiary hearing ... no disputed fact should be resolved against [the resisting] party until it has had an opportunity to be heard.' (citations omitted)); *see also Murphy v. Schneider Nat'l, Inc.,* 362 F.3d 1133, 1139 (9th Cir.2004) ('To resolve such motions when genuine factual issues are raised, it may be appropriate for the district court to hold a Rule 12(b)(3) motion in abeyance until the district court holds an evidentiary hearing on the disputed

facts. Whether to hold a hearing on disputed facts and the scope and method of the hearing is within the sound discretion of the district court.' (citations omitted)); *Novak v. Tucows, Inc.,* No. 06–CV–1909 (JFB)(ARL), 2007 WL 922306, at *7, 2007 U.S. Dist. LEXIS 21269, at *23–24 (E.D.N.Y. Mar. 26, 2007*) (*conducting an evidentiary hearing to 'resolve a disputed material fact as to whether venue is proper in this Court: specifically, whether plaintiff consented to an agreement with defendant [ ] that contained a forum selection clause mandating litigation of all related disputes in Ontario, Canada'). If such a hearing is held, the plaintiff has the burden of demonstrating venue by a preponderance of the evidence. *See Gulf Ins. Co.,* 417 F.3d at 355."
*Allied Dynamics Corp. v. Kennametal, Inc.*, 965 F.Supp.2d 276, 288 (E.D.N.Y. 2013).

When moving for dismissal under the doctrine of *forum non conveniens*, the movant has the burden of persuasion in proving all elements of its motion, including demonstrating both the availability and adequacy of an alternative forum. *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001). When analyzing dismissal of an action based on grounds of *forum non conveniens*, the plaintiff's choice of forum should receive a high level of deference and a presumption of convenience. *TNT USA, Inc v. TrafiExpress, S.A. de C.V.*, 434 F. Supp. 2d 1322, 1333 (S.D. Fla. 2006).

### III.    ARGUMENT

**D. Neither the Master Agreement nor the Pledge Agreement require the parties to litigate undisputed claims in arbitration or Colombian courts.**

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a ***controversy thereafter arising*** out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an ***existing controversy*** arising out of such a contract, transaction, or

refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2 [emphasis added].

The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). However, this is not a blanket requirement for any and all issues within a contract containing an arbitration clause to be arbitrated. "Notwithstanding this strong federal policy in favor of arbitration, *the FAA's provisions are 'not to be construed so broadly as to include claims that were never intended for arbitration.'" Faulkenberg v. CB Tax Franchise Systems, LP*, 637 F.3d 801, 808-09 (7th Cir. 2011) [emphasis added]; quoting *Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 929 (7th Cir.2003); see also *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (explaining that arbitration "is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration").

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally…should apply ordinary state-law principles that govern the formation of contracts." *Kaplan*, 514 U.S. at 944. "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *Id.* at 943.[1]

### i. The money owed to Peninsula by CI Int'l is not in dispute and the claims do not fall within the scope of the arbitration provision.

A dispute is a conflict or controversy. Black's Law Dictionary (11th ed. 2019). A claim is the assertion of an existing right or a right to payment. *Id*. They are not one and the same.

---

[1] Peninsula reserves its right to rely upon English law in the construction of the Master Agreement.

The case of *Papalote Creek II, LLC v. Lower Colorado River Auth.*, 918 F.3d 450 (5th Cir. 2019), is instructive for the arbitration clause at bar. Therein, the clause required the parties to arbitrate "any dispute [that] arises with respect to either party's performance." *Id.* at 451-52. Neither party disputed the validity of the arbitration clause. However, "Papalote" contended that the parties' dispute was not performance-based, and sought appellate court review of the District Court's finding that the dispute fell within the scope of the arbitration clause.

