**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: 22-cv-20712-RKA

PENINSULA PETROLEUM LIMITED,

Plaintiff,

v.

CI INTERNATIONAL FUELS LLC,

Defendant.

_____/

**DECLARATION OF JOSEPH JOHNSON IN SUPPORT OF**
**PLAINTIFF'S MOTION SEEKING LEAVE TO AMEND ITS COMPLAINT**

Pursuant to 28 U.S.C. §1746, Joseph Johnson declares as follows:

1.      I am a partner at Zeiler Floyd Zadkovich (US) LLP (ZFZ), counsel for Plaintiff,

Peninsula Petroleum Limited ("Peninsula" or "Plaintiff"), and admitted pro hac vice in this matter.

I am fully familiar with the facts and circumstances set forth herein, and make this declaration in

support of Peninsula's motion seeking leave to amend its complaint.

2.      In February 2022, on behalf of Peninsula, ZFZ caused a nationwide bank search to

be conducted by a duly licensed investigation company of accounts in the name of Defendant CI

International Fuels LLC ("Defendant" or "CI Int'l").

3.      That search resulted in the following findings:

Bank of America
Branch Address: 9190 Biscayne Blvd.
Miami Shores, FL 33138
Account: Checking-Acct# ending 7779: Account Balance - $21,000.00 approx balance
Account: Checking-Acct# ending 0932:  Account Balance - $6,000.00 approx balance
Account: Checking-Acct# ending 7387: Account Balance - $1,500,000.00 approx balance
Account: Savings-Acct# ending 8357: Account Balance - $246,000.00 approx balance
Approximate total:  $1,773,000

4.     In late September 2022, on behalf of Peninsula, ZFZ caused another search to be conducted by the same investigation company of the Florida accounts in the name of CI Int'l that had been previously identified. That second search resulted in the following findings:

Bank Name: Bank of America
Branch Address: 9190 Biscayne Blvd.
Miami Shores, FL 33138
Account: CHECKING ENDING 7779: Account Balance: $12,200.00 approx balance
Account: CHECKING ENDING 0932: Account Balance: $16,000.00 approx balance
Account: CHECKING ENDING 7387: Account Balance: $272,000.00 approx balance
Account: SAVINGS ENDING 8357: Account Balance: $246,000.00 approx balance
Approximate total: 546,200

5.     Attached hereto as Exhibit 1 is the proposed amended complaint (which has been redlined against the existing complaint for the convenience of the Court), seeking to assert a third claim for relief under Florida's Uniform Fraudulent Transfer Act (UFTA) (Title XLI, Chapter 726 of the Florida Statutes).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 3, 2022 at New York, New York.

Joseph Johnson

EXHIBIT "1"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| PENINSULA PETROLEUM LIMITED, | Case No.: 22-CV-20712 |
| Plaintiff, | **AMENDED VERIFIED COMPLAINT** |
| - against - | |
| CI INTERNATIONAL FUELS LLC, | |
| Defendant. | |

Plaintiff, Peninsula Petroleum Limited ("Peninsula"), by and through undersigned counsel, as and for its Amended Verified Complaint against Defendant, CI International Fuels LLC ("CI Int'l"), in the above-entitled action, hereby alleges as follows:

**NATURE OF ACTION**

1.      This is a collection action by Peninsula for a debt that is due from CI Int'l. Peninsula sold 15,000 MT of marine fuel to CI Int'l on December 3, 2020, pursuant to a written agreement. The marine fuel was delivered, partial payments were made by CI Int'l, and commercial negotiations were held in subsequent months concerning payment of the balance, and revised invoices were issued as a result. However, those revised invoices were never paid. Peninsula seeks to recover the balance owed, plus interest, for invoices totaling USD **$1,545,293.56**, plus interest.

**PARTIES**

2.      Peninsula is a foreign corporation with its principal place of business in Ireland and subsidiary offices in England, and is a global physical supplier and reseller of marine fuel.

3.      As per the Florida Secretary of State, Division of Corporations, website, CI Int'l is a registered Florida limited liability company, with its principal place of business at 7900 Harbor Island Drive, 615, North Bay Village, Florida.

4.      Upon information and belief, the only members of CI Int'l are Jaime Alberto Ochoa Munoz ("J. Ochoa") and Maria Mercedez Roa ("Roa").

