| | |
|---|---|
| **CONTRATO MARCO DE COMPRAVENTA** | **MASTER SALE AND PURCHASE AGREEMENT** |

**ENTRE:**

**CI International Fuels LLC**, una sociedad constituida en Florida cuyo domicilio social se encuentra en 5201 BLUE LAGOON DRIVE 8TH FLOOR MIAMI FL 33126 (número de sociedad L0900010156) ("**CI International**")

y

**PENINSULA PETROLEUM LIMITED**, una sociedad de responsabilidad limitada constituida en la República de Irlanda con el número 378557, cuyo domicilio social se encuentra en 10 Earlsfort Terrace, Dublín 2, D02 T380, República de Irlanda ("**Peninsula**")

(cada una de ellas una "**Parte**" y, conjuntamente, las "**Partes**")

**CONSIDERANDO:**

(A)     Que, cuando proceda, CI International y Peninsula pueden celebrar contratos para (i) la venta por parte de Peninsula y la compra por parte de CI International de determinados productos derivados del petróleo (el "**Producto**") para su entrega por parte de Peninsula en Santa Marta, Colombia (los "**Contratos de Carga**"), y (ii) la venta por parte de CI International y la compra por parte de Peninsula del Producto para su entrega por parte de CI International a los buques clientes designados por Peninsula, dentro de puertos colombianos (los "**Contratos de Repostaje**"); de forma conjunta, se hará referencia a los Contratos de Carga y a los Contratos de Repostaje como los "**Contratos**".

(B)     Que las Partes desean ahora celebrar el presente Contrato marco de compraventa ("**Contrato Marco de Compraventa**") en virtud del cual se regirán todos los Contratos.

(C)     Que Peninsula no está interesada en llevar a cabo ni desempeñar ninguna actividad relacionada con la industria transformadora colombiana, cuyas normas se disponen en el Decreto 1073, 2015 y, por lo tanto, nada de lo contenido en este Contrato Marco de Compraventa puede interpretarse como si Peninsula estuviera llevando a cabo actividades de la industria transformadora en Colombia.

**SE ACUERDA LO SIGUIENTE:**

**1.      Inicio y vigencia**

---

**BETWEEN:**

**CI International Fuels LLC**, a company incorporated in Florida whose registered office is 5201 BLUE LAGOON DRIVE 8TH FLOOR MIAMI FL 33126 (Company Number L0900010156) ("**CI International**")

and

**PENINSULA PETROLEUM LIMITED**, a private limited company incorporated in the Republic of Ireland under number 378557, whose registered office is at 10 Earlsfort Terrace, Dublin 2, D02 T380, Republic of Ireland ("**Peninsula**")

(each a "**Party**" and collectively the "**Parties**")

**RECITALS:**

(A)     From time to time, CI International and Peninsula may enter into contracts for (i) the sale by Peninsula and purchase by CI International of certain petroleum products (the "**Product**") for delivery by Peninsula in Santa Marta, Colombia (the "**Cargo Contracts**") and (ii) the sale by CI International and purchase by Peninsula of Product for delivery by CI International to Peninsula's nominated customer vessels, within Colombian ports (the "**Bunker Contracts**"), together the Cargo Contracts and the Bunker Contracts referred as the "**Contracts**".

(B)     The Parties now wish to enter this Master Sale and Purchase Agreement ("**Master Sale and Purchase Agreement**") pursuant to which all Contracts shall now be governed.

(C)     Peninsula is not interested in carrying out nor performing any activity related to the Colombian downstream industry which rules are contained in Decree 1073, 2015 and thus nothing in this Master Sale and Purchase Agreement can be construed or interpreted as if Peninsula is carrying out activities of the downstream industry in Colombia.

**IT IS NOW AGREED AS FOLLOWS**:

**1.      Commencement and Term**

1.1    El presente Contrato Marco de Compraventa comenzará el día __26__ de octubre 2020 ("**Fecha de Inicio**") y seguirá vigente hasta que cualquiera de las Partes notifique por escrito a la otra Parte su extinción con treinta (30) días de antelación; no obstante, si las Partes han formalizado un Resumen de la Carga o Resumen del Repostaje, y no se ha ejecutado por completo, dicha extinción solo será efectiva una vez se hayan satisfecho todas las obligaciones establecidas en dicho Resumen de la Carga o Resumen del Repostaje y en el presente Contrato Marco de Compraventa, en la medida en que guarden relación con dicho Resumen de la Carga o Resumen del Repostaje.

1.2    La extinción del presente Contrato Marco de Compraventa o de un Resumen de la Carga o Resumen del Repostaje, sea cual sea la causa o el origen, tendrá lugar sin perjuicio de ningún derecho o recurso que pueda haberse acumulado para cualquiera de las Partes antes de la fecha de dicha extinción, y toda disposición de este Contrato Marco de Compraventa o de un Resumen de la Carga o Resumen del Repostaje necesaria para el ejercicio de dichos derechos o recursos acumulados sobrevivirá al vencimiento o la extinción de este Contrato Marco de Compraventa o de un Resumen de la Carga o Resumen del Repostaje en la medida en que así se requiera.

## 2    Condiciones aplicables

### 2.1    Contratos de Carga

2.1.1    Todos los Contratos de Carga celebrados conforme al presente Contrato Marco de Compraventa serán confirmados por Peninsula mediante un resumen por escrito del contrato ("**Resumen de la Carga**") en el que se establecerán las condiciones aplicables del contrato individual pertinente entre Peninsula y CI International. A efectos de información entre las Partes en el ANEXO A se incluye un ejemplo de formato del Resumen de la Carga.

2.1.2    Todos los Contratos de Carga deberán incorporar y estar sujetos a las Condiciones Generales de BP Oil International Limited para la compraventa de petróleo crudo y productos derivados del petróleo, edición 2015[1] ("**CG BP 2015**"), de las cuales se adjunta una copia en el ANEXO B.

2.1.3    En caso de conflicto o incoherencia entre el presente Contrato Marco de Compraventa, un Resumen de la Carga y las condiciones establecidas en las CG BP 2015, se aplicará el siguiente orden de precedencia: (1) Resumen de

1.1 This Master Sale and Purchase Agreement shall commence on __26__ October 2020 ("Commencement Date") and shall continue, until either Party gives to the other Party thirty (30) days written notice to terminate; provided, however, that if a Cargo Recap or Bunker Recap has been executed by the Parties, and not fully performed, such termination shall only be effective once all obligations set forth in such Cargo Recap or Bunker Recap and this Master Sale and Purchase Agreement, to the extent they relate to such Cargo Recap or Bunker Recap, have been satisfied

1.2 Termination of this Master Sale and Purchase Agreement and/or a Cargo Recap or Bunker Recap, howsoever caused or occurring shall be without prejudice to any rights or remedies that may have accrued to either Party prior to the date of such termination, and any provision of this Master Sale and Purchase Agreement and/or a Cargo Recap or Bunker Recap necessary for the exercise of such accrued rights or remedies shall survive expiry or termination of this Master Sale and Purchase Agreement and/or a Cargo Recap or Bunker Recap to the extent so required.

## 2    Applicable Terms and Conditions

### 2.1 Cargo Contracts

2.1.1 All Cargo Contracts entered into pursuant to this Master Sale and Purchase Agreement shall be confirmed by Peninsula by way of a written contract recap ("Cargo Recap") which will set out the applicable terms of the relevant individual contract between Peninsula and CI International. For information purposes between the Parties ANNEX A includes an example of the Cargo Recap format.

2.1.2 All Cargo Contracts shall incorporate and be subject to BP Oil International Limited General Terms & Conditions for Sales and Purchases of Crude Oil and Petroleum Products 2015 Edition[3] ("BP 2015 GTCs"), a copy enclosed in ANNEX B.

2.1.3 If there is any conflict or inconsistency between this Master Sale and Purchase Agreement, a Cargo Recap and the terms of BP 2015 GTCs the following order of precedence shall apply: (1) Cargo Recap; (2) Master Sale and Purchase Agreement; (3) BP 2015 GTCs.

---

[1] Disponible en: https://www.bp.com/content/dam/bp-trading/en/global/trading/Documents/BPTradingGTCs/BP%20Oil%20GTCs%202015%20-%20version%201.1.pdf
[3] Available at: https://www.bp.com/content/dam/bp-trading/en/global/trading/Documents/BPTradingGTCs/BP%20Oil%20GTCs%202015%20-%20version%201.1.pdf

la Carga; (2) Contrato Marco de Compraventa; (3) CG BP 2015.

2.1.4 Todo requisito normativo colombiano y toda obligación aduanera y fiscal colombiana que se derive de este Contrato Marco de Compraventa será asumido por CI International y sus filiales que desempeñen actividades en Colombia. CI International y sus filiales acuerdan indemnizar a Peninsula por cualquier incumplimiento de dichas obligaciones aduaneras y fiscales, y pagarán a Peninsula (sobre una base de indemnización completa) por cualquier pérdida, reclamación o responsabilidad, incluidas todas las pérdidas evaluadas por cualquier autoridad aduanera o fiscal, cualquier impuesto, derecho arancelario y tasas más cualquier sanción e interés o cualquier otro coste o gasto derivado de dicho incumplimiento.

2.2 **Contratos de Repostaje**

2.2.1 Todos los Contratos de Repostaje celebrados conforme al presente Contrato Marco de Compraventa serán confirmados por Peninsula mediante un resumen por escrito del contrato ("**Resumen del Repostaje**") en el que se establecerán las condiciones aplicables del contrato individual pertinente entre Peninsula y CI International.

2.2.2 Todos los Contratos de Repostaje deberán incorporar y estar sujetos a las condiciones que se establecen en los BIMCO Terms 2015 Standard Bunker Contract ("**BIMCO**"), de los cuales se adjunta una copia en el ANEXO C[2].

2.2.3 A efectos de información entre las Partes, se incluyen los valores operacionales de cada puerto al momento de la firma de el presente Contrato Marco de Compraventa en el ANEXO D, los cuales CI International podrá ajustar de acuerdo a la situación del mercado informando a Peninsula debidamente previo a cualquier Resumen de Repostaje entre las Partes.

2.2.4 En caso de conflicto o incoherencia entre el presente Contrato Marco de Compraventa, un Resumen de la Carga y BIMCO, se aplicará el siguiente orden de precedencia: (1) Resumen del Repostaje; (2) Contrato Marco de Compraventa; (3) BIMCO.

2.2.5 Peninsula hará los mejores esfuerzos (mas no estará obligada) para comercializar el Producto de CI International dándole la opción de igualar la mejor propuesta de otros oferentes del mercado.

2.1.4 Any Colombian regulatory requirements and Colombian customs and tax obligations derived from this Master Sale and Purchase Agreement shall be borne by CI International and its affiliates carrying out activities in Colombia. CI International and its affiliates agree to indemnify Peninsula for any failure to comply with any such customs and tax obligations and shall pay Peninsula (on a full indemnity basis) for any losses, claims, or liability including all losses assessed by any customs and/or tax authorities, any taxes, customs duties and fees plus any penalties and interest or any other costs or expenses arising from such failure.

**2.2 Bunker Contracts**

2.2.1 All Bunker Contracts entered into pursuant to this Master Sale and Purchase Agreement shall be confirmed by Peninsula by way of a written contract recap ("**Bunker Recap**") which will set out the applicable terms of the relevant individual contract between CI International and Peninsula.

2.2.2 All Bunker Contracts shall incorporate and be subject to BIMCO Terms 2015 Standard Bunker Contract ("**BIMCO**"), a copy enclosed in ANNEX C[4].

2.2.3 For information purposes between the Parties, included in ANNEX D are the operational costs of each port at the time of signing of this Master Sale and Purchase Agreement, subject to changes by CI International in accordance to the market situation notifying Peninsula prior to any Bunker Recap being entered into between the Parties.

2.2.4 If there is any conflict or inconsistency between this Master Sale and Purchase Agreement, a Bunker Recap and BIMCO the following order of precedence shall apply: (1) Bunker Recap; (2) Master Sale and Purchase Agreement; (3) BIMCO.

2.2.5 Peninsula shall use best endeavours (but shall not be obliged) to commercialise CI International's Product giving CI International the option to match the best offer from other competitors in the market.

---

[2] Según la carta acuerdo firmada entre las Partes el día ___26___ *de octubre 2020*
[4] As per Letter Agreement signed between the Parties on ___26___ *October 2020*

## 3 Facturas de embarque

3.1    CI International emitirá una factura de embarque a Peninsula en relación con cada Contrato de Repostaje (cada una, una "**Factura de Embarque**"). Peninsula pagará mensualmente las Facturas de Embarque, con sujeción al pleno cumplimiento de la cláusula 4 a continuación por parte de CI International. Peninsula se reserva el derecho a retener el pago de cualquier Factura de Embarque hasta el momento en que CI International haya cumplido todas sus obligaciones (en opinión de Peninsula) en virtud de la cláusula 4 de este Contrato Marco de Compraventa.

## 4 Plazos de crédito para los Contratos de Carga

4.1    Peninsula podrá (a su entera discreción y sin obligación de hacerlo) e incluido en cada Contrato de Carga, otorgar a CI International un Periodo de Crédito (según se define a continuación) con respecto a los Productos entregados por Peninsula en virtud de cada Contrato de Carga de la siguiente manera:

4.1.1    CI International estará obligada a efectuar el pago íntegro de un tercio de los Productos en un plazo de 30 días a partir de la fecha de entrega, de acuerdo con los términos de cada Resumen de la Carga;

4.1.2    CI International estará obligada a efectuar el pago íntegro del segundo tercio de los Productos en un plazo de 60 días a partir de la fecha de entrega, de acuerdo con los términos de cada Resumen de la Carga;

4.1.3    CI International estará obligada a efectuar el pago íntegro del último tercio de los Productos en un plazo de 90 días a partir de la fecha de entrega, de acuerdo con los términos de cada Resumen de la Carga;

(cada uno de ellos un "**Periodo de Crédito**" y, conjuntamente, el "**Plazo de Crédito**").

4.2    Sin perjuicio de la cláusula 4.1 anterior, cuando CI International:

(i)    haya vendido cualquier parte de los Productos entregados por Peninsula en virtud de un Contrato de Carga en cualquier momento durante el Periodo de Crédito (salvo cuando haya vendido a Peninsula en virtud de un Contrato de Repostaje), CI International estará obligada a pagar inmediatamente a Peninsula tras la entrega por parte de CI International de dichos Productos; o

(ii)    haya vendido más de un tercio de los Productos entregados por Peninsula en virtud de cada Contrato de Carga antes del vencimiento de cualquier Periodo de Crédito, CI International deberá pagar a Peninsula el

## 3 Barging Invoices

3.1 CI International will issue a barging invoice to Peninsula in relation to each Bunker Contract (each a "**Barging Invoice**"). Peninsula shall pay the Barging Invoices on a monthly basis, subject to CI International's full compliance with clause 4 below. Peninsula reserves the right to withhold payment of any Barging Invoices until such time when CI International has fulfilled all of its obligations (in Peninsula's opinion) under clause 4 of this Master Sale and Purchase Agreement.

## 4 Credit Terms for Cargo Contracts

4.1 Peninsula may (in its sole discretion and having no obligation to do so) and included in each Cargo Contract, grant CI International with a Credit Period (as defined below) in respect of the Products delivered by Peninsula under each Cargo Contract as follows:

4.1.1 CI International shall be liable to make full payment for one-third of the Products on 30 days commencing on the date of delivery in accordance with the terms of each Cargo Recap;

4.1.2 CI International shall be liable to make full payment for the second-third of the Products on 60 days commencing on the date of delivery in accordance with the terms of each Cargo Recap;

4.1.3 CI International shall be liable to make full payment for the final third of the Products on 90 days commencing on the date of delivery in accordance with the terms of each Cargo Recap;

(each a "**Credit Period**" and together the "**Credit Term**").

4.2 Notwithstanding clause 4.1 above, where CI International:

(i)    Has on-sold any part of the Products delivered by Peninsula under a Cargo Contract at any time during the Credit Period (other than where it has sold to Peninsula under a Bunker Contract), CI International will be liable to immediately pay Peninsula upon delivery by CI International of such Products; or

(ii)    Has on-sold more than a third of the Products delivered by Peninsula under each Cargo Contract by the expiry of any Credit Period, CI International will be required to pay Peninsula for the additional on-sold Product sold during such Credit Period.

Producto adicional vendido durante dicho Periodo de Crédito.

4.3 CI International será responsable de proporcionar a Peninsula una confirmación por escrito suficiente (incluidos, sin limitación, los Albaranes de Repostaje) de los Productos que haya vendido y entregado de acuerdo con la cláusula 4.2(i) anterior.

4.4 CI International deberá realizar pagos íntegros a Peninsula tanto si se ha pagado a CI International por el Producto vendido como si no según la cláusula 4.2, y se encargará de que todos los pagos se realicen en su totalidad sin compensación, contrademanda, deducción o retención y de acuerdo con el Plazo de Crédito y las condiciones del correspondiente Resumen de la Carga.

4.5 Si en cualquier momento tras la firma de un Contrato: (i) Peninsula (en su opinión) considera que la posición financiera o la solvencia crediticia de CI International es deficiente o insatisfactoria; o (ii) la exposición financiera agregada de CI International en virtud de cualquier Contrato supera el límite de crédito establecido por Peninsula en ese momento; o (iii) Peninsula tiene conocimiento de cualquier factor que (en su opinión) pudiera mermar los derechos de Peninsula en virtud de un Contrato, Peninsula puede, sin perjuicio de sus otros derechos, exigir a CI International que:

4.5.1 pague en efectivo antes de la entrega del Producto para cualquier entrega futura; o

4.5.2 proporcione a Peninsula un nivel de seguridad satisfactorio, además del Acuerdo de Seguridad, que pueda cubrir tanto las entregas futuras como las entregas realizadas pero aún no pagadas; o

4.5.3 efectúe el pago inmediato de cualquier importe pendiente adeudado por el Grupo CI a Peninsula con respecto a cualquier Contrato entre Peninsula y el Grupo Comprador (sin perjuicio de cualquier Periodo de Crédito establecido en dicho contrato).

4.6 Si CI International incumple esta cláusula 4 con respecto a un Contrato, Peninsula no tendrá la obligación de hacer ninguna entrega de Productos a CI International en virtud de cualquier otro contrato, y podrá:

4.6.1 rescindir de forma inmediata todos los demás Contratos entre Peninsula y CI International previa notificación a este efecto a CI International; o

4.6.2 cancelar cualquier Periodo de Crédito en virtud de cualquier otro Contrato entre Peninsula y CI International; y

4.3 CI International shall be liable to provide Peninsula with sufficient written confirmation (including, but not limited to each Bunker Delivery Note (BDN) of any Product that it has on-sold and delivered in accordance with clause 4.2(i) above.

4.4 CI International shall be liable to make full payments to Peninsula whether CI International has been paid for such on-sold Product as per clause 4.2 and will arrange for all payments to be made in full without any set-off, counterclaim, deduction or withholding and in accordance with the Credit Term and the terms of the relevant Cargo Recap.

4.5 If, at any time following the entry into a Contract: (i) CI International's financial position and/or credit worthiness is deemed by Peninsula (in its opinion) to be impaired or unsatisfactory; or (ii) CI International's aggregate financial exposure under any Contracts exceeds the credit limit set by Peninsula at the time; or (iii) Peninsula becomes aware of any factor which (in its opinion) could prejudice Peninsula's rights under a Contract, Peninsula may, without prejudice to its other rights, require CI International to:

4.5.1 Pay cash before the delivery of Product for any future deliveries; and/or

4.5.2 Provide security satisfactory, in addition to the Security Agreement, to Peninsula which can cover both future deliveries and deliveries made but not yet paid for; and/or

4.5.3 Effect immediate payment of any outstanding amounts due from the CI Group to Peninsula in respect of any Contract between Peninsula and the Buyer Group (notwithstanding any Credit Period set out in such contract).

4.6 If CI International fails to comply with this clause 4 in respect of a Contract, Peninsula shall have no obligation to make any delivery of Product to CI International under any other contract, and:

4.6.1 May terminate all other Contracts between Peninsula and CI International immediately on giving notice to that effect to CI International; or

4.6.2 May cancel any Credit Period under any other Contract between Peninsula and CI International; and

4.6.3    exigir que CI International efectúe el pago inmediato de cualquier importe adeudado en virtud de cualquier otro contrato.

## 5    Compensación por parte de Peninsula

5.1    Peninsula podrá, en cualquier momento y sin previo aviso a CI International, compensar cualquier cantidad adeudada por Peninsula a CI International en virtud de cualquier Contrato de Repostaje respecto a cualquier cantidad adeudada por CI International a Peninsula en virtud de cualquier Contrato de Carga. El ejercicio por parte de Peninsula de sus derechos en virtud de esta cláusula no limitará ni afectará a ningún otro derecho o recurso disponible en virtud de cualquier Contrato de Carga, de este Contrato Marco de Compraventa o de otro modo.

## 6    Derecho de Peninsula a designar a un perito

6.1    En relación con cualquier Contrato de Carga celebrado entre las Partes, Peninsula tendrá derecho a designar a un perito para que inspeccione y mida el Producto en cualquier momento, mediante notificación por escrito a CI International con 48 horas de antelación. Los costes del perito serán por cuenta de Peninsula.

## 7    Acuerdo de seguridad

7.1    Como se establece en la cláusula 4 anterior, Peninsula podrá, a su entera discreción, conceder a CI International un Plazo de Crédito cuando lo estime oportuno en virtud de los Contratos de Carga aplicables, a través del cual Peninsula estaría entregando el Producto, y a CI International se le concederán ciertas condiciones de pago flexibles como se ha descrito anteriormente. En relación con lo anterior, y a efectos de garantizar las obligaciones de pago en virtud del Plazo de Crédito, CI International acuerda otorgar un contrato de garantía mobiliaria sobre su inventario rotativo de Productos ubicado en Colombia, en Santa Marta, Colombia, en la forma contenida en el ANEXO E del presente Contrato Marco de Compraventa que estará sujeto a la legislación colombiana, garantizará el pago correcto y oportuno de las obligaciones en virtud del presente Contrato y de los Contratos de Carga y que será debidamente inscrito en el Registro Nacional de Garantías Mobiliarias, de acuerdo con las condiciones establecidas en la Ley 1676 de 2013. El contrato de garantía mobiliaria se otorgará a partir de la formalización de este Contrato Marco de Compraventa y permanecerá en pleno vigor y efecto hasta que se hayan cumplido íntegramente todas las obligaciones de pago de CI International a Peninsula.

4.6.3    Require that CI International make immediate payment of any amounts due under any other contract.

## 5    Set-Off by Peninsula

5.1 Peninsula may at any time and without notice to CI International, set-off any amounts due by Peninsula to CI International under any Bunker Contract against any amounts due by CI International to Peninsula under any Cargo Contract. Any exercise by Peninsula of its rights under this clause shall not limit or affect any other rights or remedies available to it under any Cargo Contract, this Master Sale and Purchase Agreement or otherwise.

## 6    Peninsula's Right to Appoint a Surveyor

6.1 In relation to any Cargo Contract entered between the Parties, Peninsula shall have the right to appoint a surveyor to inspect and measure the Product at any time by giving CI International 48 hours prior written notice. The costs of the surveyor shall be for Peninsula's account.

## 7    Security Agreement

7.1 As established in Section 4 above, Peninsula may, at its own discretion, grant CI International Credit Term from time to time under the applicable Cargo Contracts, through which, Peninsula would be delivering Product and CI International will be granted certain flexible payment conditions as described above. In connection with above, and for purposes of securing the payment obligations under the Credit Term, CI International agrees to grant a pledge agreement (contrato de garantía mobiliaria) over its Product revolving inventory located in Colombia at Santa Marta, Colombia, in the form contained in ANNEX E to this Master Sale and Purchase Agreement that will be subject to Colombian law, will guarantee the correct and timely payment of the obligations under this Agreement and the Cargo Contracts and which will be duly registered in the National Registry of Security Interests over Moveable Assets, as per the terms and conditions contained in Law 1676 of 2013. The pledge agreement will be granted as of the execution of this Master Sale and Purchase Agreement and will remain in full force and effect until all payment obligations from CI International to Peninsula are complied with and fully discharged.

**8        Extinción en caso de insolvencia**

8.1    Sin perjuicio de cualquier disposición expresa o implícita en sentido contrario, Peninsula (sin perjuicio de sus demás derechos) podrá, a su entera discreción, suspender inmediatamente la entrega en virtud de un Contrato entre Peninsula y CI International, o extinguir dicho contrato, mediante notificación a CI International si CI International:

8.1.1    se disuelve;

8.1.2    se declara insolvente o no puede pagar sus deudas o no las paga o admite por escrito su incapacidad general para pagar sus deudas a medida que vencen;

8.1.3    tiene lugar cualquiera de los eventos que figuran en el párrafo 4.5. anterior;

8.1.4    hace una cesión general, o realiza un acuerdo o convenio con o en beneficio de sus acreedores;

8.1.5    inicia o se ha iniciado contra ella un procedimiento para solicitar una sentencia de insolvencia o quiebra o cualquier otra medida en virtud de cualquier ley de quiebra o insolvencia u otra ley similar que afecte a los derechos del acreedor, o se presenta una petición para su disolución o liquidación y no se retira, desestima, libera, suspende o restringe dentro del período de tiempo requerido por Peninsula a su absoluta discreción;

8.1.6    tiene una resolución aprobada para su disolución, gestión oficial o liquidación;

8.1.7    solicita o queda sujeta a la designación de un administrador, liquidador provisional, conservador, síndico, fideicomisario, custodio u otro funcionario similar para ella o para la totalidad o una parte sustancial de sus activos;

8.1.8    hace que una parte asegurada tome posesión de la totalidad o una parte sustancial de sus activos o tiene un embargo, mandamiento judicial, decomiso, confiscación u proceso legal impuesto sobre la totalidad o una parte sustancial de sus activos;

8.1.9    causa o está sujeta a cualquier evento con respecto a ella que, según las leyes aplicables de cualquier jurisdicción, tenga un efecto análogo a cualquiera de los eventos especificados en esta cláusula 8; o

8.1.10    toma alguna medida para promover o indicar su consentimiento, aprobación o aceptación de cualquiera de los actos mencionados en esta cláusula 8.

8.2    La extinción de cualquier Contrato por parte de Peninsula en virtud de esta cláusula 8 no afectará de ningún modo los derechos de Peninsula y las obligaciones de CI International en virtud de dicho Contrato o de cualquier otro

**8   Termination in the Event of Insolvency**

8.1 Notwithstanding anything to the contrary express or implied, Peninsula (without prejudice to its other rights) may at its sole discretion immediately suspend delivery under and/or terminate a Contract between Peninsula and CI International by notice to CI International if CI International:

8.1.1    Is dissolved;

8.1.2    Becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

8.1.3    Any of the event contained in numeral 4.5. above occurs;

8.1.4    Makes a general assignment, arrangement or composition with or for the benefit of its creditors;

8.1.5    Institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditor's rights, or a petition is presented for its winding-up or liquidation and is not withdrawn, dismissed, discharged, stayed or restrained within the time period required by Peninsula in its absolute discretion;

8.1.6    Has a resolution passed for its winding-up, official management or liquidation;

8.1.7    Seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets;

8.1.8    Has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets;

8.1.9    Causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in this clause 8; or

8.1.10    Takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts referred to in this clause 8.

8.2 The termination of any Contract by Peninsula under this clause 8 shall not affect in any way any of

contrato entre las partes que se haya creado, incurrido o contratado antes de dicha extinción por parte de Peninsula.

## 9        Integridad del Contrato

9.1        El presente Contrato Marco de Compraventa, los Resúmenes de la Carga y los Resúmenes de Repostaje contienen el acuerdo íntegro entre las Partes con respecto a los asuntos establecidos en el presente y sustituyen a todos los acuerdos anteriores, ya sean orales o escritos, en relación con el mismo. CI International y Peninsula garantizan que, en relación con el Contrato Marco de Compraventa, los Resúmenes de la Carga y los Resúmenes de Repostaje, no se han basado en ninguna declaración, ya sea escrita u oral, hecha por la otra Parte o en su nombre, sino que se han basado exclusivamente en su propio conocimiento, juicio y experiencia.

## 10        Idioma

10.1        El presente Contrato de Marco de Compraventa ha sido redactado en español e inglés para el beneficio de las Partes. En caso de contradicción entre lo previsto en la columna en español y la columna en ingles del presente Contrato de Marco de Compraventa, prevalecerá lo dispuesto en la columna en inglés.

## 11        Legislación aplicable y arbitraje

11.1        La interpretación, validez y ejecución del presente Contrato Marco de Compraventa o de cualquier Resumen de la Carga o Resumen del Repostaje, y cualquier disputa o reclamación que surja de o en relación con este Contrato Marco de Compraventa o con cualquier Resumen de la Carga o Resumen del Repostaje y su objeto o formación (incluidas las disputas o reclamaciones no contractuales) se regirán e interpretarán de acuerdo con la legislación inglesa, con exclusión de cualquier otra ley que pueda ser imputada de acuerdo con las normas de elección de ley aplicables en cualquier jurisdicción.

11.2        Cualquier disputa que surja de o en relación con este Contrato Marco de Compraventa o con cualquier Resumen de la Carga o Resumen del Repostaje, incluida cualquier cuestión relativa a su existencia, validez o extinción, se remitirá y resolverá finalmente mediante arbitraje conforme a las Reglas de la LCIA, las cuales se consideran incorporadas por referencia a esta cláusula. El número de árbitros será uno. La sede, o lugar legal, del arbitraje será Londres,

Peninsula's rights and CI International's obligations under any such Contract or any other contracts between the parties which were created, incurred or contracted prior to such termination by Peninsula.

## 9        Entire Agreement

9.1 This Master Sale and Purchase Agreement, the Cargo Recaps and the Bunker Recaps contain the entire agreement between the Parties with respect to the matters set out herein and supersedes all prior agreements, whether oral or written, in connection therewith. CI International and Peninsula each warrant that it has not in connection with the Master Sale and Purchase Agreement, any Cargo Recaps or Bunker Recaps relied upon any representations, whether written or oral, made by or on behalf of the other Party, but has relied exclusively on its own knowledge, judgement and expertise.

## 10        Language

**10.1** This Master Sale and Purchase Agreement has been written in Spanish and English for the benefit of the Parties. In case of contradiction between the terms of the Spanish column and the English column of this Master Sale and Purchase Agreement, the terms of the English column shall prevail.

## 11        Governing Law and Arbitration

11.1 The construction, validity and performance of this Master Sale and Purchase Agreement and/or any Cargo Recap and/or any Bunker Recap and any dispute or claim arising out of or in connection with this Master Sale and Purchase Agreement and/or any Cargo Recap and/or any Bunker Recap and their subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with English law to the exclusion of any other law which may be imputed in accordance with choice of law rules applicable in any jurisdiction.

11.2 Any dispute arising out of or in connection with this Master Sale and Purchase Agreement and/or any Cargo Recap and/or any Bunker Recap, including any question regarding their existence, validity or termination, shall be referred to and finally resolved by arbitration under the LCIA Rules, which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The seat, or legal place, of arbitration shall be

Inglaterra. El idioma que se utilizará en el procedimiento arbitral será el inglés.

**SIGNATARIOS (en la página siguiente):**

London, England. The language to be used in the arbitral proceedings shall be English.

**SIGNATORIES (on following page):**

FIRMADO en nombre de:

**CI Internacional Fuels LLC**

Por: _____

Nombre: _Jaime Ochoa Muñoz_

Cargo: _Presidente_

SIGNED on behalf of:

**CI International Fuels LLC**

By: _____

Name: _Jaime Ochoa Muñoz_

Title: _President_

FIRMADO en nombre de:

**PENINSULA PETROLEUM LIMITED**

Por: _____

Nombre: _Gabriela Sanchez Urzais_

Cargo: _Signatario Autorizado_

SIGNED on behalf of:

**PENINSULA PETROLEUM LIMITED**

By: _____

Name: _Gabriela Sanchez Urzais_

Title: _Authorised Signatory_

**Anexo A**

**Resumen de la carga**

**Annex A**

**Cargo Recap**



Peninsula Petroleum Limited
2 Shelbourne Buildings,
Shelbourne Road, Ballsbridge , Dublin 4, Ireland,
Tel : +353 1 668 7330 Fax : +353 1 668 7331
www.peninsulapetroleum.com

**SALE TRADE RECAP**

We are pleased to confirm our contract as follows:

Deal Date

Deal Reference

Buyer Contact

Buyer

Seller

Product / Specification     VLSFO  / basis ISO 8217:2017 RMG380 (sulphur max 0.50%)

Quantity                    MT

Tolerance                   -5% +5% Buyer Option

Delivery Location

Delivery Period

Delivery Term

Pricing Details

Differential                N.A.

Pricing Period              N.A.

Quantity Determination

Quality Determination

Pay Term

Credit Support

Demurrage

Inspection                   A mutually appointed independent inspector will ascertain quality
                            and quantity. Cost to be split 50-50 between buyer and seller

Remarks

Governing Law               As Per Applicable GTC

Jurisdiction                As Per Applicable GTC

**Notices**

Notices should be sent to the Seller at the address details listed above with a copy by email to contracts@peninsulapetroleum.com

**Applicable GTC**

BP Oil International Limited General Terms and Conditions for Sales and Purchases of Crude Oil and Petroleum Products 2015 Edition for the relevant Delivery Term as amended herein and/or by any further contract document sent by the Seller ("Applicable GTC") shall be incorporated into and govern this contract. This Sale Trade Recap constitutes the Special Provisions as defined in the Applicable GTC. Where the Delivery Term of the contract is CIF, CFR, DAP, DES or any equivalent term, section 16.2.4 and/or 23.2.5 (as the context dictates) of the Applicable GTC shall be disapplied. In the event of any inconsistency between this Sale Trade Recap and the Applicable GTC this Sale Trade Recap shall prevail.

The Applicable GTC are amended as follows:
i) Section 59.2.1: "45 days" is deleted and replaced with "30 days"
ii) Section 63.11: is deleted

If the broker and/or the Buyer issue contract documents for the above referenced deal, this Sale Trade Recap shall prevail and cancel and supersede any broker and/or Buyer contract document relating to this deal. Any broker's contract document shall be for the sole purpose of documenting commission, if any. Any Buyer's contract document shall have no effect and the Seller shall only be bound by the terms set out herein.

Please confirm promptly by email / fax that this Sale Trade Recap accurately states the terms and conditions of our contract. Additional terms or terms different from those set forth herein shall be construed as proposals for additions to the contract and shall not become part of the contract unless expressly agreed in writing by the Seller. Should we receive no response / confirmation within one (1) business day from the date of sending this Sale Trade Recap we shall assume your agreement to the terms herein.

**On 25 May 2018 the General Data Protection Regulation came into force. For more information on Peninsula Petroleum's Data Privacy Policy, please click on the following link: http://www.peninsulapetroleum.com/about/data-privacy-policy**

## Disclaimer

Notice & Disclaimer: The message, together with any attachment, is intended for the addressee only. It is confidential and may be legally privileged. If you are not the intended recipient please immediately delete this message from your system, destroy any hard copy and inform the sender by return. The sender and his employer shall not accept responsibility for any changes made to this message after it was sent.
Even though all reasonable care has been taken to avoid the transmission of viruses, it is the recipient's responsibility to ensure that onward transmission, opening or using this message, or any attachment, will not adversely affect any system or data, for which the sender and his employer shall not accept responsibility.

**Anexo B**

**Condiciones Generales de BP Oil International Limited**

**Annex B**

**BP Oil International Limited General Terms & Conditions**



BP Oil International Limited
General Terms & Conditions
for Sales and Purchases of

**Crude Oil and Petroleum Products**



**2015 Edition**

**BP OIL INTERNATIONAL LIMITED**

**GENERAL TERMS & CONDITIONS**

**FOR SALES AND PURCHASES OF CRUDE OIL AND PETROLEUM PRODUCTS**

**2015 EDITION**

**Version 1.1**

This version cancels and supersedes the first edition BP Oil International Limited General Terms & Conditions for Sales and Purchases of Crude Oil and Petroleum Products 2015 edition (the "First Edition GTCs"). Please disregard the First Edition GTCs. Any reference in the Special Provisions to BP Oil International Limited General Terms & Conditions for Sales and Purchases of Crude Oil and Petroleum Products 2015 edition shall be a reference to this Version 1.1.

## CONTENTS

**PART ONE**

**In respect of FOB Deliveries** ........................................................................ 6

Section 1 - Delivery ...................................................................................... 6

Section 2 - Measurement and sampling, independent inspection and certification .............. 6

Section 3 - Risk and property ........................................................................ 7

Section 4 - Laydays ...................................................................................... 7

Section 5 - Nomination of Vessels etc .............................................................. 8

Section 6 - Arrival of Vessel, Berth, loading etc. ................................................ 10

Section 7 - Time allowed, delays and demurrage ................................................ 14

**PART TWO**

**In respect of CFR and CIF deliveries** ........................................................ 18

Section 8 - Delivery ...................................................................................... 18

Section 9 - Measurement and sampling, independent inspection and certification ............ 18

Section 10 - Risk and property ...................................................................... 19

Section 11 - Laydays and Indicative Discharge Dates .......................................... 20

Section 12 - Insurance .................................................................................. 21

Section 13 - Charter party conditions .............................................................. 22

Section 14 - Nomination of Vessels, etc. .......................................................... 23

Section 15 - Arrival of Vessel, Berth, discharge, etc. .......................................... 26

Section 16 - Time allowed, delays and demurrage ............................................... 29

**PART THREE**

**In respect of Ex Ship deliveries** .............................................................. 33

Section 17 - Delivery .................................................................................... 33

Section 18  - Measurement and sampling, independent inspection and certification .......... 33

Section 19 - Risk and property ...................................................................... 34

Section 20 - Laydays .................................................................................... 34

Section 21 - Nomination of Vessels, etc. .......................................................... 34

Section 22 - Arrival of Vessel, Berth, discharge, etc............................................................... 37

Section 23 - Time allowed, delays and demurrage ................................................................. 40

**PART FOUR**

**In respect of deliveries by Barge (FOB, CFR, CIF, Ex Ship)** ............................................. 44

Section 24 - Applicability ........................................................................................................ 44

Section 25 - Nominations in respect of FOB deliveries ......................................................... 44

Section 26 - Nominations in respect of CFR, CIF and Ex Ship deliveries ............................ 45

Section 27 - Laytime .............................................................................................................. 47

Section 28 - Demurrage claims in respect of FOB deliveries ................................................ 48

Section 29 - Demurrage claims in respect of CFR, CIF and Ex-Ship deliveries ................... 49

Section 30 - Notification of demurrage claims ....................................................................... 49

**PART FIVE**

**In respect of deliveries Ex Tank, Into Tank, In Situ (stock transfer),**

**Free Into Pipeline ("FIP"), Ex Pipeline and DAP in Pipeline** ............................................ 51

Section 31 - Nominations and delivery .................................................................................. 51

Section 32 - Measurement and sampling; independent inspection ........................................ 51

Section 33 - Risk and property ............................................................................................... 52

Section 34 - Other Conditions ............................................................................................... 53

**PART SIX**

**In respect of deliveries by Road Tanker (FCA, CPT, CIP, DDP or DAP)** .......................... 54

Section 35 - Nominations in respect of FCA deliveries ......................................................... 54

Section 36 - Nominations in respect of CPT, CIP, DDP or DAP deliveries ........................... 55

Section 37 - Acceptance of Road Tanker(s) in respect of FCA deliveries............................. 56

Section 38 - Acceptance of Road Tanker(s) in respect of CPT,

        CIP, DDP or DAP  deliveries ............................................................................ 56

Section 39 - Loading and discharge ...................................................................................... 57

Section 40 - Measurement and sampling, independent inspection and certification ........... 57

Section 41 - Road Tanker(s) availability in respect of FCA deliveries ................................... 58

Section 42 - Road Tanker(s) availability in respect of CPT, CIP, DDP or DAP deliveries....... 58

Section 43 - Risk and property ......................................................................... 59

Section 44 - Insurance ................................................................................. 59

Section 45 - Other conditions ........................................................................ 59

**PART SEVEN**

**In respect of deliveries by Rail Tank Car (FCA, CPT, CIP, DDP or DAP)** ........................ 61

Section 46 - Nominations in respect of FCA deliveries ........................................... 61

Section 47 - Nominations in respect of CPT, CIP, DDP or DAP deliveries ........................... 62

Section 48 - Acceptance of Rail Tank Cars in respect of FCA deliveries ............................ 63

Section 49 - Acceptance of Rail Tank Cars in respect of CPT,

          CIP, DDP or DAP deliveries ........................................................... 63

Section 50 - Loading and discharge ................................................................ 64

Section 51 - Measurement and sampling, independent inspection and certification ........... 64

Section 52 - Rail Tank Cars availability in respect of FCA deliveries .................................... 64

Section 53 - Rail Tank Cars availability in respect of CPT, CIP, DDP or DAP deliveries ........ 65

Section 54 - Risk and property ...................................................................... 65

Section 55 - Insurance ................................................................................. 66

Section 56 - Other conditions ........................................................................ 66

**PART EIGHT**

**Applicable to each of Parts One, Two, Three, Four, Five, Six and Seven** ..................... 67

Section 57 - Definitions and Interpretation .......................................................... 67

Section 58 - Warranty of Title ......................................................................... 72

Section 59 - Quality and claims in respect of quality/quantity............................................ 72

Section 60 - Health, safety and environment ....................................................... 73

Section 61 - Destination................................................................................. 75

Section 62 - VAT/GST, customs, excise, mineral oil tax and other taxes, duties etc........... 75

Section 63 - Payment.................................................................................... 79

Section 64 - New and changed regulations, etc. .................................................... 85

Section 65 - Force majeure, etc. ..................................................................... 85

Section 66 - Limitation of liabilities................................................................... 87

Section 67 - Time bar .................................................................................................. 87

Section 68 - Default Events ........................................................................................ 87

Section 69 - Limitation on assignment ........................................................................ 89

Section 70 - Notices ................................................................................................... 89

Section 71 - Sanctions and Boycotts .......................................................................... 90

Section 72 - Facilitation Payments and Anti-Corruption .............................................. 91

Section 73 - High Court and Small Claims ................................................................... 92

Section 74 - Miscellaneous ........................................................................................ 92

Section 75 - Applicable law ........................................................................................ 94

**PART NINE**

**Schedules** ............................................................................................................... 96

Schedule A - Seller's Indemnity format ...................................................................... 96

Schedule B - Letter of Credit format .......................................................................... 98

Schedule C - Standby Letter of Credit format ............................................................ 101

Schedule D - Supplement in respect of EU documentation, etc. ................................. 103

Schedule E - Requirements in respect of Vessels at the Loading Terminal or Discharge
Terminal and, where applicable, during the Voyage ...................................... 106

Schedule F - BP Casualty Procedure ......................................................................... 111

Schedule G - Supplement in respect of LPG ............................................................... 112

Schedule H - Supplement for Electronic Documentation ............................................ 113

Schedule I -   For Crude Oil - Additional Provisions in respect of deliveries via the Druzhba
and connected pipelines ............................................................................. 115

| PART ONE |
| --- |
| **In respect of FOB Deliveries** |

### Section 1 - Delivery

1.1     Subject to the provisions of the Agreement, the Crude Oil or Product shall be delivered by the Seller to the Buyer, in bulk FOB at the Loading Terminal.

### Section 2 - Measurement and sampling, independent inspection and certification

2.1     **Measurement and Sampling**

    2.1.1     Measurement of the quantities and the taking of samples and analysis thereof for the purposes of determining the compliance of the Crude Oil or Product with the quality and quantity provisions of the Special Provisions shall be carried out in the following manner:

        (a)     where the Loading Terminal is operated by the Seller or the Seller's Affiliate, by the Loading Terminal's own qualified inspector(s) in accordance with the good standard practice at the Loading Terminal at the time of shipment, except where the Buyer and Seller jointly agree to an independent inspector in which case, by the independent inspector in accordance with good standard practice at the Loading Terminal; or

        (b)     where the Loading Terminal is not operated by the Seller or the Seller's Affiliate and if jointly agreed upon by the Buyer and Seller, by an independent inspector in accordance with the good standard practice at the Loading Terminal at the time of shipment. All charges of the independent inspector shall be shared equally between the parties and the inspector's report shall be made available to both parties. The Seller shall use reasonable endeavours to enable the independent inspector so appointed to have full access to the facilities at the Loading Terminal necessary to perform his duties; or

        (c)     should the parties fail to agree upon an independent inspector, or should the Loading Terminal refuse access to any independent inspector appointed by the parties, then by the Loading Terminal's own qualified inspector(s) in accordance with the good standard practice at the Loading Terminal at the time of shipment. In the event that the Loading Terminal does not refuse access but the parties fail to agree upon the appointment of an independent inspector, if required by the Buyer, the Seller shall allow the Buyer or its appointed representative to witness, but not to undertake, the measurement of quantity and the drawing of any samples and the laboratory analysis of those samples. Full details of the Buyer's representative shall be notified in writing to the Seller in advance. All charges relating to the Buyer's representative shall be solely for the Buyer's account and shall be considered solely as a service to the Buyer.

2.2     **Certificates of Quantity and Quality**

    2.2.1     Provided always the certificates of quantity and quality (or such other equivalent documents as may be issued at the Loading Terminal) of the Crude Oil or Product comprising the cargo are issued in accordance with Sections 2.1 and 2.2.2 then they shall, except in cases of manifest error or fraud, be used for invoicing

purposes and the Buyer shall be obliged to make payment in full in accordance with Section 63 but without prejudice to the rights of either party to make any claim pursuant to Section 59.

2.2.2   Any certificate of quantity and quality issued by an independent inspector pursuant to Sections 2.1.1 (a) or 2.1.1(b) shall record that the independent inspector did witness, or himself undertook, the taking of samples, the analysis of such samples and the measurement of quantity. For the avoidance of doubt, the parties agree that a certificate of quantity and quality countersigned by an independent inspector confirming these matters shall be a certificate of quantity and quality for the purposes of Section 2.2.1 above.

2.2.3   In the event that the independent inspector did not undertake or did not witness the measurement of quantity, the taking of samples or the analysis of such samples then the certificate of quantity and quality issued or countersigned by him must expressly reflect this and it will not, in these circumstances, be a certificate of quantity and quality for the purposes of Section 2.2.1 but merely evidence of those matters undertaken or witnessed by the inspector.

2.3   **Place of Certification**

Where it is not customary practice at the Loading Terminal at the time of shipment for measurement and sampling pursuant to Section 2.1 to take place at the Vessel's permanent hose connection immediately prior to loading, then it is a condition of the Agreement that the Seller shall be obliged to provide the same quantity and quality of the Crude Oil or Product at the Vessel's permanent hose connection at the Loading Terminal as set out in the certificates of quantity and quality so issued.

## Section 3 - Risk and property

3.1   Notwithstanding any right of the Seller to retain the documents referred to in Section 63 until payment, the risk and property in the Crude Oil or Product delivered under the Agreement shall pass to the Buyer as the Crude Oil or Product passes the Vessel's permanent hose connection at the Loading Terminal.

## Section 4 - Laydays

4.1   The Laydays shall be the day or range of days in which the Buyer's nominated Vessel must tender NOR at the Loading Terminal pursuant to Section 6.1.

4.2   The Laydays shall be:

4.2.1   as specified in the Special Provisions; or

4.2.2   established in accordance with the procedure(s) specified in the Special Provisions; or

4.2.3   where such Laydays cannot be ascertained by reference to Sections 4.2.1 or 4.2.2, or where the Agreement is for the delivery of more than one cargo, as notified by the Seller to the Buyer by not later than either:

(a)   the date 12 days prior to the first day of the Laydays so notified; or

(b)   the 20th day of the month preceding the first month in which the Laydays fall,

whichever is the later.

4.3     The Laydays established in accordance with Sections 4.2.2 or 4.2.3 shall, unless otherwise specifically agreed between the parties, fall entirely within any delivery period specified in the Special Provisions.

4.4     Where the Laydays are to be established in accordance with Section 4.2.3, the Buyer may notify the Seller of its preferred Laydays at any time prior to the date of the Seller's notice given pursuant to such Section. The Seller shall notify its supplier of such preferred Laydays provided always that the Seller shall not be under any obligation whatsoever to provide such Laydays.

### Section 5 - Nomination of Vessels etc.

5.1     **Full Cargo Lots and Part Cargo Lots**

Unless otherwise provided in the Special Provisions, delivery hereunder shall be given and taken in Full Cargo Lots or Part Cargo Lots at the Buyer's option but subject always to the prior agreement thereto of the Loading Terminal operator.

5.2     **Nomination of Vessel**

5.2.1   Each Vessel which is to load the Crude Oil or Product hereunder shall be nominated in writing by the Buyer to the Seller. Such notice shall specify:

(a)     the name of the Vessel, date built, summer deadweight and cargo tank capacity excluding slop tanks and flag;

(b)     the grade and approximate quantity of Crude Oil or Product to be loaded;

(c)     the ETA of the Vessel;

(d)     the destination(s) of the Vessel;

(e)     the length of the Vessel and such other information as may be required by the Loading Terminal operator from time to time;

(f)     full written instructions regarding the particulars and destination of the bills of lading and such other customary Loading Terminal documentation which may be required (and, for the avoidance of doubt, (i) the Buyer shall be liable for all costs resulting from any delays in loading the Crude Oil or Product hereunder due to failure by the Buyer to supply such information in a timely manner, and (ii) any such delays shall not count as used Laytime or, if the Vessel is on demurrage, as time on demurrage); and

(g)     details, where known, of any cargo on board or to be laden on board if loading a Part Cargo Lot.

5.2.2   The nomination shall not be effective unless it is received by the Seller not later than either (1) 5 days for Products or (2) 8 days for Crude Oil, prior to the first day of the Laydays. Notwithstanding the foregoing, if the nomination is received by the Seller after the above nomination deadline and is accepted by the Seller, it shall be effective but, subject to the provisions of Sections 6.2.1 and 7 running hours allowed to the Seller for the loading of the Crude Oil or Product shall not commence until such time as the Vessel has actually commenced loading. In the event that the Agreement is entered into after the nomination deadline but prior to

the first day of the Laydays then the nomination must be received by the Seller as soon as practically possible.

5.3 **Substitution of Vessels**

In respect of any Vessel named in the nomination, the Buyer may, or if necessary to perform its obligations under the Agreement must, substitute therefor another Vessel provided always that:

5.3.1   the size of the substitute Vessel and the quantity to be loaded shall not, without the prior written consent of the Seller, differ materially from the size of the Vessel previously named and the quantity specified in the nomination;

5.3.2   the Laydays which would have applied in respect of the Vessel originally nominated shall apply to the substitute Vessel; and

5.3.3   the Buyer shall give to the Seller notice in writing of the name and the destination(s) of the substitute Vessel within 1 Business Day of fixing such Vessel "sub-details" or upon receiving notice of an alternative vessel, but in any event not later than the ETA of the substitute Vessel or the ETA of the Vessel originally nominated, whichever is the earlier.

5.4 **ETA**

The Buyer or its representative shall notify the Seller or its representative of any change or changes in the ETA notified pursuant to Sections 5.2 or 5.3, but the Laydays shall be revised only with the Seller's specific written agreement. The giving or withholding of such agreement shall be at the absolute discretion of the Seller.

5.5 **Rejection of nominations and Vessels**

5.5.1   The Seller shall give notice accepting or rejecting any Vessel nominated by the Buyer within 1 Business Day of receipt of the Buyer's nomination.

5.5.2   Notwithstanding anything to the contrary express or implied elsewhere herein, the Seller shall have the right (which right may only be exercised prior to the passing of property hereunder):

(a)   to reject any nomination made by the Buyer pursuant to Sections 5.2 or 5.3 on any reasonable grounds;

(b)   to refuse, on any reasonable grounds, to accept for loading any Vessel named pursuant to Sections 5.2 or 5.3; and

(c)   to reject the Vessel in question, notwithstanding any prior acceptance of such Vessel (whether named in the Special Provisions or nominated or substituted pursuant to Sections 5.2 or 5.3), on any reasonable grounds if such Vessel is involved in any incident or more recent information regarding such Vessel becomes available to the Seller at any time after such prior acceptance.

5.5.3   Without derogating from any other reasonable grounds that may be available to the Seller, reasonable grounds shall include if the Vessel is determined by the Seller to be unacceptable under the Seller's documented marine assurance requirements.

5.6     **Vessel requirements**

5.6.1   The Vessel shall comply with:

(a)     all Applicable Law(s) at the Loading Terminal; and

(b)     the applicable requirements set out in Schedule E.

5.6.2   Notwithstanding anything to the contrary express or implied in Section 6 or in this Section 5, if any Vessel nominated by the Buyer does not comply with the foregoing provisions in this Section 5.6 or any of them, the Seller may:

(a)     reject the Vessel when nominated or subsequently; and

(b)     refuse to berth or load the Vessel in question.

5.7     **Consequences of rejection**

In the event of a rejection or a delay of the Vessel or other restriction suffered in respect of the Vessel by virtue of the application of any regulations or other applicable requirements of this Section 5 and/or of Schedule E:

5.7.1   the Seller shall not be liable for the consequences of rejection, delay or restriction of the Vessel, including demurrage;

5.7.2   the Buyer shall be liable for any costs or damages incurred by the Seller arising out of any such rejection of, delay to or restriction of the Vessel; and

5.7.3   the Buyer's obligations under the Agreement to nominate a suitable Vessel and to ensure that it tenders NOR at the Loading Terminal in accordance with Section 6.1.shall be unaffected.

5.8     **Changes in procedures**

Without prejudice to the Seller's obligations as set out in Section 6.3.1, this Section 5 shall be subject to modification, by written notice from the Seller to the Buyer, to take account of changes in the nomination and/or other procedures applicable from time to time at the Loading Terminal.

5.9     **Prompt delivery**

If the date of the Agreement is later than any of the dates for notifications, nominations and procedures specified in the Special Provisions, Section 4 or this Section 5 then both parties shall make best efforts to complete as soon as practically possible any outstanding time limited requirements, notifications, nominations and procedures which would have preceded the date of the Agreement aforesaid.

**Section 6 - Arrival of Vessel, Berth, loading etc.**

6.1     **Arrival of Vessel**

6.1.1   The Buyer shall arrange for its Vessel to report to the Seller or its representative at the Loading Terminal each of 72, 48 and 24 hours prior to its arrival and otherwise in accordance with the standard reporting procedure applicable from time to time at the Loading Terminal in question. If the Buyer's Vessel fails, for any reason, to give at least 24 hours prior notice of arrival at the Loading Terminal, the time

allowed to the Seller for loading pursuant to Section 7.3 shall be extended by a period equal to the delay in giving such 24 hours notice, but in any case not exceeding an additional 24 hours.

6.1.2   The Buyer shall ensure that by no later than 2359 hours (local time) on the last day of the Laydays:

(a)   the Vessel nominated by the Buyer hereunder shall arrive at the Loading Terminal in question complete all formalities and in all respects be ready to commence loading the Crude Oil or Product deliverable hereunder; and

(b)   NOR has been tendered.

6.1.3   Once NOR has been tendered pursuant to Section 6.1.2, the Buyer shall be obliged to receive delivery of the Crude Oil or Product in accordance with Section 6.2.2.

6.2   **Loading**

6.2.1   Unless otherwise agreed in writing by the Seller, the Seller shall not be under any obligation to commence loading hereunder prior to 0600 hours (local time) on the first day of the Laydays.

6.2.2   After receipt of the NOR pursuant to Section 6.1 the Seller, having regard to the requirements of the Loading Terminal, Loading Terminal procedures and the time when the Vessel has complied with the provisions of Section 6.1, shall commence and complete loading as soon as reasonably practicable, even if this means that loading is effected or completed outside the Laydays.

6.3   **Berth**

6.3.1   The Seller shall provide or cause to be provided free of charge to the Buyer (subject to the provisions of Section 62.5) a Berth to be indicated by the Seller or its representative at which the Vessel can when fully laden safely reach and leave and where it can always lie Safely Afloat.

6.3.2   If, while the Vessel nominated by the Buyer is approaching, entering or departing from or is present in the Berth, the length, draught or other dimensions of such Vessel shall exceed the length, draught or other dimensions so ascertained for the Berth in question for whatever reason, the Seller shall not be liable for any loss or damage caused as a result thereof and the Seller shall not be obliged to commence or continue loading.

6.4   **Vacation of Berth**

The Buyer's Vessel shall vacate the Berth as soon as loading hoses have been disconnected, provided that such Vessel's departure is not delayed awaiting production of Loading Terminal documents unless such documents can be delivered to the Vessel at a suitable anchorage or an early departure procedure is applied. If the Vessel fails to vacate the Berth, unless for reasons attributable to the Seller, its supplier or the Loading Terminal operator, any loss or damage suffered by the Seller or its supplier resulting from such failure shall be paid by the Buyer to the Seller.

6.5     **Berth utilisation**

Notwithstanding the provisions of Section 7, if at the Loading Terminal the Seller's supplier or any third party (whether or not an Affiliate of the Seller) imposes on the Seller, in respect of the Buyer's Vessel, an excess Berth utilisation charge in accordance with the Loading Terminal regulations or a contractually agreed or otherwise established scale for any hours of Berth utilisation in excess of the agreed Laytime under the Special Provisions or such specified period of hours (as may be advised by the Seller to the Buyer from time to time), but does not impose such charge directly on the Buyer's Vessel itself, such charge shall be for the Buyer's account.  The foregoing shall not apply where such excess Berth utilisation is caused by the Loading Terminal, the Seller or the Seller's supplier. For the avoidance of doubt, it is agreed that for the purposes of this Section any technical failure or breakdown on the part of the Vessel shall be a cause within the control of the Vessel and the Buyer.

6.6     **Shifting**

The Seller shall have the right to shift the Vessel from one Berth to another. All costs, including but not limited to damages for delay, shall be for the Seller's account if such shifting is for the Seller's purposes and otherwise shall be for the Buyer's account.

6.7     **Lightering**

6.7.1   If the Loading Terminal requires the Buyer's Vessel to be loaded from a lighter, this shall be subject to the Buyer's Vessel and/or terminal marine assurance procedures. The Buyer may, on any reasonable grounds and without liability, refuse the use of such lighter for the purpose of loading its nominated Vessel.

6.7.2   Either party may request to load the Vessel from lighters with such request subject to acceptance by the non-requesting party, such acceptance not to be unreasonably withheld.

6.7.3   In the event of lightering required by the Loading Terminal in accordance with Section 6.7.1, or requested by the Seller in accordance with Section 6.7.2, the cost of such lightering shall be for the Seller's account. Any additional costs in excess of those provided for in Section 7 (including but not limited to additional steaming and/or waiting time) shall be for the Seller's account.

6.7.4   In the event of lightering requested by the Buyer in accordance with Section 6.7.2, the cost of such lightering shall be for the Buyer's account. Any additional costs in excess of those provided for in Section 7 (including but not limited to additional steaming and/or waiting time) shall be for the Buyer's account.

6.7.5   All time expended in connection with any such lightering shall count as running hours for the purposes of calculating the liability for demurrage under the provisions of Section 7.

6.7.6   The Seller shall notify the place of lightering to the Buyer which shall be subject to approval of the Buyer, such approval not to be unreasonably withheld. The place of lightering shall be deemed the Berth for the purposes of Section 6 and 7 and all references therein to the Berth shall be construed accordingly.

6.8    **Floating Storage and Vessel-to-Vessel**

6.8.1    If the Loading Terminal requires the Buyer's Vessel to be loaded from a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer, this shall be subject to the Buyer's Vessel and/or terminal marine assurance procedures. The Buyer may, on any reasonable grounds and without liability, refuse the use of such floating storage facility or other Vessel for the purpose of loading its nominated Vessel.

6.8.2    In the event of loading from a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer being required by the Loading Terminal in accordance with Section 6.8.1, the cost of such loading shall be for the Seller's account. Any additional costs in excess of those provided for in Section 7 (including but not limited to additional steaming and/or waiting time) shall be for the Seller's account.

6.8.3    In the event of loading from a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer being required by the Loading Terminal in accordance with Section 6.8.1, all time expended in connection with such loading shall count as running hours for the purposes of calculating the liability for demurrage under the provisions of Section 7.

6.8.4    Where the Loading Terminal has required loading from a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer in accordance with Section 6.8.1, the Seller shall notify the place of loading to the Buyer and which shall be subject to approval of the Buyer, such approval not to be unreasonably withheld. The place of loading shall be deemed the Berth for the purposes of Section 6 and 7 and all references therein to the Berth shall be construed accordingly.

6.8.5    The Seller and the Buyer may mutually agree that delivery is made by loading from a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer.

6.9    **Lightering, Floating Storage and Vessel-to-Vessel Approval**

6.9.1    Any lighter, floating storage facility or Vessel involved in lightering, loading from floating storage or Vessel-to-Vessel transfer operation, as applicable, must be acceptable to both the Seller and the Buyer and remain acceptable throughout such operation under the parties' respective marine assurance requirements.

6.9.2    The provider of any lightering, loading from floating storage or Vessel-to-Vessel transfer services must be acceptable to both the Seller and the Buyer.

6.10    **Lightering, Floating Storage and Vessel-to-Vessel Procedures**

Any lightering, loading from floating storage, or Vessel-to-Vessel transfer operations shall be carried out in accordance with the procedures set out in the ICS/OCIMF Ship-to-Ship transfer guides and MARPOL Annex I as amended by Resolution MEPC.186 (59), Chapter 8: Prevention of Pollution during Transfer of Oil Cargo between Oil Tankers at Sea, Regulations 40, 41, 42 for the transfer of Crude Oil and Petroleum Products or any modifications thereto.

6.11    **Imposts, fees, charges and dues at the Loading Terminal**

All imposts, fees, charges (including pilotage, mooring and towage expenses) and dues (including quay dues) in respect of the Vessel (not the Crude Oil or Product) incurred at the Loading Terminal shall be for the Buyer's account.

**Section 7 - Time allowed, delays and demurrage**

7.1     **Delays**

In the event of any delay of any kind or from any cause whatsoever whether in connection with the scheduling of the Vessel's turn to load (including any change in such scheduling), provision of a Berth for the Vessel, berthing or loading of the Vessel or otherwise howsoever without limitation, and provided always that the Vessel is eventually loaded pursuant to Section 6.2.2, any rights of the Buyer against the Seller, however the same may arise and whether or not arising under the Agreement, shall be limited in all circumstances whatsoever to a claim for the payment of demurrage as specified below, and the Buyer shall not be entitled to complain directly or indirectly of any delay except for the purpose of founding a claim to such demurrage.  Further, any such right to demurrage shall be subject always to the following conditions:

7.1.1   The Buyer shall only be entitled to such amount of demurrage as follows:

(a)     if the Seller's supplier operates the Loading Terminal, such demurrage as the Seller is able to recover and does recover under the Loading Terminal's usual terms for the supply of the Crude Oil or Product; or

(b)     if the Seller has contracted with a supplier that is not the operator of the Loading Terminal, the lesser of such demurrage as the Seller is able to recover and does recover from that supplier and the amount of demurrage that would have been recovered under the Loading Terminal's usual terms for the supply of the Crude Oil or Product; or

(c)     if the Loading Terminal has no laytime and demurrage terms applicable to the supply of the Crude Oil or Product then the amount of demurrage the Seller shall pay to the Buyer shall be calculated pursuant to Sections 7.3, 7.4 and 7.5 below, irrespective of any recovery the Seller may make from its supplier.

7.1.2   In cases under Sections 7.1.1(a) and 7.1.1(b) above, the Seller shall use reasonable endeavours to recover from its supplier any demurrage for which the Buyer has submitted a claim in accordance with the provisions of this Section 7.

7.1.3   In all cases under Section 7.1.1 the Buyer must have complied with Section 7.1.4 below.

7.1.4   In no event shall the Seller be liable for demurrage unless the demurrage claim has been received by the Seller in writing within 45 days of the date of disconnection of loading hoses, stating in reasonable detail the specific facts upon which the claim is based, provided that any supporting documentation which is not at that time available to the Buyer shall be received by the Seller within 90 days of the date of disconnection of loading hoses. If the Buyer fails to give such notice or fails to provide such documentation within the aforesaid limits, then any liability of the Seller for demurrage shall be extinguished.

7.1.5   If the Seller is, due to an impediment reasonably beyond its control, prevented, delayed or hindered from or in obtaining or transporting to the Loading Terminal the Crude Oil or Product required for the cargo under the Agreement or any part thereof, or from or in loading the same, then notwithstanding any terms that might otherwise be applicable to the supply of the Crude Oil or Product by such Loading Terminal any time lost, whether in the commencement, carrying out or

completion of the loading, shall not be counted or included in calculating the time taken by the Seller to load the Crude Oil or Product; and any time so lost after the time allowed for loading as hereinbefore provided shall have expired shall not be counted or included in calculating the time in respect of which the Seller is liable for demurrage. Any such impediment shall be an impediment for the purposes of Section 65.

7.2    **Demurrage terms**

Save when the Loading Terminal has no Laytime and demurrage terms applicable to the supply of the Crude Oil or Product when Sections 7.3, 7.4 and 7.5 shall apply, any demurrage shall be recoverable only in accordance with the usual terms applicable to the supply of the Crude Oil or Product from such Loading Terminal, whether the Seller is the operator of the Loading Terminal or otherwise.

7.3    **Time allowed**

Unless provided otherwise by the Special Provisions, in those cases where the Loading Terminal has no Laytime and demurrage terms applicable to the supply of the Crude Oil or Product, the time allowed to the Seller for the loading of the quantity of the Crude Oil or Product deliverable hereunder to each Vessel shall be:

      (a)    in the case of Vessels of 15,000 tons summer deadweight or less, 24 running hours; or

      (b)    in all other cases, 36 running hours;

all days and holidays shall be included unless loading on the day or holiday in question is prohibited by Applicable Law(s) at the Loading Terminal.

7.4    **Running hours**

In those cases where the Loading Terminal has no laytime and demurrage terms applicable to the supply of the Crude Oil or Product, then:

7.4.1    Subject as otherwise provided in this Section 7.4 or elsewhere in the Special Provisions of the Agreement, running hours shall commence Berth or no Berth 6 hours after NOR is tendered, or on commencement of loading, whichever is the earlier, provided always that (a) the Buyer has complied with Section 6.1.1, and (b) such NOR is given in accordance with the provisions of Section 6.1.2.

7.4.2    If NOR is given for the Vessel before the first day of the Laydays, running hours shall commence at 0600 hours on the first day of the Laydays or on commencement of loading, whichever is the earlier. If NOR is given for the Vessel after the last day of the Laydays and is accepted for loading by the Seller in its sole and absolute discretion, then, without prejudice to any of the Seller's other rights, running hours shall commence only on commencement of loading.

7.4.3    For the purposes of calculating running hours, which shall include any time spent lightering or loading from a floating storage facility or Vessel-to-Vessel transfer, loading shall be deemed to be completed upon disconnection of loading hoses.

7.4.4    Any delay arising out of or in connection with any of the following situations shall not be counted or included in calculating the time taken by the Seller to load the Crude Oil or Product or the time in respect of which the Seller is liable for demurrage (whether or not the Vessel is already on demurrage):

(a)    awaiting free pratique, tugs, tides, pilot or daylight;

(b)    inward passage until the Vessel is securely moored at the Berth and its gangway, if it is to be used, is in place;

(c)    adverse weather or sea state;

(d)    preparing for and handling or shifting of ballast, bilges, slops or other substances or bunkering unless concurrent with cargo operations;

(e)    restrictions imposed by the owner, charterer or master of the Vessel;

(f)    any breakdown of the Vessel's equipment or failure to comply with the requirements of the Loading Terminal with respect to equipment aboard or any other matter causing delay or restriction to loading operations;

(g)    cleaning and/or inspection of the Vessel's cargo tanks (not including inspection of the Crude Oil or Product);

(h)    time spent complying with any of the regulations and other requirements referred to in Section 5;

(i)    any other delay attributable to the Vessel, the Buyer or agents of the Buyer;

(j)    any onboard strike by members of the crew.

7.4.5    Notwithstanding the provisions of Section 65, any delay in loading by reason of a strike, labour dispute or lock out of any shoreside workmen essential to loading shall count as one half laytime or, if the Vessel is on demurrage, at one half of the demurrage rate provided always that the cause of the delay was not within the reasonable control of the Seller.

## 7.5    Damages for delay

Should Section 7.2 not apply then:

7.5.1    if the Crude Oil or Product is not loaded within the time allowed in accordance with Section 7.3, the time so allowed shall be extended by the excess time but (subject always to Section 5.2.2) the Seller shall pay to the Buyer demurrage, in the same currency as is prescribed for payment for the Crude Oil or Product delivered under the Agreement, in respect of the excess time at the appropriate rate per day (or pro rata for part of a day) as hereinafter specified.  The Seller shall not be liable (other than for demurrage as aforesaid) for any loss or damage, direct or indirect, which the Buyer may suffer as a result of the Crude Oil or Product not being loaded within the time allowed in accordance with Section 7.3;

7.5.2    the appropriate rate of demurrage shall be:

(a)    the rate, if any, specified in the Special Provisions; or

(b)    the applicable charterparty rate; or

(c)    where there is no charterparty rate or, in the Seller's sole opinion the applicable charterparty rate established pursuant to Section (b) is not representative of the market rate, the market rate current on the date running hours commence as aforesaid for a Vessel of the size and type

used for a single voyage charter from the Loading Terminal to the Buyer's Discharge Terminal. If the parties fail to agree within 30 days of any claim being made upon such rate, then at the instance of either party, such rate shall be determined by The London Tanker Brokers Panel Ltd. (or its successors in title), whose decision thereon shall be final and binding and whose costs shall be paid for by the applicant.

### 7.6    Part Cargo Lots

7.6.1    If delivery is given and taken as other than a Full Cargo Lot, the provisions of Section 7.2 shall apply. If the Loading Terminal has no laytime and demurrage terms applicable to the supply of the Crude Oil or Product then Sections 7.3, 7.4 and 7.5 shall apply, but for the purposes of ascertaining the appropriate rate of demurrage under Section 7.5 a Vessel of a summer deadweight equal to the cargo plus 5 per cent shall be deemed to have been used.  If the parties fail to agree within 30 days of any claim being made upon such appropriate rate, then at the instance of either party, such rate shall be determined by The London Tanker Brokers Panel Ltd. (or its successors in title), whose decision thereon shall be final and binding and whose costs shall be paid for by the applicant.

7.6.2    If the delivery hereunder is co-loaded with the Crude Oil or Product being delivered to the Buyer by another supplier at the same Berth, the Seller shall only be liable for that proportion of the demurrage equal to the ratio of the volume delivered by the Seller to the total volume loaded onto the Vessel at that Berth.

| PART TWO |
| --- |
| In respect of CFR and CIF deliveries |

## Section 8 - Delivery

8.1     Subject to the provisions of the Agreement, Crude Oil or Product shall be placed by the Seller on board the Vessel procured by the Seller for carriage CIF/CFR from the Loading Terminal to the agreed Discharge Terminal.

## Section 9 - Measurement and sampling, independent inspection and certification

9.1     **Measurement and sampling**

9.1.1   Measurement of the quantities and the taking of samples and analysis thereof for the purposes of determining the compliance of the Crude Oil or Product with the quality and quantity provisions of the Special Provisions shall be carried out in the following manner:

(a)     where the Loading Terminal is operated by the Seller or the Seller's Affiliate, by the Loading Terminal's own qualified inspector(s) in accordance with the good standard practice at the Loading Terminal at the time of shipment, except where the Buyer and Seller jointly agree to an independent inspector in which case, by the independent inspector in accordance with good standard practice at the Loading Terminal; or

(b)     where the Loading Terminal is not operated by the Seller or the Seller's Affiliate and if jointly agreed upon by the Buyer and Seller, by an independent inspector in accordance with the good standard practice at the Loading Terminal at the time of shipment. All charges of the independent inspector shall be shared equally between the parties and the inspector's report shall be made available to both parties. The Seller shall use reasonable endeavours to enable the independent inspector so appointed to have full access to the facilities at the Loading Terminal necessary to perform his duties; or

(c)     should the parties fail to agree upon an independent inspector, or should the Loading Terminal refuse access to any independent inspector appointed by the parties, then by the Loading Terminal's own qualified inspector(s) in accordance with the good standard practice at the Loading Terminal at the time of shipment. In the event that the Loading Terminal does not refuse access but the parties fail to agree upon the appointment of an independent inspector, if required by the Buyer the Seller shall allow the Buyer or its appointed representative to witness, but not to undertake, the measurement of quantity and the drawing of any samples and the laboratory analysis of those samples. Full details of the Buyer's representative shall be notified in writing to the Seller in advance. All charges relating to the Buyer's representative shall be solely for the Buyer's account and shall be considered solely as a service to the Buyer.

9.1.2   Notwithstanding the provisions of Sections 9.1.1(a) to 9.1.1(c), if an independent inspector has already been appointed by the Seller or any third party in respect of the Crude Oil or Product prior to the nomination of such cargo by the Seller to the Buyer pursuant to Section 14 or if such inspection has already been carried out,

then both parties shall be bound by the results of such measurement of quantity, sampling and analysis thereof as carried out by such independent inspector to the extent set out in Section 9.2.1 below, provided always that the certificates of quantity and quality (or such other equivalent documents as may be issued at the Loading Terminal) of the Crude Oil or Product comprising the cargo are issued in accordance with Section 9.2.2 below.

9.2 **Certificates of Quantity and Quality**

9.2.1    Provided always the certificates of quantity and quality (or such other equivalent documents as may be issued at the Loading Terminal) of the Crude Oil or Product comprising the cargo are issued in accordance with Sections 9.1 and 9.2.2 then they shall, except in cases of manifest error or fraud, be used for invoicing purposes and the Buyer shall be obliged to make payment in full in accordance with Section 63 but without prejudice to the rights of either party to make any claim pursuant to Section 59.

9.2.2    Any certificate of quantity and quality issued by an independent inspector pursuant to Sections 9.1.1 (a) or 9.1.1(b) shall record that the independent inspector did witness, or himself undertook, the taking of samples, the analysis of such samples and the measurement of quantity. For the avoidance of doubt, the parties agree that a certificate of quantity and quality countersigned by an independent inspector confirming these matters shall be a certificate of quantity and quality for the purposes of Section 9.2.1 above.

9.2.3    In the event that the independent inspector did not undertake or did not witness the measurement of quantity, the taking of samples or the analysis of such samples then the certificate of quantity and quality issued or countersigned by him must expressly reflect this and it will not, in these circumstances, be a certificate of quantity and quality for the purposes of Section 9.2.1 but merely evidence of those matters undertaken or witnessed by the inspector.

9.3 **Place of Certification**

Where it is not customary practice at the Loading Terminal at the time of shipment for measurement and sampling pursuant to Section 9.1 to take place at the Vessel's permanent hose connection immediately prior to loading, then it is a condition of the Agreement that the Seller shall be obliged to provide the same quantity and quality of the Crude Oil or Product at the Vessel's permanent hose connection at the Loading Terminal as set out in the certificates of quantity and/or quality so issued.

9.4 **Part Cargo Lots delivered CFR or CIF**

Where delivery is made as an unsegregated Part Cargo Lot to the Buyer and a third party, the quantity determined in accordance with the foregoing shall be adjusted so that, following completion of discharge of the relevant Part Cargo Lots, the Buyer and such third party shall each be allocated a percentage of the total loaded quantity equal to that percentage of the total quantity (determined at each Discharge Terminal in accordance with the provisions of Section 18.1 below) which was discharged at its Discharge Terminal. The costs of such independent inspection shall be shared equally between the parties for their respective Discharge Terminals and the inspector's report shall be made available to all parties.

## Section 10 - Risk and property

10.1    Notwithstanding any right of the Seller to retain the documents referred to in Section 63 until payment, the risk in the Crude Oil or Product delivered under the Agreement shall

pass to the Buyer as the Crude Oil or Product passes the Vessel's permanent hose connection at the Loading Terminal, and property in the Crude Oil or Product shall pass:

10.1.1 in the case of delivery as a Full Cargo Lot, or in the case of a Part Cargo Lot where the Crude Oil or Product is separately ascertainable, as the Crude Oil or Product passes the Vessel's permanent hose connection at the Loading Terminal; or

10.1.2 in the case of delivery as a Part Cargo Lot where the Crude Oil or Product is not identifiable and ascertainable on board the Vessel separately from the Crude Oil or Product which is destined for receivers other than the Buyer:

(a) as the Crude Oil or Product passes the Vessel's permanent hose connection at the Discharge Terminal if such Part Cargo Lot is not the last Part Cargo Lot to be discharged, or

(b) immediately upon completion of discharge of all other Crude Oil or Product if such Part Cargo Lot is the last Part Cargo Lot cargo to be discharged.

10.2 If the Vessel has commenced or completed loading prior to being nominated to and accepted by the Buyer pursuant to Section 14, then, notwithstanding any right of the Seller to retain the documents referred to in Section 63 until payment, the property in the Crude Oil or Product shall pass immediately upon receipt by the Seller of the Buyer's acceptance of such nomination or as the Crude Oil or Product passes the Vessel's permanent hose connection at the Loading Terminal, whichever is later and the risk in the Crude Oil or Product delivered under the Agreement shall be deemed to have passed to the Buyer as the Crude Oil or Product passes the Vessel's permanent hose connection at the Loading Terminal.

10.3 Subject to the Seller's rights under Section 63, and notwithstanding any other provision of the Agreement and without affecting the passing of risk, where the Agreement relates to Crude Oil or Product that has already been loaded onto a Vessel and provides for the Buyer to provide Credit Support:

10.3.1 property in the Crude Oil or Product shall not pass to the Buyer before such Credit Support has been provided in accordance with the Agreement; and

10.3.2 such Credit Support shall be provided within 2 Business Days of the conclusion of the Agreement, and in any event before the Crude Oil or Product is discharged.

## Section 11 - Laydays and Indicative Discharge Dates

11.1 Where Laydays are specified in the Special Provisions, they shall be the day or range of days in which the Seller's nominated Vessel must tender NOR at the Loading Terminal and loading shall commence and complete as soon as reasonably practicable thereafter, even if this means loading is effected or completed outside the Laydays.

11.2 Where Laydays are specified in the Special Provisions and the Seller provides the Buyer with a date or range of dates either expressly or impliedly indicating the date or range of dates within which the Vessel shall arrive at the Discharge Terminal (the "Indicative Discharge Date"), this shall be indicative only. The Seller shall not assume any responsibility for the delivery of the Crude Oil or Product at the Discharge Terminal and, save as regards the calculation of Laytime and demurrage as set out in Section 16 below, the rights and obligations of the parties shall be the same in all respects as for CFR and CIF deliveries.

11.3    Where no Laydays are specified in the Special Provisions and the Seller provides the Buyer with the Indicative Discharge Date, this shall be indicative only (provided that the Seller has ensured that the Vessel has tendered NOR at the Loading Terminal at a time consistent with arrival at the Discharge Terminal within the Indicative Discharge Date, given a reasonable assessment of the customary loading and voyage time). The Seller shall not assume any responsibility for the delivery of the Crude Oil or Product at the Discharge Terminal and, save as regards the calculation of laytime and demurrage as set out in Section 16 below, the rights and obligations of the parties shall be the same in all respects as for CFR and CIF deliveries.

## Section 12 - Insurance

12.1    **CFR deliveries**

Neither party shall have any obligation to the other party to secure cargo insurance, whether against marine or other risks.

12.2    **CIF deliveries**

12.2.1   The Seller undertakes to procure and pay for insurance against marine risks to the full value of the Crude Oil or Product hereunder plus 10%.  Such insurance, which shall operate from the time the Crude Oil or Product passes the Vessel's permanent hose connection at the Loading Terminal until the time the Crude Oil or Product passes the Vessel's permanent hose connection at the Discharge Terminal, shall be in accordance with the provisions of a Marine Cargo Insurance Policy subject to Bulk Oil Clauses SP 13C, or, at the Seller's option, Institute Cargo Clauses (A), and the benefit thereof shall accrue to the Buyer upon the passing of risk in the Crude Oil or Product as provided for in the Agreement.

12.2.2   The Seller does not undertake to procure insurance against war, strikes, riots and civil commotions risks in respect of the delivery of the Crude Oil or Product hereunder save where the Seller shall, by written notice actually received by it at least 2 Business Days prior to the commencement of loading, have been requested by the Buyer to procure such insurance.  Where, upon request as aforesaid, the Seller procures such insurance, it shall be subject to Institute War Clauses (Cargo) and Institute Strikes Clauses (Cargo) current on the date of sailing of the Vessel and the actual premium payable at the current London Market rate for the voyage to be performed ruling on the said date shall be charged to and be recoverable from the Buyer by the Seller as an addition to the price in the Agreement under the Special Provisions and such addition shall then form part of such price in the Agreement.

12.2.3   If requested by the Buyer, the Seller shall provide the Buyer with the original certificate of insurance or broker's cover note.

12.3    **Additional Vessel insurance, etc.**

12.3.1   In all cases and notwithstanding Section 12.1, if and for so long as the voyage to the Discharge Terminal, or any seas through which the Vessel has to travel in performance of the Agreement, the Seller shall pursuant to the terms of the relevant charterparty incur additional insurance or war risk insurance premia whether at the date of the Agreement or subsequently for the Vessel's hull and machinery, protection and indemnity or cargo insurances, crew bonuses and the provision of security services for the Vessel, or any or all of them, the cost of such additional insurance and/or additional premia shall be paid by the Buyer to the Seller in addition to the price payable pursuant to the Agreement.

12.3.2   The Seller reserves the right to refuse at any time:

(a)   to direct any Vessel to undertake or to complete the voyage to the Discharge Terminal if such Vessel is required in the performance of the Agreement:

(i)   to transit or to proceed to or to remain in waters so that the Vessel concerned would be involved in a breach of any Institute Warranties (if applicable) or, in the Seller's opinion, to risk its safety or to risk ice damage; or

(ii)   to transit or to proceed to or to remain in waters where there is war (de facto or de jure) or threat thereof;

(b)   prior to the commencement of loading to direct any Vessel to undertake the voyage to the intended Discharge Terminal if such Vessel is required in the performance of the terms of the Agreement to transit waters which, in the Seller's reasonably held opinion, would involve abnormal delay; or

(c)   to undertake any activity in furtherance of the voyage which in the opinion of the Vessel's master could place the Vessel, its cargo or crew at risk.

12.3.3   If the Seller agrees to direct a Vessel to undertake or to complete the voyage as referred to in Section 12.3.2, the Buyer undertakes to reimburse the Seller, in addition to the price payable under the Agreement, for costs incurred by the Seller in respect of any additional insurance premia (including those referred to in Section 12.2) and any other sums that the Seller may be required to pay to the Vessel's owner including any sums in respect of any amounts deductible under such Vessel owners' insurance and any other costs and/or expenses incurred by the Seller.

## Section 13 - Charterparty conditions

13.1   Subject always to any provisions for payment and documents pursuant to Section 63.3, Section 63.11 and/or Section 63.12, the Seller may arrange shipment under bills of lading which incorporate charterparty conditions normally in use for Vessels. Without prejudice to the generality of the foregoing, such conditions shall be deemed to include:

13.1.1   the provision that the Crude Oil or Product shall be pumped out of the Vessel at the Vessel's expense;

13.1.2   the provision that if, without prejudice to the Buyer's obligations under Section 15.3.1 at any time after loading but before commencement of discharge:

(a)   importation of the Crude Oil or Product comprising the cargo at the port at which discharge was to have taken place is prohibited under the laws of the country in which such Crude Oil or Product was produced, or by laws, regulations, rules, directives or guidelines applied by the government of that country or any relevant agency thereof; and/or

(b)   the country, state, territory or region at which discharge was to have taken place  is subject to a Trade Restriction  (as defined in Section 71.1);

the Crude Oil or Product shall be discharged at an alternative safe Berth nominated by the Buyer which is not subject to any such prohibition or restriction and which is acceptable to the Seller (which acceptance shall not be unreasonably withheld).

13.2    If any prohibition or restriction referred to in Section 13.1.2 becomes applicable, such alternative port shall be deemed to be the Discharge Terminal stipulated under the Agreement for the Crude Oil or Product in question and all extra expenses (if any) involved in the Vessel's reaching such alternative Discharge Terminal and/or in the discharge of the Crude Oil or Product thereat shall be for the Buyer's account.

13.3    Without prejudice to the Buyer's obligations under Section 13.2 or Section 16, the Seller undertakes in all cases to settle freight, including deviation costs without limitation, and demurrage due to the Vessel owner.

### Section 14 - Nomination of Vessels, etc.

14.1    **Full Cargo Lots and Part Cargo Lots**

Unless otherwise provided in the Special Provisions, delivery hereunder shall be given and taken in Full Cargo Lots or Part Cargo Lots at the Seller's option.

14.2    **Nomination of Vessels**

14.2.1    The Seller shall give to the Buyer a notice of nomination of the Vessel either (1) on or about the time the Agreement is entered into between the parties, or no later than (2) 5 days for Products or (3) 8 days for Crude Oil, prior to the first day of the Loading Terminal Laydays of the Vessel so nominated, whichever is the later. Such nomination shall specify:

(a)    the name of the Vessel, date built, summer deadweight and cargo tank capacity excluding slop tanks and flag;

(b)    the grade and approximate quantity of the Crude Oil or Product to be loaded (or the bill of lading quantity, if known);

(c)    the Loading Terminal Laydays or the bill of lading date (if known) and the ETA at the Discharge Terminal;

(d)    the length of the Vessel and its estimated (or actual, if known) sailing draught on completion of loading;

(e)    the Vessel/charterer's agent at the Discharge Terminal, where known;

(f)    details, where known, of any other cargo on board or to be laden on board if delivery is of a Part Cargo Lot; and

(g)    in the case of any sales afloat, whereby the Crude Oil or Product has been or will be laden onboard (which shall include storage, and any intervening Vessel-to-Vessel transfer, as well as by way of carriage) more than one Vessel the Seller shall provide the name of each such Vessel, date built and flag.

14.2.2    Notwithstanding Section 14.2.1, if the nomination is received by the Buyer after the nomination deadline in Section 14.2.1 and is accepted by the Buyer, it shall be effective. In the event that the Agreement is entered into after the deadline but prior to the first day of the Laydays then the nomination must be received by the Buyer as soon as practically possible.

14.3 **ETA**

The Seller undertakes to inform the Buyer of any changes to the ETA at the Discharge Terminal advised pursuant to Section 14.2.1(c) as soon as practicable after receipt thereof from its supplier or the Vessel's owner or agent and, where applicable, such information as shall be necessary so as to establish the time and place of the passing of property in the Crude Oil or Product.

14.4 **Buyer's nomination**

The Buyer shall, within 1 Business Day or such other period as may be specified in the Special Provisions after receipt of the Seller's nomination made pursuant to Section 14.2, notify the Seller of:

14.4.1 the final Discharge Terminal, if not already specified in the Special Provisions, when the Seller's approval thereto shall be required in writing within 1 Business Day thereafter, such approval not to be unreasonably withheld. No change to the final Discharge Terminal so nominated or specified shall be made without the Seller's prior written acceptance which shall not be unreasonably withheld and subject always to the provisions of Section 14.10. If the Special Provisions provide a range within which a Discharge Terminal or port may be nominated, the Seller's approval to each port shall be required in writing within 1 Business Day after any valid nomination, such approval not to be unreasonably withheld; and

14.4.2 full written instructions regarding the particulars and destination of the bills of lading and such other customary Loading Terminal documentation which may be required (and, for the avoidance of doubt, the Buyer shall be liable for all costs resulting from any delays in loading the Crude Oil or Product hereunder due to failure by the Buyer to supply such information in a timely manner). The Seller shall have the right to issue its own instructions if such instructions are not so provided by the Buyer.

All costs (including demurrage) arising out of any failure by the Buyer to comply with the foregoing provisions of Section 14.4 shall be for the Buyer's account.

14.5 **Substitution of Vessels**

In respect of any Vessel named in the nomination, the Seller may, or if necessary to perform its obligations under the Agreement must, substitute therefor another Vessel provided always that:

14.5.1 the size of the substitute Vessel and the quantity to be loaded shall not, without the prior written consent of the Buyer, differ materially from the size of the Vessel previously named and the quantity specified in the nomination; and

14.5.2 the Seller shall give to the Buyer notice in writing of the name of the substitute Vessel not less than 3 days before the last day of the Loading Terminal Laydays of the substitute Vessel or the last day of the Loading Terminal Laydays of the Vessel originally nominated, whichever is the earlier, provided always that such substitution shall not be allowed after commencement of loading of the Vessel originally nominated unless otherwise specifically agreed between the parties.

14.6 **Rejection of nominations and Vessel**

14.6.1 The Buyer shall give notice accepting or rejecting any Vessel nominated by the Seller within 1 Business Day of receipt of the Seller's nomination.

14.6.2 Notwithstanding anything to the contrary express or implied elsewhere, the Buyer shall have the right (which right may only be exercised prior to the passing of property hereunder) to refuse, on any reasonable grounds, to accept any Vessel named pursuant to Section 14.2 including any Vessel referred to in Section 14.2.1(g). The Buyer shall not be liable for any loss or damage, direct or indirect, which the Seller may suffer as a result of the Buyer exercising such right.

14.6.3 Notwithstanding any prior acceptance of a Vessel (whether named in the Special Provisions or nominated or substituted pursuant to Sections 14.2 or 14.5), the Buyer shall have the right (which right may only be exercised prior to the passing of property hereunder) to reject the Vessel in question on any reasonable grounds if such Vessel is involved in any incident or more recent information regarding such Vessel becomes available to the Buyer at any time after such prior acceptance.

14.6.4 If the facilities at the Loading Terminal in question require the Seller's Vessel to be loaded from a floating storage facility, lighter or other Vessel by means of Vessel-to-Vessel transfer, such facility shall be subject to the Buyer's Vessel and/or Loading Terminal marine assurance procedures and the Buyer may, on any reasonable grounds and without liability, refuse the use of such facility for the purpose of loading the nominated Vessel.

14.6.5 Without derogating from any other reasonable grounds that may be available to the Buyer, reasonable grounds shall include if the Vessel is determined by the Buyer to be unacceptable under the Buyer's documented marine assurance requirements.

14.7 **Vessel requirements**

14.7.1 The Vessel shall comply with:

(a) all Applicable Law(s) at the Loading Terminal and at the Discharge Terminal (including any alternative or substituted Discharge Terminal under Section 14.10); and

(b) the applicable requirements set out in Schedule E.

14.7.2 Notwithstanding anything to the contrary express or implied in Section 15 and Section 16 or in this Section 14.7, if any Vessel nominated by the Seller does not comply with the foregoing provisions or any of them, the Buyer may:

(a) reject the Vessel when nominated or subsequently; and

(b) refuse to berth or discharge the Vessel in question.

14.8 **Consequences of rejection**

In the event of a rejection or a delay of the Vessel or other restriction suffered in respect of the Vessel by virtue of the application of any regulations or other applicable requirements of this Section 14 and/or of Schedule E:

14.8.1 the Buyer shall not be liable for the consequences of rejection of, delay to or restriction of the Vessel, including demurrage;

14.8.2 the Seller shall be liable for any costs or damages incurred by the Buyer arising out of any such rejection of, delay to or restriction of the Vessel; and

14.8.3   the Seller's obligations under the Agreement to nominate a suitable Vessel and to ensure that it tenders NOR at the Loading Terminal in accordance with Section 11 shall be unaffected.

## 14.9   Pumping

The Seller warrants that the Vessel will discharge her full cargo within 24 hours (or pro-rata in the case of a part cargo) or shall maintain an average minimum discharge pressure of 100PSI at the Vessel manifold throughout the bulk discharge operation, provided shore facilities permit discharge within such time or at such pressure. Time lost as a result of the Vessel being unable to discharge the Crude Oil or Product as stated above shall not count as Laytime or time on demurrage.

## 14.10   Alternative or Range of Discharge Terminal(s)

Where the Buyer exercises any Discharge Terminal options in accordance with the Special Provisions or Section 14.4.1 where such options are also available to the Seller under the terms of the relevant charterparty:

14.10.1 the price stated in the Special Provisions shall be adjusted by the freight differential calculated in accordance with such charterparty terms or, if the Vessel has not been voyage chartered, such rate as shall be mutually agreed between the parties in respect of such Discharge Terminal, provided always that any delays arising out of such failure to agree shall be for the Buyer's account; and

14.10.2 the Buyer shall be liable for any additional costs incurred by the Seller, including deviation costs and costs in respect of any additional bunker consumption.

## 14.11   Loaded details

As soon as possible after the loading has been completed, the Seller shall, if requested to by the Buyer, notify the Buyer of the actual quantity(ies) loaded and the updated ETA of the Vessel at the Discharge Terminal.

## 14.12   Prompt delivery

If the date of the Agreement is later than any of the dates for notification specified in the Special Provisions, Section 11 or this Section 14, then both parties shall make best efforts to complete as soon as practically possible any outstanding time limited requirements, notifications, nominations and procedures which would have preceded the date of the Agreement aforesaid.

## 14.13   Imposts, fees, charges and dues at the Loading Terminal

All imposts, fees, charges (including pilotage, mooring and towage expenses) and dues (including quay dues) in respect of the Vessel (not the Crude Oil or Product) incurred at the Loading Terminal shall be for the Seller's account, except for those specified in Worldscale as being for the Vessel owner's account.

## Section 15 - Arrival of Vessel, Berth, discharge, etc.

## 15.1   Arrival of Vessel

15.1.1 The Seller shall arrange for its Vessel to report to the Buyer or its representative at the Discharge Terminal each of 72, 48 and 24 hours prior to its arrival and otherwise in accordance with the standard reporting procedure applicable from time to time at the Discharge Terminal.

15.1.2   Upon arrival of the Vessel at the Discharge Terminal or Berth and having regard to the requirements of the Discharge Terminal and Discharge Terminal procedures, the Vessel shall tender NOR.

## 15.2   Discharge

After tender of NOR pursuant to Section 15.1.2 the Seller, having regard to the requirements of the Discharge Terminal, Discharge Terminal procedures and the time when the Vessel has complied with the provisions of Section 15.1, shall commence and complete discharge as soon as reasonably practicable.

## 15.3   Berth

15.3.1   For the discharge of the Crude Oil or Product the Buyer shall provide or cause to be provided free of charge to the Seller (subject to the provisions of Section 62.5) a Berth to be indicated by the Buyer or its representative at which the Vessel can when fully laden safely reach and leave and where it can always lie Safely Afloat.

15.3.2   Notwithstanding the Buyer's obligations under Section 15.3.1, where the Buyer has purchased the Crude Oil or Product on board a named Vessel, the Seller represents to the Buyer and warrants that the named Vessel can safely berth and discharge the contractual quantity of Crude Oil or Product at the Discharge Terminal regardless of whether the contractual quantity is a Full Cargo Lot or a Part Cargo Lot and irrespective of the port scheduling of the Vessel. Failure to comply with this term shall entitle the Buyer to refuse to berth the named Vessel. Any costs incurred by the Seller in providing a substitute Vessel, or lightering and/or Vessel-to-Vessel transfer of the Crude Oil or Product at the Discharge Terminal including demurrage shall be for the account of the Seller.

## 15.4   Shifting

The Buyer shall have the right to shift the Vessel from one Berth to another. All costs, including but not limited to damages for delay, shall be for the Seller's account if such shifting is for the Seller's purposes and shall otherwise be for the Buyer's account.

## 15.5   Lightering

15.5.1   If the Discharge Terminal requires the Seller's Vessel to be discharged to a lighter, this shall be subject to the Seller's Vessel and/or terminal marine assurance procedures. The Seller may, on any reasonable grounds and without liability, refuse the use of such lighter for the purpose of discharging its nominated Vessel.

15.5.2   Either party may request to discharge the Vessel to lighters with such request subject to acceptance by the non-requesting party, such acceptance not to be unreasonably withheld.

15.5.3   In the event of lightering required by the Discharge Terminal in accordance with Section 15.5.1 or by the Buyer in accordance with Section 15.5.2, the cost of such lightering shall be for the Buyer's account. Any additional costs in excess of those provided for in Section 16 (including but not limited to additional steaming and/or waiting time) shall be for the Buyer's account.

15.5.4   In the event of lightering requested by the Seller in accordance with Section 15.5.2, the cost of such lightering shall be for the Seller's account. Any additional costs in excess of those provided for in Section 16 (including but not limited to additional steaming and/or waiting time) shall be for the Seller's account.

15.5.5   All time expended in connection with any such lightering shall count as running hours for the purposes of calculating the liability for demurrage under the provisions of Section 16.

15.5.6   The Buyer shall notify the place of lightering to the Seller which shall be subject to approval of the Seller, such approval not to be unreasonably withheld. The place of lightering shall be deemed the Berth for the purposes of Sections 15 and 16 and all references therein to the Berth shall be construed accordingly.

15.6   **Floating Storage and Vessel-to-Vessel**

15.6.1   If the Discharge Terminal requires the Seller's Vessel to be discharged to a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer, this shall be subject to the Seller's Vessel and/or terminal marine assurance procedures. The Seller may, on any reasonable grounds and without liability, refuse the use of such floating storage facility or other Vessel for the purpose of discharging its nominated Vessel.

15.6.2   In the event of discharging to a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer being required by the Discharge Terminal in accordance with Section 15.6.1, the cost of such discharging shall be for the Buyer's account. Any additional costs in excess of those provided for in Section 16 (including but not limited to additional steaming and/or waiting time) shall be for the Buyer's account.

15.6.3   In the event of discharging to a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer being required by the Discharge Terminal in accordance with Section 15.6.1, all time expended in connection with such discharging shall count as running hours for the purposes of calculating liability for demurrage under the provisions of Section 16.

15.6.4   Where the Discharge Terminal has required discharging to a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer in accordance with Section 15.6.1, the Buyer shall notify the place of discharging to the Seller which shall be subject to approval of the Seller, such approval not to be unreasonably withheld. The place of discharging shall be deemed the Berth for the purposes of Sections 15 and 16 and all references therein to the Berth shall be construed accordingly.

15.6.5   The Seller and the Buyer may mutually agree that delivery is made by discharging to a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer.

15.7   **Lightering, Floating Storage and Vessel-to-Vessel Approval**

15.7.1   Any lighter, floating storage facility or Vessel involved in lightering, discharging to floating storage or Vessel-to-Vessel transfer operation, as applicable, must be acceptable to both the Seller and the Buyer and remain acceptable throughout such operation under the parties' respective marine assurance requirements.

15.7.2   The provider of any lightering, discharging to floating storage or Vessel-to-Vessel transfer services must be acceptable to both the Seller and the Buyer.

15.8   **Lightering, Floating Storage and Vessel-to-Vessel Procedures**

Any lightering, discharging to floating storage, or Vessel-to-Vessel transfer operations shall be carried out in accordance with the procedures set out in the ICS/OCIMF Ship-to-Ship transfer guides and MARPOL Annex I as amended by Resolution MEPC.186 (59), Chapter

8: Prevention of Pollution during Transfer of Oil Cargo between Oil Tankers at Sea, Regulations 40, 41, 42 for the transfer of Crude Oil and Petroleum Products or any modifications thereto.

15.9   **Imposts, fees, charges and dues at the Discharge Terminal**

All imposts, fees, charges (including pilotage, mooring and towage expenses) and dues (including quay dues) in respect of the Vessel (not the Crude Oil or Product) incurred at the Discharge Terminal shall be for the Buyer's account, except for those specified in Worldscale as being for the Vessel owners' account.

## Section 16 - Time allowed, delays and demurrage

16.1   **Time allowed**

The time allowed to the Buyer for the discharge of the quantity of the Crude Oil or Product deliverable by each Vessel hereunder shall be:

16.1.1   in the case of discharge of a Full Cargo Lot:

(a)   in the case of Vessels of 15,000 tons summer deadweight or less, 24 running hours; or

(b)   in all other cases, 36 running hours; and

16.1.2   in the case of discharge of a Part Cargo Lot, that proportion of 24 or 36 running hours, as the case may be, which the quantity of the Crude Oil or Product in the Part Cargo Lot, plus 5 per cent, bears to the total quantity of Crude Oil or Product loaded on the Vessel at the Loading Terminal(s);

all days and holidays shall be included unless discharging on the day or holiday in question is prohibited by law or regulation at the Discharge Terminal.

16.2   **Running hours**

16.2.1   Subject as otherwise provided in this Section 16.2 or elsewhere in the Special Provisions of the Agreement, running hours shall commence, Berth or no Berth, 6 hours after NOR is tendered or on commencement of discharge, whichever is the earlier. For the purposes of calculating running hours, which shall include any time spent lightering or loading from a floating storage facility or Vessel-to-Vessel transfer, discharge shall be deemed to be completed upon disconnection of discharging hoses.

16.2.2   Any delay arising out of or in connection with any of the following situations shall not be counted or included in calculating the time taken by the Buyer to discharge the Crude Oil or Product or the time in respect of which the Buyer is liable for demurrage (whether or not the Vessel is already on demurrage):

(a)   awaiting free pratique, tugs, tides, pilot or daylight;

(b)   inward passage until the Vessel is securely moored at the Berth and its gangway, if it is to be used, is in place;

(c)   preparing for and handling or shifting of ballast, bilges, slops or other substances or bunkering unless concurrent with cargo operations;

(d)     restrictions imposed by the Vessel's owner, charterer or master of the Vessel;

(e)     any breakdown of the Vessel's equipment or failure to comply with the requirements of the Discharge Terminal with respect to equipment aboard or any other matter causing delay or restriction to discharge operations;

(f)     time spent complying with any of the regulations and other requirements referred to in Section 14.7;

(g)     any other delay attributable to the Vessel, the Seller or agents of the Seller;

(h)     any onboard strike by members of the crew.

16.2.3   Notwithstanding the provisions of Section 65 below, any delay in discharge of the Crude Oil or Product by reason of a strike, labour dispute or lock out of any shoreside workmen essential to the discharge shall count as one half laytime or, if the Vessel is on demurrage, at one half of the demurrage rate provided always that the cause of the delay was not within the reasonable control of the Buyer.

16.2.4   In no event shall the Buyer be liable for demurrage unless the fully documented demurrage claim has been received by the Buyer in writing within 90 days of the date of disconnection of discharging hoses. If the Seller fails to provide such documented claim within the aforesaid limit, then any liability of the Buyer for demurrage shall be extinguished.

16.3   **Delays**

16.3.1   If the Crude Oil or Product is not discharged within the time allowed in accordance with Section 16, the Buyer shall pay to the Seller demurrage, in the same currency as is prescribed for payment of the Crude Oil or Product delivered under the Agreement, in respect of the excess time at the appropriate rate per day (or pro rata for part of a day) as hereinafter specified, always provided that, if by reason of her own deficiencies the Vessel cannot maintain an average pumping rate as specified in Section 14.9 from the time of commencing pumping, any additional time used solely by reason of such deficiencies shall be deducted in calculating the time (if any) in respect of which the Buyer is liable for demurrage as herein provided. The Buyer's liability as to Laytime and demurrage shall be absolute and not subject to qualification by the provisions of Section 65 but in the event of delay directly attributable to:

(a)     adverse weather or sea state conditions; or

(b)     the breakdown or failure of equipment, plant or machinery at the Discharge Terminal (not resulting from want of due diligence by the Buyer and always provided that the Vessel is not already on demurrage)

the rate of demurrage shall be reduced by one half for the period of such delay.

16.3.2   The appropriate rate of demurrage shall be:

(a)     the rate, if any, specified in the Special Provisions; or

(b)     the applicable charterparty rate; or

(c)     where there is no charterparty rate or, in the Buyer's sole opinion the charterparty rate established pursuant to Section 16.3.2(b) is not

representative of the market rate, the market rate current on the date running hours commence as aforesaid for a Vessel of the size and type used for a single voyage charter from the Loading Terminal to the Discharge Terminal. If the parties fail to agree within 30 days upon such rate, then at the instance of either party the question shall be referred to and determined by The London Tanker Brokers Panel Ltd. (or its successors in title), whose decision thereon shall be final and binding and whose costs shall be paid for by the applicant.

**16.4** **Time allowed and damages for delay under CIF and CFR Indicative Discharge Date contracts**

16.4.1 Should the Vessel tender NOR at the Discharge Terminal within the Indicative Discharge Date given by the Seller then the time allowed and damages for delay shall be computed in all respects in accordance with Section 16.3.

16.4.2 Should the Vessel tender NOR at the Discharge Terminal prior to the Indicative Discharge Date given by the Seller, then notwithstanding Section 16.3 running hours shall commence at 0001 hours on the earliest Indicative Discharge Date or on commencement of discharge, whichever is the earlier.

16.4.3 Should the Vessel tender NOR at the Discharge Terminal after the Indicative Discharge Date given by the Seller, then Section 16.2.1 shall be modified to the extent that running hours shall commence Berth or no Berth 36 (thirty six) hours after NOR is given or on commencement of discharge, whichever is the earlier. Save as aforesaid, Section 16.3 shall apply in full.

**16.5** **Crude Oil washing**

Cargo stripping up to a maximum of 3 (three) hours and any discharging time used for Crude Oil washing in excess of any time used to comply with MARPOL regulations shall count as Laytime, or if the Vessel is on demurrage, as demurrage.

**16.6** **Additional provisions for offshore-loaded North Sea/Atlantic Crude Oil**

Applicability

16.6.1 This Section 16.6 shall apply only in the case of deliveries of Crude Oil originating from oil fields in the United Kingdom and/or Norwegian Continental Shelf and being shipped by a Vessel dedicated to or chartered for the transportation of Crude Oil from the facilities thereat.

Changes to nominations

16.6.2 The Seller will promptly advise the Buyer of any changes in the nomination arising from production changes, weather, operational reasons or any matter beyond the Seller's reasonable influence. Any modifications in the quantity of Crude Oil, date ranges or final loading date due to changed nominations shall be deemed to be accepted by the Buyer and any modified quantity, date ranges or final loading date shall replace the quantity and/or date ranges and/or final loading date respectively as nominated.

Priority of Vessels

16.6.3 The Seller may, by written notice to the Buyer, require that the Vessel shall have priority to discharge at the Discharge Terminal ahead of other vessels whether or not they have commenced discharging, except for vessels carrying Crude Oil

which have been loaded at a facility at or adjacent to a Crude Oil production platform service at an oil field on or partly on the United Kingdom and/or Norwegian Continental Shelf. If such requirement arises, the Buyer shall procure that the Vessel may proceed without waiting directly to a Berth provided by the Buyer in accordance with Section 15 and commence discharging immediately on arrival thereat.

16.6.4 The Seller shall indemnify the Buyer against its liability for substantiated unavoidable extra port dues and demurrage incurred as a direct result of such priority being given to the Seller's Vessel by vessels which have given a valid NOR, provided that the indemnity against liability for demurrage shall in respect of each displaced vessel be limited to the equivalent of the amount of time actually used by the Seller's Vessel to discharge the Crude Oil.

16.6.5 If the time allowed to the Buyer in accordance with Section 16.1 has expired, whether the Crude Oil has been fully discharged or not, the Seller may, at its sole discretion, forthwith order the Vessel to cease discharging and leave the Discharge Terminal. If the Seller exercises such option, the Seller's invoice shall be based on the net outturn quantity discharged ascertained either in accordance with good standard practice at such Discharge Terminal or, if such discharge was attended by an independent inspector, as determined by such independent inspector, whose determinations shall, except in cases of manifest error or fraud, be used for invoicing purposes but without prejudice to the rights of either party to make any claim. In such event, notwithstanding the provisions of Section 9, all charges in respect of such independent inspection shall be shared equally between the parties and the inspectors report shall be made available to both parties. The risk and property in the Crude Oil remaining on board the Vessel shall pass back to the Seller immediately upon completion of such partial discharge.

Deadfreight

16.6.6 Any deadfreight incurred by the Seller as a direct result of meeting the requirements of the Discharge Terminal nominated by the Buyer shall be for the Buyer's account. Any deadfreight incurred solely for the Seller's purpose shall be for the Seller's account.

Demurrage rate

16.6.7 Notwithstanding the provisions of Section 16.3, the applicable rate of demurrage shall be the daily hire rate specified in the contract of affreightment current from time to time in respect of transportation of the grade of Crude Oil in question.

| PART THREE |
| In respect of Ex Ship deliveries |

## Section 17 - Delivery

17.1    Subject to the provisions of the Agreement, the Crude Oil or Product shall be delivered by the Seller to the Buyer, in bulk Ex Ship at the agreed Discharge Terminal(s).  Except as expressly modified by the Agreement or by the Special Provisions, references to Ex Ship herein shall also refer to DAP, as defined in the Incoterms® 2010.

## Section 18  - Measurement and sampling, independent inspection and certification

18.1    **Measurement and sampling**

18.1.1    Measurement of the quantities and the taking of samples and analysis thereof for the purposes of determining the compliance of the Crude Oil or Product with the quality and quantity provisions of the Special Provisions shall be carried out at the Discharge Terminal at the time of discharge by an independent inspector jointly agreed upon by the Buyer and Seller in accordance with the good standard practice at the Discharge Terminal at the time of discharge. All charges of the independent inspector shall be shared equally between the parties and the inspector's certificates of quality and quantity shall be made available to both parties. The Buyer shall use reasonable endeavours to enable the independent inspector to have full access to the facilities at the Discharge Terminal necessary to enable him to perform his duties.

18.1.2    Should the parties fail to agree upon an independent inspector, or should the Discharge Terminal refuse access to any independent inspector appointed by the parties then the measurement and sampling shall be carried out by the Discharge Terminal's own qualified inspector(s) in accordance with the good standard practice at the Discharge Terminal at the time of discharge. In the event that the Discharge Terminal does not refuse access but the parties fail to agree upon the appointment of an independent inspector, if required by the Seller the Buyer shall allow the Seller or its appointed representative to witness, but not to undertake, the measurement of quantity and the drawing of any samples and the laboratory analysis of those samples. Full details of the Seller's representative shall be notified in writing to the Buyer in advance. All charges relating to the Seller's representative shall be solely for the Seller's account and shall be considered solely as a service to the Seller.

18.2    **Certificates of Quantity and Quality**

18.2.1    Provided always the certificates of quantity and quality (or such other equivalent documents as may be issued at the Discharge Terminal) of the Crude Oil or Product comprising the cargo are issued in accordance with Sections 18.1 and 18.2.2 then they shall, except in cases of manifest error or fraud, be used for invoicing purposes and the Buyer shall be obliged to make payment in full in accordance with Section 63 but without prejudice to the rights of either party to make any claim pursuant to Section 59.

18.2.2    Any certificate of quantity and quality issued by an independent inspector pursuant to Section 18.1.1 shall record that the independent inspector did witness, or himself undertook, the taking of samples, the analysis of such samples and the

measurement of quantity. For the avoidance of doubt, the parties agree that a certificate of quantity and quality countersigned by an independent inspector confirming these matters shall be a certificate of quantity and quality for the purposes of Section 18.2.1 above.

18.2.3   In the event that the independent inspector did not undertake or did not witness the measurement of quantity, the taking of samples or the analysis of such samples then the certificate of quantity and quality issued or countersigned by him must expressly reflect this and it will not, in these circumstances, be a certificate of quantity and quality for the purposes of Section 18.2.1 but merely evidence of those matters undertaken or witnessed by the inspector.

## Section 19 - Risk and property

19.1   The risk and property in the Crude Oil or Product delivered under the Agreement shall pass to the Buyer as the Crude Oil or Product passes the Vessel's permanent hose connection at the Discharge Terminal.

## Section 20 - Laydays

20.1   The Laydays shall be the day or range of days in which the Seller's nominated Vessel must tender NOR at the Discharge Terminal pursuant to Section 22.

20.2   The Laydays shall be either:

20.2.1   as specified in the Special Provisions; or

20.2.2   established in accordance with the procedure(s) specified in the Special Provisions.

## Section 21 - Nomination of Vessels, etc.

21.1   **Full Cargo Lots and Part Cargo Lots**

Unless otherwise provided in the Special Provisions, delivery hereunder shall be given and taken in Full Cargo Lots or Part Cargo Lots at the Seller's option.

21.2   **Nomination of Vessels**

21.2.1   The Seller shall give to the Buyer a notice of nomination either (1) on or about the time the Agreement is entered into between the parties, or not later than either (2) 5 days for Products or (3) 8 days for Crude Oil prior to the first day of the Laydays, whichever is the later. Such nomination shall specify:

(a)   the name of the Vessel, date built, summer deadweight and cargo tank capacity excluding slop tanks and flag;

(b)   the grade and approximate quantity to be loaded (or the bill of lading quantity, if known);

(c)   the ETA at the Discharge Terminal;

(d)   the length of the Vessel and its estimated (or actual, if known) sailing draught on completion of loading;

(e)   the Vessel/charterer's agent at the Discharge Terminal where known;

(f)     details, where known, of any other cargo on board or to be laden on board if delivery is of a part cargo; and

(g)     in the case of any sales afloat whereby the Crude Oil or Product has been or will be laden onboard (which shall include storage, and any intervening Vessel-to-Vessel transfer, as well as by way of carriage) more than one Vessel the Seller shall provide the name of each such Vessel, date built and flag

The Seller undertakes to inform the Buyer of any changes to the ETA advised pursuant to Section (c) as soon as practicable after receipt thereof from its supplier or the Vessel's owner or agent.

21.2.2   Notwithstanding Section 21.2.1, if the nomination is received by the Buyer after the nomination deadline in Section 21.2.1 and is accepted by the Buyer, it shall be effective. In the event that the Agreement is entered into after the deadline but prior to the first day of the Laydays then the nomination must be received by the Buyer as soon as practically possible.

## 21.3   **Buyer's nomination**

The Buyer shall, within 1 Business Day or such other period as may be specified in the Special Provisions after receipt of the Seller's nomination made pursuant to Section 21.2, notify the Seller of:

21.3.1   the final Discharge Terminal, if not already specified in the Special Provisions, when the Seller's approval thereto shall be required in writing within 1 Business Day thereafter, such approval not to be unreasonably withheld. No change to the final Discharge Terminal so nominated or specified shall be made without the Seller's prior written acceptance which shall not be unreasonably withheld and subject always to the provisions of Section 21.9; and

21.3.2   if the Special Provisions provide a range within which a Discharge Terminal or ports may be nominated, the Seller's approval to each port shall be required in writing within 1 Business Day after any valid nomination, such approval not to be unreasonably withheld.

All costs (including demurrage) arising out of any failure by the Buyer to comply with the foregoing shall be for the Buyer's account.

## 21.4   **Substitution of Vessels**

In respect of any Vessel named in the nomination, the Seller may or, if necessary to perform its obligations under the Agreement, must substitute therefor another Vessel provided always that:

21.4.1   the size of the substitute Vessel and the quantity to be loaded shall not without the prior written consent of the Buyer differ materially from the size of the Vessel previously named and the quantity specified in the nomination; and

21.4.2   the Seller shall give to the Buyer notice in writing of the name of the substitute Vessel not less than 3 days before the ETA of the substitute Vessel or the ETA of the Vessel originally nominated, whichever is the earlier.

21.5    **Rejection of nominations and Vessels**

21.5.1   The Buyer shall give notice accepting or rejecting any Vessel nominated by the Seller within 1 Business Day of receipt of the Seller's nomination.

21.5.2   Notwithstanding anything to the contrary express or implied elsewhere, the Buyer shall have the right (which right may only be exercised prior to the passing of property hereunder):

(a)     to reject any nomination made by the Seller pursuant to Sections 21.2 or 21.4 on any reasonable grounds;

(b)     to refuse, on any reasonable grounds, to accept for discharge any Vessel named pursuant to Sections 21.2 or 21.4; and

(c)     to reject the Vessel, notwithstanding any prior acceptance of a Vessel (whether named in the Special Provisions or nominated or substituted pursuant to Sections 21.2 or 21.4), on any reasonable grounds if such Vessel is involved in any incident or more recent information regarding such Vessel becomes available to the Buyer at any time after such prior acceptance.

21.5.3   Without derogating from any other reasonable grounds that may be available to the Buyer, reasonable grounds shall include if the Vessel is determined by the Buyer to be unacceptable under the Buyer's documented marine assurance requirements.

21.6    **Vessel requirements**

21.6.1   The Vessel shall comply with:

(a)     the Applicable Law(s) at the Discharge Terminal (including any alternative or substituted Discharge Terminal under Section 21.9); and

(b)     the applicable requirements set out in Schedule E.

21.6.2   Notwithstanding anything to the contrary express or implied in Section 22 and Section 23 or in this Section 21.6 if any Vessel nominated by the Seller does not comply with the foregoing provisions or any of them, the Buyer may:

(a)     reject the Vessel when nominated or subsequently; and

(b)     refuse to berth or discharge the Vessel in question.

21.7    **Consequences of rejection**

In the event of a rejection or a delay of the Vessel or other restriction suffered in respect of the Vessel by virtue of the application of any regulations or other applicable requirements of this Section 21 and/or of Schedule E:

21.7.1   the Buyer shall not be liable for the consequences of rejection or delay of the Vessel or other restriction suffered in respect of the Vessel, including demurrage;

21.7.2   the Seller shall be liable for any costs or damages incurred by the Buyer arising out of any such rejection of or delay to the Vessel at the Discharge Terminal; and

21.7.3   the Seller's obligations under the Agreement to nominate a suitable Vessel and to ensure that it tenders NOR at the Discharge Terminal in accordance with Section 22 shall be unaffected.

**21.8   Pumping**

Seller warrants that the Vessel will discharge her full cargo within 24 hours (or pro-rata in the case of a part cargo) or shall maintain an average minimum discharge pressure of 100PSI at the Vessel manifold throughout the bulk discharge operation, provided shore facilities permit discharge within such time or at such pressure. Time lost as a result of a Vessel being unable to discharge the Crude Oil or Product as stated above shall not count as Laytime or time on demurrage.

**21.9   Alternative or Range of Discharge Terminal(s)**

Where the Buyer exercises any Discharge Terminal options in accordance with the Special Provisions or Section 21.3.1 and such options are also available to the Seller under the terms of the relevant charterparty:

21.9.1   the purchase price stated in the Special Provisions shall be adjusted by the freight differential calculated in accordance with such charterparty terms or, if the Vessel has not been voyage chartered, such rate as shall be mutually agreed between the parties in respect of such Discharge Terminal, provided always that any delays arising out of such failure to agree shall be for the Buyer's account; and

21.9.2   the Buyer shall be liable for any additional costs incurred by the Seller, including deviation costs and costs in respect of any additional bunker consumption.

**21.10   Prompt delivery**

If the date of the Agreement is later than any of the dates for notification specified in the Special Provisions, Section 20 or this Section 21, then both parties shall make best efforts to complete as soon as practically possible any outstanding time limited requirements, notifications, nominations and procedures which would have preceded the date of the Agreement aforesaid.

**Section 22 - Arrival of Vessel, Berth, discharge, etc.**

**22.1   Arrival of Vessel**

22.1.1   The Seller shall arrange for its Vessel to report to the Buyer or its representative at the Discharge Terminal each of 72, 48 and 24 hours prior to its arrival and otherwise in accordance with the standard reporting procedure applicable from time to time at the Discharge Terminal.

22.1.2   The Seller shall ensure that by no later than 2359 hours (local time) on the last day of the Laydays and upon arrival of the Vessel at the Discharge Terminal or Berth, NOR has been tendered.

**22.2   Discharge**

22.2.1   Unless otherwise agreed in writing by the Seller, the Seller shall not be under any obligation to commence discharge hereunder prior to 0600 hours (local time) on the first day of the Laydays.

22.2.2   After tender of NOR pursuant to Section 22.1.2 the Seller, having regard to the requirements of the Discharge Terminal, Discharge Terminal procedures and the

time when the Vessel has complied with the provisions of Section 22.1, shall commence and complete discharge as soon as reasonably practicable.

22.3 **Berth**

22.3.1 For the discharge of the Crude Oil or Product the Buyer shall provide or cause to be provided free of charge to the Seller (subject to the provisions of Section 62.5) a Berth to be indicated by the Buyer or its representative at which the Vessel can when fully laden safely reach and leave and where it can always lie Safely Afloat.

22.3.2 Notwithstanding the Buyer's obligations under Section 22.3.1, where the Buyer has purchased the Crude Oil or Product on board a named Vessel, the Seller represents to the Buyer and warrants that the named vessel can safely berth and discharge the contractual quantity of Crude Oil or Product at the Discharge Terminal regardless of whether the contractual quantity is a Full Cargo Lot or Part Cargo Lot and irrespective of the port scheduling of the Vessel. Failure to comply with this term shall entitle the Buyer to refuse to berth the named Vessel. Any costs incurred by the Seller in providing a substitute Vessel, or lightering and/or Vessel-to-Vessel transfer of the Crude Oil or Product at the Discharge Terminal including demurrage shall be for the account of the Seller.

22.4 **Shifting**

The Buyer shall have the right to shift the Vessel from one Berth to another. All costs, including but not limited to damages for delay, shall be for the Seller's account if such shifting is for the Seller's purposes and shall otherwise be for the Buyer's account.

22.5 **Lightering**

22.5.1 If the Discharge Terminal requires the Seller's Vessel to be discharged to a lighter, this shall be subject to the Seller's Vessel and/or terminal marine assurance procedures. The Seller may, on any reasonable grounds and without liability, refuse the use of such lighter for the purpose of discharging its nominated Vessel.

22.5.2 Either party may request to discharge the Vessel to lighters with such request subject to acceptance by the non-requesting party, such acceptance not to be unreasonably withheld.

22.5.3 In the event of lightering required by the Discharge Terminal in accordance with Section 22.5.1 or requested by the Buyer in accordance with Section 22.5.2, the cost of such lightering shall be for the Buyer's account. Any additional costs in excess of those provided for in Section 23 (including but not limited to additional steaming and/or waiting time) shall be for the Buyer's account.

22.5.4 In the event of lightering requested by the Seller in accordance with Section 22.5.2, the cost of such lightering shall be for the Seller's account. Any additional costs in excess of those provided for in Section 23 (including but not limited to additional steaming and/or waiting time) shall be for the Seller's account.

22.5.5 All time expended in connection with any such lightering shall count as running hours for the purposes of calculating liability for demurrage under the provisions of Section 23.

22.5.6 The Buyer shall notify the place of lightering to the Seller which shall be subject to approval of the Seller, such approval not to be unreasonably withheld. The place of

lightering shall be deemed the Berth for the purposes of Sections 22 and 23 and all references therein to the Berth shall be construed accordingly.

22.6    **Floating Storage and Vessel-to-Vessel:**

22.6.1    If the Discharge Terminal requires the Seller's Vessel to be discharged to a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer, this shall be subject to the Seller's Vessel and/or terminal marine assurance procedures. The Seller may, on any reasonable grounds and without liability, refuse the use of such floating storage facility or other Vessel for the purpose of discharging its nominated Vessel.

22.6.2    In the event of discharging to a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer being required by the Discharge Terminal in accordance with Section 22.6.1, the cost of such discharging shall be for the Buyer's account. Any additional costs in excess of those provided for in Section 23 (including but not limited to additional steaming and/or waiting time) shall be for the Buyer's account.

22.6.3    In the event of discharging to a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer being required by the Discharge Terminal in accordance with Section 22.6.1, all time expended in connection with such discharging shall count as running hours for the purposes of calculating the liability for demurrage under the provisions of Section 23.

22.6.4    Where the Discharge Terminal has required discharging to a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer in accordance with Section 22.6.1, the Buyer shall notify the place of discharging to the Seller which shall be subject to approval of the Seller, such approval not to be unreasonably withheld. The place of discharging shall be deemed the Berth for the purposes of Sections 22 and 23 and all references therein to the Berth shall be construed accordingly.

22.6.5    The Seller and the Buyer may mutually agree that delivery is made by discharging to a floating storage facility or other Vessel by means of Vessel-to-Vessel transfer.

22.7    **Lightering, Floating Storage and Vessel-to-Vessel Approval**

22.7.1    Any lighter, floating storage facility or Vessel involved in lightering, discharging to floating storage or Vessel-to-Vessel transfer operation, as applicable, must be acceptable to both the Seller and the Buyer and remain acceptable throughout such operation under the parties' respective marine assurance requirements.

22.7.2    The provider of any lightering, discharging to floating storage or Vessel-to-Vessel transfer services must be acceptable to both the Seller and the Buyer.

22.8    **Lightering, Floating Storage and Vessel-to-Vessel Procedures**

Any lightering, discharging to floating storage, or Vessel-to-Vessel transfer operations shall be carried out in accordance with the procedures set out in the ICS/OCIMF Ship-to-Ship transfer guides and MARPOL Annex I as amended by Resolution MEPC.186 (59), Chapter 8: Prevention of Pollution during Transfer of Oil Cargo between Oil Tankers at Sea, Regulations 40, 41, 42 for the transfer of Crude Oil and Petroleum Products and any modifications thereto.

22.9   **Imposts, fees, charges and dues at the Discharge Terminal**

All imposts, fees, charges (including pilotage, mooring and towage expenses) and dues (including quay dues) in respect of the Vessel (not the Crude Oil or Product) incurred at the Discharge Terminal shall be for the Seller's account, other than those that arise in respect of customs and excise entry which shall be for the Buyer's account.

**Section 23 - Time allowed, delays and demurrage**

23.1   **Time allowed**

The time allowed to the Buyer for the discharge of the quantity of the Crude Oil or Product deliverable by each Vessel hereunder shall be:

23.1.1   in the case of discharge of a Full Cargo Lot:

(a)   in the case of Vessels of 15,000 tons summer deadweight or less, 24 running hours; or

(b)   in all other cases, 36 running hours; and

23.1.2   in the case of discharge of a Part Cargo Lot, that proportion of 24 or 36 running hours, as the case may be, which the quantity of the Crude Oil or Product in the cargo, plus 5 per cent, bears to the total quantity of Crude Oil or Product loaded on the Vessel at the Loading Terminal(s);

all days and holidays included unless discharging on the day or holiday in question is prohibited by law or regulation at the Discharge Terminal.

23.2   **Running hours**

23.2.1   Subject as otherwise provided in this Section 23.2 or elsewhere in the Special Provisions of the Agreement, running hours shall commence Berth or no Berth 6 hours after NOR is tendered or on commencement of discharge, whichever is the earlier. For the purposes of calculating running hours, which shall include any time spent lightering or loading from a floating storage facility or Vessel-to-Vessel transfer, discharge shall be deemed to be completed upon disconnection of discharging hoses.

23.2.2   If NOR is given for the Vessel before the first day of the Laydays, running hours shall commence at 0001 hours on the first day of the Laydays or on commencement of discharge, whichever is the earlier. If NOR is given for the Vessel after the last day of the Laydays and is accepted for discharge by the Buyer in its sole and absolute discretion, then, without prejudice to any of the Buyer's other rights, running hours shall commence Berth or no Berth 36 (thirty six) hours after NOR is given or on commencement of discharge, whichever is the earlier.

23.2.3   Any delay arising out of or in connection with any of the following situations shall not be counted or included in calculating the time taken by the Buyer to discharge the Crude Oil or Product or the time in respect of which the Buyer is liable for demurrage (whether or not the Vessel is already on demurrage):

(a)   awaiting free pratique, tugs, tides, pilot or daylight;

(b)   inward passage until the Vessel is securely moored at the Berth and its gangway, if it is to be used, is in place;

(c)   preparing for and handling or shifting of ballast, bilges, slops or other substances or bunkering unless concurrent with cargo operations;

(d)   restrictions imposed by the Vessel's owner, charterer or master of the Vessel;

(e)   any breakdown of the Vessel's equipment or failure to comply with the requirements of the Discharge Terminal with respect to equipment aboard or any other matter causing delay or restriction to discharge operations;

(f)   time spent complying with any of the regulations and other requirements referred to in Section 21.6;

(g)   any other delay attributable to the Vessel, the Seller or agents of the Seller;

(h)   any onboard strike by members of the crew.

23.2.4   Notwithstanding the provisions of Section 65 below, any delay in discharge of the Crude Oil or Product by reason of a strike, labour dispute or lock out of any shoreside workmen essential to discharge shall count as one half laytime or, if the Vessel is on demurrage, at one half of the demurrage rate provided always that the cause of the delay was not within the reasonable control of the Buyer.

23.2.5   In no event shall the Buyer be liable for demurrage unless the fully documented demurrage claim has been received by the Buyer in writing within 90 days of the date of disconnection of discharging hoses. If the Seller fails to provide such documented claim within the aforesaid limit, then any liability of the Buyer for demurrage shall be extinguished.

23.3   **Delays**

23.3.1   If the Crude Oil or Product is not discharged within the time allowed in accordance with Section 23.1, the Buyer shall pay to the Seller demurrage, in the same currency as is prescribed for payment of the Crude Oil or Product delivered under the Agreement, in respect of the excess time at the appropriate rate per day (or pro rata for part of a day) as hereinafter specified, always provided that, if by reason of her own deficiencies the Vessel cannot maintain an average pumping rate as specified in Section 21.8 from the time of commencing pumping, any additional time used solely by reason of such deficiencies shall be deducted in calculating the time (if any) in respect of which the Buyer is liable for demurrage as herein provided. The Buyer's liability as to Laytime and demurrage shall be absolute and not subject to qualification by the provisions of Section 65 but in the event of delay directly attributable to:

(a)   adverse weather or sea state conditions; or

(b)   the breakdown or failure of equipment, plant or machinery at the Discharge Terminal (not resulting from want of due diligence by the Buyer and always provided that the Vessel is not already on demurrage);

the rate of demurrage shall be reduced by one half for the period of such delay.

23.3.2   The appropriate rate of demurrage shall be either:

(a)   the rate, if any, specified in the Special Provisions; or

(b)   the applicable charterparty rate; or

(c)   where there is no charterparty rate or, in the Buyer's sole opinion the charterparty rate established pursuant to Section (b) is not representative of the market rate, the market rate current on the date running hours commence as aforesaid for a Vessel of the size and type used for a single voyage charter from the Loading Terminal to the Discharge Terminal. If the parties fail to agree within 30 days upon such rate, then at the instance of either party the question shall be referred to and determined by The London Tanker Brokers Panel Ltd. (or its successors in title), whose decision thereon shall be final and binding and whose costs shall be paid for by the applicant.

## 23.4   Crude Oil washing

Cargo stripping up to a maximum of 3 (three) hours and any discharging time used for Crude Oil washing in excess of any time used to comply with MARPOL regulations shall count against Laytime, or if the Vessel is on demurrage, for demurrage.

## 23.5   Additional provisions for offshore-loaded North Sea/Atlantic Crude Oil

Applicability

23.5.1   This Section 23.5 shall apply only in the case of deliveries of Crude Oil originating from oil fields in the United Kingdom and/or Norwegian Continental Shelf and being shipped by a Vessel dedicated to or chartered for the transportation of Crude Oil from the facilities thereat.

Changes to nominations

23.5.2   The Seller will promptly advise the Buyer of any changes in the nomination arising from production changes, weather, operational reasons or any matter beyond the Seller's reasonable influence.  Any modifications in the quantity of Crude Oil, date ranges or final loading date due to changed nominations shall be deemed to be accepted by the Buyer and any modified quantity, date ranges or final loading date shall replace the quantity and/or date ranges and/or final loading date respectively as nominated.

Priority of Vessels

23.5.3   The Seller may, by written notice to the Buyer, require that the Vessel shall have priority to discharge at the Discharge Terminal ahead of other Vessels whether or not they have commenced discharging, except for vessels carrying Crude Oil which has been loaded at a facility at or adjacent to a Crude Oil production platform serving an oil field on or partly on the United Kingdom and/or Norwegian Continental Shelf.  If such requirement arises, the Buyer shall procure that the Vessel may proceed without waiting directly to a Berth provided by the Buyer in accordance with Section 22 and commence discharging immediately on arrival thereat.

23.5.4   The Seller shall indemnify the Buyer against its liability for substantiated unavoidable extra port dues and demurrage incurred as a direct result of such priority being given to the Seller's Vessel by vessels which have given a valid NOR provided that the indemnity against liability for demurrage shall in respect of each displaced vessel be limited to the equivalent of the amount of time actually used by the Seller's Vessel to discharge the Crude Oil.

23.5.5   If the time allowed to the Buyer in accordance with Section 23.1 has expired, whether the Crude Oil has been fully discharged or not, the Seller may, at its sole discretion, forthwith order the Vessel to cease discharging and leave the Discharge Terminal.  If the Seller exercises such option, the Seller's invoice shall be based on the net outturn quantity discharged ascertained either in accordance with good standard practice at such Discharge Terminal or, if such discharge was attended by an independent inspector, as determined by such independent inspector, whose determinations shall, except in cases of manifest error or fraud, be used for invoicing purposes but without prejudice to the rights of either party to make any claim.  In such event, notwithstanding the provisions of Section 18, all charges in respect of such independent inspection shall be shared equally between the parties and the inspector's report shall be made available to both parties.

Deadfreight

23.5.6   Any deadfreight incurred by the Seller as a direct result of meeting the requirements of the Discharge Terminal nominated by the Buyer shall be for the Buyer's account.  Any deadfreight incurred solely for the Seller's purpose shall be for the Seller's account.

Demurrage rate

23.5.7   Notwithstanding the provisions of Section 23.3, the applicable rate of demurrage shall be the daily hire rate specified in the contract of affreightment current from time to time in respect of transportation of the grade of Crude Oil in question.

| PART FOUR |
| In respect of deliveries by Barge (FOB, CFR, CIF, Ex Ship) |

**Section 24 - Applicability**

24.1   The provisions of Part One, Part Two and Part Three shall apply, where appropriate, except as specified elsewhere in this Part Four.  In particular, but without limitation, the provisions of Sections 6.6, 6.7, 15.4, 15.5, 22.4 and 22.5 of Parts One, Two and Three shall apply to the loading and/or discharge of Barges, where applicable, and shall be deemed to include any Barge-to-Barge transfers.

24.2   The provisions of Part Seven shall likewise apply, where appropriate, to this Part Four, save that where Section 63.14 applies, or where the price is otherwise to be paid by means of an irrevocable documentary letter of credit or supported by a stand-by letter of credit, then notwithstanding anything to the contrary in Section 63.14.3, such letter of credit shall be advised or confirmed no later than 1600 hours (London time) 5 Working Days before:

24.2.1   ETA at Loading Terminal for FOB/CIF/CFR; or

24.2.2   ETA at Discharge Terminal for Ex Ship.

**Section 25 – Nominations in respect of FOB deliveries**

25.1   **The Buyer's nomination**

25.1.1   Each Barge which is to load the Crude Oil or Product hereunder shall be nominated in writing by the Buyer to the Seller. The nomination shall be received by the Seller no later than:

(a)   3 Working Days prior to the ETA at the Loading Terminal (in the case of cargoes of MTBE, ETBE, Toluene, Benzene, Styrene, Ethanol or Methanol products); or

(b)   2 Working Days prior to the ETA at the Loading Terminal (in all other cases);

such period to exclude any non-Working Day.

25.2   The nomination shall include:

25.2.1   the name of the Barge, its registration number;

25.2.2   the Barge's three previous cargoes;

25.2.3   actual quantity, narrowed to within any applicable minimum/maximum tolerances;

25.2.4   Crude Oil or Product to be loaded;

25.2.5   destination(s) of the Barge, including full details necessary to comply with the requirements of EMCS, and must include (without limitation) full details (name, address and excise licence number) of the relevant excise licence holder (authorised warehousekeeper) and the tax warehouse itself;

25.2.6   where the Crude Oil or Product has not been released for free circulation in the EU (i.e. has T1 status), the Buyer must provide sufficient information about the

Page 44

Crude Oil or Product's destination as to enable the Seller to comply with the EU Community Transit rules, including by the use of the New Computerised Transit System ("NCTS");

25.2.7   the ETA of the Barge at the Loading Terminal;

25.2.8   the Barge owner's name;

25.2.9   the Buyer's VAT number and country of such VAT registration; and

25.2.10 full documentary instructions.

25.3   Subject to Section 25.4, nominations received:

25.3.1   after 1500 hours CET Monday to Thursday;

25.3.2   after 1400 hours CET on Fridays;

25.3.3   after 1400 hours CET on a day preceding a day which is not a Working Day; or

25.3.4   on a non-Working Day;

shall be deemed to have been received at 0900 hours CET on the following Working Day.

25.4   Where applicable, nominations will be deemed not to have been received until the time and date when Credit Support required under the Agreement or by the Seller has been received and agreed by the Seller.

25.5   Nominations sent by fax shall not be effective unless the nomination clearly shows the time and date of the fax transmission.

25.6   Any amendment received to any of the information stipulated under Section 25.2 will be treated as a new nomination.

25.7   **The Seller's confirmation**

25.7.1   Where the Buyer's nomination is made in accordance with this Section 25, the Seller will confirm the Loading Terminal in a timely manner and this shall act as confirmation of the nomination if not already provided.

25.7.2   Where the Buyer's nomination is made in accordance with this Section 25, if no confirmation has been received from the Seller pursuant to this Section 25.7, Laytime will commence from 0001 hours on the ETA specified in Section 25.2.7 or expiry of the nomination notification period as specified in Section 25.1 whichever is later.

25.8   The provisions of Section 5.9 shall not apply to FOB deliveries under this Part Four.

## Section 26 - Nominations in respect of CFR, CIF and Ex Ship deliveries

26.1   **The Seller's nomination**

26.1.1   The nomination from the Seller shall be received by the Buyer no later than:

(a)   3 Working Days prior to the ETA at the Discharge Terminal (in the case of cargoes of MTBE, ETBE, Toluene, Benzene, Styrene, Ethanol or Methanol products); or

        (b)   2 Working Days prior to the ETA at the Discharge Terminal (in all other cases);

such period to exclude any non-Working Day.

26.2   The nomination shall include:

    26.2.1   the name of the Barge, its registration number;

    26.2.2   the Barge's three previous cargoes;

    26.2.3   actual quantity, narrowed to within any applicable minimum/maximum tolerances;

    26.2.4   Crude Oil or Product to be loaded;

    26.2.5   Loading Terminal;

    26.2.6   the ETA of the Barge at the Loading Terminal;

    26.2.7   destination(s) of the Barge, if known;

    26.2.8   the Barge owner's name and address;

    26.2.9   the ETA of the Barge at the Discharge Terminal.

26.3   Nominations received:

    26.3.1   after 1500 hours CET Monday to Thursday;

    26.3.2   after 1400 hours CET on Fridays;

    26.3.3   after 1400 hours CET on a day preceding a day which is not a Working Day; or

    26.3.4   on a non-Working Day;

shall be deemed to have been received at 0900 hours CET on the following Working Day.

26.4   Nominations sent by fax shall not be effective unless the nomination clearly shows the time and date of the fax transmission.

26.5   Any amendment received to any of the information stipulated under Section 26.2 will be treated as a new nomination.

26.6   **The Buyer's confirmation**

    26.6.1   Following receipt of the Seller's nomination made pursuant to this Section 26, the Buyer shall notify the Seller of:

        (a)   the Buyer's VAT number and country of such VAT registration;

        (b)   destination(s) of the Barge, including full details necessary to comply with the requirements of EMCS, and must include (without limitation) full details (name, address and excise licence number) of the relevant excise licence holder (authorised warehousekeeper) and the tax warehouse itself;

        (c)   where the Crude Oil or Product has not been released for free circulation in the EU (i.e. has T1 status), the Buyer must provide sufficient information about the Crude Oil or Product's destination as to enable the Seller to

comply with the EU Community Transit rules, including by the use of the NCTS;

(d) the Discharge Terminal, if not already specified in the Special Provisions; and

(e) full documentary instructions.

26.7 Where the Seller's nomination has been made in accordance with this Section 26 but no confirmation has been received from the Buyer pursuant to Section 26.6.1, Laytime will commence from 0001 hours on the ETA specified in Section 26.2.9 or expiry of the nomination notification period as specified in Section 26.1 whichever is later. The Buyer shall be liable for all costs resulting in any delays in loading the Crude Oil or Product hereunder due to failure by the Buyer to supply its confirmation pursuant to Section 26.6.1 in a timely manner, in addition to any claim for demurrage at the Discharge Terminal by the Seller.

26.8 No change to the Discharge Terminal nominated or specified pursuant to Section 26.6.1 above shall be effective without the Seller's prior written acceptance which shall not be unreasonably withheld and provided always that:

26.8.1 such alternative discharge port is allowable pursuant to the charterparty or Barge fixture;

26.8.2 the provisions of Sections 14.10 or 21.9 shall apply;

26.8.3 full written instructions regarding the particulars and destination of any bills of lading (if applicable) and/or such other customary loading terminal documentation which may be required (and, for the avoidance of doubt, the Buyer shall be liable for all costs resulting from any delays in loading Crude Oil or Product hereunder due to failure by the Buyer to supply such information in a timely manner); and

26.8.4 the Seller shall have the right to issue its own instructions if such instructions are not so provided by the Buyer before completion of loading.

26.9 The provisions of Sections 14.12 and 21.10 shall not apply to CFR, CIF and Ex Ship deliveries under this Part Four.

## Section 27 - Laytime

27.1 The time allowed for loading (where the sale is on FOB terms) or discharging (where the sale is on CFR, CIF or Ex Ship terms) shall be one half of the total free hours for loading and discharging specified in the Tankschiff Transport Bedingungen rules (latest edition) for the quantity of the Crude Oil or Product loaded for each delivery to the Buyer under the Agreement.

27.2 Laytime shall commence no earlier than expiry of the notice periods required for nominations set out in Section 25.1.1 and Section 26.1.1 above, or on commencement of loading (FOB) or discharge (CFR/CIF/Ex Ship), as the case may be, whichever is earlier.

27.3 For the purpose of calculating demurrage due under this Agreement, Laytime allowed to the claiming party shall be treated as reversible and, in particular:

27.3.1 where the sale is on FOB terms, any Laytime unused in the discharging operation shall be added to the time allowed for loading in Section 27; and

27.3.2   where the sale is on CFR, CIF or Ex Ship terms, any Laytime unused in the loading operation shall be added to the time allowed for discharge in Section 27.

27.4   Laytime or demurrage (if on demurrage) shall end:

27.4.1   where the sale is on FOB terms, as soon as the loading documents have been received on board or if the departure of the Barge is delayed for the Seller's purposes, until the termination of such delay.

(a)   If the receipt of documents on board is not recorded on the Loading Terminal timesheet, then Laytime or demurrage (if on demurrage) shall end 2 full hours after loading is completed.  If completion of loading is not recorded on the Loading Terminal timesheet, it shall be deemed to be when hoses are disconnected (unless this is later than the NOR/reported ready time at the Barge's subsequent destination, in which case, Laytime or demurrage (if on demurrage) shall end at that NOR/reported ready time).

(b)   Under no circumstances shall Laytime or demurrage end after the departure of the Barge as indicated on the Loading Terminal timesheet.

27.4.2   where the sale is on CFR, CIF or Ex Ship terms, as soon as the discharging documents have been received on board or, if the departure of the Barge is delayed for Buyer's purposes, until the termination of such delay.

(a)   If the receipt of documents on board is not recorded on the Discharge Terminal timesheet, then Laytime or demurrage (if on demurrage) shall end 2 full hours after discharge is completed.  If completion of discharge is not recorded on the Discharge Terminal timesheet, it shall be deemed to be when hoses are disconnected (unless this is later than the NOR/reported ready time at the Barge's subsequent destination, in which case, Laytime or demurrage (if on demurrage) shall end at that NOR/reported ready time).

(b)   Under no circumstances shall Laytime or demurrage end after the departure of the Barge as indicated on the Discharge Terminal timesheet.

27.5   For the purposes of calculating demurrage due under this Agreement, Laytime shall not commence earlier and/or end later than stated in the Barge owner's demurrage calculation.

### Section 28 - Demurrage claims in respect of FOB deliveries

28.1   The demurrage rate that shall apply to the performing Barge shall be the Binnenschifffahrtsgesetz (latest edition) rate applicable to a Barge with the size and capacity equal to the quantity of the Crude Oil or Product loaded for each delivery to the Buyer under the Agreement.  Partial hours in the result of the sum calculation for the loading or discharging time shall be rounded up to full hours. Section 7.6.1 shall not apply.

28.2   If the demurrage value calculated using the Barge owner's demurrage rate and one half of the total free hours allocated by the Barge owner for loading and discharging is lower for the relevant Loading Terminal than the demurrage calculations as stated in Section 27.1 and Section 28.1, the lower demurrage calculation shall apply.

28.3   Demurrage will be payable in accordance with this Section 28 provided always that:

28.3.1   the Barge has validly tendered NOR or otherwise confirmed that she has arrived and is in all respects ready to load on or before 2359 hours on the ETA set out in the nomination;

28.3.2   if the Barge tenders NOR or otherwise confirms that she has arrived and is in all respects ready to load after 2359 hours on the ETA and/or after the agreed delivery date range then, for the purposes of demurrage only, time shall not start until commencement of loading;

28.3.3   if the Barge tenders NOR or otherwise confirms that she has arrived and is in all respects ready to load prior to commencement of the ETA then, for the purposes of demurrage only, time shall start at 0001 hours on the ETA or on commencement of loading, whichever is the earlier; and

28.3.4   if the Barge tenders NOR or otherwise confirms that she has arrived and is in all respects ready to load after the ETA, but within the delivery date range specified in the Agreement, the Seller will try to arrange to berth such Barge as soon as possible upon its arrival and Laytime shall not start until commencement of loading.

## Section 29 - Demurrage claims in respect of CFR, CIF and Ex Ship deliveries

29.1   The demurrage rate that shall apply to the performing Barge shall be the Binnenschiffahrtsgesetz (latest edition) rate applicable to a Barge with the size and capacity equal to the quantity of the Crude Oil or Product loaded for each delivery to the Buyer under the Agreement. Partial hours in the result of the sum calculation for the loading or discharging time shall be rounded up to full hours.  Section 16.1.2  and 23.1.2 shall not apply.

29.2   If the demurrage value calculated using the Barge owner's demurrage rate and one half of the total free hours allocated by the Barge owner for loading and discharging is lower for the relevant Discharge Terminal than the demurrage calculations as stated in Section 27.1 and Section 29.1, the lower demurrage calculation shall apply.

29.3   Demurrage will be payable in accordance with this Section 29 provided always that:

29.3.1   the Barge has validly tendered NOR or otherwise confirmed that she has arrived and is in all respects ready to discharge on or before 2359 hours on the ETA set out in the nomination;

29.3.2   if the Barge validly tenders NOR or otherwise confirms that she has arrived and is in all respects ready to discharge after 2359 hours on the ETA and/or after any agreed discharge date range specified in the Agreement then, for the purposes of demurrage only, time shall not start until the commencement of discharging;

29.3.3   if the Barge validly tenders NOR or otherwise confirms that she has arrived and is in all respects ready to discharge prior to commencement of the ETA then, for the purposes of demurrage, time shall start at 0001 hours on the ETA or on commencement of discharging, whichever is the earlier;

29.3.4   if the Barge validly tenders NOR or otherwise confirms that she has arrived and is in all respects ready to discharge after the ETA, but within the discharge date range specified in the Agreement, the Buyer will try to arrange to berth such Barge as soon as possible upon its arrival and Laytime shall not start until commencement of discharging.

## Section 30 - Notification of demurrage claims

30.1   This Section applies to claims for demurrage under Section 28 and Section 29 above.

30.2    The demurrage claim must have been received by the receiving party in writing no later than 1400 CET on the 30th day from the Bill of Lading Date (which shall count as day one) except where the 30th day from the Bill of Lading Date is a non-Working Day, in which case the claim must be received by the receiving party no later than 1400 CET on the previous Working Day.

30.3    The demurrage claim must be accompanied by the following documents in a legible format:

30.3.1    the claiming party's demurrage calculation;

30.3.2    copy of the Barge owner's demurrage invoice, laytime statement and demurrage calculation or, where the Barge is time-chartered, written confirmation from the Barge owner that the Barge was on time-charter and the Barge owner's running time computation;

30.3.3    copy of the nomination including verifiable evidence of the relevant time and date of its transmission; and

30.3.4    signed or stamped timesheets from the Loading Terminal and Discharge Terminal (or if not available, a timesheet signed or stamped by a terminal and Barge representative).

30.4    Where BP is the receiving party, all claims in respect of demurrage under this Agreement shall be sent by email to bargenewclaims@bp.com or such other email address as BP may provide from time to time. Claims sent by any other means shall be deemed not to have been received.

30.5    If the claiming party fails to give such notice or to provide such documentation as is required by this Section 30 then any and all liability on the part of the receiving party in respect of the claiming party's demurrage claim shall be extinguished.

---

**PART FIVE**
**In respect of deliveries Ex Tank, Into Tank, In Situ (stock transfer), Free Into Pipeline ("FIP"), Ex Pipeline and DAP in Pipeline**

---

For Crude Oil DAP at frontier deliveries free in the Druzhba or connected pipeline the provisions of Schedule I hereto shall apply to the exclusion of this Part Five.

## Section 31 – Nominations and delivery

31.1   In the case of delivery Ex Tank, Into Tank or In Situ, nominations shall be made in accordance with the standard operating procedures of the relevant storage company(ies).

31.2   In the case of delivery Free In Pipeline ("FIP") or Ex Pipeline, nominations shall be made in accordance with the standard operating procedures of the relevant pipeline operating company(ies).

31.3   In the case of Crude Oil delivery DAP at frontier in pipeline, all nominations shall be made in accordance with the standard operating procedures of the relevant pipeline operating company(ies).

31.4   In the case of Crude Oil delivery DAP at frontier in pipeline, delivery shall be given and taken in the named pipeline at such frontier border station and on the date or within the agreed period (the "**Delivery Period**") as shall be specified in the Special Provisions.

## Section 32 - Measurement and sampling; independent inspection

32.1   Measurement of the quantities and the taking of samples for the purposes of determining the compliance of the Crude Oil or Product with the quality and quantity provisions of the Special Provisions shall be carried out in accordance with good standard practice.

32.2   In the case of Ex Tank, Into Tank and In Situ deliveries, the quantity shall be as per the inspection document or certificate of transfer (where applicable) when the Crude Oil or Product was delivered into the tank.

32.3   In the case of FIP or Ex Pipeline deliveries, the quantity shall be determined by using the pipeline company's proven meters (if available). If proven meters are unavailable, the quantity shall be determined pursuant to Section 32.1.

32.4   In the case of Ex Tank, Into Tank and In Situ deliveries, the quality shall be determined in accordance with test results run on homogenous samples that accurately represent the full quantity of Crude Oil or Product delivered.

32.5   In the case of FIP or Ex Pipeline deliveries, where automatic samplers are available, the quality shall be determined in accordance with test results run from flow proportional in line with a sample or samples taken at the pipeline facility. Where properly functioning automatic samplers are not available, the quality shall be determined in accordance with test results run on a volumetrically correct homogenous sample or samples drawn from the Seller's tank(s), or if Seller's tank(s) are active, the Buyer's tank(s).

32.6   In the case DAP at frontier in pipeline deliveries, the measurement of the quantity of the Crude Oil delivered shall be determined in accordance with good standard practice at the relevant frontier border station specified in the Special Provisions.  The certificate of quantity so issued by the relevant frontier border station shall, except in cases of manifest error or fraud, be used for invoicing purposes and the Buyer shall be obliged to make

payment in full in accordance with Section 63 but without prejudice to the rights of either party to make any claim pursuant to Section 59.

32.7    In the case of DAP at frontier in pipeline deliveries, where the relevant frontier border station specified in the Special Provisions has no facilities for measurement of the quantity of the Crude Oil delivered to it, the parties agree that the certificate of quantity issued by the Loading Terminal shall, except in cases of manifest error or fraud, be used for invoicing purposes and the Buyer shall be obliged to make payment in full in accordance with Section 63 but without prejudice to the rights of either party to make any claim pursuant to Section 59.

32.8    The certificates of quantity and quality (or such other equivalent documents as may be issued by the terminal or pipeline company) shall, except in cases of manifest error or fraud, be used for invoicing purposes but without prejudice to the rights of either party to make any claim pursuant to Section 59.

32.9    Either party may appoint an independent inspector at the storage or pipeline facility(ies), subject to the prior agreement of the storage or pipeline company having been obtained where necessary. Such appointment shall be notified in writing to the other party. All charges in respect thereof shall be for the account of the party requiring the independent inspection and the duties of such inspector shall be considered solely as a service to the party requiring the inspection. Where both parties require an independent inspection, then Buyer and Seller shall jointly agree upon and appoint an independent inspector. All charges in respect thereof shall be shared between the parties and the inspector's report shall be made available to both parties. An inspector's report issued by a jointly appointed independent inspector shall, except in cases of manifest error or fraud, be used for invoicing purposes but without prejudice to the rights of either party to make any claim pursuant to Section 59.

## Section 33 - Risk and property

The risk and property in the Crude Oil or Product delivered under the Agreement shall pass to the Buyer:

33.1    in the case of delivery FIP, as the Crude Oil or Product passes the inlet flange of the Buyer's receiving pipeline system; or

33.2    in the case of delivery Ex Tank, as the Crude Oil or Product passes the outlet flange of the Seller's storage tank from which the Crude Oil or Product is being delivered; or

33.3    in the case of delivery Into Tank, as the Crude Oil or Product passes the inlet flange of the Buyer's receiving storage tank;

33.4    in the case of Ex Pipeline, as the Crude Oil or Product passes the outlet flange of the Seller's pipeline system;

33.5    in the case of DAP at frontier in pipeline deliveries, as the Crude Oil passes the point of delivery at the frontier border station within the Delivery Period specified in Section 31.4 above; or

33.6    where delivery is effected In Situ, at such time and day and in such tank(s) as shall either be specified in the Special Provisions or as agreed between the parties prior to such transfer being effected and, where applicable, confirmed by the owner/operator of such tank(s).

**Section 34 - Other Conditions**

In the case of Crude Oil delivery DAP at frontier in pipeline:

34.1    The Buyer shall be solely responsible for all customs formalities, duties, taxes and other charges payable upon import of the Crude Oil and for its subsequent transport (if any).

34.2    The Buyer must pay all costs relating to the Crude Oil from the time it has been placed at the Buyer's disposal pursuant to the delivery provisions of Section 31.4 above.

| PART SIX |
| In respect of deliveries by Road Tanker (FCA, CPT, CIP, DDP or DAP) |

### Section 35 - Nominations in respect of FCA deliveries

35.1   All nominations relating to the delivery of Crude Oil or Product in bulk into or by Road Tanker(s) shall, unless otherwise specifically agreed between the parties, be in accordance with the standard operating terms and procedures applied by the operator of the Loading Terminal.

35.2   Prior to the Buyer making its notification in Section 35.3, the Seller shall inform the Buyer of the Road Tanker Requirements at the Loading Terminal.

35.3   The Buyer shall notify to the Seller in writing the following by no later than 10 Business Days prior to the first day of the delivery date range in the Special Provisions:

35.3.1   date of arrival;

35.3.2   the number of Road Tanker(s) and their identification numbers;

35.3.3   the quantity / net weight of Crude Oil or Product to be loaded in each Road Tanker;

35.3.4   destination(s) of the Road Tanker(s), including full details necessary to comply with the requirements of EMCS, and must include (without limitation) full details (name, address and excise licence number) of the relevant excise licence holder (authorised warehousekeeper) and the tax warehouse itself; and

35.3.5   where the Crude Oil or Product has not been released for free circulation in the EU (i.e. has T1 status), the Buyer must provide sufficient information about the Crude Oil or Product's destination(s) as to enable the Seller to comply with the EU Community Transit rules, including by the use of the New Computerised Transit System ("NCTS").

35.4   Where the Buyer's nomination is made in accordance with this Section 35, the Seller will confirm the nomination and notify to the Buyer in writing the following:

35.4.1   Loading Terminal (which shall be in accordance with the Special Provisions);

35.4.2   Loading Terminal code;

35.4.3   load code; and

35.4.4   Loading Terminal contact person.

35.5   The Seller shall provide for each Road Tanker a fully trained driver certified by the Loading Terminal as being qualified to drive Road Tankers within the Loading Terminal. Such driver(s) shall be made available to the Buyer's Road Tanker(s) upon arrival of such Road Tanker(s) at the Loading Terminal. In the event that the Seller is unable to provide such driver(s), the Seller shall inform the Buyer and the Buyer shall provide the driver(s). In the event that the Buyer's driver(s) are not already certified by the Loading Terminal in accordance with the above, the Seller will provide the required training so that the driver(s) become certified.

35.6    Immediately following the completion of loading, the Seller shall place on-board each Road
Tanker the respective bills of lading and Safety Data Sheet.

35.7    The Seller shall provide the Buyer with the following documents as soon as reasonably
practicable but no later than 48 hours after the date of the despatch of the Road Tanker(s)
from the Loading Terminal:

35.7.1    copies of all CMR consignment notes or other contract(s) of carriage issued;

35.7.2    copy of the certificate of quality issued by the Loading Terminal; and

35.7.3    copy of the certificate of quantity issued by the Loading Terminal.

**Section 36 - Nominations in respect of CPT, CIP, DDP or DAP deliveries**

36.1    All nominations relating to the delivery of Crude Oil or Product in bulk into or by Road
Tanker(s) shall, unless otherwise specifically agreed between the parties, be in accordance
with the standard operating terms and procedures applied by the operator of the
Discharge Terminal.

36.2    Prior to the Seller making its notification in Section 36.3, the Buyer shall inform the Seller
of the Road Tanker Requirements at the Discharge Terminal.

36.3    The Seller shall notify to the Buyer in writing the following by no later than 10 Business
Days prior to the first day of the delivery date range in the Special Provisions:

36.3.1    date of despatch from the Loading Terminal;

36.3.2    the number of Road Tanker(s) and their identification numbers;

36.3.3    the quantity / net weight of Crude Oil or Product loaded in each Road Tanker;

36.3.4    Loading Terminal;

36.3.5    Loading Terminal code; and

36.3.6    load code.

36.4    Where the Seller's nomination is made in according with this Section 36, the Buyer will
confirm the nomination and notify to the Seller in writing the following:

36.4.1    Discharge Terminal (which shall be in accordance with the Special Provisions);

36.4.2    Discharge Terminal code;

36.4.3    discharge code;

36.4.4    Discharge Terminal contact person;

36.4.5    destination(s) of the Road Tanker(s), including full details necessary to comply with
the requirements of EMCS, and must include (without limitation) full details
(name, address and excise licence number) of the relevant excise licence holder
(authorised warehousekeeper) and the tax warehouse itself; and

36.4.6    where the Crude Oil or Product has not been released for free circulation in the
EU (i.e. has T1 status), the Buyer must provide sufficient information about the
Crude Oil or Product's destination(s) as to enable the Seller to comply with the EU

Community Transit rules, including by the use of the New Computerised Transit System ("NCTS").

36.5    The Buyer shall provide for each Road Tanker a fully trained driver certified by the Discharge Terminal as being qualified to drive Road Tankers within the Discharge Terminal. Such driver(s) shall be made available to the Seller's Road Tanker(s) upon arrival of such Road Tanker(s) at the Discharge Terminal. In the event that the Buyer is unable to provide such driver(s), the Buyer shall inform the Seller and the Seller shall provide the driver(s). In the event that the Seller's driver(s) are not already certified by the Discharge Terminal in accordance with the above, the Buyer will provide the required training so that the driver(s) become certified.

36.6    The Seller shall provide the Buyer with the respective bills of lading and Safety Data Sheet.

36.7    The Seller shall provide the Buyer with the following documents as soon as reasonably practicable but no later than 48 hours after the date of the despatch of the Road Tanker(s) from the Loading Terminal:

36.7.1    copies of all CMR consignment notes or other contract(s) of carriage issued;

36.7.2    copy of the certificate of quality issued by the Loading Terminal; and

36.7.3    copy of the certificate of quantity issued by the Loading Terminal.

## Section 37 - Acceptance of Road Tanker(s) in respect of FCA deliveries

37.1    The Road Tanker(s) and its driver(s) shall comply with Applicable Law(s) and Road Tanker Requirements at the Loading Terminal.

37.2    Notwithstanding anything to the contrary express or implied elsewhere in the Agreement, the Seller shall have the right (which right may only be exercised prior to the passing of property hereunder) to refuse, on any reasonable grounds, to accept any Road Tanker(s) nominated by the Buyer. The Seller shall not be liable for any loss or damage which the Buyer may suffer as a result of the Seller exercising such right.

37.3    Notwithstanding any prior acceptance of any Road Tanker(s), the Seller shall have the right (which right may only be exercised prior to the passing of property hereunder) to reject the Road Tanker(s) in question on any reasonable ground if such Road Tanker(s) is involved in any incident or more recent information regarding such Road Tanker(s) becomes available to the Seller at any time after such prior acceptance.

37.4    Without derogating from any other reasonable grounds that may be available to the Seller, reasonable grounds shall include if the Road Tanker(s) are determined by the Seller to be unacceptable under the Seller's documented assurance requirements.

37.5    The Road Tanker(s) must at all times have hazardous material documentation on-board and clearly display hazardous material plates in accordance with Applicable Law(s) and the Road Tanker Requirements at the Loading Terminal.

## Section 38 - Acceptance of Road Tanker(s) in respect of CPT, CIP, DDP or DAP deliveries

38.1    In respect of CPT and CIP deliveries, the Road Tanker(s) and its driver shall comply with Applicable Law(s) and Road Tanker Requirements at the Loading Terminal and the Discharge Terminal.

38.2    In respect of DDP and DAP deliveries, the Road Tanker(s) and its driver shall comply with Applicable Law(s) and Road Tanker Requirements at the Discharge Terminal.

38.3    Notwithstanding anything to the contrary express or implied elsewhere in the Agreement, the Buyer shall have the right (which right may only be exercised prior to the passing of property hereunder) to refuse, on any reasonable grounds, to accept any Road Tanker(s) nominated by the Seller. The Buyer shall not be liable for any loss or damage which the Seller may suffer as a result of the Buyer exercising such right.

38.4    Notwithstanding any prior acceptance of any Road Tanker(s), the Buyer shall have the right (which right may only be exercised prior to the passing of property hereunder) to reject the Road Tanker(s) in question on any reasonable ground if such Road Tanker(s) is involved in any incident or more recent information regarding such Road Tanker(s) becomes available to the Buyer at any time after such prior acceptance.

38.5    Without derogating from any other reasonable grounds that may be available to the Buyer, reasonable grounds shall include if the Road Tanker(s) are determined by the Buyer to be unacceptable under the Buyer's documented assurance requirements.

38.6    In respect of CPT and CIP deliveries, the Road Tanker(s) must at all times have hazardous material documentation on-board and clearly display hazardous material plates in accordance with Applicable Law(s) and the Road Tanker Requirements at the Loading Terminal and the Discharge Terminal.

38.7    In respect of DDP and DAP deliveries, the Road Tanker(s) must at all times have hazardous material documentation on-board and clearly display hazardous material plates in accordance with Applicable Law(s) and the Road Tanker Requirements at the Discharge Terminal.

## Section 39 - Loading and discharge

39.1    In respect of FCA deliveries, loading of the Road Tanker(s) must be carried out in a safe and compliant manner in accordance with Applicable Law(s) and Road Tanker Requirements at the Loading Terminal. Loading must commence at the point the hoses are connected and continue uninterrupted.

39.2    In respect of CPT, CIP, DDP and DAP deliveries, discharge of the Road Tanker(s) must be carried out in a safe and compliant manner in accordance with Applicable Law(s) and Road Tanker Requirements at the Discharge Terminal. Discharge must commence at the point the hoses are connected and continue uninterrupted.

## Section 40 - Measurement and sampling, independent inspection and certification

40.1    Measurement of the quantities and the taking of samples for the purposes of determining the compliance of the Crude Oil or Product with the quantity and quality provisions of the Special Provisions shall be carried out at the Loading Terminal in accordance with good standard practice at the time of delivery.

40.2    In the event that the Seller and the Buyer mutually agree that measurement of the quantities and the taking of samples for the purposes of determining the compliance of the Crude Oil or Product with the quantity and quality provisions of the Special Provisions shall be carried out at the Discharge Terminal, this shall be carried out in accordance with good standard practice at the time of delivery.

40.3    The certificates of quantity and quality (or such other equivalent documents as may be issued by the Loading Terminal or Discharge Terminal, as applicable) shall, except in cases of manifest error or fraud, be used for invoicing purposes but without prejudice to the rights of either party to make any claim pursuant to Section 59.

40.4    Except in the event that the Loading Terminal or Discharge Terminal, as applicable, refuses access, either party may appoint an independent inspector. Such appointment shall be notified in writing to the other party. All charges in respect thereof shall be for the account of the party requiring the independent inspection and the duties of such inspector shall be considered solely as a service to the party requiring the inspection. Where both parties require an independent inspection and the Loading Terminal or Discharge Terminal, as applicable, does not refuse access, then Buyer and Seller shall jointly agree upon and appoint an independent inspector. All charges in respect thereof shall be shared between the parties and the inspector's report shall be made available to both parties.

## Section 41 - Road Tanker(s) availability in respect of FCA deliveries

41.1    The cost of any delay at the Loading Terminal:

41.1.1    as a result of the Road Tanker failing to comply with Applicable Law(s) and Road Tanker Requirements at the Loading Terminal shall be for the Buyer's account;

41.1.2    where the Road Tanker has complied with Applicable Law(s) and Road Tanker Requirements at the Loading Terminal shall be for the Seller's account;

41.1.3    as a result of the Buyer having to provide the driver(s) shall be for the Seller's account; and

41.1.4    where loading was interrupted shall be for the Seller's account.

41.2    Such delays shall include but not be limited to any delay getting from the entrance gate of the Loading Terminal to the pumping location.

41.3    Such costs shall include but not be limited to overnight stay costs and meals which are incurred because the Buyer's driver(s) is unable under Applicable Law(s) to drive the vehicle away from the Loading Terminal on the planned working shift.

## Section 42 - Road Tanker(s) availability in respect of CPT, CIP, DDP or DAP deliveries

42.1    The cost of any delay at the Discharge Terminal:

42.1.1    as a result of the Road Tanker failing to comply with Applicable Law(s) and Road Tanker Requirements at the Discharge Terminal shall be for the Seller's account;

42.1.2    where the Road Tanker has complied with Applicable Law(s) and Road Tanker Requirements at the Discharge Terminal shall be for the Buyer's account;

42.1.3    as a result of the Seller having to provide the driver(s) shall be for the Buyer's account; and

42.1.4    where discharge was interrupted shall be for the Seller's account.

42.2    Such delays shall include but not be limited to any delay getting from the entrance gate of the Discharge Terminal to the pumping location.

42.3    Such costs shall include but not be limited to overnight stay costs and meals which are incurred because the Seller's driver(s) is unable under Applicable Law(s) to drive the vehicle away from the Discharge Terminal on the planned working shift.

## Section 43 - Risk and property

43.1   In respect of FCA, CPT and CIP deliveries, the risk and property in the Crude Oil or Product delivered under the Agreement shall pass to the Buyer as the Crude Oil or Product passes:

43.1.1   the inlet manifold of the Road Tanker in question in the case of bottom loading, or

43.1.2   the outlet of the Loading Terminal's flexible hose, in the case of gravity fed top loading.

43.2   In respect of DAP or DDP deliveries, the risk and property in the Crude Oil or Product delivered under the Agreement shall pass to the Buyer as the Crude Oil or Product passes the inlet manifold of the receiving installation at the Discharge Terminal.

## Section 44 - Insurance

44.1   In respect of FCA, CPT, DDP or DAP deliveries, neither party shall have any obligation to the other party to secure insurance on the Crude Oil or Product.

44.2   In respect of CIP deliveries, the following shall apply:

44.2.1   The Seller undertakes to procure and pay for insurance against goods in transit risks to the full value of the Crude Oil or Product hereunder plus 10%.  Such insurance, which shall operate from the time the Crude Oil or Product passes the inlet manifold of the Road Tanker in question until the time the Crude Oil or Product has been received from the Road Tanker at the named place of destination, shall be in accordance with the provisions of a Marine Cargo Insurance Policy subject to Bulk Oil Clauses SP 13C, or, at the Seller's option, Institute Cargo Clauses (A) or any similar clauses, and the benefit thereof shall accrue to the Buyer upon the passing of risk in the Crude Oil or Product as provided for in the Agreement.

44.2.2   The Seller does not undertake to procure insurance against strikes, riots and civil commotions risks in respect of the delivery of the Crude Oil or Product hereunder save where the Seller shall, by written notice actually received by it at least 2 Business Days prior to the commencement of loading, have been requested by the Buyer to procure such insurance.  Where, upon request as aforesaid, the Seller procures such insurance, it shall be subject to Institute Strikes Clauses (Cargo) or any similar clauses current on the date the Road Tanker departs from the place of loading and the actual premium payable at the current London Market rate for the transit to be performed applying on the said date shall be charged to and be recoverable from the Buyer by the Seller as an addition to the price in the Agreement under the Special Provisions and such addition shall then form part of such price in the Agreement.

44.2.3   If requested by the Buyer, the Seller shall provide the Buyer with the original certificate of insurance or insurance company's cover note.

## Section 45 - Other conditions

45.1   In respect of FCA deliveries, all other conditions relating to the delivery of the Crude Oil or Product in bulk into or by Road Tanker(s) shall, unless otherwise specifically agreed between the parties, be in accordance with the standard operating terms and procedures applied by the operator at the Loading Terminal.

45.2   In respect of CPT and CIP deliveries, all other conditions relating to the delivery of the Crude Oil or Product in bulk into or by Road Tanker(s) shall, unless otherwise specifically agreed between the parties, be in accordance with the standard operating terms and procedures applied by the operator at the Loading Terminal and the operator at the Discharge Terminal.

45.3   In respect of DDP and DAP deliveries, all other conditions relating to the delivery of the Crude Oil or Product in bulk into or by Road Tanker(s) shall, unless otherwise specifically agreed between the parties, be in accordance with the standard operating terms and procedures applied by the operator at the Discharge Terminal.

| PART SEVEN |
| In respect of deliveries by Rail Tank Car (FCA, CPT, CIP, DDP or DAP) |

## Section 46 - Nominations in respect of FCA deliveries

46.1 All nominations relating to the delivery of Crude Oil or Product in bulk into or by Rail Tank Cars shall be, unless otherwise specifically agreed between the parties, be in accordance with the standard operating terms and procedures applied by the operator of the Loading Terminal.

46.2 Prior to the Buyer making its notification in Section 46.3, the Seller shall inform the Buyer of the Rail Tank Car Requirements at the Loading Terminal.

46.3 The Buyer shall notify to the Seller in writing the following by no later than 10 Business Days prior to the first day of the delivery date range in the Special Provisions:

46.3.1 date of arrival;

46.3.2 the number of Rail Tank Cars and their identification numbers;

46.3.3 the quantity / net weight of Crude Oil or Product to be loaded in each Rail Tank Car;

46.3.4 destination(s) of the Rail Tank Cars, including full details necessary to comply with the requirements of EMCS, and must include (without limitation) full details (name, address and excise licence number) of the relevant excise licence holder (authorised warehousekeeper) and the tax warehouse itself; and

46.3.5 where the Crude Oil or Product has not been released for free circulation in the EU (i.e. has T1 status), the Buyer must provide sufficient information about the Crude Oil or Product's destination(s) as to enable the Seller to comply with the EU Community Transit rules, including by the use of the New Computerised Transit System ("NCTS").

46.4 Where the Buyer's nomination is made in accordance with this Section 46, the Seller will confirm the nomination and notify to the Buyer in writing the following:

46.4.1 Loading Terminal (which shall be in accordance with the Special Provisions);

46.4.2 Loading Terminal code;

46.4.3 load code; and

46.4.4 Loading Terminal contact person.

46.5 Immediately following the completion of loading, the Seller shall place on-board the Locomotive the respective railway bills and Safety Data Sheet.

46.6 The Seller shall provide the Buyer with the following documents as soon as reasonably practicable but no later than 48 hours after the date of the despatch of the Rail Tank Cars from the Loading Terminal:

46.6.1 copy of the certificate of quality issued by the Loading Terminal; and

46.6.2 copy of the certificate of quantity issued by the Loading Terminal.

**Section 47 - Nominations in respect of CPT, CIP, DDP or DAP deliveries**

47.1　All nominations relating to the delivery of Crude Oil or Product in bulk into or by Rail Tank Cars shall, unless otherwise specifically agreed between the parties, be in accordance with the standard operating terms and procedures applied by the operator of the Discharge Terminal.

47.2　Prior to the Seller making its notification in Section 47.3, the Buyer shall inform the Seller of the Rail Tank Car Requirements at the Discharge Terminal.

47.3　The Seller shall notify to the Buyer in writing the following by no later than 10 Business Days prior to the first day of the delivery date range in the Special Provisions:

47.3.1　date of despatch from the Loading Terminal;

47.3.2　the number of Rail Tank Cars and their identification numbers;

47.3.3　the quantity / net weight of Crude Oil or Product loaded in each Rail Tank Car;

47.3.4　Loading Terminal;

47.3.5　Loading Terminal code; and

47.3.6　load code.

47.4　Where the Seller's nomination is made in according with this Section 47, the Buyer will confirm the nomination and notify to the Seller in writing the following:

47.4.1　Discharge Terminal  (which shall be in accordance with the Special Provisions);

47.4.2　Discharge Terminal code;

47.4.3　discharge code;

47.4.4　Discharge Terminal contact person;

47.4.5　destination(s) of the Rail Tank Cars, including full details necessary to comply with the requirements of EMCS, and must include (without limitation) full details (name, address and excise licence number) of the relevant excise licence holder (authorised warehousekeeper) and the tax warehouse itself; and

47.4.6　where the Crude Oil or Product has not been released for free circulation in the EU (i.e. has T1 status), the Buyer must provide sufficient information about the Crude Oil or Product's destination(s) as to enable the Seller to comply with the EU Community Transit rules, including by the use of the New Computerised Transit System ("NCTS");

47.5　The Seller shall provide the Buyer with the railway bills and Safety Data Sheet.

47.6　The Seller shall provide the Buyer with the following documents as soon as reasonably practicable but no later than 48 hours after the date of the despatch of the Rail Tank Cars from the Loading Terminal:

47.6.1　copy of the certificate of quality issued by the Loading Terminal; and

47.6.2　copy of the certificate of quantity issued by the Loading Terminal.

## Section 48 - Acceptance of Rail Tank Cars in respect of FCA deliveries

48.1    The Rail Tank Cars shall comply with Applicable Law(s) and Rail Tank Car Requirements at the Loading Terminal.

48.2    Notwithstanding anything to the contrary express or implied elsewhere in the Agreement, the Seller shall have the right (which right may only be exercised prior to the passing of property hereunder) to refuse, on any reasonable grounds, to accept any Rail Tank Cars nominated by the Buyer. The Seller shall not be liable for any loss or damage which the Buyer may suffer as a result of the Seller exercising such right.

48.3    Notwithstanding any prior acceptance of any Rail Tank Cars, the Seller shall have the right (which right may only be exercised prior to the passing of property hereunder) to reject the Rail Tank Cars in question on any reasonable ground if such Rail Tank Cars are involved in any incident or more recent information regarding such Rail Tank Cars becomes available to the Seller at any time after such prior acceptance.

48.4    Without derogating from any other reasonable grounds that may be available to the Seller, reasonable grounds shall include if the Rail Tank Cars and/or Locomotive are determined by the Seller to be unacceptable under the Seller's documented assurance requirements.

48.5    The Rail Tank Cars and Locomotive must at all times have hazardous material documentation on-board and clearly display hazardous material plates in accordance with Applicable Law(s) and the Rail Tank Car Requirements at the Loading Terminal.

## Section 49 - Acceptance of Rail Tank Cars in respect of CPT, CIP, DDP or DAP deliveries

49.1    In respect of CPT and CIP deliveries, the Rail Tank Cars shall comply with Applicable Law(s) and Rail Tank Car Requirements at the Loading Terminal and the Discharge Terminal.

49.2    In respect of DDP and DAP deliveries, the Rail Tank Cars shall comply with Applicable Law(s) and Rail Tank Car Requirements at the Discharge Terminal.

49.3    Notwithstanding anything to the contrary express or implied elsewhere in the Agreement, the Buyer shall have the right (which right may only be exercised prior to the passing of property hereunder) to refuse, on any reasonable grounds, to accept any Rail Tank Cars nominated by the Seller. The Buyer shall not be liable for any loss or damage which the Seller may suffer as a result of the Buyer exercising such right.

49.4    Notwithstanding any prior acceptance of any Rail Tank Cars, the Buyer shall have the right (which right may only be exercised prior to the passing of property hereunder) to reject the Rail Tank Cars in question on any reasonable ground if such Rail Tank Cars are involved in any incident or more recent information regarding such Rail Tank Cars becomes available to the Buyer at any time after such prior acceptance.

49.5    Without derogating from any other reasonable grounds that may be available to the Buyer, reasonable grounds shall include if the Rail Tank Cars and/or Locomotive are determined by the Buyer to be unacceptable under the Buyer's documented assurance requirements.

49.6    In respect of CPT and CIP deliveries, the Rail Tank Cars and Locomotive must at all times have hazardous material documentation on-board and clearly display hazardous material plates in accordance with Applicable Law(s) and the Rail Tank Car Requirements at the Loading Terminal and the Discharge Terminal.

49.7    In respect of DDP and DAP deliveries, the Rail Tank Cars and Locomotive must at all times have hazardous material documentation on-board and clearly display hazardous material plates in accordance with Applicable Law(s) and the Rail Tank Car Requirements at the Discharge Terminal.

## Section 50 - Loading and discharge

50.1    In respect of FCA deliveries, loading of the Rail Tank Cars must be carried out in a safe and compliant manner in accordance with Applicable Law(s) and Rail Tank Car Requirements at the Loading Terminal.

50.2    In respect of CPT, CIP, DDP and DAP deliveries, discharge of the Rail Tank Cars must be carried out in a safe and compliant manner in accordance with Applicable Law(s) and Rail Tank Car Requirements at the Discharge Terminal.

## Section 51 - Measurement and sampling, independent inspection and certification

51.1    Measurement of the quantities and the taking of samples for the purposes of determining the compliance of the Crude Oil or Product with the quantity and quality provisions of the Special Provisions shall be carried out at the Loading Terminal in accordance with good standard practice at the time of delivery.

51.2    In the event that the Seller and the Buyer mutually agree that measurement of the quantities and the taking of samples for the purposes of determining the compliance of the Crude Oil or Product with the quantity and quality provisions of the Special Provisions shall be carried out at the Discharge Terminal, this shall be carried out in accordance with good standard practice at the time of delivery.

51.3    The certificates of quantity and quality (or such other equivalent documents as may be issued by the Loading Terminal or Discharge Terminal, as applicable) shall, except in cases of manifest error or fraud, be used for invoicing purposes but without prejudice to the rights of either party to make any claim pursuant to Section 59.

51.4    Except in the event that the Loading Terminal or Discharge Terminal, as applicable, refuses access, either party may appoint an independent inspector. Such appointment shall be notified in writing to the other party. All charges in respect thereof shall be for the account of the party requiring the independent inspection and the duties of such inspector shall be considered solely as a service to the party requiring the inspection. Where both parties require an independent inspection and the Loading Terminal or Discharge Terminal, as applicable, does not refuse access, then Buyer and Seller shall jointly agree upon and appoint an independent inspector. All charges in respect thereof shall be shared between the parties and the inspector's report shall be made available to both parties.

## Section 52 - Rail Tank Cars availability in respect of FCA deliveries

52.1    In respect of FCA deliveries, the Rail Tank Cars shall be made available by the Buyer to the Seller for a maximum of 72 hours between:

52.1.1    the time at which the empty Rail Tank Cars are made available to the Seller at the Loading Terminal for loading; and

52.1.2    the time at which all loaded Rail Tank Cars are made available at the Loading Terminal for collection by or on behalf of the Buyer.

Any time in excess thereof shall be charged to the Seller at a rate per day per Rail Tank Car (pro-rata for part of a day) as specified in the Special Provisions or at the same rate as charged to the Buyer by the Rail Tank Car owner.

52.2    The cost of any delay at the Loading Terminal:

52.2.1    as a result of the Rail Tank Cars and/or Locomotive failing to comply with Applicable Law(s) and Rail Tank Car Requirements at the Loading Terminal shall be for the Buyer's account; and

52.2.2    where the Rail Tank Cars and Locomotive have complied with Applicable Law(s) and Rail Tank Car Requirements at the Loading Terminal shall be for the Seller's account (as set out in Section 52.1 above).

## Section 53 - Rail Tank Cars availability in respect of CPT, CIP, DDP or DAP deliveries

53.1    In respect of CPT, CIP, DDP or DAP (not at frontier) deliveries, the Rail Tank Cars shall be made available by the Seller to the Buyer for a maximum of 72 hours between:

53.1.1    the time that the Locomotive used to haul the Rail Tank Cars from the Loading Terminal to the Discharge Terminal is uncoupled from such Rail Tank Cars at the Discharge Terminal; and

53.1.2    the time at which the empty Rail Tank Cars are made available at the relevant delivery point for collection by or on behalf of the Buyer.

All Rail Tank Cars despatched by the Seller in one delivery shall be returned together. Any time in excess thereof shall be charged to the Buyer at a rate per day per Rail Tank Car (pro-rata for part of a day) either as specified in the Special Provisions or at the same rate as charged to the Seller by the Rail Tank Car owner.

53.2    In respect of DAP at frontier deliveries, the Rail Tank Cars shall be made available by the Seller to the Buyer for such reasonable period of time as shall be needed to enable the Buyer to collect such Rail Tank Cars at the frontier, haul them to its receiving terminal, unload them and return them to the relevant frontier point. All Rail Tank Cars despatched by the Seller in one delivery shall be returned together. Any charges incurred by the Seller for the delay in returning such rail tank cars to the frontier shall be for the Buyer's account.

53.3    The cost of any delay at the Discharge Terminal:

53.3.1    as a result of the Rail Tank Cars and/or Locomotive failing to comply with Applicable Law(s) and Rail Tank Car Requirements at the Discharge Terminal shall be for the Seller's account; and

53.3.2    where the Rail Tank Cars and Locomotive have complied with Applicable Law(s) and Rail Tank Car Requirements at the Discharge Terminal shall be for the Buyer's account (as set out in Section 53.1 or 53.2, as applicable, above).

## Section 54 - Risk and property

54.1    In respect of FCA, CPT and CIP deliveries, the risk and property in the Crude Oil or Product delivered under the Agreement shall pass to the Buyer as the Crude Oil or Product passes:

54.1.1    the inlet manifold of the Rail Tank Car in question in the case of bottom loading; or

54.1.2    the outlet of the Loading Terminal's flexible hose, in the case of gravity fed top loading.

54.2    In respect of DAP or DDP deliveries, the risk and property in the Crude Oil or Product delivered under the Agreement shall pass to the Buyer at the moment that the Locomotive used to haul the Rail Tank Cars from the Loading Terminal to the Discharge Terminal is uncoupled from such Rail Tank Cars at the Discharge Terminal or, in respect of DAP at frontier deliveries, the frontier sidings.

## Section 55 – Insurance

55.1    In respect of FCA, CPT, DDP or DAP deliveries, neither party shall have any obligation to the other party to secure insurance on the Crude Oil or Product.

55.2    In respect of CIP deliveries, the following shall apply:

55.2.1    The Seller undertakes to procure and pay for insurance against goods in transit risks to the full value of the cargo hereunder plus 10%.  Such insurance, which shall operate from the time the Crude Oil or Product passes the inlet manifold of the Rail Tank Cars in question until the time the Crude Oil or Product has been received from the Rail Tank Cars at the named place of destination, shall be in accordance with the provisions of a Marine Cargo Insurance Policy subject to Bulk Oil Clauses SP 13C, or, at the Seller's option, Institute Cargo Clauses (A) or any similar clauses, and the benefit thereof shall accrue to the Buyer upon the passing of risk in the Crude Oil or Product as provided for in the Agreement;

55.2.2    The Seller does not undertake to procure insurance against strikes, riots and civil commotions risks in respect of the delivery of the Crude Oil or Product hereunder save where the Seller shall, by written notice actually received by it at least 2 Business Days prior to the commencement of loading, have been requested by the Buyer to procure such insurance.  Where, upon request as aforesaid, the Seller procures such insurance, it shall be subject to Institute Strikes Clauses (Cargo) or any similar clauses current on the date the Rail Tank Cars depart from the place of loading and the actual premium payable at the current London Market rate for the transit to be performed applying on the said date shall be charged to and be recoverable from the Buyer by the Seller as an addition to the price in the Agreement under the Special Provisions and such addition shall then form part of such price in the Agreement; and

55.2.3    If requested by the Buyer, the Seller shall provide the Buyer with the original certificate of insurance or insurance company's cover note.

## Section 56 - Other conditions

56.1    In respect of FCA deliveries, all other conditions relating to the delivery of the Crude Oil or Product in bulk into or by Rail Tank Cars shall, unless otherwise specifically agreed between the parties, be in accordance with the standard operating terms and procedures applied by the operator at the Loading Terminal.

56.2    In respect of CPT and CIP deliveries, all other conditions relating to the delivery of the Crude Oil or Product in bulk into or by Rail Tank Cars shall, unless otherwise specifically agreed between the parties, be in accordance with the standard operating terms and procedures applied by the operator at the Loading Terminal and the operator at the Discharge Terminal.

56.3    In respect of DDP and DAP deliveries, all other conditions relating to the delivery of the Crude Oil or Product in bulk into or by Rail Tank Cars shall, unless otherwise specifically agreed between the parties, be in accordance with the standard operating terms and procedures applied by the operator at the Discharge Terminal.

| PART EIGHT |
| --- |
| **Applicable to each of Parts One, Two, Three, Four, Five, Six and Seven** |

### Section 57 - Definitions and Interpretation

57.1    **Definitions**

In the Agreement (as hereinafter defined) unless the context otherwise requires:

57.1.1    "ADN" means the European Agreement concerning the International Carriage of Dangerous Goods by Inland Waterways (ADN) adopted on 26 May 2000 on the occasion of a Diplomatic Conference held under the joint auspices of the United Nations Economic Commission for Europe (UNECE) and the Central Commission for the Navigation of the Rhine (CCNR).

57.1.2    "Affiliate" means a company or other legal entity which directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with a party. For this purpose "control" means the direct or indirect ownership of fifty per cent or more of the voting rights attached to the issued share capital of such company or other legal entity;

57.1.3    "the Agreement" means these General Terms and Conditions (including, where applicable, the Schedules attached hereto) together with the Special Provisions;

57.1.4    "API" means the American Petroleum Institute;

57.1.5    "Applicable Law(s)" means all applicable governmental, local, port authority or terminal operator laws and regulations and any other laws and regulations or requirements in force of whatever nature and howsoever communicated;

57.1.6    "ASTM International" means the American Society for Testing and Materials (formerly ASTM);

57.1.7    "BP" means BP plc and all associated and subsidiary companies;

57.1.8    "Barge" means

(a)    a self propelled vessel or towed/pushed dumb craft employed in port areas and sheltered waterways which is not classified as a sea-going vessel (inland barge); and/or

(b)    a towed/pushed dumb craft classified for sea-going trade (sea-going barge);

57.1.9    "Barrel" means a barrel of 42 US gallons at 60°Fahrenheit;

57.1.10    "Berth" means a berth, buoy, dock, anchorage, submarine line, single point or single berth mooring facility, offshore location, alongside vessels or lighters, floating storage or any other loading or discharge place as may be indicated by the party in question;

57.1.11    "Bill of Lading Date" in Part Four means the date on which the loading of the Crude Oil or Product on the Barge is completed;

57.1.12 "Bulk Oil Clauses SP 13C" means the American Institute of Marine Underwriters Form SP 13C Bulk Oil Clauses published in January 1962;

57.1.13 "Business Day" unless the Agreement expressly provides to the contrary means a day other than a Saturday or Sunday or public holiday in London;

57.1.14 "CET" means Central European Time or Central European Summer Time (whichever is being observed as the local time in Rotterdam);

57.1.15 "CFR" and "CIF" shall each have the meaning ascribed thereto in Incoterms® 2010, except as modified by the Agreement; further, if there is any inconsistency or conflict between Incoterms® and the Agreement, the Agreement shall prevail;

57.1.16 "CLP" means Regulation (EC) No 1272/2008 of the European Parliament and of the Council of 16 December 2008 on classification, labelling and packaging of substances and mixtures as amended from time to time;

57.1.17 "CMR" refers to the Convention on the Contract for the International Carriage of Goods by Road;

57.1.18 "CPT", "CIP", "DAP", "DDP", and "FCA" shall each have the meaning ascribed thereto in Incoterms® 2010, except as modified by the Agreement; further, if there is any inconsistency or conflict between Incoterms® 2010 and the Agreement, the Agreement shall prevail;

57.1.19 "Credit Support" shall mean a parent guarantee, letter of credit or advance payment in accordance with the provisions of Sections 63.12 63.13, 63.14, or 63.15 as applicable;

57.1.20 "Crude Oil" means crude petroleum of the grade specified in the Special Provisions which has been stabilised and is suitable for loading into Vessels or for delivery by such other method as is specified in the Agreement.  If the Agreement is for the sale of condensate, references in the Agreement to the Crude Oil shall be deemed to be references to condensate;

57.1.21 "Default Event" shall have the meaning set out in Section 68;

57.1.22 "Discharge Terminal" means the port, terminal, discharge station in respect of deliveries by rail, discharge installation in respect of deliveries by road or sidings at the agreed frontier location in respect of DAP at frontier rail deliveries at which the Crude Oil or Product to be delivered hereunder is to be discharged or, where the context requires, the operator, authority or governing body of such port or terminal;

57.1.23 "e-AD" means Electronic Administrative Document;

57.1.24 "EEA" means the European Economic Area;

57.1.25 "EMCS" means the Excise Movement Control System as established pursuant to the European Council Directive 2008/118/EEC, any amendments thereto and any other subsequent successor or subordinate legislation;

57.1.26 "ETA" means the estimated time / date of arrival, and

(a) in the case of FOB deliveries, means the estimated time and/or date or range of days of arrival of the Vessel at the Loading Terminal and, in the case of CFR, CIF and Ex Ship deliveries means the estimated time and/or

date or range of days of arrival of the Vessel at the Discharge Terminal. Any ETA at the Discharge Terminal given hereunder shall not place the Seller under any obligation to meet such date (other than to use its reasonable endeavours to ensure that the contract of carriage is consistent with the meeting of such date) and, for the avoidance of doubt, in the case of a CFR or CIF Agreement, shall not be construed as changing the nature of the Agreement

    (b)    except that in the context of Barge deliveries in Part Four, shall constitute 1 whole calendar day;

57.1.27 "EU qualified" means that the Crude Oil or Product is or will be in free circulation within the EU and not subject to any import duties; "non-EU qualified" means Crude Oil or Product that does not fall within the meaning of EU qualified;

57.1.28 "Ex Ship" shall have the meaning ascribed to the term DAP in Incoterms® 2010, except as modified by the Agreement.  Where the Special Provisions refer to DAP, the provisions in the Agreement relating to Ex Ship shall be deemed to apply. Further, if there is any inconsistency or conflict between Incoterms® 2010 and the Agreement, the Agreement shall prevail;

57.1.29 "Ex Tank", "FIP", "In Situ" and "Into Tank" shall each have the meaning ascribed thereto in Part Five;

57.1.30 "FOB" shall have the meaning ascribed thereto in Incoterms® 2010, except as modified by the Agreement; further, if there is any inconsistency or conflict between Incoterms® 2010 and the Agreement, the Agreement shall prevail;

57.1.31 "Full Cargo Lot" means a quantity of Crude Oil or Product under the Agreement which is loaded and transported on a Vessel without other cargo;

57.1.32 "GOST" means the Russian State Standards;

57.1.33 "GST" means Goods and Services Tax;

57.1.34 "ICS" means the International Chamber of Shipping;

57.1.35 "Institute Cargo Clauses (A)" means the most recent publication of the terms and conditions known as Institute Cargo Clauses (A) issued by the Lloyd's Market Association and International Underwriting Association of London;

57.1.36 "Institute Strikes Clauses (Cargo)" means the most recent publication of the terms and conditions known as Institute Strikes Clauses (Cargo) issued by the Lloyd's Market Association and International Underwriting Association of London;

57.1.37 "Institute War Clauses (Cargo)" means the most recent publication of the terms and conditions known as Institute War Clauses (Cargo) issued by the Lloyd's Market Association and International Underwriting Association of London;

57.1.38 "Laydays" in the case of FOB deliveries shall have the meaning ascribed to it in Section 4, in the case of CFR and CIF deliveries in Section 11 or in the case of Ex Ship deliveries in Section 20;

57.1.39 "Laytime" means the time allowed to the Seller for loading (determined pursuant to Section 7) or the time allowed to the Buyer for discharge (determined pursuant to Section 16, Section 23 or Section 27), as the case may be;

57.1.40 "Loading Terminal" means the port, terminal, load station in respect of deliveries by rail or loading installation in respect of deliveries by road at which the Crude Oil or Product to be delivered hereunder is or will be loaded or, where the context requires, the operator, authority or governing body of such port or terminal;

57.1.41 "Locomotive" means the locomotive used to haul the Rail Tank Cars and all the equipment on the locomotive including but not limited to hoses, pipes and pumps;

57.1.42 "London Market" means the insurance market in London comprising of companies and individual Lloyd's syndicates;

57.1.43 "LPG" means "Butane" and/or "Propane" and for the purposes hereof:

    (a)    "Butane" means:

        (i)    liquefied butane gas which reaches a liquid state at or near a temperature of minus 4° Celsius when at a pressure of one atmosphere absolute in a saturated state, or

        (ii)    the Crude Oil or Product defined as Butane by the operator of the Loading Terminal at the time and place of delivery; and

    (b)    "Propane" means:

        (i)    liquefied propane gas which reaches a liquid state at or near a temperature of minus 44° Celsius when at a pressure of one atmosphere absolute in a saturated state, or

        (ii)    the Crude Oil or Product defined as Propane by the operator of the Loading Terminal at the time and place of delivery;

57.1.44 "Marine Cargo Insurance Policy" means a policy of insurance placed with a first-class underwriter;

57.1.45 "MARPOL" means the International Convention for the Prevention of Pollution from Ships, as amended from time to time;

57.1.46 "month" means a month of the Gregorian calendar;

57.1.47 "NOR" means the valid notice of readiness to load or discharge, as the case may be, as given by the master of the Vessel (or his/her representative) to the Seller (or its representative) at the Loading Terminal or to the Buyer (or its representative) at the Discharge Terminal respectively;

57.1.48 "OCIMF" means the Oil Companies International Marine Forum;

57.1.49 "Other Information" means, where performance of the obligations under the Special Provisions is outside the EEA, information relating to health, safety and environmental data in connection with the Crude Oil or Product delivered where performance of the obligations under the Special Provisions is outside the European Union;

57.1.50 "Part Cargo Lot" means a quantity of Crude Oil or Product under the Agreement which is loaded and transported on a Vessel together with other cargo which is not bought or sold under such Agreement;

57.1.51 "Product" means wholly or partially refined petroleum product or biofuel of the grade specified in the Special Provisions (including, where applicable, LPG);

57.1.52 "Rail Tank Cars" or "Rail Tank Car" means the rail tank car(s), and all equipment on the rail tank car(s) including but not limited to hoses, pipes and pumps;

57.1.53 "Rail Tank Car Requirements" mean the particular requirements that the Rail Tank Cars and Locomotive must comply with at the Loading Terminal or Discharge Terminal, as applicable. Such requirements shall include but not be limited to those relating to health, safety, security and the environment; personal protective equipment relating to the Rail Tank Cars and Locomotive; technical requirements of the Rail Tank Cars and Locomotive; and the required configuration(s) of the Rail Tank Cars and Locomotive;

57.1.54 "REACH" means Regulation (EC) No 1907/2006 of the European Parliament and of the Council of 18 December 2006 concerning the Registration, Evaluation, Authorisation and Restriction of Chemicals as amended from time to time and the expressions "Article", "Importer", "Manufacturer", "Only Representative", "Preparation", "Substance" and "Supplier" shall have the same meanings in this Agreement as in REACH;

57.1.55 "Road Tanker" means the road tanker vehicle, any trailer attached to the vehicle, and all equipment on the vehicle including but not limited to hoses, pipes and pumps;

57.1.56 "Road Tanker Requirements" mean the particular requirements that the Road Tanker and the driver must comply with at the Loading Terminal or Discharge Terminal, as applicable. Such requirements shall include but not be limited to those relating to health, safety, security and the environment; personal protective equipment relating to the Road Tanker and its driver; technical requirements of the Road Tanker; and the required configuration(s) of the Road Tanker);

57.1.57 "Safely Afloat" means that the Vessel shall at all times be water-borne in compliance with BP port clearance requirements (including underkeel clearance) and shall be able to remain at the Berth without risk of loss or damage from wind, weather or other craft which are being properly navigated;

57.1.58 "SDS" or "Safety Data Sheet" means the Safety Data Sheet containing the information set out in REACH and in CLP;

57.1.59 "Special Provisions" means the oral or written agreement in which, by reference, these General Terms and Conditions are incorporated to form the Agreement;

57.1.60 "ton" means a metric ton or tonne;

57.1.61 "typical" means a quality or characteristic often attributable to Crude Oil or Product from a particular source, given without guarantee and not amounting to a representation or warranty that such typical quality or attribute will be present in the Crude Oil or Product supplied;

57.1.62 "VAT" means Value Added Tax;

57.1.63 "Vessel" means a tankship or other vessel of any type whatsoever which is wholly or mainly constructed or adapted for the carriage of Crude Oil or Product in bulk as cargo and shall, except where otherwise provided, be deemed to include a Barge;

57.1.64 "Working Day", as used exclusively in Part Four of these General Terms and Conditions, shall mean a day (a period of twenty-four hours starting at 0000 hours and finishing at 2400 hours on the same day) on which the office of the party receiving a relevant communication is ordinarily open for business;

57.1.65 "Worldscale" means the New Worldwide Tanker Nominal Freight Scale as current on the day of commencement of loading of the Vessel in question.

57.2 **Interpretation**

57.2.1 Any reference to any Act of Parliament or to legislation of any sovereign state shall be deemed to include any amendment, replacement or re-enactment thereof for the time being in force and to include any bylaws, licences, statutory instruments, rules, regulations, orders, notices, directions, consents or permissions made thereunder and any condition attaching thereto.

57.2.2 Except where the context otherwise requires, words denoting the singular include the plural and vice versa; words denoting any gender include all genders; and words denoting persons include firms and corporations and vice versa.

57.2.3 Any words following the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or term preceding those terms.

## Section 58 - Warranty of Title

58.1 It is a condition of the Agreement that, at the time property in the Crude Oil or Product passes to the Buyer under the Agreement:

58.1.1 the Seller is entitled to possession of the Crude Oil or Product, has title in the Crude Oil or Product free of any liens, charges and encumbrances of whatsoever kind, and has the right to sell the Crude Oil or Product;

58.1.2 the goods are free from any lien, charge or encumbrance not disclosed or known to the Buyer before the Agreement is made; and

58.1.3 the Buyer will have the benefit of the warranty as to enjoyment of quiet possession implied by law.

## Section 59 - Quality and claims in respect of quality/quantity

59.1 **Quality**

59.1.1 Unless otherwise stated in the Special Provisions, the quality of: (i) the Crude Oil delivered hereunder shall be the quality of such Crude Oil as usually made available at the time and delivery point as specified in the Special Provisions; and (ii) Product delivered hereunder shall be not inferior to the specification (if any) set out in the Special Provisions. Whether set out in these General Terms and Conditions or in the Special Provisions neither typicals nor any stipulation as to time of delivery shall form part of the Crude Oil or Product's description, quality or fitness for purpose. This sub-section constitutes the whole of the Seller's obligations with respect to the description, quality and fitness for purpose of the Crude Oil or Product and (save to the extent that exclusion thereof is not permitted or is ineffective by operation of law) all statutory or other conditions or warranties, express or implied, with respect to the description or satisfactory

quality of the Crude Oil or Product or its fitness for any particular purpose or otherwise are hereby excluded.

59.1.2 Any individual listed quality or characteristic of the Crude Oil or Product delivered expressed numerically must (save if the Special Provisions provide otherwise) be correct in accordance with the relevant test methodology.

## 59.2 **Claims in respect of quality and/or quantity**

59.2.1 Any complaint of deficiency of quantity or of variation of quality shall be admissible only if notified in writing to the Seller within 45 days of the completion of discharge date and accompanied by evidence fully supporting the complaint. Any term as to quantity in the Agreement, including in the Special Provisions, shall be an innominate term. Notwithstanding the foregoing, no claim shall be admitted in respect of any deficiency of quantity where the difference between the loaded and discharged quantity is 0.5% of the loaded quantity or less.  If the difference between the loaded and discharged quantity is in excess of 0.5%, the whole amount of the loss may be claimed.

59.2.2 In the case of deliveries Ex Ship, if the difference between: (i) the quantity of the Crude Oil or Product discharged as ascertained in accordance with Section 18.1; and (ii) the quantity discharged as ascertained on board the Vessel with the vessel experience factor, if any, applied, is greater than 0.3% then the Seller shall be entitled to apply the quantity as determined by (ii) above for the purposes of payment pursuant to Section 63.3.2 but without prejudice to the rights of either party to make any claim pursuant to Section 59.2.1 above.

## Section 60 - Health, safety and environment

### 60.1 **REACH**

The provisions of this Section 60.1 shall apply only in respect of deliveries of Product under the Agreement where either the Loading Terminal or the Discharge Terminal is located within the EEA.

60.1.1 The Seller and the Buyer each agree and undertake to the other that they will comply with those obligations under REACH which (subject to any exemption which may apply) are applicable to the sale of the Product under the Agreement and its physical introduction into the EEA.

60.1.2 Subject to Section 60.1.4, at the time of each delivery the Seller shall provide to the Buyer for each Substance, on its own, in Preparations and/or in Articles which is contained in or comprises the Product, the following information ("Substance Identifier"):

(a) Chemical Abstract Service Index ("CAS") number; and/or

(b) European Inventory of Existing Commercial Chemical Substances ("EINECS") number; and/or

(c) European List of Notified Chemical Substances ("ELINCS") number; and/or

(d) any other appropriate identifier as defined in REACH;

together with confirmation that each Substance has been duly registered in accordance with REACH requirements.

60.1.3   The Seller shall provide the Substance Identifier and confirmation to the Buyer in respect of the Product no later than the time when risk and property passes from the Seller to the Buyer, but in respect of sales afloat, as soon as practically possible.

60.1.4   Where the Seller is neither an Importer nor an EEA-Manufacturer, the following shall apply:

(a)   in providing the Buyer with Substance Identifier(s) (regardless of its/their source) and confirmation pursuant to its obligations under Section 60.1.2, the Seller provides no warranty or representation as to the accuracy or completeness of such Substance Identifier(s) or confirmation; and

(b)   notwithstanding any other provision to the contrary in this Agreement, the Seller accepts no liability for loss, damage, delay or expense incurred by the Buyer for whatever reason arising from its reliance on the accuracy of the Substance Identifier(s) provided by the Seller and/or on the confirmation as to the existence of a valid registration of the Substances to be imported into the EEA.

60.1.5   For Product originating outside and to be imported into the EEA:

(a)   The Importer, whether the Buyer or the Seller as the case may be, of the Product shall comply with those of its obligations under REACH which are applicable to the physical introduction of the Product into the EEA.

(b)   If an Only Representative has been appointed by a non-EEA Manufacturer or Manufacturers of any Substance contained in or comprising the Product, the Seller shall inform the Buyer of that fact and provide to the Buyer the relevant written statement and the contact details of the Only Representative.

## 60.2   **Safety Data Sheet ("SDS")**

The Seller shall provide to the Buyer a copy of the current SDS and any other information relating to health, safety and environmental data in connection with the Crude Oil or Product delivered hereunder in compliance with the requirements of any Applicable Law(s), rules or regulations, including but not limited to REACH, CLP and ADN.

## 60.3   **The Buyer's responsibilities**

60.3.1   The Buyer shall provide its employees, agents, contractors, customers and other persons to whom it is a supplier of the Crude Oil or Product delivered hereunder with either:

(a)   a copy of a current SDS and any other information relating to health, safety and environmental data in connection with the Crude Oil or Product delivered hereunder; or

(b)   Other Information.

The Buyer shall be responsible for any consequences that result from the use of an SDS or Other Information.

The Buyer shall provide persons responsible for the management of health, safety and environment matters within its own organisation with a copy of the SDS or Other Information.

60.3.2   The Buyer shall provide its employees with appropriate information and training to enable them to handle and use the Crude Oil or Product delivered hereunder in a manner which does not endanger their health or safety.

**60.4    Liability**

To the extent permissible by law, the Seller shall not be responsible in any respect whatsoever for any loss, damage or injury resulting from any hazards inherent in the nature of the Crude Oil or Product delivered hereunder.

## Section 61 - Destination

61.1    Where not in conflict with the provisions of Section 71.1.1, it is a condition of the Agreement that the Crude Oil or Product delivered under the Agreement shall not be imported (by the Buyer or others), directly or indirectly and irrespective of means, to any destination which is at the time of such import either prohibited under the laws of the country in which such Crude Oil or Product was produced or contrary to any regulation, rule, directive or guideline applied by the government of that country or any relevant agency thereof. The Buyer shall keep itself informed as to such laws, regulations, rules, directives and guidelines and shall ensure that they are complied with.

The Buyer acknowledges that at the date hereof it is informed of all such laws, regulations, rules, directives and guidelines relevant to its undertakings under this Section.

61.2    The Buyer shall, if the Seller so requires, provide the Seller with appropriate documentation for the purposes of verifying the final destination of any delivery hereunder. Such documentation shall be so provided within 30 days of request or within such lesser period as will enable the Seller or its supplier to comply with any requirement or request of the government or authority in question and shall include the name of the port(s) of discharge, the date(s) of discharge and the grade and quantity discharged. The obligations of the Buyer to comply with such requirement shall not be affected by any sale or disposal of the Crude Oil or Product in question by the Buyer whether before the Crude Oil or Product arrives at the final destination or otherwise.

61.3    In the event of any failure to comply with such undertakings or if the Seller has reasonable grounds for believing that such undertakings will not be complied with the Seller may (without prejudice to its other rights) at its sole discretion terminate the Agreement or suspend delivery under the Agreement until further notice or decline to commence or complete loading on notifying the Buyer either in writing or orally (with written confirmation to follow).

## Section 62 - VAT/GST, customs, excise, mineral oil tax and other taxes and duties, etc.

**62.1    Applicability**

The provisions of Sections 62.2.1(a), 62.2.1(c) and 62.3 of this Section shall apply in respect of deliveries of the Crude Oil or Product under this Agreement where the Loading Terminal, Discharge Terminal or both are located within the European Union ("EU"). Section 62.2.1(d) shall apply in respect of deliveries where the Loading Terminal and Discharge Terminal are both located outside the EU. The provisions of Sections 62.2.1, 62.2.2, 62.2.3, 62.4, 62.5 and 62.6 shall apply in respect of all deliveries.

**62.2    VAT / GST/ Similar Tax**

62.2.1   Where VAT or a GST or a similar tax becomes payable under the rules applicable at the Loading Terminal and/or Discharge Terminal, the Seller shall issue a valid tax

invoice setting out such VAT, GST or similar tax and the date for its payment in accordance with the requirements of the VAT, GST or similar tax legislation of the relevant jurisdiction where the supply has taken place  Payment of such VAT, GST or similar tax shall be made to the Seller in addition to the price specified in the Special Provisions as well as any duty payable and in the same manner as provided for payment of the price. Such invoice may be rendered in either local currency of the country in which the VAT, GST or similar tax is payable or, at the Seller's option, in the invoicing currency for the Crude Oil or Product, converted at the appropriate exchange rate prevailing at the date of the tax point under the relevant VAT, GST or other similar tax legislation.  Where the relevant legislation makes provision for VAT, GST or similar tax exemptions or reliefs, then these shall be applied accordingly where the relevant requirements are fulfilled. The parties shall provide one another with the necessary documentation/information required to support such treatment within the appropriate time limits.

A sale of Crude Oil or Product may be zero rated for VAT provided that:

(a)     if the destination of the Crude Oil or Product is within the EU, the Buyer provides to the Seller:

(i)     within 30 days of the date of completion of loading:

(A)     evidence satisfactory to the EU Member States in which the Loading Terminal and Discharge Terminal are located that the Crude Oil or Product has been received by the Buyer, or on the Buyer's behalf, or by some other party acting on its own behalf, within another EU  Member State in accordance with the relevant EU Member State's legislation, and

(B)     such other evidence as is satisfactory to the relevant authorities in the above EU Member States to allow zero rating of the supply of the Crude Oil or Product; and

(b)     before transfer of property in the Crude Oil or Product to the Buyer, a valid VAT registration number issued by an EU Member State other than the EU Member State in which the loading terminal is situated in accordance with the relevant VAT legislation; and

(c)     if the destination of the Crude Oil or Product is outside the EU, the Buyer provides to the Seller, within 30 days of completion of loading of the Crude Oil or Product, evidence satisfactory to the EU Member State in which the Loading Terminal is located of receipt of the Crude Oil or Product by the Buyer, or by an authorised party on the Buyer's behalf, or by some other party acting on its own behalf, at a destination outside the EU.

(d)     Where both the Loading Terminal and Discharge Terminal are located outside the EU, the Buyer must provide to the Seller, within 30 days of completion of loading of the Crude Oil or Product, evidence satisfactory to the Non-EU Member State in which the Loading Terminal is located of receipt of the Crude Oil or Product by the Buyer, or by an authorised party on the Buyer's behalf, or by some other party acting on its own behalf, at a destination outside the EU.  Furthermore, where the Buyer is responsible for the transportation of the Crude Oil or Product, the Buyer must provide to the Seller, within the same time limits as stated above, evidence satisfactory to the Non-EU Member State in which the Loading Terminal is

located such that the export can be treated as zero-rated for VAT, GST or similar tax purposes.

62.2.2  In circumstances where either Sections 62.2.1(a) and 62.2.1(c) or 62.2.1(d) above may apply, the Seller will issue an invoice in respect of the Crude Oil or Product which is zero rated for VAT or GST. However, if the Buyer fails to comply with the requirements set out in Sections 62.2.1(a) 62.2.1(c) or 62.2.1(d) above within the allotted time frame or in the event of any fraud or misappropriation in respect of the Crude Oil or Product and/or the documents/information referred to in Section 62.2.1(a) above, or as appropriate for transactions that are effected outside the EU Member States, the Seller shall be entitled to issue a further invoice for the amount of any VAT or GST payable on the Crude Oil or Product (inclusive of duty if appropriate) together with interest at the rate stipulated under the VAT or GST rules applicable and any associated penalties incurred. Such invoice may be rendered either in local currency of the country in which VAT or GST is payable or, at the Seller's option, in the invoicing currency for the Crude Oil or Product, converted at the appropriate exchange rate prevailing at the date of the tax point under the relevant VAT or GST rules. Any such invoice shall be paid in full within one banking day in New York of presentation or, if later, the date of payment for the Crude Oil or Product, in each case without set-off, withholding, deduction or counterclaim, to the Seller's bank account. Any outstanding amount shall bear interest in accordance with the provisions of Section 63.9 hereof.

62.2.3  If the Seller is subsequently able to obtain a credit or repayment from the authorities of any such VAT or GST which has been paid by the Buyer, the Seller shall within 5 banking days in New York reimburse the Buyer with the net amount so credited or repaid less any costs, penalties and interest and the Seller shall use reasonable endeavours, at the cost of the Buyer, to obtain such credit or repayment.

62.3  **EU customs and excise duty or mineral oil tax**

62.3.1  Excise Duty or Mineral Oil Tax may be payable in respect of the Crude Oil or Product being removed from a duty suspension regime in an EU Member State unless:

(a)  it is moving to another EU Member State under the provisions of the EMCS as established pursuant to the European Council Directive 2008/118/EEC, any amendments thereto and any other subsequent successor or subordinate legislation and within the timeframe stipulated by EMCS and the e-AD ("Electronic Administrative Document") is receipted by the nominated consignee; or

(b)  where allowed under National Excise Legislation it has moved to another approved bonded location under National Legislation based on EMCS and within the timeframe stipulated by National Legislation is receipted by the nominated consignee; or

(c)  the Buyer can provide evidence satisfactory to the EU Member State where the Crude Oil or Product was taken out of bonded premises without an e-AD as a result of the Buyer's nomination, that the Crude Oil or Product was delivered into bonded premises within the EU in circumstances where such deliveries allow for suspension of Mineral Oil Tax or excise duty has been accounted for; or

(d)     the Buyer can provide evidence that the Crude Oil or Product was exported from the EU.

62.3.2   The nomination provided by the Buyer to the Seller must include full details necessary to comply with the requirements of EMCS, and must include (without limitation) full details (name, address and excise licence number) of the relevant excise licence holder (authorised warehousekeeper) and tax warehouse itself.

62.3.3   Where the Crude Oil or Product has not been released for free circulation in the EU (i.e. has T1 status), the Buyer must provide sufficient information about the Crude Oil or Product's destination as to enable the Seller to comply with the applicable customs and related legislation, including but not limited to export or EU Community Transit rules (including by the use of the New Computerised Transit System ("NCTS")).

62.3.4   Where amendments are legitimately required to e-ADs after the Vessel has sailed, the Seller shall ensure such changes are made by the consignor.  If the Seller fails to ensure such changes are made, the Seller shall indemnify, and hold indemnified, the Buyer against any and all liability in respect of excise duty or mineral oil tax incurred by the Buyer. The indemnity is subject to the Buyer informing the Seller of any such changes.

62.3.5   If the Buyer fails to take the necessary steps to ensure one of the exceptions in Sections 62.3.1(a) to 62.3.1(d) applies, or does not comply with Sections 62.3.2 or 62.3.3, or in the event of any fraud or misappropriation in respect of the Crude Oil or Product and/or the documents referred to in such Sections,  the Buyer shall indemnify, and hold indemnified, the Seller against any and all liability in respect of customs and/or excise duty or mineral oil tax incurred by the Seller, including any interest, penalties and costs in respect thereof. In addition, notwithstanding compliance with such Sections, the Buyer shall, except in the case of delivery Ex Ship, remain liable under the above indemnity for any customs and/or excise duty or mineral oil tax claimed by any relevant EU Member State in respect of discrepancies between the loaded and discharged quantities.

62.4   For the purposes this Section "evidence satisfactory" to an EU Member State or Non-EU state shall, as a minimum and without prejudice to the provisions of Section 61 hereof, require a certificate of discharge of the Crude Oil or Product. For the avoidance of doubt, the Buyer shall not be obliged to provide any documents pursuant to this Section which are not required by the relevant authorities in the EU Member State or non-EU state in question.

62.5   **Other taxes and duties etc.**

62.5.1   **The Buyer's responsibilities**

Where not already specified in Sections 62.2 and 62.3, and unless expressly otherwise agreed by the parties, the amount of any taxes, duties, imposts, fees, charges and dues of every description imposed or levied by any governmental, local or port authority on the Crude Oil or Product supplied hereunder, or on its export, delivery, transportation, ownership, sale or use, in respect of any stage after risk in such Crude Oil or Product has passed to the Buyer shall be for the Buyer's account.

In the case of FOB sales, all taxes and duties in respect of the Vessel (not the Crude Oil or Product) incurred at the Loading Terminal shall be for the Buyer's account.

In the case of CFR and CIF sales, all taxes and duties in respect of the Vessel (not the Crude Oil or Product) incurred at the Discharge Terminal shall be for the Buyer's account, except for those specified in Worldscale as being for the Vessel owners' account.

For the avoidance of doubt and in respect of every type of sale (except DDP), the Seller shall not be the importer of record but shall be responsible for ensuring that the Buyer is provided with all necessary documentation required to comply with customs and excise entry procedures at the Discharge Terminal and all duties and taxes that arise in respect of such customs and excise entry shall be for the Buyer's account.

62.5.2 **The Seller's responsibilities**

Where not already specified in Sections 62.2 and 62.3, and unless expressly otherwise agreed by the parties, the amount of any taxes, duties, imposts, fees, charges and dues of every description imposed or levied by any governmental, local or port authority on the Crude Oil or Product supplied hereunder, or on its export, delivery, transportation, ownership, sale or use, in respect of any stage prior to risk in such Crude Oil or Product passing to the Buyer shall be for the Seller's account.

In the case of CFR and CIF sales, all taxes and duties in respect of the Vessel (not the Crude Oil or Product) incurred at the Loading Terminal shall be for the Seller's account, except for those specified in Worldscale as being for the Vessel owners' account.

In the case of Ex Ship sales, all taxes and duties in respect of the Vessel (not the Crude Oil or Product) incurred at the Discharge Terminal shall be for the Seller's account, other than those that arise in respect of customs and excise entry which shall be for the Buyer's account.

62.6 **No time bar for claims relating to taxes and duties**

There shall be no time limit on claims solely for taxes and duties pursuant to this Section 62, and the provisions of Section 67 shall not apply.

**Section 63 – Payment**

63.1 Except where Section 63.2 applies or as expressly provided elsewhere in the Agreement, payment shall be made by the Buyer to the Seller without any discount, deduction, withholding, offset or counterclaim by wire transfer of same day funds on or before the due date.

63.2 Except as provided for by Schedule D 1.4, where any Applicable Law requires a deduction or withholding in respect of tax to be made, the Buyer shall inform the Seller of that requirement and will pay such additional amount to the Seller as will ensure that the net amount received by the Seller is equal to the full amount that the Seller would have received had the deduction or withholding not been required.

63.3 **Payment documents**

Except as expressly provided elsewhere in the Agreement, payment shall be made against presentation to the Buyer of:

63.3.1   in the case of delivery FOB, CFR or CIF by Vessel (not including inland barges):

(a) the Seller's faxed commercial invoice (provisional invoice acceptable where the provisions of Section 63.5.2 apply); and

(b) 3/3 original bills of lading issued or endorsed to the order of the Buyer; and

(c) original certificate(s) of quantity, quality and origin (or equivalent documents issued at the Loading Terminal).

63.3.2 in the case of delivery Ex Ship:

(a) the Seller's faxed commercial invoice (provisional invoice acceptable where the provisions of Section 63.5.2 apply); and

(b) a copy of the certificates of quantity and quality. Where Section 59.2.2 applies such certificate of quantity shall be determined in accordance with that Section.

63.3.3 in the case of delivery by Barge (not including sea-going barges), or delivery Ex Tank, Into Tank, Ex Pipeline, In Situ, FIP, FCA, CPT, CIP, DAP deliveries as per Part Six or Seven (except where the provisions of section 63.3.4 apply) or DDP: against presentation to the Buyer of the Seller's faxed commercial invoice (provisional invoice acceptable where the provisions of Section 63.5.2 apply) and a copy of the certificate(s) of quantity and quality (or equivalent documents) issued at the terminal/pipeline facility.

63.3.4 in the case of delivery DAP by road or rail where the delivery point is at frontier:

(a) The Seller's faxed commercial invoice (provisional invoice acceptable where the provisions of Section 63.5.2 apply); and

(b) For delivery by rail tank car: a copy of the relevant railway bill(s) date stamped at the border crossing railway station being the place of delivery provided in the Special Provisions and certified as a true copy by the Seller;

(c) For delivery by road: a copy of the relevant CMR note(s) or other contract evidencing the carriage of the Crude Oil or Product, date stamped at the border crossing being the place of delivery provided in the Special Provisions and certified as a true copy by the Seller.

63.4 **Seller's indemnity in lieu of shipping documents**

If the documents referred to in Section 63.3.1 are not available for presentation to the Buyer on or before the payment due date, the Buyer agrees to pay the Seller upon presentation to the Buyer of:

63.4.1 the Seller's faxed commercial invoice (provisional invoice acceptable where the provisions of Section 63.5.2 apply); plus

63.4.2 the Seller's faxed indemnity counter-signed, if so requested by the Buyer by a first-class international bank acceptable to the Buyer, in the format set out in Schedule A.

63.5 **Seller's invoice**

63.5.1 The Seller's invoice shall be prepared on the basis of:

(a)   in the case of delivery FOB, CFR, CIF, Ex Tank, Into Tank, Ex Pipeline, In Situ, FIP, FCA, CPT, CIP, DDP or DAP where the delivery point is at frontier, the certificate(s) of quantity and, where applicable, quality (or equivalent document(s) issued at the Loading Terminal); or

(b)   in the case of delivery Ex Ship, the certificate(s) of quantity and, where applicable, quality (or equivalent document(s) issued at the Discharge Terminal).

63.5.2   Except where the provisions of Section 63.15 apply, where the applicable pricing mechanism and/or the availability of discharge quantities does not allow for the preparation of a final invoice prior to the payment due date, the Seller may issue and the Buyer shall make payment against a provisional invoice. The provisional invoice shall, unless otherwise agreed between the parties, be based upon:

(a)   the pricing information available to the Seller at the time it issues such provisional invoice; and/or

(b)   the mean of any minimum or maximum quantity specified in the Special Provisions.

Payment of any balance due by either party to the other shall be made within three New York banking days of receipt of the Seller's final invoice which shall be prepared as soon as practicable after all the relevant pricing and/or quantity information becomes available to the Seller.

## 63.6   Other costs, expenses and charges

Unless otherwise agreed, the payment of any other costs, expenses or charges which arise under the terms of the Agreement shall be made against presentation of the invoice therefor and shall be for immediate settlement by the payer on or before the date specified therein.

## 63.7   Payment due date

63.7.1   The payment due date shall be as specified in the Special Provisions.

63.7.2   Where no payment due date is specified in the Special Provisions, payment shall be due 3 New York banking days after the date property in the Crude Oil or Product passes to the Buyer.

63.7.3   In the case of CFR or CIF deliveries, in the event that the payment due date specified in the Special Provisions is based on either the NOR date at the Discharge Terminal or the completion of discharge date, and providing property in the Crude Oil or Product has passed to the Buyer, in the event that the Vessel, for whatever reason, does not tender NOR at the Discharge Terminal or does not complete discharge, then for payment purposes the NOR or completion of discharge date shall be deemed to be the last day of the Indicative Discharge Date range or, if there is no Indicative Discharge Date range, then payment shall be due 30 days after the bill of lading date.

## 63.8   Payments due at weekends or on bank holidays

Whether due from the Buyer or from the Seller, if any payment falls due on a Sunday or bank holiday Monday in New York, such payment shall be made on the first New York

banking day following and if any payment falls due on a Saturday or any other bank holiday in New York such payment shall be made on the last preceding banking day in New York.

63.9    **Interest**

63.9.1    If either party (the "Paying Party") fails to pay in full any sums on the due date for payment, the other party (the "Receiving Party") shall have the right to require the payment by the Paying Party of interest on any unpaid amount at 3 percentage points above the London Interbank Offered Rate ("LIBOR") for one month US dollar as administered by the ICE Benchmark Administration ("IBA") or any other entity which takes over the administration of that rate and published on the due date by Thomson Reuters on behalf of the IBA, such interest to run from the due date until the date payment is received by the Receiving Party's bank. Interest shall continue to accrue under this Section 63.9 until payment notwithstanding the termination of the Agreement for any cause whatsoever. The amount of interest payable to the Receiving Party shall be engrossed for withholding tax, if any, such that the net amount received by the Receiving Party after the deduction of any such withholding tax shall be equal to the full amount of interest due.

63.9.2    The provisions of this Section 63.9 shall not be construed as an indication of any willingness on the part of the Receiving Party to provide extended credit as a matter of course, and shall be without prejudice to any rights and remedies which the Receiving Party may have under the Agreement or otherwise. Any expenses incurred by the Receiving Party, including reasonable legal fees, court costs and collection agency fees, caused by delayed or non-payment by the Paying Party of the amount(s) due shall be for the account of the Paying Party and payable upon demand with supporting documentation.

63.10    **Payment account**

Payment(s) shall be made to the Seller's bank, account name and account number as specified in the Special Provisions. If at any time either Party sends notice of changed banking information or an invoice containing banking information different from that currently in the other Party's records, the Paying Party may,  prior to making any payment then due, require that the other Party provide email or fax confirmation of the new banking information as well as the Paying Party's usual account opening information.  The other Party shall provide such information in a timely manner and payment shall not be due until one (1) Business Day after the Paying Party has completed its account opening process (including any "know your customer" verification).  The Paying Party shall update its records in a timely manner upon receipt of the confirmation so as to avoid unnecessary further requests for confirmation.

63.11    **Netting of Invoices**

The parties may net invoices for amounts that are due to each other on the same date. In that case, prior to the due date the parties shall confirm either orally (to be confirmed in writing) or in writing, the invoice amounts and the balance due, if any, after netting (being the excess of the larger aggregate amount owed over the smaller aggregate amount owed). When the balance due has been confirmed, each party's obligation to make payments to the other will be automatically satisfied and discharged and replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party on the date due the agreed balance. Notwithstanding the above, payments for any demurrage, quantity, quality or other claims shall not be included in such netting of invoices.

63.12   **Credit Support**

63.12.1 If a form of Credit Support is not already provided for in the Special Provisions, or where the Credit Support that has been provided for in the Special Provisions (including where such Credit Support has already been provided by the Buyer) becomes unacceptable to the Seller, the Seller shall have the right, on giving the Buyer notice of not less than 2 Business Days to that effect, to require Credit Support or additional Credit Support of a type acceptable to the Seller to be provided in accordance with the provisions of Sections 63.13, 63.14 or 63.15 as applicable and by the time specified in the Seller's notice aforesaid.

63.12.2 Where Credit Support is required in accordance with the Special Provisions or Section 63.12.1, such Credit Support shall not be construed as excluding the Buyer's basic responsibility for paying the price within the due date for Crude Oil or Product delivered hereunder.

63.12.3 Failure by the Buyer to provide Credit Support in accordance with the provisions of Sections 63.13, 63.14 or 63.15 as applicable shall be a breach by the Buyer of the Agreement entitling the Seller to terminate the Agreement and claim damages. Any delay in exercising such a right to terminate the Agreement shall not constitute a waiver of that right. In any event, whether the Seller has exercised that right to terminate or not, the Seller:

(a)   shall be under no obligation to commence loading or discharge of the Crude Oil or Product in question;

(b)   shall be entitled to give such instructions to the Vessel as it may reasonably think fit; and

(c)   shall be entitled to claim damages (including demurrage, if any).

63.13   **Parent Guarantee**

Where under the Agreement or by virtue of the provisions of Section 63.12 the Buyer is to provide a Parent Guarantee, the Buyer shall provide such a Parent Guarantee in a form to be agreed between the parties.

63.14   **Letter of credit**

63.14.1 Where under the Agreement or by virtue of the provisions of Section 63.12 the price is to be paid by means of an irrevocable documentary letter of credit or supported by a standby letter of credit in favour of the Seller (both herein referred to as an "L/C"), the Buyer shall cause such L/C to be opened with or confirmed by a first-class international bank acceptable to the Seller (the "Bank") in terms specified in this Section 63.14.

63.14.2 The L/C shall be sufficient to cover the contractual mean value of the Crude Oil or Product at the price specified in the Special Provisions (or the provisional price in the invoice, if the contractual mean value of the Crude Oil or Product at the price specified in the Special Provisions is not known) plus 15 percent and a further amount to cover escalation in duties including VAT if appropriate and the Buyer shall cause it to be advised or confirmed in writing by the Bank to the Seller, in a form substantially as set out in Schedule B or C (whichever is applicable) and in all respects acceptable to the Seller.

63.14.3 Save as provided in Section 24.2 the L/C shall be so advised or confirmed by not later than 1600 hours (London time) on 7 days before:

    (a)    the first day of the Laydays, where applicable; or

    (b)    in all other cases, the beginning of the date or range of dates on which loading or delivery, whichever is earlier, is scheduled or indicated to take place under the Agreement.

63.14.4 Where the deadline for advising or confirming the L/C would fall prior to the date of the Agreement, the L/C shall be advised or confirmed as soon as reasonably practicable following the date of the Agreement, and in any event no later than 1200 hours on the second Business Day prior to the event specified in Sections 63.14.3(a) or 63.14.3(b) as applicable.

63.14.5 Pursuant to such L/C the Seller shall present the documents referred to in Section 63.3 or 63.4 at the counter of the Bank, or its correspondent bank in London.

63.14.6 All charges in respect of the L/C shall be for the Buyer's account.

63.14.7 The L/C shall take effect in accordance with its terms (including any agreed amendment(s) thereto) but such terms (including any agreed amendment(s) thereto) shall not alter, add to, or in any way affect, the provisions of the Agreement (or any of them) unless the Seller and the Buyer expressly agree in writing that any such term shall so alter, add to, or in any way affect, the provisions of the Agreement.

63.14.8 If for any reason the loading or discharge, as the case may be, of the Vessel will not take place within the period for such loading or discharge referred to in the L/C, the Buyer shall either obtain an extension of such period for loading or discharge or provide a new L/C in terms acceptable to the Seller.

63.15 **Advance Payment**

63.15.1 Where, under the Agreement or by virtue of the provisions of Section 63.12 the price is to be paid by means of cash in advance, the Seller shall issue and the Buyer shall make payment against a provisional invoice. The provisional invoice shall, unless otherwise agreed between the parties, be based upon:

    (a)    the pricing information available to the Seller at the time it issues such provisional invoice; and

    (b)    120% of the maximum contractual quantity specified in the Special Provisions.

63.15.2 The provisional payment shall be made by the date specified in the Special Provisions or by the date specified in the Seller's notice pursuant to section 63.12.

63.15.3 Payment of any balance due by either party to the other shall be made on the due date specified in the Special Provisions or, where there is no final due date specified in the Special Provisions, within three Business Days of receipt of the Seller's final invoice which shall be prepared as soon as practicable after all the relevant pricing and quantity information becomes available to the Seller. No interest shall be due on the difference between the provisional and final invoice.

63.16 **Purchase confirmation**

If requested by the Seller, the Buyer shall provide the Seller's bank with a letter confirming the existence of the Agreement and that, subject to the terms of the Agreement, the Buyer shall make payment to the account specified in the Seller's invoice against the documents specified in Section 63.3.

63.17 **Currency of Payment**

Notwithstanding the currency of payment specified in the Special Provisions, it is a condition of this Agreement that the Crude Oil or Product nominated by the Seller shall be Crude Oil or Product for which payment of the contract price can be freely made and received in United States Dollars via standard banking channels.

## Section 64 - New and changed regulations, etc.

64.1 It is understood by the parties that the Seller is entering into the Agreement in reliance on the laws, rules, regulations, decrees, agreements, concessions and arrangements ("Regulations") in effect on the date hereof with governments, government instrumentalities or public authorities affecting the Crude Oil or Product sold hereunder including those relating to the production, acquisition, gathering, manufacturing, transportation, storage, trading or delivery thereof, insofar as such Regulations affect the Seller or the Seller's supplier(s).

64.2 If at any time and from time to time during the currency of the Agreement any Regulations are changed or new Regulations have become or are due to become effective, whether by law, decree or regulation or by response to the insistence or request of any governmental or public authority or any person purporting to act therefor, and the material effect of such changed or new Regulations (a) is not covered by any other provision of the Agreement; and (b) has or will have a material adverse economic effect on the Seller, the Seller shall have the option to request renegotiation of the price(s) or other pertinent terms of the Agreement. Such option may be exercised by the Seller at any time after such changed or new Regulations are promulgated by written notice to the Buyer, such notice to contain the new price(s) or terms desired by the Seller. If the parties do not agree upon new price(s) or terms satisfactory to both parties within 15 days after the date of the Seller's notice, either party shall have the right to terminate the Agreement immediately at the end of such 15 day period. Any Crude Oil or Product delivered during such 15 day period shall be sold and purchased at the price(s) and on the terms applying under the Agreement without any adjustment in respect of the new or changed regulations.

## Section 65 - Force majeure, etc.

65.1 Neither the Seller nor the Buyer shall be liable for a failure to perform any of its obligations under the Agreement insofar as that party proves that the failure was due to an impediment beyond its control.

65.2 An impediment within Section 65.1 above shall:

65.2.1 Provided that the general requirements of Section 65.1 are present, include delay, hindrance, reduction in, interference with, curtailment or prevention of a party's performance of its obligations hereunder resulting from events such as the following, this enumeration not being exhaustive:

(a) war, whether declared or not, civil war, riots and revolutions, acts of piracy, acts of sabotage;

(b) natural disasters such as violent storms, cyclones, earthquakes, tidal waves, floods, destruction by lightning;

(c) explosions, fires, destruction of tankage, pipelines, of refineries or terminals and any of kind of installations;

(d) boycotts, strikes, lock-outs, labour disputes of all kinds, go-slows, occupation of factories and premises;

(e) any curtailment, reduction in, interference with, failure or cessation of supplies of Crude Oil or Product from any of the Seller's or the Seller's suppliers' sources of supply or by any refusal to supply Crude Oil or Product whether lawful or otherwise by the Seller's suppliers (provided in fact the sources of supply are for the purposes of the Agreement);

(f) any compliance with any law, regulation or ordinance, or with any order, demand or request of an international, national, port, transportation, local or other authority or agency (including the International Energy Agency ("IEA")) or of any body or person purporting to be or to act for any such authority or agency or any corporation directly or indirectly controlled by any of them;

65.2.2 any impediment within Section 65.1 above shall not include delay, hindrance, interference with, curtailment or prevention of a party's accrued obligation to make payment under the Agreement whether in respect of price, despatch, demurrage or any other financial obligation whatsoever where the impediment is solely caused by lack of funds.

65.3 The party seeking relief (the "Relying Party") shall as soon as reasonably practicable after the impediment becomes known to it give notice in writing to the other party of such impediment and the effects, or the reasonably anticipated effects, on its ability to perform in as much detail as possible and the appropriate relief sought, and of its intention to rely on this Section 65. The Relying Party shall use all reasonable endeavours to mitigate and overcome the effects of the impediment and shall, during the continuation of the impediment, provide the other party with reasonable updates, when and if available, of the extent and expected duration of the impediment. Delay or failure to comply with this Section 65.3 shall not deprive the Relying Party of the right to claim relief but may make the Relying Party liable in damages to the other party for loss which otherwise could reasonably have been avoided.

65.4 The appropriate relief under this Section shall be as follows:

65.4.1 in respect of an impediment that renders impossible the Relying Party's performance of its obligations, immediate termination of the affected delivery obligation(s) without liability for damages, penalties and other contractual remedies;

65.4.2 in respect of an impediment that delays, hinders, reduces or interferes with the performance of the delivery obligation(s), immediate postponement of those obligations without liability for damages, penalties and other contractual remedies for a period until midnight local time on the last date of the Laydays, or until such time as the impediment is removed, whichever is the earlier. The impediment shall not, however, operate to extend the term of the Agreement or to abrogate the provisions of Section 74.13. Further, should the impediment continue beyond midnight local time on the last day of the Laydays then either party may terminate the Agreement without liability for damages, penalties and other contractual remedies by and upon giving written notice to the other party;

65.4.3 in respect of an impediment that delays, hinders, reduces or interferes with the performance of an obligation other than the delivery obligation(s), immediate postponement of those obligations without liability for damages, penalties and other contractual remedies until such time as the impediment is removed.

The Relying Party, if the Seller, shall not be obliged to purchase afloat or otherwise from other suppliers to make good shortages or deficiency of delivery resulting from an impediment.

65.5 Nothing in this Section shall be taken to limit or prevent the operation of the Common Law doctrine of frustration (including frustration of the adventure, of purpose or of the Agreement).

## Section 66 - Limitation of liabilities

66.1 Except as specifically provided in the Agreement, in no event, including the negligent act or omission on its part, shall either party be liable to the other, whether under the Agreement or otherwise in connection with it, in contract, tort, breach of statutory duty or otherwise, in respect of any indirect or consequential losses or expenses including if and to the extent that they might otherwise not constitute indirect or consequential losses or expenses, loss of anticipated profits, plant shut-down or reduced production, loss of power generation, blackouts or electrical shut-down or reduction, goodwill, use, market reputation, business receipts or contracts or commercial opportunities, whether or not foreseeable.

66.2 The provisions of this Section 66 shall continue to apply notwithstanding the termination or expiry of the Agreement for any reason whatsoever.

## Section 67 - Time bar

67. Without derogating from Section 62.6 (claims relating to taxes) or the specific time limits set out in Sections 7.1.4, 16.2.4 or 23.2.5 (submission of demurrage claims), Section 59.2.1 (complaint of deficiency of quantity or of variation of quality), and any other provisions requiring compliance within a given period, all of which shall remain in full force and effect, legal proceedings in respect of any claim or dispute arising under the Agreement in accordance with Section 73 shall be commenced within 1 year of the date on which the Crude Oil or Product was delivered or, in the case of a total loss, the date upon which the Crude Oil or Product should have been delivered. If legal proceedings are not commenced within the time limits specified the claim shall be time barred and any liability or alleged liability of the other Party shall be finally extinguished.

## Section 68 - Default Events

68.1 The events and circumstances set out below with respect to any Party (the "Defaulting Party") shall constitute "Default Events":

68.1.1 the Defaulting Party or its immediate or ultimate parent or the party which has issued any Credit Support pursuant to Sections 63.13 or 63.14 in favour of the Defaulting Party:

(a) is dissolved (other than pursuant to a consolidation, amalgamation or merger);

(b) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

(c)  makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(d)  institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation and is not withdrawn, dismissed, discharged, stayed or restrained within 15 days of the institution or presentation thereof;

(e)  has a resolution passed for its winding up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(f)  seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets;

(g)  has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 15 days thereafter;

(h)  causes or is subject to any event with respect to it which, under the Applicable Law(s) of any jurisdiction, has an analogous effect to any of the events specified in Sections (a) to (g) above; or

(i)  takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

68.1.2  the Defaulting Party commits a repudiatory or renunciatory breach of the Agreement;

68.1.3  the Defaulting Party fails to deliver to the Non-Defaulting Party any Credit Support complying with the requirements of the Agreement within the time set out in the Agreement;

68.1.4  without prejudice to the Non-Defaulting Party's rights under Section 68.1.3 above, the Defaulting Party fails to make a payment (other than a pre-payment which, as Credit Support, falls under Section 63.12 above) due in full and punctually by the due date and does not correct such failure within five Business Days of notice being given by the other party of such breach;

68.1.5  in the case of the Buyer, the Defaulting Party fails to take delivery in accordance with the quantity or delivery provisions of the Agreement; or

68.1.6  a change of Control of the Defaulting Party occurs, save where it is a transfer of Control to an entity which is itself subject to the direct or indirect Control of an entity that currently has direct or indirect Control of the Defaulting Party.

"Control" for the purposes of this Section means the ability to direct the activity of a corporation or an entity, excluding an ability deriving merely from holding an office of director or another office in the corporate or entity, and a person shall be

presumed to control a corporation or entity if that person holds half or more of a certain type of means of control of that corporation or entity.

68.2  In the event of a Default Event, the party not subject to the Default Event (the "Non-Defaulting Party") may at its sole discretion, without prejudice to its other rights, by and upon notifying the Defaulting Party either orally (confirming such notification in writing) or by notice in writing:

68.2.1  terminate the Agreement;

68.2.2  in the case of the Non-Defaulting Party being the Seller, suspend delivery under the Agreement until further notice;

68.2.3  in the case of an Agreement for the delivery of multiple cargoes, terminate an individual cargo; or

68.2.4  set-off monies payable by the Non-Defaulting Party against the liabilities of the Defaulting Party pursuant to the Agreement or any other contract between the Non-Defaulting Party and the Defaulting Party.

## Section 69 - Limitation on assignment

69.1  Neither of the parties to the Agreement shall without the previous consent in writing of the other party (which shall not be unreasonably withheld or delayed) assign the Agreement or any rights or obligations hereunder. In the event of an assignment in accordance with the terms of this Section, the assignor shall nevertheless remain responsible for the proper performance of the Agreement. Any assignment not made in accordance with the terms of this Section shall be void.

69.2  Notwithstanding Section 69.1, the Seller may without the Buyer's consent assign its rights to receive and obtain payment under the Agreement in connection with any finance, securitisation or bank funding arrangements, provided that the assignee is not affected by any law, order or regulation which would prevent the Buyer from dealing with the assignee or expose the Buyer or any of its Affiliates to a prohibition, penalty or punitive measure. Payment made by the Buyer to the payee specified in the Seller's invoice of the full amount owed in respect of Crude Oil or Product deliverable under the Agreement shall be in full discharge of the Buyer's payment obligations to the Seller under the Agreement. Any such assignment will not affect the Seller's obligations under the Agreement.

## Section 70 - Notices

70.1  Unless otherwise provided elsewhere in the Agreement, any communication by either party to the other shall be sufficiently made if sent by first class post (by airmail where airmail is possible), postage paid, or by fax transmission or by courier to the address of the other party specified for this purpose in the Special Provisions and shall, unless otherwise provided herein, be deemed to have been received as follows:

70.1.1  In the case of a communication sent by first class post within the United Kingdom, on the second Business Day after it was posted.

70.1.2  In the case of a communication sent by airmail, on the fifth day after it was posted.

70.1.3  In the case of a communication by fax transmission: if it is transmitted on a Business Day before 1600 hours, then on that day: in any other case, on the Business Day after the day on which it is transmitted.

70.1.4   In the case of a communication by courier: if delivered on a Business Day before 1600 hours, then on that day: in any other case it will be treated as being received on the next Business Day.

70.2   Except for notices under Section 68, Section 69 and Section 73, parties may exchange messages with respect to the performance of the Agreement by email. Any message sent by email shall be sent to the address of the other party specified for this purpose in the Special Provisions or communicated in writing. Email messages are only valid if and when actually received and the sender bears the risk of a failure in transmission.

70.3   Any alterations to the contacts or addresses specified in the Special Provisions shall be notified immediately by letter or facsimile to the other party.

70.4   Notices may not be given by instant messaging.

## Section 71 - Sanctions and Boycotts

71.1   Notwithstanding anything to the contrary elsewhere in the Agreement:

71.1.1   Nothing in the Agreement is intended, and nothing herein should be interpreted or construed, to induce or require either party hereto to act in any manner (including failing to take any actions in connection with a transaction) which is inconsistent with, penalised or prohibited under any laws, regulations, decrees, ordinance, order, demand, request, rules or requirements of the United States of America applicable to such party which relate to international boycotts of any type; and

71.1.2   Neither party shall be obliged to perform any obligation otherwise required by this Agreement (including without limitation an obligation to (a) perform, deliver, accept, sell, purchase, pay or receive monies to, from, or through a person or entity, or (b) engage in any other acts) if this would be in violation of, inconsistent with, or expose such party to punitive measures under, any laws, regulations, decrees, ordinances, orders, demands, requests, rules or requirements of the European Union, any EU member state, the United Nations or the United States of America applicable to the parties relating to trade sanctions, foreign trade controls, export controls, non-proliferation, anti-terrorism and similar laws (the "Trade Restrictions").

71.2   Where any performance by a party would be in violation of, inconsistent with, or expose such party to punitive measures under, the Trade Restrictions, such party (the "Affected Party") shall, as soon as reasonably practicable give written notice to the other party of its inability to perform. Once such notice has been given the Affected Party shall be entitled:

71.2.1   immediately to suspend the affected obligation (whether payment or performance) until such time as the Affected Party may lawfully discharge such obligation; and/or

71.2.2   where the inability to discharge the obligation continues (or is reasonably expected to continue) until the end of the contractual time for discharge thereof, to a full release from the affected obligation, provided that where the relevant obligation relates to payment for goods which have already been delivered, the affected payment obligation shall remain suspended (without prejudice to the accrual of any interest on an outstanding payment amount) until such time as the Affected Party may lawfully resume payment; and/or

71.2.3   where the obligation affected is acceptance of the vessel, to require the other party to nominate an alternative vessel;

in each case without any liability whatsoever (including but not limited to any damages for breach of contract, penalties, costs, fees and expenses).

71.3   Nothing in this Section shall be taken to limit or prevent the operation, where available under the governing law of the Agreement, of any doctrine analogous to the English Common Law doctrine of frustration.

### Section 72 - Facilitation Payments and Anti-Corruption

72.1   The Buyer and the Seller each agree and undertake to the other that in connection with this Agreement, they will each respectively comply with all Applicable Law(s), rules, regulations, decrees and/or official government orders of the United Kingdom and the United States of America or any other relevant jurisdiction relating to anti-bribery and anti-money laundering and that they shall each respectively take no action which would subject the other to fines or penalties under such laws, regulations, rules or requirements.

72.2   The Buyer and the Seller each represent, warrant and undertake to the other that they shall not, directly or indirectly

72.2.1   pay, offer, give or promise to pay or authorise the payment of any monies or the transfer of any financial or other advantage or other things of value to:

(a)   a government official or an officer or employee of a government or any department, agency or instrumentality of any government;

(b)   an officer or employee of a public international organization;

(c)   any person acting in an official capacity for or on behalf of any government or department, agency, or instrumentality of such government or of any public international organization;

(d)   any political party or official thereof, or any candidate for political office;

(e)   any director, officer, employee or agent/representative of an actual or prospective counterparty, supplier or customer of Buyer or Seller; or

(f)   any other person, individual or entity at the suggestion, request or direction or for the benefit of any of the above-described persons and entities, or

72.2.2   engage in other acts or transactions

in each case if this is in violation of or inconsistent with the anti-bribery or anti-money laundering legislation of any government, including without limitation the U.S. Foreign Corrupt Practices Act, the UK Bribery Act 2010, the U.K. Anti-Terrorism, Crime and Security Act 2001, the Money Laundering Regulation 2007 and the Proceeds of Crime Act 2002 and the applicable country legislation implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

72.3   In particular, the Seller represents and warrants to the Buyer that it has not made any payments or given anything of value to officials, officers or employees of the government of the country in which the Crude Oil or Product originated or any agency, department or instrumentality of such government in connection with the Crude Oil or Product which is the subject of the Agreement which would be inconsistent with or contravene any of the above-referenced legislation.

72.4    The Buyer or the Seller may terminate the Agreement forthwith upon written notice to the other at any time, if in their reasonable judgement the other is in breach of any of the above representations, warranties or undertakings in this Section 72.

## Section 73 - High Court and Small Claims

73.1    **High Court**

Subject to Sections 73.2, 73.3 and 75.1, any dispute arising out of or in connection with the Agreement, including any question regarding its existence, validity or termination (the "Dispute"), shall be referred to the Commercial Court of the High Court in London. Each party agrees to appoint a solicitor to accept service of proceedings relating to the Dispute within 14 days of a written request from the other side so to do.

73.2    **Small Claims**

Notwithstanding Section 73.1 above, the parties agree that where the amount in dispute between them is US$100,000 or less (excluding interest and costs) then the Dispute shall be referred to a sole arbitrator and the arbitration shall be conducted in accordance with the London Maritime Arbitrators' Association ("LMAA") Small Claims Procedure current at the time when the claiming party commences arbitration proceedings.

73.3    **Demurrage Claims**

Notwithstanding Section 73.1 above, the parties agree that where the Dispute between them is in relation to demurrage, including the commencement and computation of laytime, then the dispute shall be referred to arbitration to be conducted in accordance with the LMAA Terms current at the time when the claiming party commences arbitration proceedings. The tribunal shall consist of 3 arbitrators, each arbitrator shall be a full Member of the LMAA, and the timetable for constitution of the tribunal shall be in accordance with that laid out in the current LMAA Terms.  Where the parties are not in a chain and the amount in dispute is less than US$25,000, the parties may agree to refer the dispute to a referee by whose decision the parties will be bound.

## Section 74 - Miscellaneous

74.1    **Severability**

If any provision of the Agreement is declared to be illegal, invalid or otherwise unenforceable by a court of competent jurisdiction or either party's compliance with any ruling or resolution of the United Nations or the European Union has a like or similar effect, the remainder of the Agreement (and of such provision) shall not be affected except to the extent necessary to delete such illegal, invalid or unenforceable provision (or part thereof).

74.2    **Survivability**

If for any reason the Agreement shall be terminated then such termination shall be without prejudice to any rights, obligations or liabilities of either party which have accrued at the date of termination but have not been performed or discharged, and any parts of the Agreement having any relevance thereto or any bearing thereon shall, notwithstanding the termination of the Agreement for any reason, continue in force and effect.

74.3    **Consents, etc.**

Each party shall be responsible for obtaining all consents, authorisations, approvals and assurances of whatsoever nature necessary to enable it to comply with its obligations under the Agreement.

74.4    **Conflict**

In the event of conflict or inconsistency between these General Terms and Conditions and the Special Provisions, the Special Provisions shall prevail over these General Terms and Conditions.

74.5    **Modification**

The terms of the Agreement as agreed between the parties shall not be modified unless mutually agreed by the parties, which agreement must be evidenced in writing.

74.6    **Waiver**

Any waiver shall relate only to the matter, non-compliance or breach as it expressly relates to and shall not apply to any subsequent or other matter, non-compliance or breach.

74.7    **Recording, Retention and Monitoring of Communications**

Each party hereby acknowledges to the other party and consents that such other party may from time to time and without further notice and to the extent permitted by law:

74.7.1  record and retain electronic transmissions (including telephone conversations, e-mail and instant messaging between the parties' respective representatives in connection with the Agreement or other commercial matters between the parties) on central and local databases for their respective legitimate purposes; and

74.7.2  monitor electronic transmissions through their internal and external networks for purposes of security and compliance with Applicable Law(s), regulations and internal policies for their other legitimate business purposes.

74.8    **Entire Agreement**

The Agreement contains the entire agreement between the Seller and the Buyer with respect to the matters set forth in the Special Provisions and supersedes all prior agreements, whether oral or written, in connection therewith.

74.9    **Warranties**

The Buyer and the Seller each warrant that it has not in connection with the Agreement relied upon any representations, whether written or oral, made by or on behalf of the other party, but has relied exclusively on its own knowledge, judgement and expertise.

74.10   **Third party rights**

No term of the Agreement is intended to, or does, confer a benefit or remedy on any third party. A person, company or other legal entity who is not a party to the Agreement shall neither have nor acquire whether by virtue of the Contracts (Rights of Third Parties) Act 1999 or otherwise any rights in relation to the Agreement. Further, the parties hereto may rescind or vary the Agreement, whether in whole or in part, without the consent of any third party.

74.11   **Trade marks**

Nothing in the Agreement whether express or implied shall be deemed to confer any right upon the Buyer to apply any trade mark owned by the Seller or any of its Associated Companies to any Crude Oil or Product supplied under the Agreement nor to use such trade marks in relation to such Crude Oil or Product nor vice versa in respect of any trade mark owned by the Buyer.

74.12   **Confidentiality**

74.12.1 If it is specified in the Special Provisions that the agreement shall be held confidential, then details of the Agreement shall not be disclosed by either party to any third party without the previous consent in writing of the other party.

74.12.2 Notwithstanding the provisions of Section 74.12.1, a party (the "Disclosing Party") may disclose details of the Agreement without the other party's prior written consent if:

(a)   such disclosure is required by law or by any securities exchange or regulatory or governmental body or fiscal authority having jurisdiction over it, wherever situated;

(b)   the confidential information is or was already in the public domain other than through the fault or action of the Disclosing Party; or

(c)   such disclosure is to an Affiliate, legal advisor, agent, financing bank, insurance company/broker or in connection with any dispute, legal or arbitration proceedings, and the Disclosing Party shall cause all parties in receipt of such information to be bound by the same obligations of confidentiality as contained in the Agreement.

74.13   **Time of the essence**

Time is of the essence for the Agreement and every provision hereof in which time of performance is expressed to be a factor, save for the obligations under Sections 5.5.1, 14.6.1 and 21.5.1 to accept or reject nominated Vessels, and to give or update ETAs.

## Section 75 - Applicable law

75.1   **Governing law**

The construction, validity and performance of the Agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with English law to the exclusion of any other law which may be imputed in accordance with choice of law rules applicable in any jurisdiction. However, neither party shall be precluded from pursuing arrest, attachment and/or other conservatory, interlocutory or interim actions in any court or exercising any contractual rights in relation to the Crude Oil or Product or Vessel provided for elsewhere in the Agreement.

75.2   **The UN Convention**

The United Nations Convention on Contracts for the International Sale of Goods of Vienna, 11th April 1980, shall not apply to the Agreement.

75.3    **Sovereign immunity**

Each party hereto warrants that it has entered into the Agreement in a commercial capacity and that with respect to the Agreement it is in all respects subject to civil and commercial law. Each party hereby irrevocably and unconditionally and to the fullest extent permitted by law waives any rights of sovereign immunity which it may have now or which it may subsequently acquire in respect of its position or any property and/or assets (present or subsequently acquired and wherever located) belonging to it.

| PART NINE |
| Schedules |

## SCHEDULE A

## Seller's Indemnity format

The indemnity referred to in Section 63.4 shall be in the following format:

Quote

We refer to our Agreement dated [DATE] (the "Agreement") in respect of your purchase from us of [QUANTITY] tons of [GRADE] Crude Oil or Product (the "Cargo") FOB/CFR/CIF on Vessel "[VESSEL NAME]", bill of lading date [B/L DATE].

In consideration of your making payment of US dollars [US DOLLAR AMOUNT] for the Crude Oil or Product in accordance with the Agreement and having agreed to accept delivery of the cargo without having been provided with [HERE INSERT THE RELEVANT DOCUMENTS AS SET OUT IN THE AGREEMENT] ("the Documents"), we hereby represent and warrant all of the following:

(i)     the existence and validity of the Documents;

(ii)    that we are entitled to possession of the Documents;

(iii)   that we were entitled to possession of the Cargo;

(iv)   that we had good title to the Cargo;

(v)    that title in the Cargo has been passed as provided in the Agreement to you free of all liens, charges or encumbrances of whatever kind;

(vi)   that you will have the benefit of the warranty as to enjoyment of quiet possession implied by law in the Agreement but without prejudice to any other warranty so implied.

Without prejudice to your rights under the Agreement we hereby agree to protect, indemnify and hold you harmless from and against any and all damages, losses, liabilities, costs, claims and reasonable expenses which you may suffer by reason of:

(a)    our failure to present the Documents to you in accordance with the Agreement; and/or

(b)    any action or proceeding brought or threatened against you by reason of our said failure and any breach of our above express representations and warranties in connection with questions of title to or the right to possession of the Documents or the Cargo or the proceeds of either; or any liens, charges or encumbrances asserted on the documents or the Cargo or any other claims arising out of or in connection with the Documents.

Our liability hereunder shall remain in full force and effect unless and until we provide you with the Documents, which we irrevocably agree to provide to you promptly after the same have come into our possession.

No term of this indemnity is intended to, or does, confer a benefit or remedy on any party other than the named Buyer under the Agreement whether by virtue of the Contracts (Rights of Third Parties) Act 1999 or howsoever.

This indemnity shall be governed by and construed in accordance with English law, shall be subject to the exclusive jurisdiction of the English Courts and shall cease to have effect upon the Documents being provided to you.

Signed by: ..................... Title: .....................

of: [COMPANY NAME]

Unquote

[THE BELOW SECTION TO BE COMPLETED AND SIGNED WHERE THE BUYER EXERCISES ITS RIGHT TO REQUIRE A BANK TO COUNTER-SIGN THE LETTER OF INDEMNITY]

Quote

In consideration of your agreeing as aforesaid we the undersigned [BANK NAME] whose customer is [FULL NAME OF SELLER] hereby jointly and severally agree to be bound by the terms of the above letter of indemnity.

By: ..................... .....................

Bank Authorised Signatory

Unquote

**SCHEDULE B**

**Letter of Credit format**

Format of Irrevocable Documentary Letter of Credit as required pursuant to Section 63.14:

Please urgently advise [FULL NAME OF SELLER], [ADDRESS], that we [BANK] hereby issue our irrevocable documentary letter of credit number [L/C NUMBER], in their favour for account of [FULL NAME OF BUYER], [ADDRESS] for an amount of USD [US DOLLAR AMOUNT] (say [US DOLLAR AMOUNT IN WORDS]) +/-15% available at our counters [DAYS] days [FROM/AFTER] [PAYMENT TERMS] against presentation of the following documents in one original and [NUMBER OF] copies unless otherwise stated:-

1.      One or more signed commercial invoices.

2.

      (a)      [in the case of FOB/CFR/CIF delivery] one or more full sets of 3/3 original clean on board ocean bills of lading issued or endorsed to the order of.......

      (b)      [in the case of ITT/FIP delivery] copy of the transfer certificate

3.      One or more certificates of quality.

4.      One or more certificates of quantity.

5.      *[One or more certificates of origin].

6.      [in the case of CIF delivery] insurance certificate covering 110% of the cargo value

*Amend as appropriate

Evidencing [SHIPMENT/DELIVERY] of [QUANTITY] [UNIT OF MEASURE] +/-15% of [PRODUCT] [INCOTERM] [LOAD/DISCHARGE PORT] between [DATE] and [DATE] (both dates inclusive).

PRICE CLAUSE [Here insert text of Price Clause as per the agreement]

This credit expires on [DATE]

[In the case of delivery FOB/CFR/CIF only] In the event that the above documents are unavailable at the time of presentation, payment will be made against document number one above (the Invoice) and a letter of indemnity issued by beneficiary in the following format:-

Quote

To:

[here insert text of Indemnity as per Schedule A]

Unquote

SPECIAL CONDITIONS

1.      This letter of credit shall take effect in accordance with its terms but such terms shall not alter, add to or in any way affect the provisions of the agreement between [BUYER] and [SELLER] to which this letter of credit relates.

2.     [In the case of delivery FOB/CFR/CIF only] charterparty bills of lading/vessel bills of lading and/or bills of lading and/or bills of lading signed by the master or agent and not indicating that they have been issued by a named carrier are acceptable.

3.     Documents presented later than 21 days after the [BILL OF LADING/NOTICE OF READINESS] date but within the validity of this credit are acceptable.

4.     Transhipment [ALLOWED/PROHIBITED].

5.     Partial shipment [ALLOWED/PROHIBITED].

6.     Photocopies in lieu of copy documents acceptable.

7.     Swift/fax invoice and letter of indemnity acceptable.

8.     All banking charges are for the account of the applicant.

9.     The construction, validity and performance of this letter of credit shall be governed by and construed in accordance with English law.  Any dispute or claim arising out of or in connection with this letter of credit shall be subject to the exclusive jurisdiction of the English courts.

10.    Typographical and spelling errors shall not constitute a discrepancy unless with regard to quantity and amount.

11.    The value of this letter of credit may escalate/de-escalate above or below the tolerances allowed without any amendment on our behalf.

12.    Except as otherwise expressly stated herein, this letter of credit is subject to the Uniform Customs and Practice for Documentary Credits 2007 Revision, (ICC publication no. 600).

13.    Multiple/partial drawings allowed.

14.    Original documents stating grade name different to LC acceptable.

15.    Any discrepancy resulting from the invoiced quantity exceeding or falling below the quantity range allowed in this letter of credit is acceptable.  Payment will be effected on the invoiced quantity in case the maximum quantity allowed in this letter of credit is not exceeded.  In case the invoiced quantity exceeds the maximum quantity allowed in this letter of credit the bank will pay on the maximum quantity allowed in this letter of credit.

16.    Beneficiary may discount this LC at own cost and request.

17.    Documents named as different but servicing the same purpose are acceptable.

18.    Price clause and calculation not stated on the commercial invoice is acceptable.

19.    [In event that payment due date falls on a Saturday or a New York bank holiday, except Monday, payment will be effected on the last banking day prior.  If the payment due date falls on a Sunday or Monday bank holiday in New York payment will be made on the next business day].

20.    [Beneficiary may draw under this letter of credit against provisional invoice based on price quotation on [NOR/BL] date.  If no quotation is published on the date of [NOR/BL] date.  If no quotation is published on the date of [NOR/BL], the provisional invoice to be based on the quotation published immediately preceding the date of [NOR/BL].  Balance payment to be effected under this L/C within 3 New York banking days against presentation of final

invoice if the amount owed is in beneficiary's favour.  If the balance of the payment is in the applicant's favour payment to be effected outside of the letter of credit].

21.     [NOR date to count as delivery date and to appear on invoice only].

22.     [Ports of discharge other than mentioned are acceptable].

23.     [Presentation of a Tax invoice acceptable].

24.     [In the case of delivery Ex Ship only] In the event that the outturn quantity is not known at the time of presentation, beneficiary may draw under the letter of credit against a provisional invoice based on the mean volume of the LC quantity.  In the event the actual outturn quantity is greater than mean volume of the LC quantity beneficiary may present a final claim under this LC.  If the actual outturn quantity is less than mean volume of the LC quantity then the difference is to be settled outside of the LC.

25.     PDF copies acceptable.

26.     Documents showing different density to invoice is acceptable.

27.     Any discrepancy resulting from the invoice value exceeding or falling below the US dollar range allowed in this letter of credit is acceptable. In the event that the invoice amount does not exceed the LC value, payment will be effected on the invoice amount. In the event that the invoice value exceeds the maximum value of the LC, the bank will pay on the maximum value allowed under this Letter of Credit.

**SCHEDULE C**

**Standby Letter of Credit format**

Format of Standby Letter of credit as required pursuant to 63.14:

-Irrevocable Standby Letter of Credit No. [NUMBER].

| | |
|---|---|
| BENEFICIARY | APPLICANT |
| [name and address] | [name and address] |

At the request of the above applicant, and for its account, we [FULL NAME AND ADDRESS OF BANK] hereby open in your favour our Irrevocable Standby Letter of Credit No. [L/C NUMBER].

This Standby Letter of Credit is for an amount of [AMOUNT IN FIGURES/WORDS] and is available for payment at our counters at sight against the following documents.

1.      Copy of unpaid invoice.

2.      Beneficiary's certificate purporting to be signed by an official of the Beneficiary certifying that "the amount demanded represents a payment which has not been made to [FULL NAME OF BENEFICIARY] by [FULL NAME OF APPLICANT] within the terms of the contract in respect of invoice number [NUMBER] which is legally and properly past due".

Covering: [SHIPMENT/DELIVERY] of [QUANTITY] [UNIT OF MEASURE] +/-15% of [PRODUCT] [INCOTERM] [LOAD/DISCHARGE PORT] between [DATE] and [DATE] (both dates inclusive).

Multiple drawings are permitted.

The expiration of this Letter of Credit is [DATE].

We hereby agree with you that presentation of the documents in compliance with the terms of this Standby Letter of Credit will be duly honoured on presentation to us no later than the expiry date of this Credit.

Special Conditions:

1.      All bank charges are for the account of the Applicant.

2.      Above documents presented by SWIFT/FAX acceptable.

3.      This Standby Letter of Credit shall take effect in accordance with its terms but such terms shall not alter, add to or in any way affect the Agreement between [SELLER] and [BUYER] to which this Standby Letter of Credit relates.

4.      The construction, validity and performance of this Standby Letter of Credit shall be governed by and construed in accordance with English law.  Any dispute or claim arising out of or in connection with this Standby Letter of Credit shall be subject to the exclusive jurisdiction of the English courts.

5.      Except as otherwise expressly provided herein, this Standby Letter of Credit is subject to the [Uniform Customs and Practices for Documentary Credits 2007 Revision (ICC Publication No. 600)] [International Standby Practices 1998 (ISP98)].

6.      The value of this Standby Letter of Credit may escalate/de-escalate above or below the tolerances allowed without any amendment on our behalf.

7.      Partial and multiple drawings are permitted.

8.      Beneficiary may draw under this Standby Letter of Credit against provisional invoice based on price quotation on [NOR/BL] date.  If no quotation is published on the date of [NOR/BL], the provisional invoice to be based on the quotation published immediately preceding the date of [NOR/BL].  Balance payment to be effected under this L/C within 3 New York banking days against presentation of final invoice if the amount owed is in beneficiary's favour.  If the balance of the payment is in the applicant's favour payment to be effected outside of the Standby Letter of Credit.

9.      Any discrepancy resulting from the invoiced quantity exceeding or falling below the quantity range allowed in this Standby Letter of Credit is acceptable.  Payment will be effected on the invoiced quantity in case the maximum quantity allowed in this letter of credit is not exceeded.  In case the invoiced quantity exceeds the maximum quantity allowed in this Standby Letter of Credit the bank will pay on the maximum quantity allowed in this Standby Letter of Credit.

10.     Price clause and calculation not stated on the commercial invoice is acceptable.

11.     [In event that payment due date falls on a Saturday or a New York bank holiday, except Monday, payment will be effected on the last banking day prior.  If the payment due date falls on a Sunday or Monday bank holiday in New York payment will be made on the next business day].

12.     [NOR date to count as delivery date and to appear on invoice only].

13.     [Ports of discharge other than mentioned are acceptable].

14.     [Presentation of a Tax invoice acceptable].

15.     [In the case of delivery Ex Ship only] In the event that the outturn quantity is not known at the time of presentation, beneficiary may draw under the letter of credit against a provisional invoice based on the mean volume of the LC quantity.  In the event the actual outturn quantity is greater than mean volume of the LC quantity beneficiary may present a final claim under this LC.  If the actual outturn quantity is less than mean volume of the LC quantity then the difference is to be settled outside of the LC.

16.     Price clause and calculation not stated on the commercial invoice is acceptable.

**SCHEDULE D**

**Supplement in respect of EU documentation, etc.**

1.　**Imports into the EU under "Preference" from non-EU Member States**

1.1　If the Loading Terminal is located in a State with which the EU has a Preferential Trade Agreement affording the Crude Oil or Product preferential (reduced or nil) rate of customs (import) duty on importation into the EU, the Seller shall provide the Buyer with the relevant original qualifying document(s) (e.g. EUR1, GSP Form A or Invoice Declaration).

1.2　The Buyer shall submit such original qualifying document(s) to the relevant and local customs authorities, and only if such customs authorities accept such qualifying document(s) (thereby agreeing that a Tariff Preference is valid and import duty is therefore reduced or not due on the Crude Oil or Product) shall such Crude Oil or Product be deemed as qualifying for preferential customs duty treatment to be EU-qualified.

1.3　If the relevant qualifying document(s) is/are not available for presentation to the Buyer or its representative by 1200 hours (London time) on the banking day in New York prior to the payment due date, or if the customs authorities refuse to accept and/or verify such qualifying document(s), the Buyer shall have the right, notwithstanding the payment terms specified in the Special Provisions, to deduct from its payment to the Seller for the Crude Oil or Product an amount equal to the amount of any duty which may become payable.

1.4　If, pursuant to paragraph 1.3 of this Schedule, the Buyer makes payment with a deduction in respect of duty payable, but the relevant qualifying document(s) is/are subsequently made available and presented to and accepted by the relevant customs authorities, the Buyer shall promptly pay to the Seller the amount so deducted (or, if lesser, an amount equal to the sum refunded by such customs authorities at their sole discretion provided always that the Buyer shall provide the Seller with documentary evidence of such refund).

2.　**Movements within the United Kingdom and other EU Member States**

2.1　**Domestic movements within the UK**

　　2.1.1　If the Crude Oil or Product is to be moved within the UK, subject to the Buyer having made satisfactory arrangements with H. M. Revenue and Customs for the deferred payment of Duty, where applicable, Excise Duty will be deferred to the Buyer's deferment number which shall be advised by the Buyer in writing to the Seller as soon as possible but always before the Crude Oil or Product leaves the loading premises.

　　2.1.2　If an internal UK movement is made on a "Duty Paid" basis, any and all taxes levied on the Crude Oil or Product shall be for the Buyer's account payable in full in Pounds Sterling at the same time as payment of the price.

　　Without prejudice to the provisions of Section 62, in order for any delivery of Crude Oil or Product hereunder for transfer/transportation within the UK to be treated as being outside the scope of VAT, the Seller shall, in addition to any other requirements in the Agreement, require confirmation in writing (fax acceptable) from the Buyer stating that "the Crude Oil or Product deliverable under the Agreement will be used as feedstock only" and accompanied by HM Revenue and Customs form W8.

2.2 **Domestic movements within other EU States**

Wherever possible and permitted under national legislation Crude Oil or Product shall move under suspension of excise duty between excise bonded warehouses.

2.3 **Domestic movements within the Netherlands**

Without prejudice to the provisions of Section 62 in order for any delivery of Crude Oil or Product hereunder for transfer/transportation within the Netherlands to be zero rated for VAT, the Buyer is required to provide the Seller, prior to commencement of loading/ discharge/transfer, with a declaration (in accordance with the requirements of Article 12 of the "Uitvoeringsbesluit Omzetbelasting 1968") stating that "(a) the Crude Oil or Product delivered under the Agreement will be delivered under a suspension regime for excise duties by delivery of the Crude Oil or Product into an AGP (Accijnsgoederenplaats), the licence number of which is [licence number], and (b) the Crude Oil or Product will not be drawn from this regime for purposes other than a fully VAT recoverable supply".

In addition, if the  Discharge  Terminal is not operated by the Buyer then the Buyer and the licence keeper of the  Discharge Terminal are required to provide separate declarations declaring that the Crude Oil or Product will be placed in a VAT suspension regime for excise duties (i.e. the AGP) on behalf of the customer (i.e. the Buyer). The declarations must include the name, address and licence number of the licence keeper.

3. **Movements between EU Member States**

3.1 Notwithstanding the provisions of Section 62:

3.1.1 the Seller shall confirm to the Buyer the ARC (Administrative Reference Code) number of the e-AD, or provide an original and valid INF3 (for product consigned to an unknown destination) or T2L document (for products not covered by an e-AD;

3.1.2 only upon the acceptance of the e-AD, INF3 or T2L by the relevant local customs authorities shall the Crude Oil or Product be deemed as not subject to EU customs duty;

3.1.3 if the relevant e-AD or document(s) is/are not available for presentation to the Buyer or its representative by 1200 hours (London time) on the banking day in New York prior to the payment due date, or if the customs authorities refuse to accept and/or verify such document(s), the provisions of paragraphs 1.3 and 1.4 of this Schedule shall apply mutatis mutandis.

3.2 Without prejudice to the provisions of Section 62 in order for any delivery of Crude Oil or Product hereunder for transfer/transportation within the EU to qualify as zero rated Intra Community Dispatch for VAT purposes, the Buyer is required to provide the Seller, prior to commencement of loading/transfer, with a written (fax) declaration stating "a valid VAT registration number of the Buyer in an EU Member State other than the EU Member State in which the Loading Terminal is located in accordance with the relevant VAT legislation.

4. **New Zealand GST**

Where the Loading Terminal or Discharge Terminal is located within New Zealand, regardless of whether the entity is incorporated in New Zealand, Section 8(4) of the Goods and Services Tax Act 1985 will not apply to the goods and services supplied by Seller. As a result, the goods and services supplied by Seller will be subject to GST in New Zealand, if applicable under Section 8(3) of the Goods and Services Tax Act 1985, and the price for the goods and services supplied will be determined on a "plus GST" basis.

5.    **Australian GST**

Where the Loading Terminal or Discharge Terminal is located within Australia, all price/charges contemplated in this Agreement are exclusive of any Value Added Tax/Goods and Services Tax ("VAT/GST") or other similar taxes (including applicable federal, state or local sales taxes).  To the extent that payments to be made under this Agreement are subject to VAT/GST, the Seller may, in addition to the amount payable under the Agreement, recover from the Buyer an additional amount to account for VAT/GST and issue valid VAT/GST invoices in respect of such payments.  The invoices shall conform to all relevant fiscal requirements and shall separately show the amount and rate of VAT/GST. Where the relevant legislation makes provision for VAT, GST or similar tax exemptions or reliefs, then these shall be applied accordingly where the relevant requirements are fulfilled.  The parties shall provide one another with the necessary documentation/information required to support such treatment within the appropriate time.

6.    **Other fiscal and excise documentary requirements**

The parties will each comply with any applicable documentary requirement for fiscal or excise purposes as now exists or comes into effect in the future. A party that fails to comply with this obligation (a "Defaulting Party") shall indemnify the other in respect of any costs or expenses incurred by that party which would not have been incurred but for the failure of the Defaulting Party.

**SCHEDULE E**

**Requirements in respect of Vessels at the Loading Terminal or Discharge Terminal and, where applicable, during the Voyage**

1.      **Requirements in respect of Vessels at the Loading Terminal or Discharge Terminal**

1.1     If any Vessel does not meet any of the following requirements of this Part 1 of this Schedule E:

(a)     at the Loading Terminal, the Seller or the Seller's supplier may refuse to berth, load or continue loading such Vessel; and/or

(b)     at the Discharge Terminal, the Buyer or the Buyer's receiver may refuse to berth, discharge or continue discharging such Vessel.

1.2     **ITOPF**

Except in the case of LPG, each Vessel shall be owned by or demise chartered to a member or associate member e.g. for non-tankers of the International Tanker Owners Pollution Federation Ltd. ("ITOPF").

1.3     **ISPS CODE**

**A.      FOB Provisions**

(i)     The Buyer shall procure that the Vessel shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) and where the loading port is within the USA and US territories or waters, with the US Maritime Transportation Security Act 2002 (MTSA).

(ii)    The Vessel shall when required submit a Declaration of Security (DoS) to the appropriate authorities prior to arrival at the Loading Terminal.

(iii)   Notwithstanding any prior acceptance of the Vessel by the Seller, if at any time prior to the passing of risk and title the Vessel ceases to comply with the requirements of the ISPS code or MTSA:

(a)     The Seller shall have the right not to berth such nominated Vessel and any demurrage resulting shall not be for the account of the Seller.

(b)     The Buyer shall be obliged to substitute such nominated Vessel with a Vessel complying with the requirements of the ISPS Code and MTSA and with Sections 5.3 and 5.5 of Part One hereof.

(iv)

(a)     The Seller shall procure that the Loading Terminal/installation shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) and if located within the USA and US territories, with the US Maritime Transportation Security Act 2002 (MTSA).

(b)     Subject always to sub-paragraph (vi) below any costs or expenses in respect of the Vessel including demurrage or any additional charge, fee or duty levied on the Vessel at the loading port and actually incurred by the Buyer resulting directly from the failure of the Loading Terminal/installation to comply with the ISPS Code and if located within the USA and US territories, with the MTSA, shall be for the account of the Seller, including the time required or costs incurred by the Vessel in taking any action or any special or additional security measures required by the ISPS code or MTSA.

(v)     Save where the Vessel has failed to comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) and within the USA and US territories or waters, with the US Maritime Transportation Security Act 2002 (MTSA), the Seller shall be responsible for any demurrage actually incurred by the Buyer arising from delay to the Vessel at the loading port resulting directly from the Vessel being required by the port facility or any relevant authority to take any action or any special or additional security measures or undergo additional inspections.

(vi)    If the Loading Terminal is not operated by the Seller or an Affiliate of the Seller, the Seller's liability to the Buyer hereunder for any demurrage, costs, losses or expenses incurred by the Vessel, the charterers or the Vessel owners resulting from the failure of the Loading Terminal/installation to comply with the ISPS Code or MTSA shall be limited to the payment of demurrage, costs, losses or expenses that the Seller is able to recover and does recover from its supplier or other relevant third party, and then only to the extent of such recovery. The Seller shall, however, use reasonable endeavours so to recover from its supplier or other relevant third party.

**B.     CIF/CFR/Ex Ship Provisions**

(i)     The Seller shall procure that the Vessel shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) and if located within the USA and US territories or waters, with the US Maritime Transportation Security Act 2002 (MTSA).

(ii)    The Vessel shall when required submit a Declaration of Security (DoS) to the appropriate authorities prior to arrival at the Discharge Terminal.

(iii)   Notwithstanding any prior acceptance of the Vessel by the Buyer, if at any time prior to the arrival of the Vessel at the Discharge Terminal the Vessel ceases to comply with the requirements of the ISPS code or MTSA:

(a)     The Buyer shall have the right not to Berth such nominated Vessel at the Discharge Terminal and any demurrage resulting shall not be for the account of the Buyer.

(b)     The Seller shall be obliged to substitute such nominated Vessel with a Vessel complying with the requirements of the ISPS Code and MTSA and also with Sections 14.5 and 14.6 of Part Two hereof in respect of CIF/CFR and Sections 21.4 and 21.5 of Part Three hereof in respect of Ex Ship. If title and risk to the cargo on board the Vessel subsequently substituted pursuant to iii) b) has already passed to the Buyer, such title and risk shall be deemed to have reverted to the Seller.

(iv)

    (a)    The Buyer shall procure that the Discharge Terminal / installation shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) and if located within the USA and US territories, with the US Maritime Transportation Security Act 2002 (MTSA).

    (b)    Subject always to sub-paragraph vi) below, any costs or expenses in respect of the Vessel including demurrage or any additional charge, fee or duty levied on the Vessel at the Discharge Terminal and actually incurred by the Seller resulting directly from the failure of the Discharge Terminal/installation to comply with the ISPS Code and if located within the USA and US territories, with the MTSA shall be for the account of the Buyer, including the time required or costs incurred by the Vessel in taking any action or any special or additional security measures required by the ISPS code or MTSA.

(v)    Save where the Vessel has failed to comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) and within the USA and US territories or waters, with the US Maritime Transportation Security Act 2002 (MTSA), the Buyer shall be responsible for any demurrage actually incurred by the Seller arising from delay to the Vessel at the Discharge Terminal resulting directly from the Vessel being required by the port facility or any relevant authority to take any action or any special or additional security measures or undergo additional inspections.

(vi)    If the Discharging Terminal is not operated by the Buyer or an Affiliate of the Buyer, the Buyer's liability to the Seller under this agreement for any costs, losses or expenses incurred by the Vessel, the charterers or the Vessel owners resulting from the failure of the Discharge Terminal/installation to comply with the ISPS Code or MTSA shall be limited to the payment of demurrage, costs, losses or expenses that the Buyer is able to recover and does recover from its receiver or other relevant third party, and then only to the extent of such recovery. The Buyer shall, however, use reasonable endeavours so to recover from its receiver or other relevant third party.

## 1.4   **CLC**

If the Crude Oil or Product (or the bunkers used as fuel for the Vessel) constitutes Persistent Oil (as defined in CLC), the Vessel shall:

(a)    carry on board certificate(s) as required pursuant to the 1992 Civil Liability Convention for Oil Pollution Damage or any Protocols thereto ("CLC"); and

(b)    have in place insurance cover for oil pollution no less in scope and amounts than available at that time under the rules of P&I Clubs entered into the International Group of P&I Clubs (currently standard oil pollution cover of US$ 1,000 million),

provided always the Vessel constitutes a "Ship" for the purpose of CLC.

1.5   **ISM Certificates**

The Vessel shall have on board at all times a valid ISM certificate and the owners, before and during the voyage, comply with the requirements of the ISM Code. (For the purposes of the Agreement, "ISM" means the International Management Code for the Safe Operations of Ships and for Pollution Prevention.)

1.6   **ISGOTT, etc.**

The Vessel shall be manned, operated and maintained so as to fully comply with (i) the standards set out in ISGOTT or ISGINTT as applicable, (ii) appropriate IMO recommendations, and (iii) the OCIMF Guidelines for the Control of Drugs and Alcohol On-board Ship (1990), each as amended from time to time. (For the purposes hereof, "ISGOTT" means the International Safety Guide for Oil Tankers and Terminals, "ISGINTT" means International Safety Guide for Inland Navigation Tank-Barges and Terminals, as current from time to time, and "IMO" means the International Maritime Organisation.)

1.7   **Closed loading and/or discharge**

Vessels which are loading/discharging a volatile, toxic or noxious cargo must operate at all times in the Closed Operations mode. Closed Operations refers to the procedures whereby Vessels conduct cargo transfer and ballasting operations into cargo tanks, with tank apertures closed and with vapours being emitted only by means of the dedicated venting system which is designed to disperse vapour clear of working areas and possible ignition sources. For the purposes of this sub-paragraph:

"volatile" shall mean a liquid from which gas evaporates rapidly and shall be taken to include any naturally volatile Crude Oil or Product or any Crude Oil or Product being carried at a temperature which is higher than the flash point of the Crude Oil or Product minus 10 degrees Celsius; "toxic" shall mean a poison which can affect personnel following inhalation, absorption or ingestion and shall be taken to include all Products which give off vapours containing substances for which exposure limits are recommended as they may be hazardous to the health of personnel exposed to them; and "noxious" shall mean harmful to personnel or the environment.

1.8   **IGS**

Where, pursuant to documented BP marine assurance requirements applicable at the time of the relevant shipment, the Crude Oil or Product under the Agreement is required to be carried in a Vessel which is both fitted with and actually uses an inert gas system ("IGS"), the following shall apply.

Any Vessel fitted with an IGS will not be permitted to berth or to load or discharge Crude Oil or Product unless the IGS is in good order, operative and the cargo tanks inerted.

If an IGS-equipped Vessel arrives with the IGS inoperative, the Vessel will not be berthed until the IGS is operative and the cargo tanks inerted and until that time NOR shall not be given, or if given shall not be valid, and Laytime shall not commence until commencement of loading or discharge, as the case may be.

1.9   **Ballast**

Discharge of dirty ballast, bilges, slops or other substances into water shall be in accordance with MARPOL 73/78, as amended from time to time, and is in any event totally prohibited within the confines of the Loading Terminal or the Discharge Terminal.

1.10 **Port Regulations**

The Vessel shall comply with the Buyer's receivers' regulations at the Discharge Terminal and with BP port clearance regulations at the Loading Terminal and at the Discharge Terminal.

2. **Loading or Discharge at ports in the United Kingdom**

Where the Loading Terminal or the Discharge Terminal is located within the United Kingdom, the Vessel shall observe the Code of Practice relating, inter alia, to recommendations as to routes to be taken by Vessels in certain sensitive locations in UK waters as drawn up by the British Chamber of Shipping in March 1993 and as amended from time to time.

3. **Maritime Traffic Schemes**

The Vessel shall comply with all regulations and recommendations contained in any Maritime Traffic Schemes applicable to the voyage the subject matter of the Agreement and in particular and as appropriate the Vessel shall comply with the "Turkish Straits Maritime Traffic Scheme Regulations" dated 6th November 1998, as amended or re-issued from time to time.

4. **Incorporation of Schedule F**

Where applicable, the requirements set out in Schedule F shall apply.

**SCHEDULE F**

**BP Casualty Procedure**


In the event of any incident relating to a Vessel carrying Product or Crude Oil, the risk in which has passed from the Seller to a member of the BP Group of companies, the Seller shall use its best efforts to ensure that the master of the Vessel implements the BP casualty emergency instructions as stated on the document instructions issued by the BP operator.

**SCHEDULE G**

**Supplement in respect of LPG**

1. **Applicability**

   The provisions of Part One, Part Two and Part Three shall apply to deliveries of LPG except as modified by this Schedule G.

2. **FOB deliveries**

   2.1 **Nominations**

   The provisions of Section 5 shall apply, but the following shall be added to sub Section 5.2.1:

   "(i) the loading temperature of the Vessel's cargo tanks; and

   (j) the Vessels' three previous cargoes."

   2.2 **Time allowed, running hours and damages for delay**

   For the purposes of Section 7, unless otherwise agreed between the parties and specified in the Special Provisions, the provisions relating to time allowed, running hours and damages for delay shall be in accordance with the Loading Terminal regulations as current on the day on which the Buyer's Vessel tenders NOR. If such provisions are not so specified either in the Special Provisions or in the relevant Loading Terminal regulations, then the provisions of Sections 7.3, 7.4 and 7.5 shall apply except that for the purposes of this Schedule G, "36 running hours" in Section 7.3(b) shall be deleted and replaced by "24 running hours".

3. **CFR and CIF deliveries**

   3.1 **Nominations**

   The provisions of Section 14 shall apply, except that the following shall be added to Section 14.2.1:

   "(i) the loading temperature of the Vessel's cargo tanks".

4. **Ex Ship deliveries**

   4.1 **Nomination**

   The provisions of Section 21 shall apply, except that the following shall be added to Section 21.2.1:

   "(i) the loading temperature of the Vessel's cargo tanks".

**SCHEDULE H**

**Supplement for Electronic Documentation**

In the event that the parties agree in the Special Provisions for electronic documents to be used in the Agreement, the following shall apply.

1.  Notwithstanding anything herein contained, any bill of lading, waybill, delivery order, certificate, receipt or other document issued pursuant to, or in connection with, the Agreement may be issued, stored and signed in electronic form and transmitted electronically using a secure system agreed by the parties (the "eDoc System") in accordance with the terms and conditions of the eDoc System as amended from time to time in accordance with its terms (the "Terms of Use") and the rights, obligations and interests contained in, represented by or evidenced by any such document (each, an "eDoc") may be transferred, novated or otherwise dealt with (or the transfer, novation or other dealings with them may be evidenced) electronically in accordance with the terms of the Terms of Use.

2.  Any requirement of this Agreement for presentation of one or more originals or copies of a document is satisfied by the presentation of one eDoc.

3.  Any applicable requirement of law, contract, custom or practice that any bill of lading, waybill, delivery order, certificate, receipt or other document or communication issued pursuant to, or in connection with, this Agreement (including any negotiation or endorsement thereof) shall be made or evidenced in writing, signed or sealed may be satisfied in electronic form, by an eDoc or by its electronic transfer as appropriate. The parties hereto agree not to contend in any dispute arising out of or in connection with the Agreement that any legal formality requiring any such bill of lading, waybill, delivery order, certificate, receipt or other document or communication issued pursuant to, or in connection with, the Agreement (including any negotiation or endorsement thereof) to be made or evidenced in writing, signed or sealed, has not been met by reason only that the same has been made or performed in electronic form by an eDoc.

4.  The parties hereto agree that eDocs which are converted to paper in accordance with the terms and conditions of the Terms of Use ("Converted eDocs") and which are presented, issued or otherwise utilised pursuant to, or in connection with, this Agreement shall be given full force and effect according to their tenor and in accordance with the terms and conditions of the Terms of Use, and shall not be rejected on the grounds that they are electronic records which have been converted to paper originals, or that the documents have been produced in accordance with the Terms of Use.

5.  Where under the Agreement or by virtue of the provisions of Section 63.12 the price is to be paid by means of an irrevocable documentary letter of credit, such documentary letter of credit shall, if so required by the Seller, be opened and confirmed (if applicable) with a bank which participates in the eDocs System and is bound by the Terms of Use. The documentary letter of credit shall include the following provisions in addition to the requirements set out in Section 63.14:

> "This documentary credit is subject to The Supplement to the Uniform Customs and Practice for Documentary Credits for Electronic Presentation (the "eUCP") and is also subject to the Uniform Customs and Practice for Documentary Credits (2007 Revision ICC Publication No. 600) to the extent applicable.

The following shall constitute electronic records (as defined by the eUCP) for the purposes of this documentary credit:

(a)     data created, generated, sent, communicated, received, stored or uploaded to the [*insert name of eDocs System*], signed electronically by the issuer and digitally signed by the [*insert name of eDocs System*] to authenticate the apparent identity of the sender, the apparent source of the data contained in it and that it has remained complete and unaltered; and

(b)     original paper documents which have been scanned and uploaded to the [*insert name of eDocs System*] and which have been certified by the party uploading them as a true copy of the original and digitally signed by the [*insert name of eDocs System*] for authentication purposes.

Any document which the beneficiary is required to present under this documentary credit may be presented either as a paper document or an electronic record.

Where any of the documents presented under this documentary credit is presented as an electronic record, in addition to the documents required to be presented by the beneficiary in accordance with the terms of this documentary credit, the beneficiary shall also provide a notice to the Bank to which presentation is made signifying when presentation is complete. Presentation is deemed not to have been made if the beneficiary's notice is not received.

Electronic records which are converted to paper in accordance with the provisions of the [*insert name of Terms of Use of the eDocs System*] and which are presented, issued or otherwise utilised pursuant to, or in connection with, this documentary credit shall be given full force and effect according to their tenor and in accordance with the said provisions, and shall not be rejected on the grounds that they are electronic records which have been converted to paper originals, or that the documents have been produced in accordance with the said provisions."

**SCHEDULE I**

**For Crude Oil, Additional Provisions in respect of deliveries via the Druzhba and connected pipelines**

1. **Delivery**

1.1   Delivery shall be given and taken DAP at frontier free in the Druzhba or connected pipeline at such frontier border station as shall be specified in the Special Provisions.

1.2   By not later than the day 10 days prior to the first day of the scheduled month of delivery, the Seller shall endeavour to notify the Buyer of the approximate quantity and dates of each delivery during the month in question, the actual delivery dates being at the Seller's option conditional upon the relevant Pipeline Operator's performance.  Within 3 banking days in London of receipt thereof, the Buyer shall confirm to the Seller its readiness to accept each such delivery.

1.3   The date of the last Delivery Acceptance Act ("DAA") of each separate lot delivered within any month shall be the delivery date for the total quantity so delivered.  Any quantities delivered up to and on the 5th day of the month following the scheduled delivery month shall be deemed to have been delivered during the scheduled delivery month (except for the purposes of determining the price and payment due date, for which purpose the actual date of the DAA shall be used).

2. **Quality, quantity, measurement and sampling**

2.1   Save as provided in Clause 2.2 below, the quality of the crude oil delivered shall be determined in accordance with the testing and measuring methods used at the relevant frontier border station specified in the Special Provisions and as stated in the DAA.  The certificate of quality so issued shall, except in cases of manifest error or fraud, be used for invoicing purposes but without prejudice to the rights of either party to make any claim pursuant to Section 59.2.

2.2   Where there is no relevant frontier border station issuing DAAs (in which event the DAA will be issued by the relevant authorities at the receiving refinery).  The quality shall be determined at the receiving refinery in accordance with good industry practice and the certificate of quality so issued shall, except in case of manifest error or fraud, be used for invoicing purposes but without prejudice to the rights of either party to make any claim pursuant to Section 59.

2.3   Save as provided in Clause 2.4 below, the quantity of the crude oil delivered shall be determined in accordance with the measuring methods used at the relevant frontier border station specified in the Special Provisions and as stated in the DAA. The certificate of quantity so issued shall, except in cases of manifest error or fraud, be used for invoicing purposes but without prejudice to the rights of either party to make any claim pursuant to Section 59.2.

2.4   Where there is no relevant frontier border station issuing DAAs (in which event the DAA will be issued by the relevant authorities at the receiving refinery) the quantity shall be as specified in the Route Telegram ("RT") issued by the relevant Pipeline Operator for the frontier border station.  The certificate of quantity so issued shall, except in cases of manifest error or fraud, be used for invoicing purposes but without prejudice to the rights of either party to make any claim pursuant to Section 59.2.

2.5   The Buyer shall have the right to appoint its own representative at the relevant frontier border station and/or the receiving refinery and, except with the specific prior written agreement of the Seller, all charges in respect thereof shall be for the Buyer's account and the duties of such representative shall be considered solely as a service to the Buyer.

3.   **Risk and property**

3.1   Notwithstanding any right of the Seller to retain documents until payment, the risk and property in the crude oil delivered under the Agreement shall pass to the Buyer as the crude oil passes the point of delivery specified in paragraph 1 of this Schedule.

4.   **Payment documents**

4.1   For the purposes of Section 63.3, payment shall be made by the Buyer to the Seller against presentation to the Buyer of:

(a)   the Seller's telex or fax commercial invoice (provisional invoice acceptable where the provisions of Section 63.4.2 apply); and

(b)   a copy of the DAA certified by the Seller as a true copy and, where relevant pursuant to Clause 2.2 of this Schedule, the RT or, in lieu thereof, the Seller's indemnity.

**Anexo C**

**BIMCO Terms 2015 Standard Bunker Contract**

**Annex C**

**BIMCO Terms 2015 Standard Bunker Contract**

**Letter Agreement**

(the "**Agreement**")

**Relating to the use of BIMCO Terms**

Effective Date: _____ October 2020

**Between:**

**Peninsula Petroleum Limited** with its registered office at 10 Earlsfort Terrace, Dublin 2, D02 T380, Ireland ("**PPL**");

**Peninsula Petroleum Far East Pte Limited** with its registered office at 50 Raffles Place, #06-00 Singapore Land Tower (048623), Singapore ("**PPFE**"); and

**CI International Fuels LLC** with its registered office at 5201 BLUE LAGOON DRIVE 8TH FLOOR MIAMI FL 33126 ("**CI**")

In consideration for the parties entering into commercial transactions for the sale and purchase of Marine Fuels from the date of this Agreement, the parties hereby agree that the BIMCO Standard Bunker Contract Terms 2015 ("**BIMCO**") shall govern all sales of Marine Fuels by CI to PPL or PPFE, to the exclusion of any other general terms and conditions of contract, notwithstanding any wording to the contrary on any Confirmation Note or similar document issued by CI or PPL or PPFE.  This Agreement may only be modified, amended, or supplemented by written instrument signed by each of the parties.

A copy of BIMCO is provided in the Annex.

It is further agreed that clause 22(a) (Dispute Resolution Clause 2015) of BIMCO shall apply to any Contracts, as well as to this Agreement.

Capitalised terms shall, unless defined herein, have the meaning given to them in BIMCO.

**Agreed and accepted**

By                                                      for and on behalf of **Peninsula Petroleum Limited**



By                                        for and on behalf of **Peninsula Petroleum Far East Pte Limited**



By                                                      for and on behalf of **CI International Fuels LLC**

# BIMCO TERMS 2015

STANDARD BUNKER CONTRACT

General Terms and Conditions

**Preamble**

These General Terms and Conditions shall apply to all deliveries contracted for unless the Sellers expressly confirm otherwise in the Confirmation Note. Each delivery shall constitute a separate contract.

**1.    Definitions**

Throughout this Contract, except where the context otherwise requires, the following definitions shall be applied:

**"Banking Day"** shall mean a day on which banks are open in the places of business of the Sellers and the Buyers and, where a remittance is in US dollars, in New York or, if other than US dollars, in the country of the price currency.

"**BDN**" means Bunker Delivery Note or Bunker Delivery Receipt.

"**Bunker Tanker**" means bunker barge or tanker or tank truck supplying Marine Fuels to the Vessel.

"**Buyers**" means the party contracting to purchase, take delivery and pay for the Marine Fuels.

"**Confirmation Note**" means the Sellers' written confirmation.

**"Contract"** means this contract of sale and delivery of Marine Fuels on the terms hereof as agreed by and between the Parties

**"Day/days"** means a calendar day(s), unless otherwise stated.

"**Marine Fuels**" means products as stated in the Confirmation Note.

**"Parties"** means the Sellers and Buyers collectively.

**"Party"** means Sellers or Buyers.

"**Sellers**" means the Party contracting to sell and arrange delivery of the Marine Fuels.

**"Vessel"** means the vessel nominated by the Buyers to receive Marine Fuels.

**2.          Specifications/Grades/Quality**

**(a)** The Buyers shall have the sole responsibility for the nomination of the specifications and grades of Marine Fuels fit for use by the Vessel.

**(b)** The Sellers warrant that the Marine Fuels shall be of a homogeneous and stable nature and shall comply with the specifications and grades nominated by the Buyers. Unless otherwise

agreed in the Confirmation Note, the Marine Fuels shall in all respects comply with the latest edition of ISO Standard 8217 as per the date of the Confirmation Note.

**3.**        **Quantities/Measurements**

**(a)** Subject to the provisions of Sub-clause 6(c) and Clause 9 (Claims) hereunder the quantities of Marine Fuels delivered shall be determined from the official gauge or manual sounding or meter of the Bunker Tanker effecting delivery, or in case of delivery ex-wharf, of the shore-meter or the like equipment.

**(b)** The Sellers shall invite the Buyers or their representatives to witness the opening and closing gauge, or manual sounding or meter reading and the taking of bunker temperature of all bunker tanks on the Bunker Tanker and shall be given sufficient information and access to the official gauge or manual soundings or meter of the Bunker Tanker or shore-meter and relevant documentation to verify the volume delivered.

**(c)** The Marine Fuels to be delivered under this Contract shall be measured and calculated in accordance with the ISO-ASTM-API-IP Petroleum Measurement Tables.

**4.**        **Sampling**

**(a)** The Sellers shall invite the Buyers or their representatives to witness the sampling of Marine Fuels. During bunkering a primary sample shall be drawn at a point, to be mutually agreed between the Sellers and the Buyers or their respective representatives, closest to the Vessel's bunker manifold and otherwise in accordance with the procedures set out in IMO Resolution MEPC.182(59) Guidelines for the Sampling of Fuel Oil for Determination of Compliance with MARPOL 73/78 Annex VI or any subsequent amendments thereto. Each sample shall be thoroughly mixed and carefully divided into a minimum of five (5) identical samples and one sample of each grade of Marine Fuels shall be retained on board for MARPOL purposes. The absence of the Buyers or their representatives shall not prejudice the validity of the samples taken. In the event that local bunkering rules and regulations apply mandatorily, these shall take precedence over the provisions of this Sub-clause (a).

**(b)** The samples referred to in sub-clause 4(a) shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, product name, delivery date and place and point of sampling and seal number, authenticated with the Vessel's stamp and signed by the Sellers' representative and the Master of the Vessel or the Master's authorized representative.

**(c)** Two (2) samples shall be retained by the Sellers for minimum forty-five (45) days after delivery of the Marine Fuels to the Vessel or, on being requested in writing by the Buyers, for as long as the Buyers may reasonably require, and the other three (3) samples shall be retained on board the Vessel (one of which shall be for MARPOL purposes).

**(d)** If the quantity is delivered by more than one Bunker Tanker, the sampling procedure shall be repeated as outlined in this Clause 4.

**5.**        **Delivery**

**(a)** Delivery of the Marine Fuels shall be made day and night, Sundays and holidays included, at the port or place of delivery, subject always to the custom of that port or place.

**(b)** The Buyers, or their agents at the port or place of delivery, shall give the Sellers or their representatives at the port or place of delivery, seventy-two (72) and forty-eight (48) hours approximate and twenty-four (24) hours definite notice of the Vessel's arrival and the location and time at which deliveries are required.

**(c)** The Sellers shall:

**(i)**   be in possession of all permits required to comply with all relevant regulations pertaining to delivery of Marine Fuels at the port or place of delivery, and;

**(ii)**   subject to local laws, render all necessary assistance which may be reasonably required to make connections and disconnections between the delivery hose(s) and the Vessel's bunker manifold.

**(d)** The Buyers shall be responsible for making all connections and disconnections between the delivery hose(s) and the Vessel's bunker manifold and to ensure that the hose(s) are properly connected to the Vessel's bunker manifold prior to the commencement of delivery.

**(e)** The Buyers shall ensure that the Vessel is in possession of all certificates required to comply with all relevant regulations pertaining to delivery of the Marine Fuels at the port or place of delivery and that the Master of the Vessel shall:

**(i)**   advise the Sellers in writing, prior to delivery, of the maximum allowable pumping rate and pressure and agree on communication and emergency shut-down procedures;

**(ii)**   notify the Sellers in writing prior to delivery, of any special conditions, difficulties, peculiarities, deficiencies or defects in respect of and particular to the Vessel which might adversely affect the delivery of the Marine Fuels, and;

**(iii)**   provide a free side to receive the Marine Fuels and render all necessary assistance which may reasonably be required to moor or unmoor the Bunker Tanker, as applicable.

**6.**         **Documentation**

**(a)** Before commencement of delivery the Sellers shall present for written acknowledgement by the Master of the Vessel or the Master's authorised representative, a bunker pre-delivery form or similar document, duly signed by the Sellers or their representative, which shall contain the quantities to be delivered and all information required in accordance with ISO 13739 or any subsequent amendments thereof, including, in particular, the values for: viscosity; density; sulphur content; flash point; and delivery temperature. In addition, and if available, similar information shall be provided for vanadium, ash content, water content and pour point. In the event that local bunkering rules and regulation apply mandatorily, these shall take precedence over the provisions of this Sub-clause (a).

**(b)** Once the delivery is completed and quantities measured, a BDN shall be signed and stamped by the Master of the Vessel or the Master's authorised representative, and returned to the Sellers, or their representative, as acknowledgement of the actual volume and the actual delivery temperature only and a duplicate copy shall be retained by the Master of the Vessel. This receipt shall contain the following minimum information which is warranted by the Sellers: delivered quantity in volume units; density in $kg/m^3$ at 15° C as per ISO 3675; delivery temperature; flash point; sulphur content in % m/m as per ISO 8754; and viscosity.

**(c)** In the event the Master of the Vessel is not satisfied with the sampling, quantity or any other matter concerning the Marine Fuels or their delivery, the Master shall on completion of delivery:

**(i)**   make appropriate remarks in the BDN detailing the complaints and/or referring to a separate letter of protest; or

**(ii)**   if remarks in the BDN are not permitted, issue a separate letter of protest,

receipt of either of which shall be acknowledged in writing by the Sellers' representative.

**7.**         **Price**

**(a)** The price of the Marine Fuels shall be in the amount expressed per unit and in the currency stated in the Confirmation Note for each grade of Marine Fuels delivered into the Vessel's tanks

free delivered/ex-wharf as applicable and stated in the Confirmation Note.  In the event the price is quoted in volume units, conversion to standard volume shall be at sixty (60) degrees Fahrenheit or at fifteen (15) degrees Celsius.

**(b)** Any and all additional charges incurred by the Sellers which are for the Buyers' account shall be specified in the Sellers' quotation and in the Confirmation Note and shall include but not be limited to:

**(i)** wharfage charges, barging charges or other similar charges;

**(ii)** mooring charges or port dues, and;

**(iii)** duties, taxes, charges or other costs in the country where delivery takes place.

**8.**          **Payment**

**(a)** Payment for the Marine Fuels shall be made by the Buyers within thirty (30) days or, if otherwise agreed, within the number of days stated in the Confirmation Note after the completion of delivery. In the event payment has been made in advance of delivery, such payment shall be adjusted on the basis of the actual quantities of Marine Fuels delivered and additional payment and/or refund shall be made within seven (7) days after the completion of delivery.

**(b)** Payment shall be made in full, without set-off, counterclaim, deduction and/or discount, free of bank charges.

**(c)** Payment shall be deemed to have been made on the date the payment is credited to the bank account designated by the Sellers.

**(d)** If payment falls due on a non-Banking Day, then payment shall be made on or before the last Banking Day before the due date.

**)** Any delay in payment and/or refund shall entitle either Party to interest at the rate of two (2) per cent per month or any part thereof or as otherwise agreed as per the Confirmation Note.

**(f)** In the event of non-payment or non-refund, the non-defaulting Party reserves the right to pursue such legal remedies as may be available to them to recover the amount owed.

**9.**          **Claims**

**(a)** Quantity

**(i)** Any dispute as to the quantity delivered must be noted at the time of delivery in accordance with sub-clause 6(c). If no claim for such quantity dispute is presented to the Sellers by the Buyers in writing within fourteen (14) days from the date of delivery, any such claim shall be deemed to be waived and barred.

**(ii)** The Sellers shall have the right to charge the Buyers for all proven additional expenses incurred by the Sellers in connection with the Buyers' failure to take delivery of the full quantity of the Marine Fuels ordered by the Buyers.

**(iii)** The Buyers shall have the right to charge the Sellers for all proven additional expenses incurred by the Buyers in connection with the Sellers' failure to deliver the full quantity of the Marine Fuels agreed as per the Confirmation Note, unless the quantity is amended by the Master in writing.

**(b)** Quality/Specification

**(i)** Any claim as to the quality or specification of the Marine Fuels must be notified in writing promptly after the circumstances giving rise to such claim have been discovered. If the

Buyers do not notify the Sellers of any such claim within thirty (30) days of the date of delivery, such claim shall be deemed to be waived and barred.

**(ii)** In the event a claim is raised pursuant to sub-clause 9(b)(i), the Parties hereto shall have the quality of the Marine Fuels analysed by a mutually agreed, qualified and independent laboratory. The Buyers have the option to request a full ISO 8217 analysis. The Sellers shall provide the laboratory with one of the samples retained by them as per sub-clause 4(c). The analysis shall be established by tests in accordance with ISO 8217 and ISO 4259 or any subsequent amendments thereof. Unless otherwise agreed, the expenses of the analysis shall be for the account of the Party whose claim is found wrong by the analysis.

**(c)** <u>Delay</u>

In the event of any delay resulting from:

**(i)** the Buyers' failure to give proper notices and/or to comply with the notices given pursuant to sub-clause 5(b) and/or the Buyers' Vessel failing to receive Marine Fuels at the pumping rate and pressure referred to in sub-clause 5(e)(i), or;

**(ii)** the Sellers' failure to commence delivery of the Marine Fuels promptly in accordance with the Buyers' required delivery time as notified pursuant to sub-clause 5(b) and confirmed by the Seller in writing and/or the Sellers' failure to deliver the Marine Fuels in accordance with the minimum hourly pumping rate and pressure referred to in the Confirmation Note,

then the Party suffering such delay shall be entitled to compensation from the other Party for any documented loss suffered as a result of that delay.

**(d)** <u>Exclusions</u>

Other than those mentioned above, neither the Buyers nor the Sellers shall be liable to the other Party for:

**(i)** any loss of profit, loss of use or loss of production  whatsoever and whether arising directly or indirectly from the performance or non-performance of this Contract, and whether or not the same is due to negligence or any other fault on the part of either Party, their servants or agents, or

**(ii)** any consequential loss or damage for any reason whatsoever, whether or not the same is due to any breach of contract, negligence or any other fault on the part of either Party, their servants or agents.

**(e)** <u>Time Bar</u>

In each and every case any and all claims, except those under Sub-clauses 9(a)(i) and 9(b)(i), by the Buyers shall be time barred unless arbitration proceedings have been commenced in accordance with Clause 22 (Dispute Resolution) hereof within twelve (12) months of the date of delivery of the bunkers or the day that delivery should have commenced as per the Confirmation Note.

**10.    Risk/Title**

**(a)** Risk in the Marine Fuels shall pass to the Buyers once the Marine Fuels have passed the Sellers' flange connected to the Vessel's bunker manifold.

**(b)** Title to the Marine Fuels shall pass to the Buyers upon payment for the value of the Marine Fuels delivered, pursuant to the terms of Clause 8 (Payment) hereof. Until such time as payment is made, on behalf of themselves and the Vessel, the Buyers agree that they are in possession of the Marine Fuels solely as bailee for the Sellers. If, prior to payment, the Sellers' Marine Fuels

are commingled with other marine fuels on board the Vessel, title to the Marine Fuels shall remain with the Sellers corresponding to the quantity of the Marine Fuels delivered. The above is without prejudice to such other rights as the Sellers may have under the laws of the governing jurisdiction against the Buyers or the Vessel in the event of non-payment.

**11.    Compliance with Laws and Regulations**

The Parties will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Flag State, or of the places where the Vessel trades or takes bunkers.

**12.    Sanctions Compliance Clause**

**(a)** In this Contract the following provisions shall apply where any sanction, prohibition or restriction is imposed on any specified persons, entities or bodies including the designation of any specified vessels or fleets under United Nations Resolutions or trade or economic sanctions, laws or regulations of the European Union or the United States of America.

**(b)** The Buyers and the Sellers each warrant that at the date of entering into this Contract and continuing until delivery of the Marine Fuels and Payment by the Buyers to the Sellers in full:

**(i)**    neither Party is subject to any of the sanctions, prohibitions, restrictions or designation referred to in sub-clause (a) which prohibit or render unlawful any performance under this Contract;

**(ii)**    the Sellers are selling and the Buyers are purchasing the Marine Fuels as principals and not as agent, trustee or nominee of any person with whom transactions are prohibited or restricted under sub-clause (a);

**(iii)**    the Buyers further warrant that the Vessel is not a designated vessel and is not and will not be chartered to any entity or transport any cargo contrary to the restrictions or prohibitions in sub-clause (a) above.

**(iv)**    the Sellers further warrant that the Marine Fuels are not of an origin or have been exported as a product from a place that is subject to any of the sanctions, prohibitions, restrictions or designation referred to in sub-clause (a) above.

**(c)** If at any time during the performance of this Contract either Party becomes aware that the other Party is in breach of warranty as aforesaid, the Party not in breach shall comply with the laws and regulations of any Government to which that Party or the Vessel is subject and follow any orders or directions which may be given by any regulatory or administrative body, acting with powers to compel compliance. In the absence of any such orders, directions, laws or regulations, the Party not in breach may terminate this Contract forthwith.

**(d)** Notwithstanding anything to the contrary in this Clause, Buyers and Sellers shall not be required to do anything which constitutes a violation of the laws and regulations of any State to which either of them is subject.

**(e)** The Buyers and the Sellers shall be liable to indemnify the other Party against any and all claims, including return of any Payment, losses, damage, costs and fines whatsoever suffered by the other Party resulting from any breach of warranty as aforesaid and in accordance with this Contract.

13.    **Indemnity**

**(a)** Without prejudice to any other claims arising hereunder or in connection herewith and notwithstanding the provisions of sub-clause 9(d), if loss is suffered or a liability is incurred by either Party hereto as a direct result of compliance with directions given by the other Party, during or for the purposes of the Parties' obligations hereunder, then the injured party is to be indemnified by the other in respect of such loss or liability; unless such loss or liability arises due to a negligent act or omission by the Party incurring the loss or liability.

**(b)** Where claims arise under sub-clause 9(c) and sub-clause 13(a), compensation payable in accordance with sub-clause 9(c) shall be taken into account in assessing sums payable under sub-clause 13(a).

14.    **Force Majeure**

Neither Party shall be liable for any loss, damage or delay due to any of the following force majeure events and/or conditions at the port of delivery to the extent the Party invoking force majeure is prevented or hindered from performing any or all of their obligations under this Contract, provided they have made all reasonable efforts to avoid, minimize or prevent the effect of such events and/or conditions:

**(a)** acts of God;

**(b)** any Government requisition, control, intervention, requirement or interference;

**(c)** any circumstances arising out of war, threatened act of war or warlike operations, acts of terrorism, sabotage or piracy, or the consequences thereof;

**(d)** riots, civil commotion, blockades or embargoes;

**(e)** epidemics;

**(f)** earthquakes, landslides, floods or other extraordinary weather conditions;

**(g)** strikes, lockouts or other industrial action, unless limited to the employees of the Party seeking to invoke force majeure;

**(h)** fire, accident, explosion except where caused by negligence of the Party seeking to invoke force majeure;

**(i)** any other similar cause beyond the reasonable control of either Party.

The party seeking to invoke force majeure shall notify the other Party in writing within two (2) Days of the occurrence of any such event/condition.

15.    **Termination**

Without prejudice to accrued rights hereunder, either Party hereto shall be entitled to terminate this Contract in the event of:

**(a)** any application being made or any proceedings being commenced, or any order or judgment being given by any court, for

**(i)**    the winding up, dissolution, liquidation or bankruptcy of either Party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver or administrator is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors; or

**(ii)** the appointment of a receiver, liquidator, trustee, administrator, administrative receiver or similar functionary of the other Party of all or a substantial part of its assets (otherwise than for the purpose of a reconstruction or amalgamation); or

**(b)** any act being done or event occurring which, under the applicable law thereof, has a substantially similar effect to any of the said acts or events described above; or

**(c)** either Party is in breach of the provisions of Clause 12 (Sanctions Compliance Clause ); or

**(d)** if a force majeure event as defined in Clause 14 (Force Majeure) prevents or hinders the performance of the Contract for a period exceeding ten (10) consecutive days from the time at which the impediment begins to prevent performance if notice is given without delay or, if notice is not given without delay, from the time at which notice thereof reaches the other Party.

## 16.    Pollution

**(a)** In the event of any spillage (which for the purpose of this Clause shall mean any leakage, escape, spillage or overflow of the Marine Fuels) causing or likely to cause pollution occurring at any stage of the bunkering operation, the Buyers and the Sellers shall jointly, and regardless as to whether the Buyers or the Sellers are responsible, immediately take such actions as are reasonably necessary to effect clean up and which shall always be conducted in accordance with such local laws and regulations which may compulsorily apply.

**(b)** Where it is a compulsory requirement of the law of the port or place of delivery of the Marine Fuels that the Sellers shall have in place their own oil spill contingency plans, the Sellers shall ensure that they have in place valid oil spill contingency plans.

**(c)** The Sellers hereby guarantee payment of and/or agree to indemnify and hold the Buyers harmless for any claims, losses, damages, expenses, penalties or other liabilities incurred by the Buyers under any state, national or international oil pollution legislation, as a result of any spillage occurring whilst the Marine Fuels are being transported directly or indirectly to or from the Vessel's bunker manifold except to the extent that such spillage is caused by any fault on the part of the Buyers. The Buyers shall similarly indemnify the Sellers where any such spillage occurs once risk in the Marine Fuels has passed to the Buyers except to the extent that such spillage is caused by any fault on the part of the Sellers.

**(d)** The Sellers shall use their best endeavours to ensure that the owners of the Bunker Tanker are fully insured for oil spill liabilities as required by statutory rules or regulations. If such coverage or insurance is not obtained by the owners of the Bunker Tanker, it shall be the sole responsibility of the Sellers to establish such coverage for their account. Proof and conditions of such coverage, whether established by the bunker supplying company or by the Sellers shall be made available to the Buyers at their request, as soon as practically possible.

## 17.    Drugs and Alcohol Policy

**(a)** Each Party shall enforce a company drug and alcohol policy on board the Vessel and the Bunker Tanker and, in the case of the Sellers, also in their facilities.

**(b)** Such company drug and alcohol policies shall meet or exceed the standards in the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended.

**(c)** The Buyers' personnel shall comply with the Sellers' policy in the Seller's facilities or on board the Bunker Tanker, and the Seller's personnel shall comply with the Buyer's policy when on board the Vessel.

**(d)** Both Parties acknowledge and agree that the selling, possession, distribution, use or being under the influence of alcohol or any controlled substance or dangerous drugs other than those medically prescribed is prohibited.

18.     **Confidentiality**

**(a)** Neither Party shall disclose to third parties any confidential information relating to pre-contractual discussions and/or the terms and conditions of this Contract, except with the prior written consent of the other Party, or to the extent required by law, or by a request of a government or its agency thereof.

**(b)** The Parties shall take reasonable precautions to ensure that no unauthorised disclosure of confidential information takes place.

**(c)** If a Party is uncertain as to whether information is confidential, the Sellers or the Buyers (as the case may be) shall consult with the other Party.

**(d)** Should either Party be required by law to disclose confidential information, the disclosing Party will notify the other party and shall disclose only the minimum confidential information required to satisfy legal requirements.

**(e)** Information is not confidential for the purposes of this Clause if it was in the possession of the Party prior to receipt from the other Party; becomes publicly available other than as a result of a breach of this Contract by one of the Parties; or is lawfully received from a third party.

**(f)** This Clause shall survive termination of this Contract.

19.     **Third Party Rights**

No third parties may enforce any term of this Contract.

20.     **Assignment**

Neither Party shall assign any of their rights under this Contract without the prior written consent of the other Party, such consent not to be unreasonably withheld or delayed.

21.     **Partial Validity**

If any provision of this Contract is or becomes or is held to be illegal, invalid or unenforceable in any respect under any law or jurisdiction, the provision shall be deemed to be amended to the extent necessary to avoid such illegality, invalidity or unenforceability, or, if such amendment is not possible, the provision shall be deemed to be deleted from this Contract to the extent of such illegality, invalidity or unenforceability, and the remaining provisions shall continue in full force and effect and shall not in any way be affected or impaired thereby.

22.     **Dispute Resolution Clause 2015**

**(a)** *This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A Party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other Party requiring the other Party to appoint its own arbitrator within fourteen (14) calendar days of that notice and

stating that it will appoint its arbitrator as sole arbitrator unless the other Party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other Party does not appoint its own arbitrator and give notice that it has done so within the fourteen (14) days specified, the Party referring a dispute to arbitration may, without the requirement of any further prior notice to the other Party, appoint its arbitrator as sole arbitrator and shall advise the other Party accordingly. The award of the sole arbitrator shall be binding on both Parties as if he had been appointed by agreement.

Nothing herein shall prevent the Parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 100,000 (or such other sum as the Parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

(b) * This Contract shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this Contract shall be referred to three (3) persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgment may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 100,000 (or such other sum as the parties may agree), the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.

(c)* This Contract shall be governed by and construed in accordance with Singapore**/English** law.

Any dispute arising out of or in connection with this Contract, including any question regarding its existence, validity or termination shall be referred to and finally resolved by arbitration in Singapore in accordance with the Singapore International Arbitration Act (Chapter 143A) and any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the Arbitration Rules of the Singapore Chamber of Maritime Arbitration (SCMA) current at the time when the arbitration proceedings are commenced.

The reference to arbitration of disputes under this clause shall be to three arbitrators. A Party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other Party requiring the other Party to appoint its own arbitrator and give notice that it has done so within fourteen (14) calendar days of that notice and stating that it will appoint its own arbitrator as sole arbitrator unless the other Party appoints its own arbitrator and gives notice that it has done so within the fourteen (14) days specified. If the other Party does not give notice that it has done so within the fourteen (14) days specified, the Party referring a dispute to arbitration may, without the requirement of any further prior notice to the other Party, appoint its arbitrator as sole arbitrator and shall advise the other Party accordingly. The award of a sole arbitrator shall be binding on both Parties as if he had been appointed by agreement.

Nothing herein shall prevent the Parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of USD 75,000 (or such other sum as the Parties may agree) the arbitration shall be conducted before a single arbitrator in accordance with the SCMA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

**(d)\***This Contract shall be governed by and construed in accordance with the laws of the place mutually agreed by the Parties and any dispute arising out of or in connection with this Contract shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there.

**(e)** Notwithstanding (a), (b) (c) or (d) above, the Parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract. In the case of a dispute in respect of which arbitration has been commenced under (a), (b), (c) or (d) above, the following shall apply:

**(i)** Either Party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other Party of a written notice (the "Mediation Notice") calling on the other Party to agree to mediation.

**(ii)** The other Party shall thereupon within fourteen (14) calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the Parties shall thereafter agree a mediator within a further fourteen (14) calendar days, failing which on the application of either Party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the Parties may agree or, in the event of disagreement, as may be set by the mediator.

**(iii)** If the other Party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the Parties.

**(iv)** The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

**(v)** Either Party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

**(vi)** Unless otherwise agreed or specified in the mediation terms, each Party shall bear its own costs incurred in the mediation and the Parties shall share equally the mediator's costs and expenses.

**(vii)** The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

*(Note: The Parties should be aware that the mediation process may not necessarily interrupt time limits.)*

*Sub-clauses (a), (b), (c) and (d) are alternatives; if this Clause has been incorporated into the Contract without an express choice of law and arbitration forum chosen from sub-clauses (a), (b), (c) and (d), then sub-clause (a) of this Clause shall apply. Sub-clause (e) shall apply in all cases.*

*\*\* Singapore and English law are alternatives; if Sub-clause (c) agreed also indicate choice of Singapore or English law. If neither or both are indicated, then English law shall apply by default.*

**23.    Notices**

Any Party giving notice under this Contract shall ensure that it is effectively given and such notice shall be treated as received during the recipients' office hours. If such notice is sent outside the recipients' office hours it shall be treated as received during the recipients' next working day.

**24.    Entire Agreement**

**(a)** The written terms of this Contract comprise the entire agreement between the Buyers and the Sellers in relation to the sale and purchase of the Marine Fuels and supersede all previous agreements whether oral or written between the Parties in relation thereto.

**(b)** Each of the Parties acknowledges that in entering into this Contract it has not relied on and shall have no right or remedy in respect of any statement, representation, assurance or warranty (whether or not made negligently) other than as is expressly set out in this Contract.

**(c)** Any terms implied into this Contract by any applicable statute or law are hereby excluded to the extent that such exclusion can legally be made. Nothing in this Clause shall limit or exclude any liability for fraud.

**25.    UK Sale of Goods Act**

The United Kingdom Sale of Goods Act 1979 shall apply to this Contract.

**Anexo D**

**Valores Operacionales de cada Puerto**

**Annex D**

**Operational Costs of each Port**

## SANTA MARTA PORT

| DELIVERY COSTS | |
|---|---|
| | USD / mt |
| TRUCK DELIVERIES | $      10.50 |

| BARGE DELIVERIES  LUMPSUM | $  7,000.00 |
|---|---|

## PORT OF CARTAGENA

| DELIVERY COSTS | USD/ MT |
|---|---|
| TRUCK DELIVERIES | $      16.20 |

(*trucks capacity 32 mt)

| BARGE DELIVERY AT ANCHORAGE OR PORT | USD/ MT |
|---|---|
| 30-150 mt lumpsum | $  2,000.00 |
| 151-1000 mt | $      14.00 |
| 1001-2000 mt | $      10.00 |
| 2001 - 3000 mt | $       9.00 |

| Terminals fees / Insurances / Port operation fee | USD/mt |
|---|---|
| SPRC | $       3.00 |
| Soc.Portuaria Del Dique | $       5.00 |
| CONTECAR | $       3.00 |
| Puerto Buena Vista | $       6.00 |
| Puerto Bahia | $       6.00 |
| Compas | $       3.00 |
| Pto Mamonal | $       7.00 |

## PORT OF BARRANQUILLA

| DELIVERY COSTS | USD/mt |
|---|---|
| TRUCK DELIVERIES | $      13.00 |

| BARGE FEE COST PER DELIVERY LUMPSUM | $  3,500.00 |
|---|---|

| Terminals fees / Insurances / Port operation fee | USD/ mt |
|---|---|
| SPRB | $       4.00 |
| Portmagdalena | $       4.00 |
| COMPAS | $       4.00 |
| Palermo | $       4.00 |

| | | |
|---|---|---|
| BITCO | $ | 4.00 |
| Monomeros | $ | 6.00 |
| Michellmar | $ | 4.00 |

**Anexo E**

**Contrato de Garantía Mobiliaria**


**Annex E**

**Pledge Agreement over Assets**

## CONTRATO DE GARANTÍA MOBILIARIA SOBRE ACTIVOS

Este contrato de garantía mobiliaria sobre activos (el "Contrato"), se suscribe el ____de octubre de 2020 entre:

(i) **PENINSULA PETROLEUM LIMITED**, una sociedad creada y existente de conformidad con las leyes de la República de Irlanda (el "Acreedor Garantizado"); y

(ii) **CI INTERNATIONAL FUELS LLC**, una sociedad creada y existente de conformidad con las leyes de Florida, USA (el "Garante" y conjuntamente con el Acreedor Garantizado, las "Partes").

### CONSIDERACIONES

(a). QUE, el ____ de octubre de 2020 se celebró un Contrato Marco de Compraventa (el "Contrato Marco") entre el Acreedor Garantizado y el Garante para la compra y venta de tiempo en tiempo del Activo (según este término se define más adelante).

(b). QUE, de tiempo en tiempo, el Acreedor Garantizado podrá celebrar contratos con el Garante para (i) la venta por parte del Acreedor Garantizado y la compra por parte del Garante de productos derivados del petróleo a ser entregados por el Acreedor Garantizado en la Zona Franca de Santa Marta, Colombia (los "Contratos de Carga") y (ii) la venta por parte del Garante y la compra por del Acreedor Garantizado de Producto a ser entregados por el Garante al Acreedor Garantizado en los buques de sus clientes, dentro de puertos colombianos (los "Contratos de Bunker" y junto con los Contratos de Carga, los "Contratos de Compraventa de Producto").

(c). QUE, para garantizar el cumplimiento de las obligaciones del Garante bajo el Contrato Marco y los Contratos de Compraventa de Producto, las Partes acordaron celebrar

## PLEDGE AGREEMENT OVER ASSETS

This pledge agreement over assets (the "Agreement") is entered into on ____ October 2020 by:

(i) **PENINSULA PETROLEUM LIMITED**, a company organized under the laws of the Republic of Ireland (the "Secured Creditor"); and

(ii) **CI INTERNATIONAL FUELS LLC,** a company organized under the laws of Florida, USA (the "Grantor" and together with the Secured Creditor, the "Parties").

### RECITALS

(a). WHEREAS, on ____ October 2020 a Master Sale and Purchase Agreement (the "Master Agreement") was entered between the Secured Creditor and the Grantor for the sale and purchase from time to time of the Asset (as this term is defined below).

(b). WHEREAS, from time to time, Peninsula may enter into contracts with the Grantor for (i) the sale by Peninsula and purchase by the Grantor of petroleum products for delivery by Peninsula in the Santa Marta Free Trade Zone, Colombia (the "Cargo Contracts") and (ii) the sale by the Grantor and purchase by Peninsula of Product for delivery by Grantor to Peninsula´s nominated customer vessels, within Colombian ports (the "Bunker Contracts" and together with the Cargo Contracts referred as the "Product Sale and Purchase Agreements")

(c). WHEREAS, in order to fulfill the obligations of the Grantor under the Master Agreement, the Parties agreed to execute this Pledge Agreement

1

este Contrato de Garantía Mobiliaria por medio del cual el Garante ha aceptado constituir en favor del Acreedor Garantizado, una garantía mobiliaria de primer grado de prelación sin tenencia, en los términos de la Ley de Garantías Mobiliarias, sobre los Activos (como este término se define más adelante)

(d). EN CONSECUENCIA, las Partes acuerdan celebrar este Contrato de Garantía Mobiliaria en los términos que se establecen a continuación:

whereby the Grantor has agreed to grant in favor of the Secured Creditor, a first priority security interest without possession, under the terms of Law of Securities over Movable Assets, on the Assets (as those terms are defined below).

(d). THEREFORE, the Parties agree to enter into this Pledge Agreement under the terms established below:

## CLÁUSULA I
## DEFINICIONES E INTERPRETACIÓN

## CLAUSE I
## DEFINED TERMS AND INTERPRETATION

**Sección 1.01.** *Definiciones*

**Section 1.01.** *Defined Terms*

Para efectos del presente Contrato, y a menos que expresamente se estipule de otra manera, los términos iniciados en mayúscula que se usan a lo largo del Contrato tendrán el significado otorgado a dichos términos a continuación:

For purposes of this Agreement, and unless expressly stated otherwise, capitalized terms used throughout the Agreement shall have the meaning assigned to them as set forth below:

"Acreedor Garantizado" tiene el significado asignado en el encabezado el presente Contrato.

"Secured Creditor" has the meaning assigned to such term in the preamble of this Agreement.

"Activos" significa los cargamentos de productos derivados del petróleo presentes y futuros que de tiempo en tiempo adquiera el Garante y almacene en la Zona Franca, de conformidad con el Contratos Marco y los Contratos de Compraventa de Producto y los bienes derivados o atribuibles de estos.

"Assets" means all present and future cargoes of petroleum products that are from time to time acquired by the Grantor and storage in the Free Trade Zone pursuant to the Master Agreement and the Product Sale and Purchase Agreements and all proceeds or assets derived or attributable to them thereof.

"Autoridad Gubernamental" significa cualquier gobierno estatal, municipal, nacional u otro gobierno, departamento gubernamental, comisión, junta, oficina, tribunal, árbitro, agencia o instrumentalidad, o subdivisión política de los mismos o cualquier entidad, funcionario o examinador que ejerza funciones ejecutivas, legislativas o judiciales, funciones regulatorias o administrativas pertenecientes a cualquier gobierno o a cualquier tribunal en

"Governmental Authority" means any, state, municipal, national or other government, governmental department, commission, board, bureau, court, arbitrator, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive legislative, judicial, regulatory or administrative functions of or pretraining to any government or any court, in each case whether associated with the state, provincial, or local

2

cada caso ya sea asociado con los gobiernos estatales, provinciales o locales de la República de Colombia o cualquier otra subdivisión política de los mismos (incluido el Banco de la República de Colombia).

governments of the Republic of Colombia or any other political subdivision thereof (including Banco de la República de Colombia).

"Contrato" tiene el significado asignado en el encabezado del presente Contrato.

"Agreement" has the meaning assigned to such term in the preamble of this Agreement.

"Contrato Marco" tiene el significado asignado en las consideraciones del presente Contrato.

"Master Agreement" has the meaning assigned to such term in the recitals of this Agreement.

"Contratos de Búnker" tiene el significado asignado en las consideraciones del presente Contrato.

"Bunker Contracts" has the meaning assigned to such term in the recitals of this Agreement.

"Contratos de Carga" tiene el significado asignado en las consideraciones del presente Contrato.

"Cargo Contracts" has the meaning assigned to such term in the recitals of this Agreement.

"Contratos de Compraventa de Producto" tiene el significado asignado en las consideraciones del presente Contrato

"Product Sale and Purchase Agreements" has the meaning assigned to such term in the recitals of this Agreement.

"Documentos de la Transacción" significan conjuntamente el Contrato Marco y los Contratos de Compraventa de Producto.

"Transaction Documents" means the Master Agreement and the Product Sale Agreements.

"Evento de Incumplimiento" significa el incumplimiento por parte del Garante del pago completo y oportuno de las Obligaciones Garantizadas, en los términos de los Documentos de la Transacción.

"Event of Default" means the default by the Grantor on the payment of the Secured Obligations, in the terms of the Transaction Documents.

"Garante" tiene el significado asignado en el encabezado del presente Contrato.

"Grantor" has the meaning assigned to such term in the preamble of this Agreement.

"Garantía Mobiliaria" tiene el significado otorgado a este término en la Sección 2.01 del presente Contrato.

"Security Interest" has the meaning assigned to this term in Section 2.01 of this Agreement.

"Gravamen" significa, en relación con cualquier activo, (a) cualquier hipoteca, prenda, garantía mobiliaria, contrato de fiducia en garantía o de administración o de fuente de pago o cualquier combinación de las anteriores, o encargos fiduciarios que tengan por objeto respaldar el cumplimiento de obligaciones, o limitación de dominio o de derechos sobre el activo

"Lien" means, with respect to any asset, (a) any mortgage, pledge, security interest, trust agreement that are intended to secure the payment of obligations, or limitation of domain or rights over the respective asset; (b) the right of a seller or financial lessor under a conditional sale or capital finance lease contract related to the same asset; and (c) in the case of securities,

respectivo; (b) el derecho de un vendedor o arrendador financiero bajo un contrato de compraventa condicionado o de arrendamiento financiero de capital que se relacione con el mismo activo; y (c) en caso de valores, cualquier opción de compra o derecho similar que tenga un tercero respecto de dichos valores.

any purchase option or similar right that a third party has regarding said securities.

"Ley Aplicable" significa, con respecto a cualquier Persona, cualquier ley, tratado, reglamento, decreto, resolución, acto administrativo, laudo arbitral, fallo judicial o decisión de cualquier Autoridad Gubernamental, que le sea aplicable u obligatorio a dicha Persona o a cualquiera de sus activos.

"Applicable Law" means, with respect to any Person, any law, statute, code, regulation or treaty with the force of law, and any court decision, custom or similar governmental restriction or order or guideline from any Governmental Authority that applies to Said Person or any of such Person's assets.

"Ley de Garantías Mobiliarias" significa, conjuntamente la Ley 1676 de 2013 y aquellas normas que la modifiquen, complementen o sustituyan de tiempo en tiempo, junto con sus decretos reglamentarios.

"Law of Securities over Movable Assets" means collectively, Law 1676 of 2013 and those that modify, supplement or replace it and its implementing regulations.

"Notificación de Inicio" tiene el significado asignado a este término en la Sección 6.01(ii)(a) de este Contrato.

"Initiation Notice" has the meaning assigned to such term in Section 6.01(ii)(a) of this Agreement.

"Notificación de Evento de Incumplimiento" significa la notificación que envíe el Acreedor Garantizado al Garante informando sobre la ocurrencia de un Evento de Incumplimiento.

"Event of Default Notice" means the notice to be sent by the Secured Creditor to the Grantor informing about the occurrence of an Event of Default.

"Obligaciones Garantizadas" significa todas las obligaciones (ya sean actuales o futuras, absolutas o contingentes, conjuntas, solidarias o independientes) de cualquier naturaleza que el Garante deba de tiempo en tiempo bajo los Documentos de la Transacción, ya sea por capital, intereses, honorarios, gastos, indemnización o a cualquier otro título.

"Secured Obligations" means all obligations (whether now existing or hereafter arising, absolute or contingent, joint, several, or independent) of every nature of the Grantor from time to time owed under the Transaction Documents, whether for principal, interest, fees, expenses, indemnification or otherwise.

"Pago de Obligaciones Garantizadas" significa la fecha en la que todas las Obligaciones Garantizadas sean pagadas en su totalidad según lo confirme el Acreedor Garantizado en su total discreción.

"Discharge of Secured Obligations" means the date on which all of the Secured Obligations have been paid in full as confirmed by the Secured Creditor in its sole discretion.

4

"Partes" tiene el significado asignado en el encabezado del presente Contrato.

"Persona" significa una persona natural, una sociedad comercial o civil de cualquier tipo, empresa unipersonal, patrimonio autónomo, entidad sin ánimo de lucro, asociación constituida o no constituida, fundación, corporación, *joint venture*, Autoridad Gubernamental o cualquier otro tipo de entidad o persona jurídica.

"Poder Especial" tiene el significado asignado en la Sección 6.01(ii)(f) del presente Contrato.

"Precio Justo de Mercado" significa el precio justo de mercado de los Activos que determine el avaluador contratado de conformidad con la Sección 6.01(i) del presente Contrato con base en [•].

"Procedimiento de Ejecución Especial" tiene el significado asignado en la Sección 6.01(ii) del presente Contrato.

"Registro de Garantías Mobiliarias" significa el registro de garantías mobiliarias contemplado en el artículo 38 de la Ley de Garantías Mobiliarias y reglamentado por el Decreto 1074 de 2015, así como cualquier otra norma que las adicione, sustituya o complemente.

"Zona Franca" significa la Zona Franca de Santa Marta.

**Sección 1.02.** *Interpretación.*

Salvo que expresamente se indique lo contrario o el contexto así lo requiera, en la interpretación del presente Contrato deberán observarse las siguientes reglas:

    (a) El singular incluye al plural y viceversa.

---

"Parties" has the meaning assigned to this term in the preamble of this Agreement.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Limited Power of Attorney" has the meaning assigned to this term in Section 6.01(ii)(f) of this Agreement.

"Fair Market Price" means the fair market price of the Assets that is determined by the third-party appraiser hired pursuant to Section 6.01(i) of this Agreement, based on [•].

"Special Enforcement Proceeding" has the meaning assigned to this term in Section 6.01(ii) of this Agreement.

"Registry of Liens over Movable Assets" means the created pursuant to Article 38 of the Law of Securities over Movable Assets and regulated by Decree 1074 of 2015, as modified and/or complemented from time to time.

"Free Trade Zone" means the Santa Marta Free Zone Area

**Section 1.02.** *Interpretation.*

Unless the context of this Agreement requires otherwise, the following rules will be used to interpret this Agreement:

    (a) Defined terms used herein shall be equally applicable in singular and in plural according to their respective meanings;

(b) La referencia a cualquier género incluye al otro género.

(b) When the context so requires, any pronoun shall be deemed to refer to the correct male, female or neutral form;

(c) Las referencias a días se entenderán como días calendario, salvo que se use el término "Días Hábiles".

(c) References to days shall be interpreted as calendar days, unless the term "Business Days" is used;

(d) cualquier definición de o referencia a cualquier contrato u otro documento se debe entender como referido a dicho contrato o documento incluyendo sus modificaciones.

(d) References to this Agreement or any other contract, agreement or document, or any specific provision thereof, should be construed as references to such contract, agreement, document or specific provision, as modified in accordance with its respective terms;

(e) cualquier referencia a una Persona se deberá entender como si incluyera a sus sucesores o cesionarios que se ajusten a las disposiciones del presente Contrato.

(e) Reference to a Person should also be understood to include the successors of that Person, and the permitted assignees under any agreement, instrument, contract or other document;

(f) Salvo que el contexto exija una interpretación en sentido contrario, la referencia a cualquier sección, cláusula o anexo significa aquella sección, cláusula o anexo del presente Contrato.

(f) All references to articles, sections, numerals, literals, paragraphs and annexes shall be understood as made with respect to the articles, sections, numerals, literals, paragraphs and annexes of this Agreement, unless otherwise may be inferred from the context;

(g) "Incluyendo" (y, consiguientemente, "incluye", "incluido" o "incluso") significa que comprende aquello que a continuación se indica, sin limitar la generalidad de la descripción que precede al uso de dicho término.

(g) "Including" shall be understood as "including without limitation", unless it is clear from the text that it is a limited statement;

(h) Cualquier referencia a "Parte" o "Partes" en el presente Contrato deberá entenderse efectuada a una parte o las partes del presente Contrato, según sea el caso.

(h) Any reference to "Party" or "Parties" in this Agreement shall be understood to be made to a party or parties to this Agreement, as the case may be.

(i) Los títulos que encabezan las cláusulas y secciones del presente Contrato son meramente enunciativos y no serán tomados en cuenta para la

(i) The titles of the clauses and sections of this Agreement are merely illustrative and will not be taken into account for the interpretation of the content of said clauses and sections.

interpretación del contenido de dichas cláusulas y secciones.

(j)  Las palabras técnicas o científicas que no se encuentren definidas expresamente en el presente Contrato tendrán los significados que les correspondan según la técnica o ciencia respectiva, y las demás palabras se entenderán en su sentido natural y obvio, según el uso general de las mismas.

(j)  The technical or scientific words that are not expressly defined in this Agreement will have the meaning that correspond to them according to the respective technique or science, and the other words will be understood in their natural and obvious sense, according to the general use of the themselves.

## CLÁUSULA II
## GARANTÍA MOBILIARIA

**Sección 2.01. *Constitución*.**

En virtud de este Contrato y de conformidad con lo establecido en la Ley de Garantías Mobiliarias y las demás Leyes Aplicables, el Garante otorga a favor del Acreedor Garantizado una garantía mobiliaria de primer grado sin tenencia sobre los Activos, como garantía del pago oportuno y completo y el cumplimiento cuando sea debido (ya sea al vencimiento, por aceleración o de otro modo) de todas las Obligaciones Garantizadas (la "Garantía Mobiliaria").

**Sección 2.02. *Obligaciones Garantizadas*.**

Esta Garantía Mobiliaria garantiza el pago oportuno y completo, y el cumplimiento de todas las Obligaciones Garantizadas.

El otorgamiento de esta Garantía Mobiliaria no limita al Acreedor Garantizado para hacer efectiva cualquier otra garantía (sea esta personal o real) disponible a su favor conforme a lo establecido en los Documentos de la Transacción, ni para adelantar cualesquiera otras acciones para hacer cumplir las Obligaciones Garantizadas.

La presente Garantía Mobiliaria de ninguna manera se entenderá terminada si las

## CLAUSE II
## SECURITY INTEREST

**Section 2.01. *Creation*.**

By virtue of this Agreement and in accordance with the provisions of the Law of Securities over Movable Assets and other Applicable Laws, the Grantor hereby grants in favor of the Secured Creditor a first priority security interest without possession over the Assets, to secure the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of all of the Secured Obligations (the "Security Interest").

**Section 2.02. *Secured Obligations***

The Security Interest created hereby constitutes continuing collateral security interest for all of the Secured Obligations.

The granting of this Security Interest shall not limit the rights of the Secured Creditor to enforce any other security interest granted in their favor pursuant to the Transaction Documents, or to exercise any other actions available to obtain payment in full of the Secured Obligations.

The Security Interest shall remain in full force and effect as long as there are Secured

Obligaciones Garantizadas fueran ampliadas, extendidas, modificadas, reestructuradas o novadas y cobijará cualquier obligación que se derive de dicha extensión, modificación, reestructuración o novación.

Obligations pending payment or discharge, and, if such Secured Obligations are extended, amended, restructured or novated, the Security Interest shall cover the obligations derived from such extension, amendment, restructuring or novation.

**Sección 2.03.** *Garantía Mobiliaria*

**Section 2.03.** *Security Interest*

Para los propósitos del artículo 14 de la Ley de Garantías Mobiliarias, los términos principales de las Obligaciones Garantizadas y de la presente Garantía Mobiliaria son los siguientes:

For purposes of Article 14 of the Law of Securities over Movable Assets, the main terms of the Secured Obligations and the Security Interest are as follows:

| Garante | CI International Fuels LLC |
|---|---|
| **Obligaciones Garantizadas** | Son las Obligaciones Garantizadas |
| **Monto máximo cubierto por la Garantía Mobiliaria** | USD 6,500,000 |
| **Vigencia de la Garantía Mobiliaria** | Hasta ___ de octubre de _____ más seis (6) meses adicionales. La vigencia del registro de la Garantía Mobiliaria en el Registro Nacional de Garantías Mobiliarias será renovada automáticamente por períodos sucesivos de 3 años, mientras el Pago de las Obligaciones Garantizadas no haya ocurrido. La Garantía Mobiliaria y por tanto este Contrato, continuaran vigentes hasta la fecha en que ocurra el Pago de las Obligaciones Garantizadas. |
| **Bienes dados en garantía** | Los Activos. |

| Grantor | CI International Fuels LLC |
|---|---|
| **Secured Obligations** | The Secured Obligations |
| **Maximum amount covered by this Security Interest** | USD 6,500,000 |
| **Validity of the Security Interest registration** | Until ___ October _____ plus an additional of six (6) months. The validity term for the Security Interest registration before the National Registry of Securities Over Movable Assets shall be automatically and successively extended for 3-year terms, as long as the Discharge of Secured Obligations has not occurred. The Security Interest and, consequently, this Agreement, shall continue to be valid and enforceable until the date on which the Discharge of Secured Obligations has occurred. |
| **Collateral** | The Assets. |

Las Partes reconocen expresamente que la presente Garantía Mobiliaria recae sobre

The Parties expressly acknowledge that the present Security Interest covers present and

8

bienes presentes y futuros, incluyendo los Activos y en consecuencia cubre todos los Activos que en el futuro adquiera el Garante.

future assets, including the Assets and consequently covers all of the Assets that the Grantor acquires in the future.

**Sección 2.03. *Garantía Absoluta.***

**Section 2.04. *Unconditional Security Interest***

En la máxima medida permitida por las Leyes Aplicables, y siempre que el presente Contrato se encuentre vigente, los derechos y recursos del Acreedor Garantizado bajo el presente Contrato y la Garantía Mobiliaria constituida bajo el presente Contrato son absolutos, irrevocables e incondicionales, y permanecerán en pleno vigor mientras no haya ocurrido el Pago de las Obligaciones Garantizadas y no serán liberados, suspendidos, descargados, terminados ni de ninguna manera afectados por ninguna circunstancia u ocurrencia, incluyendo:

To the maximum extent permitted by Applicable Law, and provided that this Agreement is in force, the rights and remedies of the Secured Creditor under this Agreement and the Security Interest itself shall be irrevocable and unconditional. Therefore, such rights and remedies shall continue to be in full force and effect until the Discharge of Secured Obligations has occurred; and such rights and remedies shall in no event be released, suspended, discharged, terminated or affected by any circumstance or event, including the following:

(i) Cualquier renovación, reestructuración, refinanciación, extensión, modificación, adición o eliminación de los Documentos de la Transacción o de cualquier instrumento o acuerdo al que se haga referencia en dichos documentos, o cualquier cesión o traspaso de los mismos;

(i) Any renewal, amendment or termination of any of the Transaction Documents or of any instrument or agreement referred therein, or the assignment of any of them;

(ii) Cualquier renuncia, ampliación, consentimiento, extensión, dispensa, restructuración, novación u otra acción bajo o con respecto a cualquiera de las Obligaciones Garantizadas, el presente Contrato, cualquiera de los Documentos de la Transacción u otro instrumento o acuerdo relacionado con los anteriores, o cualquier ejercicio o falta de ejercicio de cualquier derecho, facultad, recurso o privilegio bajo o respecto de las Obligaciones Garantizadas, el presente Contrato, cualquier documento parte los Documentos de la Transacción o cualquier otro instrumento o acuerdo relacionado con los anteriores;

(ii) Any waiver, extension, modification or amendment, consent, release, restructuring, novation or any other action or omission in respect of any of the Secured Obligations, this Agreement or in any other Transaction Document or in any other instrument or agreement related thereto, or any exercise or lack of exercise of any right or remedy in respect of the Secured Obligations, this Agreement, any other Transaction Document or any other instrument or agreement related thereto;

(iii) El otorgamiento de cualquier garantía o Gravamen adicional para el cumplimiento de cualquiera de las Obligaciones Garantizadas a favor del

(iii) The granting of any additional collateral, Lien or security interest with respect to the Secured Obligations for the benefit of the Secured Creditor or for the benefit of any other Person;

9

Acreedor Garantizado, o a favor de cualquier otra Persona;

(iv) Cualquier sustitución, venta, cesión, intercambio, liberación, rendición o realización de los derechos u obligaciones en virtud de los Documentos de la Transacción, o sobre cualquier garantía en favor del Acreedor Garantizado o a favor de cualquier otra Persona; y

(v) La aceleración de cualquiera de las Obligaciones Garantizadas o cualquier otro cambio del tiempo dentro del cual aquellas deban ser pagadas.

(iv) Any substitution, sale, transfer, exchange, release, surrender or realization of the rights or obligations under the Transaction Documents, or on any security interest in favor of the Secured Creditor or in favor of any other Person; and

(v) The acceleration of the maturity of any of the Secured Obligations or any other amendment in the maturity date thereof.

## CLÁUSULA III
## PERFECCIONAMIENTO Y REGISTRO

**Sección 3.01.** *Registro como Garantía Mobiliaria.*

La Garantía Mobiliaria se perfecciona con la firma de este Contrato por las Partes.

De conformidad con lo dispuesto en el artículo 21 de la Ley de Garantías Mobiliarias, este Contrato producirá efectos frente a terceros mediante su inscripción en el Registro Nacional de Garantías Mobiliarias.

El Garante autoriza al Acreedor Garantizado a realizar la inscripción de la Garantía Mobiliaria en el Registro Nacional de Garantías Mobiliaria conforme a los términos previstos para el efecto en este Contrato.

Las Partes acuerdan que los costos e impuestos de registro pagaderos por dicha inscripción serán enteramente por cuenta y cargo del Garante.

Para efectos del registro, el Acreedor Garantizado tendrá en cuenta la siguiente información para diligenciar el formulario de inscripción:

- *Garante:* CI International Fuels LLC

## CLAUSE III
## PERFECTION AND REGISTRY

**Section 3.01.** *Registry as Secured Interest.*

This Security Interest is perfected upon the execution of this Agreement by the Parties.

In accordance with the provisions of article 21 of the Law of Securities over Movable Assets, this Agreement will produce effects vis-a-vis third parties after its registration in the Registry of Liens over Movable Assets.

The Grantor authorizes the Secured Creditor to register the Security Interest in the Registry of Liens over Movable Assets, pursuant to the terms set forth in this Agreement.

The Parties agree that the registration costs and taxes payable for such registration will be entirely at the expense of the Grantor.

For purposes of registration, the Secured Creditor will take into account the following information to fill out the registration form:

- *Grantor:* CI International Fuels LLC
- *Tax ID:* L09000101567

10

- *Número de identificación tributaria:* L09000101567
- *País:* EE.UU
- *Ciudad:* Miami, Florida
- *Dirección:* 5201 Blue Lagoon Drive 8th Floor Miami FL 33126
- *Correo Electrónico:* managerciinternationalfuels.com; Andrea.cotes@hotmail.com
- *Teléfono Fijo:* +57 (035) 8630
- *Celular:* +1 (786) 477 0428, +57 (316) 275 3880, +57 (315) 683 1507
- *Proceso de Insolvencia:* N/A
- *Bienes dados en garantía:* Los Activos que de tiempo en tiempo adquiera el Garante bajo los Documentos de la Transacción y que sean almacenados en la Zona Franca de Santa Marta.
- *Monto máximo garantizado:* USD 6,500,000
- *Fecha de finalización:* Hasta Hasta ___ de octubre de _____ más seis (6) meses adicionales. Este término se prorrogará automáticamente, siempre que continúen Obligaciones Garantizadas pendientes de pago, por periodos de tres (3) años como establece el artículo 42 de la Ley de Garantías Mobiliarias.

- *Country:* USA
- *City:* Miami, Florida
- *Address:* 5201 Blue Lagoon Drive 8th Floor Miami FL 33126
- *Email:* managerciinternationalfuels.com; andrea.cotes@hotmail.com
- *Phone number:* +57 (035) 8630
- *Mobile:* +1 (786) 477 0428, +57 (316) 275 3880, +57 (315) 683 1507
- *Insolvency proceeding:* N/A
- *Collateral:* The Assets that are from time to time acquired by the Grantor pursuant to the Transaction Documents and that are stored in the Santa Marta Free Trade Zone.
- *Maximum amount covered by the Security Interest:* USD 6,500,000
- *Termination Date:* Until ___ October _____ plus an additional of six (6) months. The validity term for the Security Interest registration before the National Registry of Securities Over Movable Assets shall be automatically and successively extended for 3-year terms, pursuant to Article 42 of the Law of Securities over Movable Assets.

**Sección 3.02.** *Cancelación.*

El Garante no podrá solicitar la cancelación parcial, disminución o modificación en el Registro Nacional de Garantías Mobiliarias de la Garantía Mobiliaria con base en el pago parcial de las Obligaciones Garantizadas.

Una vez terminado el presente Contrato de conformidad con la Sección 8.03, el Garante podrá solicitar la cancelación del registro del presente Contrato en el Registro Nacional de Garantías Mobiliarias. El Acreedor Garantizado cancelará el registro de la Garantía Mobiliaria ante el Registro Nacional de Garantías Mobiliarias dentro de los treinta (30) Días Hábiles siguientes a la solicitud escrita que le haga el Garante en tal sentido, siempre y

**Section 3.02.** *Cancellation*

The Grantor may not request the partial cancellation, reduction or modification of the Security Interest in the Registry of Liens over Movable Assets based on the partial payment of the Secured Obligations.

Upon termination of this Agreement in accordance with Section 8.03, the Grantor may request the cancellation of the registration of this Agreement in the Registry of Liens over Movable Assets. The Secured Creditor shall cancel the registration of the Security interest before the Registry of Liens over Movable Assets within thirty (30) Business Days following the written request made by the Grantor in this

cuando haya ocurrido el Pago de las Obligaciones Garantizadas.

regard, as long as the Discharge of Secured Obligations has occurred.

**Sección 3.03. *Suscripción de Documentos.***

**Section 3.03. *Further Assurances.***

El Acreedor Garantizado, podrá solicitar al Garante que firme o entregue, en cualquier momento, cualquier documento o instrumento adicional y adelante cualquier medida subsiguiente o tome cualquier acción que se considere razonablemente necesaria o adecuada, o que razonablemente sea solicitada por el Acreedor Garantizado, con el fin de diligenciar e inscribir los formularios de registro correspondientes en el Registro Nacional de Garantías Mobiliarias de forma eficaz o con el fin de mantener la oponibilidad, creación, perfeccionamiento o protección de la Garantía Mobiliaria o este Contrato.

The Secured Creditor may request the Grantor to execute or deliver, at any time, any additional document or instrument and take any additional action that it reasonably deems necessary or appropriate, or that is reasonably requested by the Secured Creditor in order to fill out and register the corresponding registration forms in the Registry of Liens over Movable Assets or in order to maintain the enforceability, creation, perfection or protection of the Security Interest or this Agreement.

## CLÁUSULA IV
## DECLARACIONES Y MANIFESTACIONES

**Sección 4.01. *Declaraciones y Manifestaciones del Garante***

## CLAUSE IV
## REPRESENTATIONS AND WARRANTIES

**Section 4.01. Representations and Warranties of the Grantor**

El Garante declara y garantiza al Acreedor Garantizado, que:

(i) Es una sociedad debidamente constituida de conformidad con las Leyes Aplicables, que se encuentra válidamente existente y vigente;

(ii) Tiene todas las facultades y autorizaciones societarias y estatutarias requeridas para realizar sus actividades comerciales, poseer bienes, suscribir el presente Contrato y cumplir las obligaciones aquí previstas;

(iii) El presente Contrato es válido, legal, vinculante y exigible al Garante de acuerdo con sus términos aquí previstos;

(iv) Es el titular pleno y legítimo de los Activos, y será el titular pleno y legítimo de los Activos que adquiera en el futuro y los mismos no están, y, respecto de los bienes futuros, no estarán sometidos a Gravámenes de ningún tipo, litigios, ni han sido y, respecto de

The Grantor represents and warrants to the Secured Creditor that:

(i) It is a company duly incorporated in accordance with the Applicable Laws, and it is validly existing;

(ii) It has all the corporate and statutory powers and authorizations required to carry out its business, possess its assets, execute this Agreement and fulfill the obligations set forth herein;

(iii) This Agreement is valid, binding and enforceable in accordance with its terms as set forth herein;

(iv) It is the sole legal owner of the Assets and it will be the sole legal owner of the Assets to be acquired in the future, and they are not and, with respect to future rights, will not be subject to any kind of Liens, litigations, nor have they been and, with respect to future rights, will not

12

los bienes futuros, no serán enajenados, o dados en cualquier otra operación de transferencia, limitación o modificación del derecho de dominio, ni han sido y, respecto de los bienes futuros, no serán| prometidos en venta ni sobre ellos se han conferido opciones de venta o garantías (distintas a la presente Garantía Mobiliaria);

(v) La suscripción de este Contrato, así como el cumplimiento por parte del Garante de sus obligaciones bajo el mismo: (a) no contraviene sus disposiciones estatutarias; (b) no contraviene las disposiciones de cualquier Ley aplicable; y (c) no resulta ni resultará en un incumplimiento de cualquier otro contrato en el que el Garante sea parte, o por virtud del cual sus bienes, activos y/o derechos pudieran resultar gravados o afectados;

(vi) Con excepción de las obligaciones de registro establecidas en el presente Contrato, en el Registro Nacional de Garantías Mobiliarias, no se necesita ninguna autorización, aprobación, presentación, registro ni ninguna otra acción de una Autoridad Gubernamental (i) que no haya sido obtenida para la debida celebración y cumplimiento de este Contrato, o (ii) que deba obtenerse antes de la celebración y cumplimiento de este Contrato, para su validez, oponibilidad o exigibilidad contra el Garante; y

(vii) El presente Contrato (una vez registrado por el Acreedor Garantizado ante el Registro Nacional de Garantías Mobiliarias), constituye en favor del Acreedor Garantizado, una garantía mobiliaria de primer grado de prelación sobre los Activos.

be sold, or given in any other operation of transfer, limitation or modification of the right of ownership, neither have they have been and, with respect to future rights, will not be promised for sale, nor have they been conferred sale options or guarantees (other than this Security Interest);

(v) The execution of this Agreement, as well as the compliance with the obligations set forth herein: (a) do not contravene its bylaws; (b) do not contravene the provisions of any applicable Laws; and (c) do not result or will not result in a breach of any other contract to which the Grantor is a party, or by virtue of which its assets and / or rights could be encumbered or affected;

(vi) Except for the registration obligations established herein, in the Registry of Liens over Movable Assets, no authorization, approval, presentation, registration or any other action is required from a Government Authority (i) that has not been obtained for the execution and compliance with this Agreement, or (ii) that must be obtained before the execution and compliance, for its validity, enforceability or enforceability against the Grantor; and

(vii) This Agreement (once registered by the Secured Creditor in the Registry of Liens over Movable Assets), constitutes in favor of the Secured Creditor a first priority perfected security interest over the Assets.

**Sección 4.02.** *Confianza en las Declaraciones y Representaciones*

**Section 4.02.** *Reliance in the Representations and Warranties*

Se entiende que las declaraciones contenidas en este Contrato fueron realizadas para que el

It is understood that the representations contained in this Agreement were made in order

Acreedor Garantizado, suscribiera el presente Contrato, reconociendo además que el Acreedor Garantizado, ha accedido a suscribirlo en función de dichas declaraciones y manifestaciones, confiando plenamente en la veracidad y exactitud de cada una de estas.

for the Secured Creditor to enter into this Agreement, and the Grantor further acknowledges that the Secured Creditor has agreed to enter into the Agreement based on such representations, fully trusting the veracity and accuracy of each of these.

### CLÁUSULA V
### OBLIGACIONES

**Sección 5.01.** *Obligaciones del Garante*

### CLAUSE V
### COVENANTS

**Section 5.01. Covenants of the Grantor**

Además de las obligaciones legales, las obligaciones establecidas en los Documentos de la Transacción, así como las demás obligaciones consagradas en el presente Contrato, el Garante deberá cumplir las siguientes obligaciones hasta el Pago de las Obligaciones Garantizadas:

In addition to the obligations set forth in the Transaction Documents, as well as any other obligations established in this Agreement, the Grantor agrees until the Discharge of Secured Obligations to:

(i) Suscribir todos los documentos necesarios para el registro de esta Garantía Mobiliaria de acuerdo con los términos y dentro de los plazos previstos en el presente Contrato;

(i) Execute all the necessary documents for the registration of this Security Interest in accordance with the terms established in this Agreement;

(ii) Abstenerse de (i) otorgar a terceros algún derecho, garantía, o derecho de garantía real sobre los Activos, (b) imponer Gravámenes sobre dichos Activos o (c) llevar a cabo cualquier acción que afecte la validez o ejecución de la Garantía Mobiliaria, a menos que cuente con el consentimiento previo y escrito del Acreedor Garantizado;

(ii) Refrain from (a) giving any third party any right or guarantee over the Assets, (b) creating any Liens on the Assets or (c) carrying out any action that affects the perfection, validity or enforcement of the Security Interest, unless with prior written consent of the Secured Creditor;

(iii) Abstenerse de enajenar, prometer en venta, pignorar, dar en anticresis, dar en usufructo, otorgar opciones de venta o de cualquier manera realizar cualquier operación de transferencia, limitación o modificación del derecho de dominio, gravar o disponer total o parcialmente u obligarse en el futuro a gravar o disponer total o parcialmente de sus derechos sobre los Activos, ni celebrar algún acto o adelantar actividad alguna que tenga como objeto o efecto desmejorar los derechos Acreedor Garantizado, salvo permitido

(iii) Refrain from transferring, pledging, transferring by *anticresis* or granting a beneficial ownership over the Assets or to dispose of them entirely or partially in any other manner or to agree to dispose of them in the future entirely or partially nor celebrate any act or carry out any activity that has the purpose or effect of diminishing the rights of the Secured Creditor other than as permitted under the Transaction Documents without the prior and written consent of the Secured Creditor;

14

bajo los Documentos de la Transacción sin el previo consentimiento por escrito del Acreedor Garantizado;

(iv) Mantener la Garantía Mobiliaria como una garantía mobiliaria de primer grado y defender la Garantía Mobiliaria frente a los reclamos y demandas de cualquier Persona;

(iv) Maintain the Security Interest as a first priority perfected security interest and defend the Security Interest against the claims and demands of all Persons whomsoever;

(v) Asumir todos los gastos, incurridos o pagados derivados de la constitución, modificación, extensión, cancelación y ejecución de la Garantía Mobiliaria y este Contrato;

(v) Assume all the expenses related to the creation, modification or amendment, extension, enforcement or cancellation of the Security Interest and this Agreement;

(vi) Actualizar y enviar al Acreedor Garantizado, el Anexo A del presente Contrato dentro de los tres (3) Días Hábiles siguientes a la fecha en que suscriba nuevos Contratos de Compraventa de Producto.

(vi) Update and send to the Secured Creditor Annex A of this Agreement within three (3) Business Days following the date on which a new Product Sale and Purchase Agreements is executed; and

(vii) Tomar todas las acciones necesarias para mantener la propiedad de los Activos, salvo por lo permitido bajo los Documentos de la Transacción.

(vii) Take all necessary actions to maintain the ownership of the Assets except as otherwise permitted under the Transaction Documents.

## CLÁUSULA VI
## EJECUCIÓN DE LA GARANTÍA MOBILIARIA

## CLAUSE VI
## ENFORCEMENT OF THE SECURITY INTEREST

**Sección 6.01.** *Ejecución de la Garantía Mobiliaria.*

**Section 6.01. Enforcement of the Security Interest**

Las Partes acuerdan en virtud de este Contrato que, en el momento en que el que se configure un Evento de Incumplimiento y dicho evento sea comunicado al Garante a través de una Notificación de Evento de Incumplimiento, el Acreedor Garantizado, podrá iniciar a su discreción cualquiera de los siguientes procedimientos:

The Parties agree that upon the occurrence of an Event of Default informed to the Grantor through an Event of Default Notice, the Secured Creditor may initiate any of the following proceedings in its sole discretion:

(i) *Pago Directo:* satisfacer el pago de las Obligaciones Garantizadas directamente con los Activos.

(i) *Direct Payment*: to obtain payment in full of the Secured Obligations directly with the Assets.

Para efectos del Artículo 60 de la Ley de Garantías Mobiliaria, las Partes acuerdan que el Acreedor Garantizado contratará un tercero evaluador, el cual será informado al Garante de manera previa a su contratación, para que avalúe los Activos y determine su Precio Justo de Mercado. Si la Ley aplicable establece que esta designación no está autorizada, el nombramiento de un tercero y la valoración se harán exclusivamente de acuerdo con la Ley aplicable.

(ii) _Procedimiento de Ejecución Especial_: para asegurar el pago completo de las Obligaciones Garantizadas mediante la realización del procedimiento de ejecución especial de la Garantía Mobiliaria previsto en esta Sección. En cualquier momento después de haber enviado una Notificación de Evento de Incumplimiento al Garante, el Acreedor Garantizado podrá iniciar el siguiente procedimiento (el "Procedimiento de Ejecución Especial"):

    (a) El Acreedor Garantizado dará inicio al Procedimiento de Ejecución Especial mediante la presentación del formulario correspondiente en el Registro de Garantías Mobiliarias, registro que tendrá el efecto de notificar al Garante el inicio del Procedimiento de Ejecución Especial, de acuerdo con las disposiciones de la Ley de Garantías Mobiliarias (la "Notificación de Inicio").

    (b) Dentro de los treinta (30) Días Hábiles siguientes a la Notificación de Inicio, el Acreedor Garantizado, a su elección, podrá acudir ante notario público o centro de conciliación de la Cámara de Comercio de Bogotá para ejecutar la Garantía Mobiliaria.

    (c) Inmediatamente después de la recepción de la Notificación de Inicio, siempre que el procedimiento de oposición establecido en el Artículo 67 de la Ley de Garantías Mobiliarias se haya llevado a cabo ante un juez o mediante conciliación ante el Centro de

For purposes of Article 60 of the Law of Securities over Movable Assets, the Parties agree that the Secured Creditor will hire a third-party appraiser, who will be informed to the Grantor prior to hiring it, to assess the Assets to and determine their Fair Market Price. If the applicable Law provides that this designation is not authorized, the appointment of the third party and the valuation shall be made exclusively according to the applicable Law.

(ii) _Special Enforcement Proceeding_: to secure payment in full of the Secured Obligations by conducting the special enforcement proceeding of the Security Interest provided for in this Section. At any time after having sent an Event of Default Notice the Secured Creditor may, initiate the following proceeding (the "Special Enforcement Proceeding"):

    (a) The Secured Creditor may initiate the Special Enforcement Proceeding by filing the corresponding form on the Registry of Liens over Movable Assets. This filing shall serve as notice to the Grantor of the initiation of the Special Enforcement Proceeding in accordance with the rules of the Law of Securities over Movable Assets (the "Initiation Notice").

    (b) Within thirty (30) Business Days following the Initiation Notice, the Secured Creditor, at its sole discretion, may resort to a public notary or to the Conciliation Center of the Chamber of Commerce of Bogotá, Colombia to enforce the Security Interest.

    (c) Promptly following the receipt of the Initiation Notice, provided that the opposition proceeding established in Article 67 of the Law of Securities over Movable Assets has been carried out before a court of law or by conciliation before the Center of Conciliation of the

16

Conciliación de la Cámara de Comercio de Bogotá, Colombia, a criterio exclusivo del Acreedor Garantizado, el Acreedor Garantizadoprocederá a llevar a cabo la ejecución especial de la Garantía Mobiliaria bajo las reglas especiales establecidas en este Contrato, y en lo no previsto en este Contrato de conformidad con las reglas del Capítulo V del Título VI de la Ley de Garantías Mobiliarias y el Decreto 1074 de 2015. Este procedimiento se llevará a cabo ya sea ante el Centro de Conciliación de la Cámara de Comercio de Bogotá, Colombia, o ante un notario público, según lo determine el Acreedor Garantizado (la "<u>Entidad de Procedimiento</u>"). Para efectos del Artículo 66 (2) de la Ley de Garantías Mobiliarias, el Garante renuncia a cualquier derecho de alegar que las Obligaciones Garantizadas están sujetas a un término o cualquier otra condición previa en el momento en que el Acreedor Garantizado le entregue una Notificación de Evento de Incumplimiento.

Chamber of Commerce of Bogotá, Colombia, in the Secured Creditor's sole discretion, the Secured Creditor shall proceed to carry out the special enforcement of the Security Interest under the special rules set forth in this Agreement; and, with respect to matters not contemplated by this Agreement, in accordance with the rules of Chapter V of Title VI of the Law of Securities over Movable Assets and Decree 1074 of 2015. This proceeding shall be carried out before the Center of Conciliation of the Chamber of Commerce of Bogotá Colombia or before a public notary, as determined by the Secured Creditor. For purposes of Article 66(2) of the Law of Securities over Movable Assets, the Grantor waives any right to allege that the Secured Obligations are subject to a term or to any other condition precedent at the time the Secured Creditor delivers an Event of Default Notice.

(d) Una vez surtidas las notificaciones, inscripciones y trámites de objeciones descritos en los literales (a), (b) y (c) anteriores, el Acreedor Garantizado procederá a ofrecer en venta los Activos. Para determinar el precio de los Activos, de conformidad con el artículo 2.2.2.4.2.15. del Decreto 1074 de 2015, el Acreedor Garantizado tendrá en cuenta el Precio Justo de Mercado aplicable en el momento de ofrecer en venta los Activos.

(d) Once the notifications, registrations and objection procedures described in subparagraphs (a), (b) and (c) above have been carried out, the Secured Creditor will proceed to offer the Assets for sale. To determine the price of the Assets, pursuant to Article 2.2.2.4.2.15 of Decree 1074 of 2010, the Secured Creditor will take into account the Fair Market Price applicable at the moment on which the Assets will be offered for sale.

(e) El procedimiento para la venta de los Activos deberá seguir las siguientes reglas y principios:

(e) The proceeding for the sale of the Assets shall follow the following rules and principles:

(A) El tercero a quien se venderán los Activos no puede ser el beneficiario real del Garante. No es necesario que exista un

(A) The third party to which the Assets will be sold may not be the beneficial owner of the Grantor. It is not necessary that

número plural de oferentes para transferir los Activos;

(B) Los Activos pueden transferirse al oferente que haya ofrecido las mejores condiciones según lo determine el Acreedor Garantizado. La evaluación de las "mejores condiciones" comprenderá no solo la evaluación del precio ofrecido sino también las condiciones de pago. El precio base para el proceso de oferta será el 100% del Precio Justo de Mercado. El precio base estará vigente después de iniciado el proceso para la venta. Si no se reciben ofertas con un valor que oscile entre el 100% y el 90% del Precio Justo de Mercado, el Acreedor Garantizado iniciará un nuevo proceso con un precio que no sea inferior al 70% del Precio Justo de Mercado. Cualquier reducción del precio base de la oferta solo surtirá efecto si ningún oferente ha aceptado presentar una oferta por el precio base respectivo propuesto dentro de un mes;

(f) Una vez que se hayan llevado a cabo las actividades anteriores, el Garante procederá a transferir los Activos al oferente adjudicatario. Para estos fines, el Garante otorga suficiente poder al Acreedor Garantizado para que pueda llevar a cabo cualquier acto y ejecutar cualquier documento que sea necesario para perfeccionar la transferencia de los Activos (el "Poder

there is a plural number of bidders for transferring the Assets;

(B) The Assets may be transferred to the bidder that has offered the best conditions as determined by the Secured Creditor. Evaluation of the "best conditions" shall comprise of not only evaluating the price tendered but also the payment terms. The base price for the bid process shall be 100% of the Fair Market Price. The base price shall be in force for at least one month after the Secured Creditor has initiated the proceeding for the sale of the Assets. If no offers with a value that range between 100% and 90% of the Fair Market Price are received, the Secured Creditor shall initiate a new process with a price that is not less than 80% of the Fair Market Price. In addition, if such process fails, the Secured Creditor shall initiate a new process with a price that is not less than 70% of the Fair Market Price. Any reduction of the base price for the bid shall only take effect if no bidder has agreed to submit an offer for the respective proposed base price within one month;

(f) Once the above activities have been carried out, the Grantor shall proceed to transfer the Assets to the awarded bidder. For these purposes, the Grantor grants sufficient power to the Secured Creditor so that it may carry out any acts and execute any documents as necessary to perfect the transfer of the Assets (the "Limited Power of Attorney"). Such Limited Power of

Especial"). Dicho Poder Especial es irrevocable y se otorga en beneficio del Acreedor Garantizado. Al ejecutar este Contrato de Garantía Mobiliaria, el Acreedor Garantizado acepta irrevocablemente el Poder Especial otorgado en este documento. El Garante renuncia expresamente a su derecho a presentar cualquier reclamo u objeción con respecto a las condiciones bajo las cuales se han vendido o transferido los Activos, como el precio, lo términos de pago, el comprador y cualquier otra observación con respecto al acuerdo de venta o cesión aplicable que se firme, o con respecto a cualquier efecto o condición de la transferencia realizada en lugar de pago, según sea el caso.

Attorney is irrevocable and granted for the benefit of the Secured Creditor. By executing this Agreement, the Secured Creditor irrevocably accepts the Limited Power of Attorney granted herein. The Grantor expressly waives its right to make any claim or any objection with respect to the conditions under which the Assets have been sold or assigned, such as the price, the payment terms, the buyer and any other observation in respect of the applicable sales or assignment agreement that is signed, or in respect of any effects or conditions of the transfer made in lieu of payment, as the case may be.

(g) En cualquier momento antes de que el Acreedor Garantizado transfiera los Activos, el Garante puede solicitar que el Procedimiento de Ejecución Especial se termine mediante el pago completo de las Obligaciones Garantizadas en fondos inmediatamente disponibles y de otra manera efectuando el Pago de las Obligaciones Garantizadas, así como el pago total en fondos inmediatamente disponibles de cualquier gasto incurrido por el Acreedor Garantizado durante el Procedimiento de Ejecución Especial.

(g) At any time before the Secured Creditor transfers the Assets, the Grantor may request the Special Enforcement Proceeding to be terminated by payment in full of the Secured Obligations in immediately available funds and otherwise effecting the Discharge of Secured Obligations, as well as the payment in full in immediately available funds of any expenses incurred by the Secured Creditor or otherwise during the Special Enforcement Proceeding.

(iii) _Procedimiento Judicial:_ asegurar el pago completo de las Obligaciones Garantizadas mediante la ejecución de la Garantía Mobiliaria ante los jueces colombianos aplicables de conformidad con la Ley aplicable, incluida cualquier ley procesal vigente.

(iii) _Court Collection Proceedings:_ to secure payment in full of the Secured Obligations by enforcing the Security Interest before the applicable Colombian courts in accordance with the applicable Law, including any current procedural law.

**Sección 6.02.** *Recursos Acumulables*

**Section 6.02.** *Cumulative Remedies*

Todos y cada uno de los derechos, poderes, facultades y recursos específicamente otorgados al Acreedor Garantizado, bajo este

Each and every one of the rights, powers, authority and remedies specifically given to the Secured Creditor pursuant to this Agreement

Contrato, se otorgan en adición de cada uno de los otros derechos, poderes, facultades y recursos conferidos específicamente al Acreedor Garantizado, bajo los demás contratos o documentos que se suscriban de tiempo en tiempo en virtud de los Documentos de la Transacción y las Leyes aplicables o por orden de una Autoridad Gubernamental, y todos y cada uno de tales derechos, poderes, facultades y recursos, sea que específicamente se otorguen aquí o que existan de otro modo cualquiera de tiempo en tiempo o simultáneamente, podrán ejercerse parcial o totalmente y con la frecuencia y en el orden en que el Acreedor Garantizado estime conveniente o de acuerdo con la Ley aplicable.

Todos estos derechos, poderes, facultades y recursos serán acumulables y el ejercicio o el inicio del ejercicio de uno no implicarán la renuncia de ningún otro de dichos derechos. Ni la demora ni la omisión por el Acreedor Garantizado en el ejercicio de tales derechos, poderes facultades y recursos, ni la falta de renovación o prórroga de alguna de las Obligaciones Garantizadas menoscabará ninguno de tales derechos, poderes, facultades y recursos ni constituirá una renuncia con respecto a un Evento de Incumplimiento, así como tampoco la aceptación del mismo. La falta de notificación al Garante en relación con sus obligaciones en ningún caso les dará derecho a ser notificados en el futuro en otras o similares circunstancias ni constituirá una renuncia de ninguno de los derechos del Acreedor Garantizado, a ninguna otra acción o acción adicional en cualquier circunstancia sin que medie notificación, exigencia o requerimiento. En el evento en que el Acreedor Garantizado entable cualquier demanda para hacer valer los derechos aquí establecidos, y obtenga una sentencia favorable, entonces en tal juicio el Acreedor Garantizado podrá recobrar sus gastos, incluyendo los honorarios del abogado, y las sumas que sean determinadas en la sentencia.

are conferred in addition to any other rights, powers, authority and recourses conferred to the Secured Creditor under any other agreement or documents that are execute under the Transaction Documents and applicable Law, or under any acts or decisions from any Governmental Authority. The Secured Creditor may exercise in a partial or total manner and as frequently as it chooses, in its sole discretion, or in accordance with applicable Law each one of such rights, powers, authority and recourses.

All these rights, powers, authority and remedies are cumulative; and exercising them or starting to exercise them shall not constitute a waiver of any of such rights. No delay or omission on the part of the Secured Creditor in the exercise of such rights, powers, authority and remedies shall impair or constitute a waiver of any of such rights, powers, authority and remedies or the occurrence of an Event of Default. The failure to give notice to the Grantor regarding its obligations will in no case give the right to be notified in the future in other or similar circumstances or constitute a waiver of any of the rights of the Secured Creditor to any other action or additional action in any circumstance without the need of a notification, demand or requirement. In case the Secured Creditor initiates any claim or lawsuit or any out-of-court proceeding to enforce the rights established herein, and obtains a favorable decision or pronouncement therein, then, in such proceeding, the Secured Creditor shall be entitled to be reimbursed by the Grantor for any expenses incurred by it, including any attorney fees and any amounts awarded or that are determined in the decision.

## CLÁUSULA VII
## NOTIFICACIONES

**Sección 7.01. *Notificaciones*.**

Toda notificación o comunicación que se curse conforme al presente Contrato se hará por escrito. Salvo indicación contraria en el presente Contrato, las notificaciones o comunicaciones se darán por debidamente cursadas cuando hayan sido entregadas en mano, o por correo electrónico o aéreo certificado, o por servicio de *courier*, al obligado o a la Persona facultada a recibirlas, o se entreguen en la dirección de dicha parte especificada a continuación, o en cualquier otra dirección que haya sido indicada mediante aviso cursado al remitente de la notificación o comunicación, estipulándose, sin embargo, que el aviso de cambio de dirección será efectivo desde el momento de la recepción del aviso correspondiente remitido por la parte respectiva. Así mismo, las Partes aceptan ser notificados en cualquier juicio, demanda, reclamación, acción o procedimiento que surja o resulte del presente Contrato en las siguientes direcciones:

Por el Garante:

Nombre: CI International Fuels SAS
Dirección: 77B Street 59-61 Office1101 Barranquilla - Colombia
Correo electrónico: managerciinternationalfuels.com

Por el Acreedor Garantizado:

Nombre: Peninsula Petroleum (Brokers) Limited
Dirección: Byron House 7-9 St. James's St. Londres SW1A 1EE
Correo electrónico: legal@peninsulapetroleum.com

## CLAUSE VII
## NOTICES

**Section 7.01. *Notices*.**

Any notice or communication that is made pursuant to this Agreement shall be made in writing. Unless otherwise indicated in this Agreement, notices or communications will be considered duly processed when they have been delivered by hand, or by certified mail or airmail, or by courier service, to the obligor or to the Person authorized to receive them, or are delivered. at the address of said party specified below, or at any other address that has been indicated by notice sent to the sender of the notification or communication, stipulating, however, that the notice of change of address will be effective from the time of receipt of the corresponding notice sent by the respective party. Likewise, the Parties agree to be notified in any judgment, demand, claim, action or procedure that arises or results from this Agreement at the following addresses:

To the Grantor:

Name: CI International Fuels SAS
Address: 77B Street 59-61 Office1101 Barranquilla - Colombia
Email: managerciinternationalfuels.com

To the Secured Creditor:

Name: Peninsula Petroleum (Brokers) Limited
Address: Byron House 7-9 St. James's St. London SW1A 1EE
Email: legal@peninsulapetroleum.com

21

| CLÁUSULA VIII | CLAUSE VIII |
|---|---|
| MISCELÁNEOS | MISCELLANEOUS |

**Sección 8.01.** *Indivisibilidad.*

Los Activos garantizan el pago y el cumplimiento completo y oportuno cuando sean debidos (ya sean por el vencimiento, aceleración o de otra manera) de la totalidad de las Obligaciones Garantizadas y sus obligaciones accesorias, en caso de que las hubiere. En consecuencia, al concurrir el Acreedor Garantizado a hacer efectivo el pago de las Obligaciones Garantizadas, los Activos objeto de este Contrato, se destinarán en forma exclusiva y privilegiada a cubrir la totalidad de las Obligaciones Garantizadas.

**Sección 8.02.** *Costos y gastos.*

Serán de cargo del Garante todos los gastos, impuestos, honorarios, estudios y costos que ocasione el otorgamiento de este Contrato, especialmente los de registro, los de la cancelación y del cobro, si fueran del caso. En el caso en que haya lugar a una acción judicial o extrajudicial, serán de cargo del Garante los costos y gastos de cobranza y los honorarios del abogado.

**Sección 8.03.** *Vigencia.*

Este Contrato permanecerá plenamente vigente hasta el Pago de las Obligaciones Garantizadas, salvo que se acuerde lo contrario bajo los Documentos de la Transacción o se acuerde por escrito entre las Partes.

**Sección 8.04.** *Renuncia de derechos.*

La Garantía Mobiliaria no se extinguirá por ningún acto u omisión del Acreedor Garantizado, ni por el hecho que el Acreedor Garantizado permita al Garante que incumpla sus obligaciones o las cumpla tardía, imperfectamente o en forma distinta de la pactada, ni por el hecho de que el Acreedor Garantizado no insista en el cumplimiento

**Section 8.01.** *Non-Severability.*

The Assets guarantee the entire and punctual performance of the entire Secured Obligations. In this manner, when the Secured Creditor concurs to make effective payment of the Secured Obligations, the entire Assets shall be applied in exclusive and preferential manner for the payment of the entire Secured Obligations.

**Section 8.02.** *Costs and expenses.*

The Grantor will be in charge of all the expenses, taxes, fees and costs caused by the execution of this Agreement, especially those caused for the registration, cancellation and collection, if applicable. In the event that there is a judicial or extrajudicial action, the Grantor will be responsible for the costs and expenses of collection and the attorney's fees

**Section 8.03.** *Termination.*

This Agreement shall remain in full force and effect until the Discharge of Secured Obligations, except as otherwise agreed under the Transaction Documents or agreed in writing by the Parties.

**Section 8.04.** *No waiver.*

No delay or failure on the part of the Secured Creditor to exercise any right hereunder or under any other Transaction Documents shall constitute a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

22

exacto de tales obligaciones o no ejerza oportunamente los derechos contractuales o legales que le corresponden contra el Garante.

**Sección 8.05.** *Cesión.*

El Garante no podrá ceder a ningún título sus derechos u obligaciones bajo el presente Contrato, sin el consentimiento previo, expreso y escrito del Acreedor Garantizado. El Acreedor Garantizado podrá ceder su posición bajo el presente Contrato en cualquier momento a favor de la persona o entidad a quien ceda su posición bajo el Contrato Marco.

**Sección 8.06.** *Modificaciones.*

Cualquier modificación al presente Contrato deberá constar por escrito y estar suscrita por los representantes debidamente autorizados de cada una de las Partes.

**Sección 8.07.** *Nulidades.*

Toda disposición del presente Contrato que resultare nula, inválida o inexigible en una jurisdicción determinada, no anulará, invalidará o hará inexigible las demás disposiciones de este Contrato en dicha jurisdicción, ni afectará la validez y exigibilidad de dicha disposición y del Contrato en cualquier otra jurisdicción.

**Sección 8.08.** *Ejemplares.*

Este Contrato se suscribe en tantos ejemplares como Partes del mismo lo suscriban, todos los cuales tomados como un todo constituirán un único y mismo instrumento.

**Sección 8.09.** *Agente o Apoderado.*

Las Partes reconocen y aceptan que el Acreedor Garantizado podrá nombrar un agente o apoderado para que ejerza sus derechos bajo el presente Contrato. Dicho agente o apoderado será un simple mandatario del Acreedor Garantizado y, en consecuencia,

**Section 8.05.** *Assignment.*

The Grantor may not assign his rights or obligations under this Agreement, without the prior, express and written consent of the Secured Creditor. The Secured Creditor may assign its position under this Agreement at any time in favor of the person or entity to whom it assigns its position under the Master Agreement.

**Section 8.06.** *Amendments.*

Any amendment to this Agreement must be in writing and signed by the duly authorized representatives of each of the Parties.

**Section 8.07.** *Invalidity.*

Any provision of this Agreement that becomes void, invalid or unenforceable in a given jurisdiction, will not nullify, invalidate or render unenforceable the other provisions of this Agreement in that jurisdiction, nor will it affect the validity and enforceability of said provision and the Agreement in any other jurisdiction.

**Section 8.08.** *Copies.*

This Agreement is executed in as many copies as Parties to it, all of which taken as a whole will constitute a single and same instrument.

**Section 8.09.** *Agent or Attorney in Fact*

The Parties acknowledge and agree that the Secured Creditor may appoint an agent or attorney in fact to exercise its rights under this Agreement. Said agent or attorney in fact shall be a simple agent of the Secured Creditor and, consequently, the Secured Creditor shall retain

éste conserva en todo momento durante la vigencia de las Obligaciones Garantizadas o este Contrato, el derecho a revocar el respectivo mandato o apoderamiento al agente o apoderado en cualquier momento y a designar cualquier tercero para que ejerza las funciones conferidas al agente o apoderado, dando notificación al Garante de la nueva designación.

at all times during the term of the Secured Obligations or this Agreement, the right to revoke the respective mandate or power of attorney of the agent or attorney in fact at any time and to designate any third party to exercise the functions conferred on the agent or attorney in fact, and shall undertake to notify the Grantor of the new designation.

**Sección 8.10.** *Idioma.*

**Section 8.10.** *Language*

Este Contrato ha sido redactado en español e inglés para el beneficio de las Partes. En caso de contradicción entre lo previsto en la columna en español y la columna en inglés de este Contrato, prevalecerá lo dispuesto en la columna en español.

This Agreement has been written in Spanish and English for the benefit of the Parties. In case of contradiction between the terms of the Spanish column and the English column of this Agreement, the terms of the Spanish column shall prevail.

**Sección 8.11.** *Legislación Aplicable y Resolución de Conflictos.*

**Section 8.11.** *Applicable Law and Jurisdiction*

Las Partes convienen que el presente Contrato se regirá por las leyes de Colombia y se someten expresa e irrevocablemente a la jurisdicción de los jueces competentes de Colombia.

The Parties agree that this Agreement will be governed by the laws of Colombia and submit expressly and irrevocably to the jurisdiction of the competent judges of Colombia.

24

En constancia de lo anterior, el presente Contrato de Garantía Mobiliaria sobre Activos se suscribe el _____ de _____ de 2020.

**CI INTERNATIONAL FUELS LLC**
(en calidad de Garante),

_____

Nombre:
Cargo:

25

En constancia de lo anterior, el presente Contrato de Garantía Mobiliaria sobre Activos se suscribe el ____de _____ de 2020.

**PENINSULA PETROLEUM LIMITED**
(en calidad de Acreedor Garantizado),

_____

Nombre:
Cargo: