**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

Case No.: 22-cv-20712-RKA

PENINSULA PETROLEUM LIMITED,

                Plaintiff,

   v.

CI INTERNATIONAL FUELS LLC,

_____Defendant._____/

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S MOTION
<u>TO DISMISS FOR FORUM NON CONVENIENS (DKT. 52)</u>**

Plaintiff, Peninsula Petroleum Limited ("Peninsula" or "Plaintiff"), by and through its undersigned counsel, respectfully submits this memorandum of law in opposition to the Motion to Dismiss for Forum Non Conveniens (Dkt. 52 "Defendant's Present Motion") filed by CI International Fuels LLC ("Defendant" or "CI Int'l"). For the reasons stated below, Defendant's Motion should be denied in its entirety.

**PRELIMINARY STATEMENT**

Defendant erroneously contends that the "Governing Law and Arbitration" clause of the Master Sale and Purchase Agreement (Dkt. 38-2*:* "Master Agreement") between the parties is an all-or-nothing proposition requiring "arbitration as to any disputes and claims arising from or in connection with the [Master Agreement]." (Dkt. 52 "Defendant's Present Motion" pg. 3.) This is a material misrepresentation of the plain language of the Master Agreement, which clearly draws a distinction between a "claim" and a "dispute." (*Compare* Master Agreement, § 11.1 vs. 11.2.) The narrow arbitration provision (Section 11.2) includes disputes but by omission excludes the claims referenced in the broader governing law provision (Section 11.1). By the plain language of the Master Agreement, a liquidated claim – that is, a claim to recover a specific amount of money that one party agrees it owes another – is outside of the scope of the arbitration provision.

The Amended Verified Complaint (Dkt. 38 "AVC") centers around such a liquidated *claim* and not a *dispute* between the parties. The distinction between the two cannot be overemphasized.

And despite having previously submitted an earlier Motion to Dismiss that was directed at identical claims in Plaintiff's First Verified Complaint (Dkt. 26 "Previous Motion") and considering the points made in Peninsula's opposition thereto (Dkt. 29 "Previous Opp. Memo") – including facts proving that Defendant never contested the amount it owed (*Id*. at 14) – Defendant *still* presents no facts to prove that it did not agree to the liquidated sum.

1

Defendant's conduct in the months leading up to this lawsuit, as set forth in the Declarations of Mauricio Perez Grosso and Gabriela Sanchez Urzais (which are being re-filed contemporaneously herewith), establish that Defendant *agreed* upon the sum that it owed Peninsula. Despite this agreement, Defendant failed to pay. Peninsula made a demand for money due as a result. Peninsula has an uncontroverted right to this money. Peninsula has a liquidated claim.

Only for the first time on reply on the Previous Motion – in response to Peninsula pointing out the glaring deficiency in its proof – did Defendant state in conclusory fashion that "[t]he parties did not reach agreement concerning the validity, existence, and amount, if any, of the alleged price adjustment debt." (Dkt. 31 "Previous Reply Memorandum" at 3.) Under applicable law, this assertion should have been rejected then and should be rejected if it is rased now. This holds even more true considering that, with a second bite at the apple in filing the Present Motion, Defendant submitted no new proof. Instead, it purports to rely solely on the declaration that was filed in support of the Previous Motion. Thus, the Present Motion has the *same* major deficiency. In fact, it does not even reference the arguments made previously in reply, opting instead to conflate the scope of Master Agreement § 11.1 ("dispute or claim") with the narrower scope of § 11.2 ("dispute") hoping that this Court will look over the fact that it *twice* failed to prove that it did not agree to the liquidated sum. But in an abundance of caution, and to head off any gamesmanship that may come in reply for the Present Motion, Peninsula submits that the conclusory, general allegations in Ochoa's reply declaration renders it evidentiarily weightless.

Alternatively, if the Court was to somehow find that the liquidated claim should be arbitrable, Defendant's Present Motion fails to provide any argument that an adequate alternative forum is available or that public interest factors weigh in favor of dismissal. In fact, Defendant

argues that the public interest factors weigh in favor of the forum of this action being in Colombia (Present Motion at 9), despite arguing that the claims should be arbitrated in London (*Id.* at 7). It seems Defendant wants these claims to be heard anywhere but its home state, its place of incorporation, where its registered principal address is located, and where it issued invoices.

Finally, Defendant makes no effort to argue that the Third Claim for Relief (Fraudulent Transfers) in the Amended Verified Complaint was subject to its *forum non conveniens* arguments. And it is easy to see why: a fraudulent transfer claim based on post-litigation transfers of money is clearly outside the scope of Master Agreement § 11.2.

Both the original liquidated claim and the fraudulent transfer claim are rightfully and properly brought in this Court against Defendant – a limited liability company incorporated in this very jurisdiction – as matters outside the scope of the Master Agreement's arbitration provisions. Defendant's Present Motion should be denied.