The Fifth Circuit Court of Appeals reversed the District Court. In doing so, the Fifth Circuit noted that:

> The parties may agree upon a broad language in the arbitration clause either by incorporating "[t]he standard broad arbitration provision recommended by the American Arbitration Association" or by creating their own broad provision. These standard arbitration provisions typically require arbitration of "[a]ny controversy or claim arising out of or relating to [the] contract" or "any dispute ... with respect to the interpretation or performance."
>
> …
>
> Alternatively, the parties may agree upon a narrow language in the arbitration clause by deviating from the broad standard provisions and by limiting arbitration only to a subset of disputes that may arise out of the contract. For example, the parties may limit arbitration to either interpretation-related disputes or performance-based disputes at the exclusion of other categories of disputes. *Id.* at 454-55 [Internal citations omitted].

Here, the parties also deviated from the standard broad arbitration provisions recommended by the AAA (quoted above in the *Papalote Creek* case), by omitting the word "claims" from the language employed. The conclusion must be that it was intentional, and that the clause is necessarily more narrow and thus limits arbitration only to a subset of potential matters that could arise, by excluding claims therefrom. A liquidated claim for damages is before the court, and this claim is not arbitrable.

Likewise, in *Art Etc. LLC v. Angel Gifts, Inc.*, 686 F.3d 654 (8th Cir. 2012), the Eighth Circuit Court of Appeals was confronted with an arbitration clause contained in a promissory note (given for payment of a portion of the purchase price) addressing "a dispute between the parties as

to the existence of an infringement", which was an exhibit to an asset purchase agreement (APA). The defendant sought to stay the litigation pending arbitration on an issue not having to do with the promissory note, and the scope of that clause was squarely at issue. The Appellate Court affirmed the denial of the motion. The court resorted to Black's Law Dictionary for the definition of "offset", since an offset by the plaintiff under the note appeared to be the precondition to arbitration, out of which a dispute had to arise. *Id*. at 656-57.

One of the assertions made by the defendant was that the arbitration clause applied to all "claims" for monetary damages arising under the APA. *Id*. at 657. In rejecting that assertion, the Court relied not only on the language of the arbitration clause itself, but also the broader context of the APA, together with several of its provisions, in order to strive to "give effect to all language in [the] contract". *Id*. The APA repeatedly referred to litigation in various contexts, plainly contemplating that not all disputes were arbitrable. The arbitration provision was not applicable.

In the case at bar, the parties intentionally made the governing law clause extremely broad: (i) they included language from BOTH clauses recommended by the AAA – *to wit*, both that the governing law applied to "[t]he construction, validity and performance" of the agreements AND any "dispute or claim" arising out of or in connection with the agreements; (ii) they further extended that language -- any "dispute or claim" – to encompass the "subject matter or formation" of the agreements; and (iii) they further extended that language by identifying and including "non-contractual" disputes or claims. (Master Agreement § 11.1.)

Equally important to this analysis is the fact that almost all of the above-noted, expansive matters were excluded from the arbitration clause, especially "claims". (Master Agreement § 11.2.) Moreover, in the arbitration clause, the parties referenced three particular disputes as arbitrable, namely those arising out of or on connection with the "existence, validity or termination" of the

Master Agreement, or any cargo recap or bunker recap. (*Id.*) These particular disputes differ from the ones that are identified in the governing clause (with the exception of a dispute concerning the "validity" of an agreement). Clearly, the parties ascribed the proper meanings to the different words that were employed, and in doing so differentiated and limited what was to be arbitrated.

In order for the Court to give effect to all language in the Master Agreement, there must be a recognition of the foregoing. The parties intentionally excluded "claims" from the arbitration clause, and identified types of disputes that should be included. And "claims" has a meaning which is distinct from disputes. One need not engage in a sophisticated legal analysis to find clear differences between how *claims* and *disputes* could arise under the terms of the Master Agreement. For example, per Section 3 – "Barging Invoices" – Peninsula could baselessly withhold payment of a Barging Invoice, giving rise to a claim by CI Int'l. However, if Peninsula withheld payment based on the contemporaneous assertion that CI Int'l had previously failed to fulfill all of its obligations under Clause 4 as a basis for its refusal to pay, this could arguably give rise to a dispute.