5.      The information upon which Peninsula formed a reasonable belief concerning the immediately preceding allegation is from the Florida Secretary of State, Division of Corporations, website, which also indicates that CI Int'l's only "authorized persons" are J. Ochoa and Roa, who both have the same address as CI Int'l, namely 7900 Harbor Island Drive, 615, North Bay Village, Florida. Attached hereto and made a part hereof as Exhibit 1 is a true and correct copy of the printout from the Florida Secretary of State, Division of Corporations, website.

6.      Further information upon which Peninsula formed a reasonable belief is that CI Int'l has filed on that website organizational documents and its annual reports. The most recent annual report (filed April 22, 2021) states that the authorized persons are "Ochoa Munoz, Jaime A 50%", with title of "MGRM" and "Roa, Maria Mercedez 50%", with title of "S". The Amendment to the Articles of Organization (filed May 24, 2021) is consistent therewith. *See*, Ex. 1.

7.      Based upon the foregoing information, namely the designation of J. Munoz and Roa as each holding fifty percent in CI Int'l's most recent annual report, it is Peninsula's reasonable belief that they are the members, and only members, of CI Int'l.

8.      Peninsula is not aware of any other publicly available information concerning the number or identity of the members of CI Int'l.

2

9.      The factual allegation that J. Ochoa and Roa are the sole members of CI Int'l will likely have further evidentiary support after a reasonable opportunity for discovery on the issue, if necessary.

10.      Upon information and belief, J. Ochoa and Roa are natural persons and citizens of the State of Florida who reside and are domiciled in the State of Florida at 7900 Harbor Island Drive, 615, North Bay Village, Florida.

11.      The information upon which Peninsula formed a reasonable belief concerning the immediately preceding allegation are "peoplemap reports" prepared by Westlaw on each person, which is a compilation of various types of information derived from other data sources.

12.      Mr. Ochoa's peoplemap report indicates 7900 Harbor Island Drive, 615, North Bay Village, Florida as his address by reference to "By Motor vehicle" and "By driver license".

13.      Roa's peoplemap report indicates 7900 Harbor Island Drive, 615, North Bay Village, Florida as her address by reference to: "By Equifax Credit Header 09/01/2017 - 09/30/2017; By Experian Credit Header 08/16/2014 - 08/13/2017; By New Movers 02/23/2013 - 02/23/2013; By People Find 01/15/2013 - 01/15/2013; By People Household 01/01/2012 - 12/31/2012; By Real Property Deeds; By Real Property Tax Assessor.

## JURISDICTION AND VENUE

14.      The Court has subject matter jurisdiction over this civil action under 28 U.S.C § 1332 by reason of diversity jurisdiction between the members of CI Int'l, who are citizens of one American State (namely Florida), and Peninsula, which is a citizen of a foreign state, and because the matter in controversy exceeds $75,000, exclusive of interest and costs.

15.      This District is a proper venue for this action pursuant to 28 U.S.C. §1391 because it is where CI Int'l and its members reside.

3

### FACTS COMMON TO ALL CLAIMS

16.     As a result of negotiations, in October, 2020, Peninsula and CI Int'l entered into two related agreements concerning commodities transactions, including the sale/purchase of marine fuels between them (as well as the delivery, from time to time, by CI Int'l to Peninsula's nominated customer vessels within Colombian ports).

17.     The two agreements are 1) a master sale and purchase agreement ("Master Agreement") and 2) a "Pledge Agreement", true and correct copies of which are attached hereto as Exhibits 2 and 3, respectively.

18.     A "Guarantee" was also issued by C.I. International Fuels SAS ("CI SAS", not a party hereto), for CI Int'l's timely payment and performance.

19.     Pursuant to these agreements, Peninsula could sell oil to CI Int'l, to be stored in CI Int'l's storage tanks at the Santa Marta, Colombian port and CI Int'l could either (i) use the product for its own purposes or (ii) to the extent Peninsula had the demand for it, sell the product back to Peninsula (to be delivered directly into Peninsula's nominated customers' vessels).

20.     Pursuant to the Master Agreement, in the event Peninsula sold to CI Int'l, they would enter into "Cargo Contracts", the terms of which were to be confirmed by "Cargo Recaps".

21.     On 3 December 2020, Peninsula sold and delivered to CI Int'l a total cargo of approximately 15,000 MT of oil pursuant to three Cargo Recaps of 5,000 MT each, and on 17 December 2020, issued three pro-forma invoices, each for USD 2,025,000.00 (tentatively priced at USD 405 per MT, the market price at that time) (the "Pro-forma Invoice(s)").