## I.   SUMMARY OF THE FACTS AND PROCEDURAL POSTURE

### A.  Plaintiff's Liquidated Claim

The facts of this matter, established by Plaintiff's Amended Verified Complaint and uncontradicted by the Declaration of Jaime Ochoa, the Manager of CI Int'l (Dkt. 26-2: "First Ochoa Decl."), are relatively straightforward. On or about October 26, 2020, the parties entered into the Master Agreement, whereby Peninsula agreed to sell and CI Int'l agreed to purchase marine fuel. (AVC ¶¶ 16-17; First Ochoa Decl. ¶ 6.) On December 3, 2020, Peninsula sold and delivered to CI Int'l a total cargo of approximately 15,000 MT of oil pursuant to three Cargo Recaps of 5,000 MT each. Two weeks later, Peninsula issued three pro-forma invoices, each for USD 2,025,000.00 (tentatively priced at USD 405 per MT, the market price at that time). (AVC ¶¶ 21-23.) CI Int'l then made all the payments in relation to each Pro-forma Invoice (as set forth on Schedule 1 to the AVC), over the course of February, March, and April, 2021 (subject to a

slight downward adjustment to reflect the actual total discharge volume of 14,969.728 MT, such that the third invoice was only for 4969.728 MT). (*Id.*)

Due to low demand and rising prices, CI Int'l did not immediately lift any of the 14,969.728 MT of oil that had been sold and delivered to it. (*Id.* ¶ 24.) The first 5,000 MT was lifted and price adjusted on or about 3 May 2021 (*i.e.,* four months after delivery), at which time Peninsula sent a price-adjusted invoice for a total amount of USD 334,912.50, which was fully paid by CI Int'l. (*Id.* ¶ 25.) Another 1,000 MT was lifted and price adjusted on or about 24 May 2021, at which time Peninsula sent a price-adjusted invoice for a total amount of USD 82,750.00, which was also fully paid. (*Id.* ¶ 26.) By mid-May 2021, market prices concerning marine fuel had gone up significantly. (*Id.* ¶¶ 27.) Peninsula demanded that the parties agree upon the price adjustment for the balance of the oil (roundly in the amount of 9,000 MT), that had not yet been lifted by CI Int'l, in order for CI Int'l to pay the difference to Peninsula. (*Id.*)

On June 7 and 8, 2021, Mauricio Perez Grosso of Peninsula exchanged "WhatsApp" messages with Mr. Ochoa, in which they agreed to adjusted pricing for 1,000 MT. (Grosso Decl. ¶ 4.) On June 15, 2021, they spoke about resolving the price adjustment for the remaining 8,000 MT. (*Id.* ¶ 5; Exhibit 1 thereto.) Mr. Grosso then sent Mr. Ochoa an email memorializing their discussion and presenting two options for resolving the remaining price adjustment. (*Id.*; Ex. 1.) They spoke again on June 16 or 17, 2021, and agreed on option one. (*Id.*; Ex. 1.) Mr. Grosso sent Mr. Ochoa another email memorializing their discussion and again accepting option one, together with calculations and due dates, promising to send invoices in furtherance of their agreement. (*Id.*; Exhibit 1.) He did so on June 22, 2021, sending five corresponding invoices. (*Id.*; Exhibit 1.) CI Int'l never paid the agreed-upon invoices (totaling $1,545,293.56). (*Id.*)

In his First Declaration, Mr. Ochoa confirmed his authority to take legal action for CI Int'l. (First Ochoa Decl. ¶ 3.) This is plainly substantiated by his agreement for CI Int'l to pay $1,545,293.56 to Peninsula to resolve the matter of the price adjustment.

Once CI Int'l was in default in paying four of the five invoices, it reached out again to Peninsula with a proposed "payment plan agreement." (Grosso Decl. ¶ 7.) The proposed agreement sought to resolve the payment of the $1,545,293.56, together with accrued interest, via payment installments. (*Id.* ¶¶ 7-9; Exhibit 2.) It is worth emphasis that CI Int'l included or adopted "whereas" clauses that expressly acknowledged the debt it owed by reason of its failure to pay the five invoices within the specified due dates (and calculated owed interest for the four invoices that were past due). (*Id.* ¶ 10; Ex. 2.) The parties went back and forth with proposed revisions but did not reach consensus on a new repayment plan for the money that CI Int'l acknowledged it owed. (*Id.* ¶ 11.)

As a result of Peninsula thereafter sending default notices, Gabriela Sanchez Urzais, senior legal associate affiliated with Peninsula, began dealing with Willingthon Perinan, representing CI Int'l. (Urzais Decl. ¶ 4.) On October 5, 2021, Mr. Perinan sent an email (prefaced by various legal caveats) acknowledging the "obligation due in the sum of $1,545,293.56" and seeking a new repayment schedule for the agreed upon debt. (*Id.* ¶ 5; Exhibit 1 thereto.) The parties spoke and continued to email but to no avail. (*Id.* ¶¶ 4-6; Exhibit 1 thereto.) CI Int'l never paid the amount owed. (*Id.*)

Despite acknowledging its debt to Peninsula, CI Int'l failed to make a single payment, forcing Peninsula to commence this litigation against it for its liquidated claim. Neither Defendant's Previous Motion, Defendant's Present Motion, nor Mr. Ochoa's Declarations state anything to the contrary.