Under Clause 4.6, Peninsula could refuse to make delivery of Product if it believed CI Int'l had failed to comply with any other provision of Section 4; Defendant could dispute this and demand payment on the basis that it complied with Section 4. This is also arguably an arbitrable dispute.

Unlike the above hypotheticals, Peninsula here negotiated for a price adjustment, for additional monies owed, *and CI Int'l agreed to such sum.* A unilateral decision to renege on what was previously agreed upon is not a dispute or controversy. The refusal to pay what is owed gave rise to Peninsula's liquidated claim.

Assuming, *arguendo*, that a claim may be the subject of a dispute (and thereby become arbitrable), there is nevertheless no such dispute before the Court. The evidence is clear that CI Int'l agreed to pay Peninsula $1,545,293.56, defaulted, thereafter acknowledged the debt and sought to negotiate a payment plan (including interest), Peninsula now has a claim for that amount, and there is no dispute about it. Defendant admits that it purchased petroleum from Plaintiff per the Master Agreement. (Ochoa Decl. ¶ 9.) Remarkably, there is not one single instance in Mr. Ochoa's Declaration where these sums clearly due are contested (save for a throw-away line in Defendant's Motion's Preliminary Statement that "Defendant indeed disputes the validity and existence of the debt.") (Moving Memo. at 1.) CI Int'l cannot manufacture a dispute on reply by submitting another declaration from Mr. Ochoa. That ship has sailed.[2]

The facts before the Court at this juncture, construed in a light most favorable to Peninsula as the non-moving party, plainly demonstrate an undisputed, liquidated claim for amounts due and previously agreed upon. This type of undisputed claim is not encompassed within the scope of the Master Agreement's arbitration provisions and, as such, is properly before this Court. Defendant's Motion under 12(b)(3) must therefore be denied.

**E. The doctrine of "forum non conveniens" is inapplicable to the case *sub judice*.**

**i.   No adequate alternate forum.**

Peninsula does not contest that it has filed an action in Colombia to enforce the terms of the Pledge Agreement against CI Int'l's assets found there. That does not bear on the claims before this Court which, *inter alia*, seek to enforce the terms of the Pledge Agreement against CI Int'l's assets found here. Two lawsuits seeking to enforce against assets of the same company in two jurisdictions does not make one jurisdiction unsuitable. It is axiomatic that Colombia is not the

---

[2] Nor is the second claim for relief a dispute that is arbitrable. It arises under a different agreement and seeks to enforce Peninsula's right to payment from secured assets that may reside in the District.

HAMILTON, MILLER & BIRTHISEL LLP
150 SOUTHEAST SECOND AVENUE, SUITE 1200   MIAMI, FLORIDA 33131   TELEPHONE: 305-379-3686   FACSIMILE: 305-379-3690

proper forum for a claim for execution against Defendant's assets located in Florida. Suit in Florida is appropriate.

Neither Defendant's Motion nor Mr. Ochoa's Declaration establish before this Court that Defendant, a Florida limited liability company, is amenable to suit in Colombia (much less England or Ireland) for the claims brought pursuant to the Master Agreement. Even if Ochoa were to have asserted this, the Court could not simply take him at his word; this would be an improper burden-shifting as more fully described in the very case Defendant cites in support of its adequate alternate forum argument, *Tyco Fire & Sec., LLC v. Alcocer*, 218 Fed.Appx.860 (11th Cir. 2007). Nor did Defendant's Motion demonstrate that adequate remedies exist in Colombia for the claims with respect to the Master Agreement. This element has not been satisfied.

Defendant failed to show that an adequate alternative forum is available to Peninsula for the claims before this Court.