22.     The first Pro Forma Invoice was payable in 30 days, the second invoice was payable in 60 days and the third invoice was payable in 90 days.

4

23.     CI Int'l then made all the payments in relation to each Pro-forma Invoice, as set forth on <u>Schedule 1</u> hereto, over the course of February, March and April, 2021, subject to a slight downward adjustment to reflect the actual total discharge volume of 14.969,728 metric tons (such that the third invoice was only for 4969.728 metric tons).

24.     Due to low demand and rising prices, CI Int'l did not immediately lift any of the 14.,969,728 MT of oil that had been sold and delivered to it.

25.     The first 5,000 MT was lifted and price adjusted on or about 3 May 2021 (*i.e.,* 4 months after delivery), at which time Peninsula sent a price-adjusted invoice for a total amount of USD 334,912.50, which was fully paid by CI Int'l.

26.     Another 1,000 MT was lifted and price adjusted on or about 24 May 2021, at which time Peninsula sent a price-adjusted invoice for a total amount of USD 82,750.00, which was also fully paid.

27.     By mid-May 2021, market prices concerning the oil at issue had gone significantly up (USD 563.5 per MT), at which time Peninsula demanded the parties agree upon the price adjustment for the balance, in order for CI Int'l to pay the difference owed.

[Remainder of page intentionally left blank]

5

28.     In or around June 2021, the parties agreed upon a price adjustment for the balance of the oil, in accordance with which Peninsula issued five corresponding invoices (set forth below):

| Invoice Number | Invoice Issue Date | Invoice Amount (USD) | Cargo Recap Ref | Due Date |
|---|---|---|---|---|
| 10I175369 | 11 June 2021 | 164,500.00 | STA-000024-20 | 30 June 2021 |
| 10I176202 | 22 June 2021 | 354,000.00 | STA-000024-20 | 30 June 2021 |
| 10I176205 | 22 June 2021 | 344,000.00 | STA-000025-20 | 30 July 2021 |
| 10I176204 | 22 June 2021 | 172,000.00 | STA-000024-20 | 30 July 2021 |
| 10I176206 | 22 June 2021 | 510,793.56 | STA-000025-20 | 31 August 2021 |

29.     The first two invoices became due on 30 June 2021, however, CI Int'l failed to pay them.

30.     The next two invoices became due on 30 July 2021, however, CI Int'l failed to pay them as well.

31.     On 13 August 2021, Peninsula issued and delivered to CI Int'l an Event of Default Notice in respect to the four invoices that were due at the time (totalling USD 1,034,500), rendering the fifth invoice immediately due as well.

32.     On 17 August 2021, following non-payment of the said invoices, Peninsula issued and delivered to CI Int'l a second Event of Default Notice, referencing all five invoices due, with respect to a total outstanding debt of USD 1,545,293.56.

33.     On 23 August 2021, Peninsula served on CI Int'l an Event of Default Notice (sent to its Colombian affiliate, CI SAS) in accordance with the Pledge Agreement.

6

34.     On or about 23 September 2021, in accordance with Section 2.03 of the Pledge Agreement, Peninsula registered its "Security Interest" with the National Registry of Securities Over Movable Assets in Colombia, which allows Peninsula to carry forward proceedings to enforce the pledge.

35.     Upon information and belief, CI Int'l never contested the calculation of the amounts it agreed were owed in June 2021 and set forth in at no time since the issuance of the June 2021 Cargo Recaps or Invoices, which were agreed upon, until June 21, 2022, when CI Int'l filed the reply declaration of Jaime Ochoa (Dkt. 31-1) in response to Peninsula pointing out the foregoing (Dkt. 29) in opposition to CI Int'l's motion to dismiss.has CI Int'l objected to the amounts owed as set forth therein.

35.36.   The Ochoa 6-21-22 reply declaration states only, for the first time, in conclusory terms that "[t]he parties did not reach an agreement concerning the validity, existence, and amount, if any, of the alleged price adjustment debt" (Dkt. 31-1, Para. 9), despite the significant contemporaneous written evidence to the contrary.