In its Previous Motion, Defendant failed to contest any of the above, an incredibly significant point that Peninsula raised in its opposition to the Previous Motion (Dkt. 29 at 14). Then, on reply and for the very first time, Mr. Ochoa alleged that he did not agree to an amount owed. (Dkt. 31-1: "Second Ochoa Decl.") He did so in a wholly conclusory manner: baldly asserting that "[t]he parties did not agree on the validity, existence, and amount, if any, of the alleged price adjustment debt." (*Id.* ¶ 9.) All previous declarations, writings, and conduct by the parties contradict this unsupported and belated assertion and prove it to be false.

Moreover, the sole document on which Mr. Ochoa purported to rely does not support this position. It is a WhatsApp exchange between Messrs. Grosso and Ochoa on June 1, 2021. (Dkt. 31-2: Ex. A to Second Ochoa Decl.) That date is significant, because the exchange was made days and weeks *before* the parties agreed on the respective price adjustments. (Grosso Decl. ¶¶ 4-6.) It was a preliminary discussion that *preceded* their agreements on price adjustments and thus does not disprove their subsequent agreements. Only after a full year had passed since Mr. Ochoa had agreed to the price adjustments and sought a payment plan (after defaulting on the related invoices) did he assert without factual basis, and only in a reply declaration, that there was no such agreement. Clearly, what is before this Court is a liquidated claim.

## B. Defendant's Presence in this District and the Convenience of this Venue

CI Int'l is incorporated under the laws of Florida, is registered and has active status with the Florida Division of Corporations, and lists its "principal address" as located in North Bay Village, Florida. (Dkt. 38-1: Ex. 1 to AVC – Florida Division of Corporations materials, registration details, certificate of status and amendment to articles of organization.) Mr. Ochoa and Maria M. Roa are listed as 100% members of CI Int'l, and they list the same North Bay Village address as their own. (*Id.*)

Mr. Ochoa asserted that CI Int'l "does not have any assets, employees, premises or any other sort of infrastructure or operations conducted in Florida or elsewhere in the United States." (First Ochoa Decl. ¶9.) Leaving aside the ambiguous and conclusory nature of that statement, it seems impossible to reconcile it with the registration status of CI Int'l.

Mr. Ochoa stated that he and Maria M. Roa both reside in Colombia. (First Ochoa Decl. ¶¶ 4-5.) After Peninsula pointed out in its Opposition to the Previous Motion that Mr. Ochoa did not deny that he also resides and is domiciled in Florida (at 7900 Harbor Island Drive, Unit 615, in North Bay Village) – both can be true, as one can maintain more than one residence – he contested that assertion for the first time on reply. (Second Ochoa Decl. ¶ 11.). The fact remains that the Detailed Report of the Miami-Dade County Office of the Property Appraiser shows that this address is a two-bedroom, two-bathroom condominium zoned "multi-family" with primary land use "residential" owned by Maria M. Roa. (Exhibit 1 to Johnson Declaration.) Moreover, CI Int'l has issued invoices to Peninsula from a Florida address. (Urzais Decl. ¶ 7.)

Furthermore, Mr. Ochoa has admitted that Defendant's purpose is to make and take payments in the United States (Ochoa Decl. ¶ 2.) Thus, despite his claim that CI Int'l has no assets or other infrastructure in Florida, Mr. Ochoa's Declarations were craftily worded to avoid admitting or denying that CI Int'l has either a Florida bank account or a bank account in one of the other 49 states. It turns out that CI Int'l has Florida bank accounts: from which it emptied its balances, serving as the basis for Peninsula to amend the complaint to assert a fraudulent transfer claim. (Dkt. 36.)

## C. Operative Terms of Relevant Contracts – Master Agreement and Pledge Agreement

As a common theme throughout, CI Int'l falsely contends that the Master Agreement provides that any "disputes and/or claims" arising from it shall be subject to arbitration in

accordance with the London Court of International Arbitration. (Defendant's Present Motion pgs. 3, 5, 7.) CI Int'l is correct in relying on the entirety of Section 11 – Governing Law and Arbitration – of the Master Agreement to determine what law governs construction, validity, and performance of the Master Agreement and under what scenarios arbitration is mandated. But, upon close scrutiny, said Section says something entirely and materially different than how CI Int'l would have this Court interpret it.

Said Section is subdivided into two subsections:

Clause 11.1 provide as follows:

> The construction, validity and performance of this Master Sale and Purchase Agreement and/or any Cargo Recap and/or any Bunker Recap and **any dispute or claim** arising out of or in connection with this Master Sale and Purchase Agreement and/or any Cargo Recap and/or any Bunker Recap and their subject matter or formation (**including non-contractual disputes or claims**) shall be governed by and construed in accordance with English law to the exclusion of any other law which may be imputed in accordance with choice of law rules applicable in any jurisdiction. [Emphasis added.]