### ii. Private interest factors.

Assuming, *arguendo,* that the Court was to find that Defendant satisfied its burden of demonstrating an adequate alternative forum, the analysis does not stop there. "The second part of the forum non conveniens analysis—the balancing of the private and public factors—is a 'comparative inquiry [that] requires the district court to weigh the 'relative' advantages and disadvantages of each respective forum.'" *Fresh Results, LLC v. ASF Holland, B.V.*, 921 F.3d 1043, 1049 (11th Cir. 2019); quoting *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1331 (11th Cir. 2001). The private factors focus on the interests of the specific participants in the given litigation. *Id.*

In support of its burden to show that private interest factors weigh in favor of its *forum non conveniens* motion, Defendant offers no argument, but rather a recitation of the location of the various entities. This falls woefully short of detailing the "availability of compulsory process for

attendance of unwilling, and the cost of obtaining attendance of willing, witnesses." *Id.*; quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

Although this litigation is in its infancy, Peninsula anticipates its witness list to be comparatively small. The primary witness, Mr. Ochoa, is a member of the Florida limited liability company Defendant. Said Florida limited liability company has its principal place of business in a two-bedroom, two-bathroom condominium right in this very district. It seems wholly disingenuous to argue that the jurisdiction in which an entity is incorporated and has its principal place of business, and in which one of its two members owns a residence, could somehow be inconvenient.

Indeed, in this circumstance, courts give proper deference to what in this case is the "elephant in the room" —that the Defendant is at home in Florida. *Compare, Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331, 1343, 1345 (11th Cir. 2020)("[Citigroup] is the only defendant in this case, and it is based in the United States. Not only that, it has offices in Miami and conducts substantial activities throughout the United States, including New York—where the Institutional Clients Group is based. One would therefore think that it would be more convenient for Citigroup to litigate in the Southern District of Florida than in Mexico."; "But at this juncture, we see no evidence of improper forum shopping. Indeed, it would be ironic to fault the foreign plaintiffs for their willingness to travel to the United States to sue Citigroup in its country of citizenship.")

Defendant's Motion offers no factual detail to support its conclusory assertion that Defendant has no assets, employees, premises, or any other sort of infrastructure or operations conducted in Florida or elsewhere in the United States (Ochoa Decl. ¶ 9). Indeed, that assertion is incompatible with Mr. Ochoa's earlier admission that Defendant's purpose is to make and take payments in the United States (*Id.* ¶ 2).

It is also controverted by various facts: (i) his admission that CI Int'l makes and takes payments in the U.S.; (ii) CI Int'l's registration disclosures with the Florida Division of Corporations of its Florida address, matching the Florida address of Mr. Ochoa and Ms. Roa; (iii) Peninsula's receipt of CI Int'l invoices indicating a Florida address, (iv) his failure to deny that he is also a resident and domiciliary of Florida, and (v) the office of the property appraiser report establishing the address of CI Int'l, Mr. Ochoa and Ms. Roa as a residential condominium. CI Int'l also does not address whether it has intangible assets in Florida, such as a bank account. This is precisely the type of property that the Pledge Agreement seeks to enforce against. Florida is the suitable place for that claim.

In any event, Defendant has not and cannot show that it is somehow prejudiced by this litigation taking place in its home state: state of incorporation, where it is registered to do business, and where its registration lists its Florida address as its "principal address". Nor should it matter where Peninsula's principal place of business is, Defendant's assets lie, or the petroleum products themselves were sold or delivered. This breach of contract action – for moneys due and owing in United States currency and against a Florida limited liability company – is properly before this Court.

### iii.   Public interest factors.

The public factors "pertain to the relative interests of the two fora." *Tazoe*, 631 F.3d at 1333. In considering public factors, the court should look to the administrative difficulties flowing from court congestion, the local interest in having localized controversies decided at home, and the unfairness of burdening citizens in an unrelated forum with jury duty. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1991); see also *Gulf Oil*, 330 U.S. at 509, 67 S.Ct. 839. A court may also consider what law will govern the action, including "the avoidance of unnecessary problems

HAMILTON, MILLER & BIRTHISEL LLP
150 SOUTHEAST SECOND AVENUE, SUITE 1200   MIAMI, FLORIDA 33131   TELEPHONE: 305-379-3686   FACSIMILE: 305-379-3690

in conflicts of laws" and "the application of foreign law." *Fresh Results, LLC*, 921 F.3d 1043, 1049; quoting *Piper Aircraft*, 454 U.S. at 241 n.6.