37.     Upon information and belief, CI Int'l has no intention to pay the monies it owes to Peninsula.

38.     In February 2022, Peninsula engaged a duly licensed investigation company to search for all U.S. bank accounts in the name of CI Int'l. That company reported that it found the following accounts and approximate balances in the name of CI Int'l:

Bank of America
Branch Address: 9190 Biscayne Blvd.
Miami Shores, FL 33138
Account: Checking-Acct# ending 7779: Account Balance - $21,000.00 approx balance
Account: Checking-Acct# ending 0932:  Account Balance - $6,000.00 approx balance
Account: Checking-Acct# ending 7387: Account Balance - $1,500,000.00 approx balance
Account: Savings-Acct# ending 8357: Account Balance - $246,000.00 approx balance
Approximate total:  $1,773,000

39.      In late September 2022, Peninsula caused the aforementioned investigation company to search again for the Florida bank accounts that had been found in February 2022 in the name of CI Int'l. That company reported that CI Int'l then had the following accounts and approximate balances:

Bank Name: Bank of America
Branch Address: 9190 Biscayne Blvd.
Miami Shores, FL 33138
Account: CHECKING ENDING 7779: Account Balance: $12,200.00 approx balance
Account: CHECKING ENDING 0932: Account Balance: $16,000.00 approx balance
Account: CHECKING ENDING 7387: Account Balance: $272,000.00 approx balance
Account: SAVINGS ENDING 8357: Account Balance: $246,000.00 approx balance
Approximate total: 546,200

40.      A basic before-and-after tally of CI Int'l's bank account information yields that at the time of the commencement of this suit, it had enough monies in the State of Florida to pay the principal owed to Peninsula ($1,545,293.56) but thereafter transferred away approximately $1,226,800.

41.      The declarations of Jaime Ochoa filed on May 17, 2022 and May 31, 2022, which asserted that CI Int'l had no assets in Florida or elsewhere in the United States (Dkt. 20-2, Para. 8; Dkt. 26-2, Para. 9), appear to have been false in that respect as it relates to Florida.

36.

**FIRST CLAIM FOR RELIEF**

8

**(Breach of Contract)**

37.42.  Peninsula realleges and incorporates by reference the allegations contained in Paragraphs 1 through 4136 above as if specifically set forth herein.

38.43.  The parties entered into a binding and enforceable written agreement for the purchase and sale of petroleum products, namely the Master Agreement and the corresponding Cargo Contracts, which were supported by valid consideration.

39.44.  Peninsula sold and delivered 14.969,728 MT of oil to CI Int'l in accordance with the terms of the Master Agreement and consistent with several Cargo Recaps.

40.45.  Peninsula fully performed any and all other obligations under the Master Agreement and the corresponding Cargo Contracts that entitled it to payment from CI Int'l for the 14.969,728 MT of oil.

41.46.  Section 11 of the Master Agreement has a governing law provision which provides for "[t]he construction, validity and performance" thereunder and/or of any Cargo Recap "and any dispute or claim arising out of or in connection with" the foregoing to be "governed by and construed in accordance with English law".

42.47.  Section 12 of the Master Agreement has an arbitration provision, however, which only pertains to "[a]ny dispute arising out of or in connection with" said agreement and/or Cargo Recap.

43.48.  Since there is no dispute concerning Peninsula's claim for money due from CI Int'l., no such arbitration has been commenced between the parties.

44.49.  To the extent that CI Int'l may contend there is an existing dispute concerning the amount it owes to Peninsula under the Master Agreement or any Cargo Recap, any such dispute

was previously resolved by negotiation, agreement, amendment, novation, admission of liability or otherwise and all that remains is an uncontested claim for money due from CI Int'l.

45.50.  Peninsula's claim is to recover the amount which it is owed, namely USD 1,545,293.56 (plus interest), in accordance with the Master Agreement and the corresponding Cargo Contracts.

46.51.  Any and all conditions precedent to Peninsula's right to be paid the amount sought herein have been performed, have occurred, or have been excused or waived.

47.52.  Any and all conditions precedent to Peninsula's right to pursue this claim in court herein have been performed, have occurred, or have been excused or waived.

48.53.  By reason of the foregoing breach of contract by CI Int'l, Peninsula has suffered damages in an amount of USD 1,545,293.56, plus applicable interest.

**SECOND CLAIM FOR RELIEF**
**(Enforcement of Security Interest contained in Pledge Agreement)**

49.54.  Peninsula realleges and incorporates by reference the allegations contained in Paragraphs 1 through 5348 above as if specifically set forth herein.

50.55.  The parties entered into a secondary binding and enforceable written agreement in connection with CI Int'l's purchase of petroleum products from Peninsula pursuant to the Master Agreement, namely the Pledge Agreement, which was supported by valid consideration.