Clause 11.2 provides as follows:

> 11.2 **Any dispute** arising out of or in connection with this Master Sale and Purchase Agreement and/or any Cargo Recap and/or any Bunker Recap, **including any question regarding their existence, validity or termination**, shall be referred to and finally resolved by arbitration under the LCIA Riles, which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be one. The seat, or legal place, of arbitration shall be London, England. The language to be used in the arbitral proceedings shall be English. [Emphasis added.]

As set forth more fully below in the Argument section below, these provisions must be compared and contrasted in order to determine the scope of the arbitration provision. It is clear that the governing law clause (§ 11.1) recognizes a distinction between disputes and claims, and it is intended to cover both. It is also clear that it is even broader than that, extending beyond the contract itself, to "non-contractual disputes or claims." But the arbitration clause (§ 11.2) is far narrower in its scope; it is limited to *disputes* alone. There was an obvious and intentional drafting

decision to exclude many types of matters from arbitration *to wit*, contractual and non-contractual claims arising out of the Master Agreement. The liquidated claim presently before this Court is one such matter excluded from arbitration.

CI Int'l is correct in saying that the Pledge Agreement has an applicable law and jurisdiction clause, which provides that the parties submit to the jurisdiction of Colombia. (Exhibit 2 to Johnson Declaration, previously filed as Dkt. 1-3: Pledge Agreement, § 8.11.) However, it is not an exclusive jurisdiction provision. In any event, as set forth in the Amended Verified Complaint (Dkt. 38 ¶¶ 54-67), a security interest was granted over "Assets" broadly defined to encompass not just the cargoes of marine fuel themselves that were sold and delivered to CI Int'l but also any proceeds or other assets derived from them. That may include any monies that CI Int'l received or may receive in respect of that marine fuel, subjecting it to the security interest that Peninsula is seeking to enforce. More specifically, that very well may include proceeds that flowed into Florida and are now assets of CI Int'l.

Lastly, neither the BP Oil Limited General Terms and Conditions (incorporated into the Master Agreement) nor the Guarantee made by C.I. International Fuels SAS have any bearing on where this matter should be heard. Defendant's repeated mention of them in its Present Motion is nothing more than a red herring and should not be considered.

## II.  LEGAL STANDARD

"When a defendant objects to venue under Rule 12(b)(3), the plaintiff bears the burden of showing that the venue selected is proper." *HNA LH OD, LLC v. Local House International, Inc.*, 2021 WL 44549404 *3 (S.D .Fla. September 29, 2021); citing *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988) (explaining that the plaintiff must make "only a prima facie showing of venue"); and *BP Prods. N. Am., Inc. v. Super Stop 79, Inc.*, 464 F. Supp. 2d 1253, 1256 (S.D. Fla. 2006). "The facts as alleged in the complaint are taken as true, to

the extent they are uncontroverted by defendants' affidavits." *Delong Equip. Co.*, 840 F.2d at 845. "[W]hen an allegation is so challenged the court may examine facts outside of the complaint to determine whether venue is proper….The court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Wai v. Rainbow Holdings*, 315 F.Supp.2d 1261, 1268 (S.D. Fla. 2004).

"Generally, venue in federal civil actions is governed by 28 U.S.C. § 1391." *HNA LH OD, LLC*, 2021 WL 44549404 *3. "However, if there is a forum-selection provision that requires the dispute to be litigated in a non-federal forum, the United States Supreme Court has determined that a motion to dismiss for forum non conveniens, and not a Rule 12(b)(3) motion for improper venue, is the appropriate means to enforce a valid forum-selection clause." *Id.*; citing *Atl. Marine Constr. Co. v. United States Dist. Court for Western Dist. of Texas*, 571 U.S. 49, 60 (2013).

When moving for dismissal under the doctrine of *forum non conveniens*, the movant has the burden of persuasion in proving all elements of its motion, and must demonstrate that "(1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1028 (11th Cir. 2014); quoting *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1310-11 (11th Cir. 2001). But "[t]he existence of a valid forum-selection clause requires a district court to apply the Supreme Court's modified *forum non conveniens* analysis — namely, courts must assess (1) whether an adequate alternative forum is available, and (2) whether the public factors weigh in favor of dismissal." *HNA LH OD, LLC*, 2021 WL 4459404 at *9; quoting *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. of Texas*, 571 U.S. 49, 63-65 (2013).

However, the Court is still required to determine whether a plaintiff's claims at issue are within the scope of the parties' forum selection clause. "'Under general contract principles, the plain meaning of a contract's language governs its interpretation.' *Slater v. Energy Servs. Grp. Int'l, Inc.*, 643 F.3d 1326, 1330 (11th Cir. 2011) [internal citation omitted]. Thus, '[t]o determine if a forum-selection clause encompasses a particular type of claim, we look to its language.' *Stiles*, 637 F. App'x at 559 (citing *Slater*, 634 F.3d at 1330)." *HNA LH OD, LLC*, 2021 WL 4459404 *6.