Clearly, this case has a general nexus with the Southern District of Florida such that it is sufficient and proper to use this forum's judicial time and resources. The Master Agreement was entered into by Defendant, a company incorporated in Florida, registered to do business in Florida, and whose principal place of business is in North Bay Village. (Verified Cmplt. ¶3; Ex. 1 to Verified Cmplt; Master Agreement at 1.) Both the initial purchase price on the December 2020 invoices and the agreed-upon price adjustment were in US Dollars (*see Verified Compl.* ¶¶21, 28). They were paid by a US entity (Defendant) whose purpose is to make and take payments in the United States as part of a tax and sales/purchase strategy.

Defendant seeks to have the best of both worlds. It argues that it should be free to take advantage of a "tax and sales/purchase strategy" by incorporating in the United States, yet it should somehow be immune from litigation in the very state and country in which it has incorporated.

Although Mr. Ochoa declared that he resides in Colombia, he offered no evidence to refute the allegation in the *Verified Complaint (Dkt. 1)* that he also resides at 7900 Harbor Island Drive, Unit 615, North Bay Village, Florida (which is CI Int'l's principal address). In fact, this address is for a two-bedroom, two-bathroom condominium zoned as "multi-family" with primary land use listed as "residential." (Ex. 1 to Johnson Decl.)

"For purposes of diversity jurisdiction, 'citizenship' means 'domicile.' [Internal citation omitted.] In fact, it is a party's domicile rather than his residence which is determinative of citizenship for diversity jurisdiction' [Internal citation omitted.] 'A person's domicile is the place of his true, fixed, and permanent home and principal establishment, and to which he has the

intention of returning whenever he is absent therefrom....' [Internal quotations omitted]." *Audi Performance & Racing, LLC v. Kasberger*, 273 F.Supp.2d 1220, 1226 (M.D. Ala. 2003).[3]

In its Memorandum, Defendant relies heavily on *McLane v. Marriott Intern, Inc.*, 777 F.Supp.2d 1302 (S.D. Fla. 2010), in arguing that public interest factors somehow weigh in favor of dismissal. (Moving Memo at 8-9.) However, Defendant failed to point out that this decision was *reversed* by the 11th Circuit Court of Appeals, which indicated that "[g]iven that we are reversing and remanding on the basis of the district court's errors in balancing the private factors, we do not need to continue with our analysis of the public interest factors." *McLane v. Los Suenos Marriot Ocean and Golf Resort*, 476 Fed.Appx. 831, 834 (11th Cir. 2012).

Plainly, Defendant has not met its burden of showing that its home district is an inconvenient forum for this suit against it.

**F. Alternatively, the Court should hold an evidentiary hearing to determine whether Peninsula has met its burden of proving proper venue.**

If the court relies only on pleadings and affidavits with respect to the venue issue, the plaintiff need only make a *prima facie* showing of venue. *See Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 355 (2d Cir.2005). Thus, if an evidentiary hearing on the question of venue has not been held, 'the Court accepts facts alleged in the complaint as true and draws all reasonable inferences in [plaintiff's] favor.' *Person v. Google Inc.*, 456 F.Supp.2d 488, 493 (S.D.N.Y.2006) (quoting *Caremark Therapeutic Servs. v. Leavitt,* 405 F.Supp.2d 454, 457 (S.D.N.Y.2005)); *see also New Moon Shipping Co. v. MAN B & W Diesel A.G.,* 121 F.3d 24, 29 (2d Cir.1997) (explaining that, 'at the initial stage of litigation, a party seeking to establish jurisdiction need only make a *prima facie* showing by alleging facts which, if true, would support