51.56.  In accordance with the Pledge Agreement, CI Int'l granted a first priority security interest, without possession, to Peninsula over the "Assets" (which is a defined term discussed below), to secure prompt payment from CI Int'l when due.

52.57.  Peninsula has a valid and existing right to be paid USD 1,545,293.56 (plus interest) in accordance with the Master Agreement, which is a secured obligation under the Pledge Agreement.

53.58.  The security interest created by the Pledge Agreement and the debt owed constitutes collateral security interest for the secured obligation.

54.59.  The security interest granted by CI Int'l to Peninsula for Peninsula's right to be paid was perfected upon the execution of the Pledge Agreement and has been registered in accordance therewith.

55.60.  "Assets" is defined in the Pledge Agreement to mean:

> "all present and future cargoes of petroleum products that are from time to time acquired by [CI LLC] and storage [sic] in the Free Trade Zone pursuant to the Master Agreement and the Product Sale and Purchase Agreements and all proceeds or assets derived or attributable to them thereof." Section 1.01.

56.61.  Inasmuch as the "Assets" is broadly defined to encompass not just the cargoes of marine fuel themselves that were sold and delivered to CI Int'l but also any proceeds or other assets derived from them, among other things, any monies that CI Int'l has received or may receive in respect of that marine fuel may also fall within and be subject to the security interest that PPL is seeking to enforce herein.

57.62.  There has been an occurrence of an "Event of Default" as defined by the Pledge Agreement, thereby entitling Peninsula to enforce its security interest with respect to the secured obligation.

58.63.  As set forth in Section 8.11 of the Pledge Agreement, it is governed by the laws of Colombia. While that section also provides that the parties submit to the jurisdiction of Colombia, it is not an exclusive jurisdiction clause.

59.64.  Any and all conditions precedent to Peninsula's ability to exercise its rights under the Pledge Agreement have been performed, have occurred, or have been excused or waived.

60.65.  Any and all conditions precedent to Peninsula's right to pursue this claim in court have been performed, have occurred, or have been excused or waived.

61.66.  In accordance with the Pledge Agreement, Peninsula is entitled to, *inter alia*, payment in full of the secured obligation directly with the Assets.

62.67.  By reason of the foregoing, Peninsula seeks to enforce its rights in accordance with the Pledge Agreement as set forth above in order to satisfy its secured obligation.

### THIRD CLAIM FOR RELIEF
### (Fraudulent Transfers)

68.     Peninsula realleges and incorporates by reference the allegations contained in Paragraphs 1 through 67 above as if specifically set forth herein.

69.     Pursuant to the Florida Uniform Fraudulent Transfer Act (UFTA) (Title XLI, Chapter 726 of the Florida Statutes), a "creditor" is defined as a person who has a "claim", that is, a right to payment whether or not the right is, among other things, reduced to judgment or un-disputed, and a "debtor" means a person who is liable on a claim. Fla. Stat. § 726.102(4), (5), (7).

70.  As to present creditors, UFTA provides:

(1)   A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
(2)   A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.  Fla. Stat. § 726.106.

71.  As to present creditors and future creditors, UFTA also provides that:

(1) a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(a)   With actual intent to hinder, delay, or defraud any creditor of the debtor; or
(b)   Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
1.   Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
2.   Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.  Fla. Stat. §726.105.

72.     Pursuant to UFTA, Peninsula is a present creditor of CI Int'l whose claim arose before, upon information and belief, CI Int'l transferred a net amount of approximately $1,226,800

13

from its Florida accounts, leaving a remaining in-state balance of approximately $546,200, which is insufficient to satisfy Peninsula's claim.

73.     Upon information and belief, CI Int'l made the aforementioned transfer(s):

(a) without receiving a reasonably equivalent value in exchange for the transfer(s) or obligation(s) and CI Int'l was insolvent at that time or became insolvent as a result of the transfer(s) or obligation(s);

(b) to an insider for an antecedent debt, CI Int'l was insolvent at that time, and the insider had reasonable cause to believe that CI Int'l was insolvent;

(c)  with actual intent to hinder, delay, or defraud Peninsula; and/or

(d) without receiving a reasonably equivalent value in exchange for the transfer(s) or obligation(s), and CI Int'l (i) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

74.     By reason of the foregoing fraudulent transfers, Peninsula seeks to enforce its rights in accordance with UFTA including, but not limited to (a) avoidance of the transfer(s) or obligation(s) to the extent necessary to satisfy its claim, (b) an attachment or other provisional remedy against the monies transferred or other property of CI Int'l in accordance with applicable law, (c) an injunction against further disposition by CI Int'l and/or its transferee(s) of the monies transferred or of other property, (d) appointment of a receiver to take charge of the monies transferred or of other property of CI Int'l; and (e) any other relief the circumstances may require.