### III. ARGUMENT

**A. Neither the Master Agreement nor the Pledge Agreement require the parties to litigate undisputed claims in arbitration or Colombian courts.**

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a ***controversy thereafter arising*** out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an ***existing controversy*** arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Federal Arbitration Act ("FAA") 9 U.S.C. §2 [emphasis added].

The FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). However, this is not a blanket requirement for any and all issues within a contract containing an arbitration clause to be arbitrated. "Notwithstanding this strong federal policy in favor of arbitration, ***the FAA's provisions are 'not to be construed so broadly as to include claims that were never intended for arbitration.'***" *Faulkenberg v. CB Tax Franchise Systems, LP*, 637 F.3d 801, 808-09 (7th Cir. 2011) [emphasis added]; quoting *Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 929

(7th Cir.2003); see also *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (explaining

that arbitration "is a way to resolve those disputes—but only those disputes—that the parties have

agreed to submit to arbitration").

"When deciding whether the parties agreed to arbitrate a certain matter (including

arbitrability), courts generally…should apply ordinary state-law principles that govern the

formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

"[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those

disputes—but only those disputes—that the parties have agreed to submit to arbitration." *Id.* at

943.[1]

> **i.  The money owed to Peninsula by CI Int'l is not in dispute, and Peninsula's claims do not fall within the scope of the arbitration provision.**

A dispute is a conflict or controversy. Black's Law Dictionary (11th ed. 2019). A claim is

the assertion of an existing right or a right to payment. *Id*. They are not one and the same.

The case of *Papalote Creek II, LLC v. Lower Colorado River Auth.*, 918 F.3d 450 (5th Cir.

2019), is instructive for the arbitration clause at bar. Therein, the clause required the parties to

arbitrate "any dispute [that] arises with respect to either party's performance." *Id.* at 451-52.

Neither party disputed the validity of the arbitration clause. However, "Papalote" contended that

the parties' dispute was not performance-based and sought appellate court review of the District

Court's finding that the dispute fell within the scope of the arbitration clause. The Fifth Circuit

Court of Appeals reversed the District Court, noting:

> The parties may agree upon a broad language in the arbitration clause either by
> incorporating "[t]he standard broad arbitration provision recommended by the
> American Arbitration Association" or by creating their own broad provision. These
> standard arbitration provisions typically require arbitration of "[a]ny controversy
> or claim arising out of or relating to [the] contract" or "any dispute ... with respect
> to the interpretation or performance."

---

[1] Peninsula reserves its right to rely upon English law in the construction of the Master Agreement.

…

> Alternatively, the parties may agree upon a narrow language in the arbitration clause by deviating from the broad standard provisions and by limiting arbitration only to a subset of disputes that may arise out of the contract. For example, the parties may limit arbitration to either interpretation-related disputes or performance-based disputes at the exclusion of other categories of disputes.

*Id.* at 454-55 [internal citations omitted].

Here, the parties likewise deviated from the standard broad arbitration provisions recommended by the American Arbitration Association ("AAA") (quoted above in the *Papalote Creek* case), by omitting the word "claims" from the language employed. The arbitration clause is narrow and limits arbitration only to a subset of potential matters that could arise, by excluding "claims" therefrom.

Likewise, in *Art Etc. LLC v. Angel Gifts, Inc.*, 686 F.3d 654 (8th Cir. 2012), the Eighth Circuit Court of Appeals was confronted with an arbitration clause contained in a promissory note (given for payment of a portion of the purchase price) addressing "a dispute between the parties as to the existence of an infringement," which was an exhibit to an asset purchase agreement ("APA"). The defendant sought to stay the litigation pending arbitration on an issue not having to do with the promissory note, and the scope of that clause was squarely at issue. The Appellate Court affirmed the denial of the motion. The court resorted to Black's Law Dictionary for the definition of "offset," since an offset by the plaintiff under the note appeared to be the precondition to arbitration, out of which a dispute had to arise. *Id*. at 656-57.

One of the assertions made by the defendant therein was that the arbitration clause applied to all "claims" for monetary damages arising under the APA. *Id*. at 657. In rejecting that assertion, the Court relied not only on the language of the arbitration clause itself, but also the broader context of the APA, together with several of its provisions, in order to strive to "give effect to all language in [the] contract." *Id*. The APA repeatedly referred to litigation in various contexts, plainly

13

contemplating that not all disputes were arbitrable. The arbitration provision was thus held to not be applicable.

In the case at bar, the parties intentionally made the governing law clause extremely broad: (i) they included language from **both** clauses recommended by the AAA – *to wit*, both that the governing law applied to "[t]he construction, validity and performance" of the agreements AND any "dispute or claim" arising out of or in connection with the agreements; (ii) they further extended that language – any "dispute or claim" – to encompass the "subject matter or formation" of the agreements; and (iii) they further extended that language by identifying and including "non-contractual" disputes or claims. (Master Agreement § 11.1.)