---

[3] It is Defendant's status as a registered Florida limited liability company, not its member's domicile, that affords this Court diversity jurisdiction pursuant to 28 U.S.C. § 1332. Nonetheless, this dicta provides a guide on the differences between "residence" and "domicile."

the court's exercise of jurisdiction' (citation omitted)); *Magi XXI, Inc. v. Stato Della Citta Del Vaticano*, 818 F.Supp.2d 597, 604 (E.D.N.Y.2011) ('[A]bsent an evidentiary hearing, the Court must view the facts in the light most favorable to the plaintiff.'). The Court is permitted, however, to consider facts outside of the pleadings on a Rule 12(b)(3) motion. *See TradeComet.com LLC v. Google, Inc.,* 693 F.Supp.2d 370, 375 n. 3 (S.D.N.Y.2010) (explaining that a court, in deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(3), 'may consider evidentiary matters outside the pleadings, by affidavit or otherwise, regarding the existence of jurisdiction' (citation and internal quotation marks omitted))." *Allied Dynamics Corp.*, 965 F.Supp.2d at 288.

It is respectfully submitted that any disputed facts relating to the venue issue before the Court should be resolved by an evidentiary hearing. In all events, the motion to dismiss should be denied.

## IV.    CONCLUSION

For all the aforementioned reasons, Defendant's Motion to Dismiss Plaintiff's Verified Complaint should be denied in its entirety. Alternatively, an evidentiary hearing should be held on such matters as the Court deems appropriate. In the event the Court concludes that arbitration is appropriate, it should stay this matter pending resolution of such arbitration.

**Dated: June 14, 2022**

Respectfully submitted,

By:      /s/ Evan S. Gutwein
HAMILTON, MILLER, & BIRTHISEL LLP
Jerry D. Hamilton (FBN 970700)
jhamilton@hamiltonmillerlaw.com
Evan S. Gutwein (FBN 58741)
egutwein@hamiltonmillerlaw.com
150 S.E. Second Avenue, Suite 1200
Miami, Florida 33131
(305) 379-3686 (telephone)
(305) 279-3690 (facsimile)
*Attorneys for Plaintiff*

-and-

ZEILER FLOYD ZADKOVICH (US) LLP
Luke Zadkovich, Esq.
Luke.zadkovich@zeilerfloydzad.com
(Admitted *Pro Hac Vice*)
Joseph Johnson, Esq.
joe.johnson@zeilerfloydzad.com
(Admitted *Pro Hac Vice*)
215 Park Avenue, 11th Floor
New York, NY 100003
(917) 375-9511

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 14, 2022 I electronically filed this document using the

Court's CM/ECF system, which will automatically serve a copy on all counsel of record.

By:   *Evan S. Gutwein*

| | |
|---|---|
| Fernando Franco<br>Counselor Franco, P.A.<br>1990 Sw 27th Ave 2nd Floor<br>Miami, FL 33145<br>(786)724-0900 (telephone)<br>(786)221-2407 (fax)<br>Service@francolawfirmpa.com<br><br>*Attorneys for Defendant* | HAMILTON, MILLER, & BIRTHISEL LLP<br>Evan S. Gutwein (FBN 58741)<br>egutwein@hamiltonmillerlaw.com<br>150 S.E. Second Avenue, Suite 1200<br>Miami, Florida 33131<br>(305) 379-3686 (telephone)<br>(305) 279-3690 (facsimile)<br><br>and<br><br>ZEILER FLOYD ZADKOVICH (US) LLP<br>Luke Zadkovich, Esq.<br>Luke.zadkovich@zeilerfloydzad.com<br>(Admitted *Pro Hac Vice*)<br>Joseph Johnson, Esq.<br>joe.johnson@zeilerfloydzad.com<br>(Admitted *Pro Hac Vice*)<br>215 Park Avenue, 11th Floor<br>New York, NY 100003<br>(917) 375-9511<br><br>*Attorneys for Plaintiff* |