**WHEREFORE**, Plaintiff demands judgment for costs and attorneys' fees, together with the following relief:

(a)     On Plaintiff's first claim for relief against Defendant for breach of contract, damages in an amount to be determined at trial but which is not less than USD 1,545,293.56 plus interest thereon;

(b)     On Plaintiff's second claim for relief against Defendant for enforcement of its rights under the Pledge Agreement, the exercise and enforcement of any and all remedies available at law and in equity, including but not limited to the attachment, seizure, restraint and/or sale of assets in the possession of Defendant or third parties in order to obtain payment in full of the secured obligation thereunder, *to wit*, Plaintiff's right to be paid not less than USD 1,545,293.56 plus interest thereon;

(b)(c)   On Plaintiff's third claim for relief against Defendant for fraudulent transfers of approximately USD 1,209,000, enforcement of some or all of its remedies  under the Florida Uniform Fraudulent Transfer Act; and and

(c)     For such other and further relief as this Court may deem just and proper.

Dated: New York, New York
        November    March 9, 2022

                                        Respectfully submitted,

                                        _____
                                        Evan S. Gutwein Fla.
                                        Bar No. 58741
                                        egutwein@hamiltonmillerlaw.com
                                        jmendez@hamiltonmillerlaw.com
                                        HAMILTON, MILLER & BIRTHISEL, LLP
                                        150 S.E. Second Avenue, Suite 1200
                                        Miami, Florida 33131
                                        Telephone:  —305-379-3686
                                        Facsimile:  —305-379-3690

15

Luke Zadkovich, Esq.
Joseph Johnson, Esq.
(~~To be~~ admitted Pro Hac Vice)

ZEILER FLOYD ZADKOVICH (US) LLP
215 Park Avenue, 11th Floor
New York, NY 100003
(917) 375-9511

*Attorneys for Plaintiff Peninsula Petroleum Limited*

*SCHEDULE 1*

| PAYMENT PERFORMANCE | | | |
|---|---|---|---|
| | $ 2,025,000.00 | | |
| STA 23-20 | $1,821,292.25 | $203,707.75 | 05-Feb |
| | $1,179,073.97 | $642,218.28 | 11-Feb |
| | $877,798.97 | $301,275.00 | 11-Feb |
| | $0.28 | $877,799.25 | 22-Feb |
| | | | |
| | $ 2,025,000.00 | | |
| STA 24-20 | $1,741,500.00 | $283,500.00 | 05-Mar |
| | $931,500.00 | $810,000.00 | 08-Mar |
| | $413,100.00 | $518,400.00 | 19-Mar |
| | $85,050.00 | $328,050.00 | 25-Mar |
| | | $85,050.00 | 30-Mar |
| | | | |
| | $ 2,012,739.84 | $402,700.00 | 30-Mar |
| STA 25-20 | $1,610,039.84 | $356,400.00 | 05-Apr |
| | $1,253,639.84 | $188,825.00 | 07-Apr |
| | $1,064,814.84 | $283,500.00 | 19-Apr |
| | $781,314.84 | $89,100.00 | 13-Apr |
| | $692,214.84 | $550,200.00 | 23-Apr |
| | $142,014.84 | $97,550.00 | 23-Apr |
| | $44,464.84 | $44,464.84 | 24-Apr |
| | | | |

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, Gabriela Sanchez Urzais, declares as follows:

I am Senior Legal Associate affiliated with Plaintiff, Peninsula Petroleum Limited ("Peninsula") and have been so affiliated at all times referred to in the foregoing Verified Amended Complaint. I have read the foregoing Verified Amended Complaint and know the contents thereof. I verify that I believe the allegations contained therein to be true to my own knowledge, except as to matters stated to be upon information and belief, and as to those matters I believe them to be true. The grounds for my belief are based upon my personal knowledge gained during the course of my duties as Senior Legal Associate and my review of and familiarity with correspondence and other relevant documents, including the schedule and exhibits to the foregoing Verified Amended Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the __ day of November~~March~~, 2022 in London, England.

_____
Gabriela Sanchez Urzais