Equally important to this analysis is the fact that almost all of the above-noted, expansive matters were **excluded** from the arbitration clause, especially "claims." (Master Agreement § 11.2.) Moreover, in the arbitration clause, the parties referenced three particular disputes as arbitrable, namely those arising out of or on connection with the "existence, validity or termination" of the Master Agreement, or any cargo recap or bunker recap. (*Id.*) These particular disputes differ from the ones that are identified in the governing clause (with the exception of a dispute concerning the "validity" of an agreement). Clearly, the parties ascribed the proper meanings to the different words that were employed and in doing so differentiated and limited what was to be arbitrated.

In order for the Court to give effect to the Master Agreement in its entirety, there must be a recognition of the foregoing. The parties intentionally excluded "claims" from the arbitration clause and identified types of disputes that should be included. And "claims" has a meaning which is distinct from disputes. One need not engage in a sophisticated legal analysis to find clear differences between how *claims* and *disputes* arise under the Master Agreement's terms.

14

For example, per Section 3 – "Barging Invoices" – Peninsula could baselessly withhold payment of a Barging Invoice, giving rise to a ***claim*** by CI Int'l. However, if Peninsula withheld payment based on the contemporaneous assertion that CI Int'l had previously failed to fulfill all of its obligations under Clause 4 as a basis for its refusal to pay, a ***dispute*** has arisen. Or, under Clause 4.6, Peninsula could refuse to make delivery of Product if it believed CI Int'l had failed to comply with any other provision of Section 4; CI Int'l could dispute this and demand payment on the basis that it complied with Section 4. This would be another example of an arbitrable ***dispute***.

Here, Peninsula negotiated for a price adjustment, for additional monies owed, *and CI Int'l agreed to such sum.* A unilateral decision to renege on what was previously agreed upon is not a dispute. The refusal to pay what is owed gave rise to Peninsula's liquidated claim.

### ii. The Master Agreement's arbitration clause (§ 11.2) is limited to disputes alone and is far narrower than its governing law clause (§ 11.1).

The deliberate conflation of the terms used in Master Agreement § 11.1 and § 11.2 in Defendant's Present Motion cannot be overlooked. Three different times, Defendant references six provisions in the parties' "Agreement"[2] for the application of governing law and jurisdiction, each time claiming that these provisions require "any disputes and/or claims" to be handled in a forum other than this Court. (Present Motion at 5, 7.) All three times, the argument is a deliberate misinterpretation of the actual language found in the Master Agreement.

And even assuming, *arguendo*, that a claim may be the subject of a dispute (and thereby become arbitrable), there is no such dispute before the Court. The evidence is clear that CI Int'l agreed to pay Peninsula $1,545,293.56, defaulted, and thereafter acknowledged the debt and

---

[2] Despite being a capitalized term, "Agreement" is never defined in Defendant's Motion. Nonetheless, for purposes of this Opposition, Peninsula has gleaned, based on the last paragraph on Page 2 of Defendant's Motion, that "Agreement" is meant to refer to the Master Sale and Purchase Agreement together with Annexes A-E, which is referred to as "Master Agreement" in this Memorandum.

sought to negotiate a payment plan (including interest). Remarkably, Mr. Ochoa waited to assert that CI Int'l did not agree to the price adjustment until Peninsula pointed out that glaring omission. But CI Int'l cannot manufacture a "dispute" after the fact by contradicting its contemporaneous words and actions. That ship has sailed.[3] "Generally, a party should not use a reply brief to raise or submit new issues or facts for the first time." *Hogan v. City of Fort Walton Beach*, 2019 WL 11638966 at *2 (N.D. Fla. June 3, 2019); citing *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F.Supp. 1511, 1515 (S.D. Fla. 1996); *see also Garner v. Acuity Brands Lighting, Inc.*, 2017 WL 10753617 at *14 (N.D. Ga. July 6, 2017) ("The Court perceives no basis to consider this new evidence, filed for the first time as an attachment to a reply brief… such evidence is not typically considered absent a showing of excusable neglect.").

Yet even if the Court were to accept this new issue raised for the first time in reply for the Previous Motion or for the first time in reply in support of the Present Motion, the conclusory, deliberately vague nature of the Second Ochoa Declaration's wording cannot be overlooked. *See, e.g., Cardoso v. FPB Bank*, 879 So.2d 1247, 1249-50 (Fla. 3d DCA 2004) ("We observe at the outset, as has one of our sister courts, 'that this case involves the exceptional situation in which the defendant[ ][has] been sued in [his] own home forum and [has] objected that [his] home forum is inconvenient.' [Internal citation omitted.] A forum non conveniens argument coming from a party sued where he resides is both 'puzzling' and 'strange.' [Internal citation omitted.] In addition, Cardoso neither filed nor succinctly articulated his defenses to the guarantee claim prior to the hearing on his motion to dismiss. It is therefore hardly surprising that his affidavit in support of his motion was both general and conclusory in nature…failing to identify any factual circumstance…with evidentiary value to Mr. Cardoso's defense of the claim.")

---

[3] Nor is the second claim for relief a dispute that is arbitrable. It arises under a different agreement and seeks to enforce Peninsula's right to payment from secured assets that may reside in the District.

Defendant's Present Motion is devoid of a single case to support its patently strained conflation of the "dispute or claim" language in Master Agreement § 11.1 with the "dispute arising out of or in connection with" language in Master Agreement § 11.2. Instead, Defendant's Present Motion tries to confuse the issue by citing language in the Master Agreement's annexes and the Guarantee, none of which apply. These are wholly irrelevant to the single issue before this Court: whether Master Agreement § 11.2 requires a liquidated claim to be resolved by arbitration.

Under previously established precedent as seen in the Fifth Circuit in *Papalote Creek II, LLC* and the Eighth Circuit in *Art Etc. LLC*, it is easy to see that the deliberate narrowing of the language from Master Agreement § 11.1 to Master Agreement § 11.2 renders the Amended Complaint as properly before this Court. That is, the facts, construed in a light most favorable to Peninsula as the non-moving party, plainly demonstrate an undisputed, liquidated claim for amounts due and previously agreed upon. This type of undisputed claim is not encompassed within the scope of Master Agreement § 11.2 and, as such, is properly before this Court. Defendant's Present Motion must therefore be denied.

**B. Alternatively, Defendant's Motion does not satisfy the elements of *forum non conveniens* analysis.**

**i. CI Int'l fails to meet its burden of demonstrating that an adequate alternative forum exists outside of this Court.**

Peninsula does not contest that it has filed an action in Colombia to enforce the terms of the Pledge Agreement against Defendant's assets found *there*. That does not bear on the claims before this Court which, *inter alia*, seek to enforce the terms of the Pledge Agreement against Defendant's assets found *here*. Two lawsuits seeking to enforce against assets of the same company in two jurisdictions does not make one jurisdiction unsuitable. Colombia is not the proper forum for a claim for execution against Defendant's assets located in Florida.

Neither Defendant's Previous Motion, its Present Motion, nor Mr. Ochoa's Declarations establish that Defendant, a Florida limited liability company, is amenable to suit in Colombia (much less England or Ireland) for the claims brought pursuant to the Master Agreement. Even if Ochoa were to have asserted this, the Court could not simply take him at his word; this would be an improper burden-shifting as more fully described in the very case Defendant cited in its Previous Motion in support of its adequate alternate forum argument, *Tyco Fire & Sec., LLC v. Alcocer*, 218 Fed.Appx. 860 (11th Cir. 2007). Nor did Defendant's Motions demonstrate that adequate remedies exist in Colombia for the claims with respect to the Master Agreement. In fact, the Present Motion abandoned all arguments about an adequate alternative forum from the Previous Motion, instead simply stating: "As a citizen of Colombia, Mr. Ochoa is subject to jurisdiction in his place of domicile, which is an adequate forum for resolving the instant dispute because Colombian law can redress the Plaintiff's claims and has jurisdiction over the movable assets." (Defendant's Present Motion at 8-9.) This single sentence clearly fails the two-part test in *Tyco Fire*, where the Eleventh Circuit finds that "the defendant must demonstrate both the availability and the adequacy of the proposed alternative forum." *Tyco Fire & Sec. LLC*, 218 Fed.Appx. at 865; quoting *Leon v. Million Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001).

As such, Defendant failed to show that an adequate alternative forum is available to Peninsula for the claims before this Court, and its *forum non conveniens* argument must fail.

ii.  **CI Int'l fails to meet its burden showing that public interest factors support enforcement of a forum-selection clause.**

The public interest factors "pertain to the relative interests of the two fora." *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1333 (11th Cir. 2011). In considering public factors, the court should look to the administrative difficulties flowing from court congestion, the local interest in having localized controversies decided at home, and the unfairness of burdening citizens in an unrelated

forum with jury duty. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1991); see also *Gulf Oil*, 330 U.S. at 509, 67 S.Ct. 839. A court may also consider what law will govern the action, including "the avoidance of unnecessary problems in conflicts of laws" and "the application of foreign law." *Fresh Results, LLC*, 921 F.3d 1043, 1049; quoting *Piper Aircraft*, 454 U.S. at 241 n.6.

Clearly, this case has a general nexus with the Southern District of Florida such that it is sufficient and proper to use this forum's judicial time and resources. But Defendant seeks to have the best of both worlds. It argues that it should be free to take advantage of a "tax and sales/purchase strategy" by incorporating in Florida, yet should somehow be immune from litigation in the very state in which it is incorporated and where one of its members owns a residence registered with the Florida Secretary of State as its principal place of business.[4]

Defendant cites no case law in arguing that the public interest factors somehow weigh in favor of dismissal. Instead, it argues that "the forum which is most at home with the foreign law governing the Agreement and action is Colombia – the forum selected by the parties under the Agreement." (Defendant's Present Motion at 9.) Instead, Peninsula respectfully submits that this Court should be guided by the Western District of Texas' recent decision in *Sisk v. BWS Inspection Services, LLC*, 2022 WL 3567349 (W.D. Tex. August 16, 2022) where the Magistrate Judge found that the plaintiff met its burden of demonstrating that dismissing its action for *forum non conveniens* would be unwarranted despite a presumptively valid forum selection clause the scope of which mandated that the type of claims brought by plaintiff be litigated elsewhere. In fact, the

---

[4] "For purposes of diversity jurisdiction, 'citizenship' means 'domicile.' [Internal citation omitted.] In fact, it is a party's domicile rather than his residence which is determinative of citizenship for diversity jurisdiction' [Internal citation omitted.] 'A person's domicile is the place of his true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom....' [Internal quotations omitted]." *Audi Performance & Racing, LLC v. Kasberger*, 273 F.Supp.2d 1220, 1226 (M.D. Ala. 2003)It is Defendant's status as a registered Florida limited liability company, not its member's domicile, that affords this Court diversity jurisdiction pursuant to 28 U.S.C. § 1332. Nonetheless, this dicta provides a guide on the differences between "residence" and "domicile."

Magistrate Judge even noted that the "'strong presumption in favor of the enforcement of mandatory forum selection clauses' applies." *Sisk*, 2022 WL 3567349 at *7; quoting *Polaris Eng'g, Inc. v. Tex. Int'l Terminals, Ltd.*, 2021 WL 5155691 at *6 (S.D. Tex. Apr. 16, 2021). And despite holding that the defendant had shown an adequate alternative forum was available – something CI Int'l fails to do here – the Magistrate Judge nonetheless found that the interest-balancing rendered the dismissal or transfer to Texas state court possible, but not warranted. *Id.* at 9-10.

Here, Defendant does not offer even a scintilla of evidence or argument that (i) this Court has any administrative difficulties flowing from court congestion or that (ii) there is no local interest in having claims decided in Florida against a corporate entity that makes and takes payments in Florida, whose registration disclosures lists its address as being in Florida address, who sends invoices from a Florida address, and whose principals own a residential condominium in Florida. Both these factors weigh *against* dismissal. And while this Court may not be as familiar with English law as a London arbitrator would be, Defendant does not even seek to rely upon it, much less offers no argument as to (i) how this Court would be unfamiliar with English law or (ii) how there would be any unnecessary problems presented by a conflict of laws or in applying English law. As such, two of the public interest factors weigh against dismissal and two are, at worst, neutral. Even if dismissal is possible, it is not warranted. *See Sisk*, 2022 WL 3567349 at *9. Just as in *Sisk*, the Present Motion should be denied.

**CONCLUSION**

Defendant failed to show that any of the claims in the Amended Verified Complaint fell under the scope of the Master Agreement's arbitration clause. Alternatively, even if this Court finds that some claims may be within the scope of the arbitration clause, the public interest factors weigh in favor of this matter remaining in this jurisdiction. Defendant did not meet its burden. The Present Motion should be denied.

Dated: January 19, 2023

Respectfully submitted,

By: /s/ Evan S. Gutwein
HAMILTON, MILLER, & BIRTHISEL LLP
Jerry D. Hamilton (FBN 970700)
jhamilton@hamiltonmillerlaw.com
Evan S. Gutwein (FBN 58741)
egutwein@hamiltonmillerlaw.com
150 S.E. Second Avenue, Suite 1200
Miami, Florida 33131
(305) 379-3686 (telephone)
(305) 279-3690 (facsimile)
*Attorneys for Plaintiff*

-and-

ZEILER FLOYD ZADKOVICH (US) LLP
Luke Zadkovich, Esq.
luke.zadkovich@zeilerfloydzad.com
(Admitted *Pro Hac Vice*)
Joseph Johnson, Esq.
joe.johnson@zeilerfloydzad.com
(Admitted *Pro Hac Vice*)
215 Park Avenue, 11th Floor
New York, NY 100003
(917) 375-9511

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 19, 2023 I electronically filed this document using

the Court's CM/ECF system, which will automatically serve a copy on all counsel of record.

By:     *Evan S. Gutwein*

| | |
|---|---|
| SANCHEZ VADILLO, LLP<br>Lori Dilican<br>ldilican@svlawus.com<br>11402 NW 41st St, Suite 202<br>Doral, Florida 44178<br>(305) 436-1410 (telephone)<br>(305) 436-0191 (facsimile)<br>***Attorneys for Defendant*** | HAMILTON, MILLER, & BIRTHISEL LLP<br>Evan S. Gutwein (FBN 58741)<br>egutwein@hamiltonmillerlaw.com<br>150 S.E. Second Avenue, Suite 1200<br>Miami, Florida 33131<br>(305) 379-3686 (telephone)<br>(305) 279-3690 (facsimile)<br><br>and<br><br>ZEILER FLOYD ZADKOVICH (US) LLP<br>Luke Zadkovich, Esq.<br>Luke.zadkovich@zeilerfloydzad.com<br>(Admitted *Pro Hac Vice*)<br>Joseph Johnson, Esq.<br>joe.johnson@zeilerfloydzad.com<br>(Admitted *Pro Hac Vice*)<br>215 Park Avenue, 11th Floor<br>New York, NY 100003<br>(917) 375-9511<br><br>*Attorneys for Plaintiff* |