**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No.: 22-cv-20712-RKA-LMR

PENINSULA PETROLEUM LIMITED,

                     Plaintiff,

      v.

CI INTERNATIONAL FUELS LLC,

                     Defendant.

_____/

**<u>PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SANCTIONS</u>**

Peninsula Petroluem Limited ("Peninsula" or "Plaintiff") respectfully submits this Reply in further support of its Motion for Sanctions [Dkt. 104] ("Motion") and in response to Defendant CI International Fuels LLC's ("CI") Opposition [Dkt. 106] ("Opposition").

## PRELIMINARY STATEMENT

The thrust of CI's Opposition attempts to deflect the Court's attention from the specific deficiencies addressed in the Motion to instead focusing on CI's affiliate entity, C.I. International Fuels SAS ("SAS"). Such objections to Peninsula's right to obtain documents from SAS are disingenuous, relate only to a small subset of Peninsula's requests, and entirely fail to otherwise address deficiencies in CI's production.

CI provides no reasonable, much less substantially justified, explanation for its failure to adequately respond to or produce documents responsive to Peninsula's first set of requests for production (the "First Requests") Nos. 18 (*financial accounts*) and  28 (*utilities*) [Dkt. 104-1: First Requests, 5, 7] or second set of requests for production (the "Second Requests") Nos. 8 (*disposition of assets*), 9 (*flow of assets*), 10 (*all transfers*), and 11 (*solvency*) [Dkt. 104-2, 5-6]. Such failures have harmed Peninsula by significantly delaying its pursuit of its claim and causing it to incur attorney's fees in pursuit of the discovery it is so clearly entitled to.

CI has still to this day failed to produce documents responsive to the First and Second Requests that it was previously ordered to in the Court's October 30, 2023 Order (the "10-30-23 Order") and, as such, an imposition of sanctions by this Court is appropriate pursuant to Federal Rules of Civil Procedure ("FRCP") Rules 37(b)(2) and 37(c)(1), and this Court's inherent authority to address bad faith conduct. [Dkt. 104: Motion, 15.]

## ARGUMENT

**I.     CI failed to produce documents responsive to Peninsula's First Requests which CI does not contest were in its possession, custody, or control.**

CI's Opposition fails to either establish that it produced all documents responsive to Peninsula's First Request Nos. 18 (*financial records*) and 28 (*utilities*), or provide substantial justification for its failure to do so. CI does not contest, nor has it ever contested, that documents responsive to First Request Nos. 18 and 28 are within its clear possession, custody, or control.

**(a) First Request No. 18 (*financial records*)**

As set forth in the Motion, CI failed to produce: "(i) <u>six years</u> of wire transfer records for the five newly disclosed [Bank of America ("<u>BofA</u>")] accounts; (ii) <u>six years</u> of records for the two undisclosed BofA accounts; and (iii) <u>over five years</u> of records pertaining to the accounts of Mr. Ochoa at Banco Falabella, Bancolombia, and Scotiabank, and of CI at BCP." [Dkt. 104: Motion, 12.] CI *does not address*, let alone provide *any* substantive explanation for, its failure to supplement production pertaining to the accounts of Mr. Ochoa at Banco Falabella, Bancolombia, Scotiabank [Dkt. 106: Opposition, 14],[1] conceding its violation of the Court's 10-30-23 Order.

CI also does not address the deficiencies in its production of records from BCP, and only asserts "that some production for the BCP was provided in March of 2024." [*Id*.] It is true that in March 2024 (more than three months after the Court-ordered deadline of November 30, 2023), just one day before Peninsula filed its Motion, CI produced documents related to *three* additional bank accounts[2] which it, inexplicably, had not previously disclosed.[3] Yet CI produced just a

---

[1] For each account, CI produced less than one year of records rather than years 2018 through 2023 as requested. [Dkt. 104: Motion, 8.]

[2] Three accounts in the name of Jaime Ochoa, two at Wells Fargo, ending 0390 and 1808, and one at BCP, ending 2869.

[3] In an attempt to justify its failure to produce these records until March 2024, and mitigate the appearance of any harm to Peninsula for this clear failure, CI claims that "Plaintiff had received these records from its [sic] BCP pursuant to its subpoena . . . and Plaintiff suffer [sic] zero harm therefrom." [Dkt. 106: Opposition, 14.] That statement is patently false, as Peninsula had not received any records for this account previously nor had knowledge of the account's existence prior to March 11, 2024.

fraction of the requested number of months of statements for those accounts. [Dkt. 104: Motion. at 13-14.] In any event, production related to one BCP account cannot supplement outstanding document requests related to another BCP account. This production only brought to light new deficiencies that CI's Opposition wholly fails to address. CI's failure to produce documents responding to Peninsula's requests regarding the BCP accounts is a clear violation of this Court's 10-30-23 Order. The same holds true for CI's failure to produce records responsive to the outstanding requests, including sufficient records pertaining to the recently disclosed account at Wells Fargo.

**(b) First Request No. 28 (*utilities*)**

First Request No. 28 seeks, in part, utility bills in the name of CI or its members for the condominium located at 7900 Harbor Drive. [Dkt. 104-1: First Requests, 7.] CI only produced (in addition to the monthly assessments) *three months* of electricity bills for this condominium. CI's sole relevant assertion, that "the only utility bills associated with the Condo are those for assessments and electricity" [Dkt. 106: Opposition, 14], does not respond to, let alone answer, why CI did not produce the other 69 months of requested electricity bills.[4] CI therefore concedes its violation of the Court's 10-30-23 Order regarding this request.

CI also failed to produce the requested scope of Mr. Ochoa's DirectTV statements. CI has never once objected to the relevance or discoverability of these statements, but instead simply asserts in its Opposition that "the years of requested statements are not in Mr. Ochoa's possession." [*Id*.] However, the requested bills are in Mr. Ochoa's name, falling squarely within his possession,

---

[4] Peninsula has also repeatedly requested utility statements related the property at Blue Lagoon Drive which was listed by the Master Sale and Purchase Agreement as CI's registered address. CI has never provided a sufficient explanation for why documents relating to the property listed as CI's registered address were not produced. Yet finally, here, CI explains *for the first time* that "the use of this address was extended by a friend of the members, solely for the purpose of receiving mail." [Dkt. 106: Opposition, 14.]

custody, or control. CI's failure to produce these documents is inexplicable, and a clear violation of the Court's 10-30-23 Order.

## II.     CI's arguments in support of its assertion that documents responsive to Peninsula's Second Requests are not within its possession, custody, or control are meritless.

As with the First Requests, CI's Opposition fails to establish a valid basis for failing to cure the deficiencies with respect to the Second Requests, and instead offers only ill-fated excuses.

### (a) CI is much more than an "invoice processing center."

The first over-arching, nonsensical argument set forth in CI's Opposition is that "it has repeatedly been explained that LLC simply services as an invoice processing center for SAS," [Dkt. 106: Opposition, 12], which limits what information SAS would share with CI only to "information related to invoicing." [*Id.* at 2.] [5] CI then argues that accordingly, Peninsula is not entitled to certain documents it seeks from CI because they are actually within SAS' possession,[6] not CI's. This novel assertion stretches far beyond how CI previously represented its role, and is without support.[7] It further contradicts CI's *actual* role as a purchaser of marine fuel under its agreement with Peninsula. Any non-production justified on this basis is disingenuous.

### (b) CI and its member, Jaime Ochoa, clearly maintain the requisite possession, custody, or control over documents requested by Peninsula.

CI's second overarching objection to production is that documents related to SAS are not within the possession, custody, or control of CI, and thus Peninsula is not entitled to their

---

[5] CI attempts to legitimize this characterization of CI only as an invoicing center by asserting further that it is SAS, and not CI, which is "actually and exclusively engaged in the buying and selling of marine fuel." [Dkt. 106: Opposition, 2.] However, this statement contradicts all prior assertions made by CI regarding SAS's business purpose, all which purport that SAS is engaged in the business of *delivery* of marine fuel to vessels in Colombia. [Dkt. 26-2: Ochoa's First Declaration, 1; Dkt. 31-1: Ochoa's Second Declaration, 1.]

[6] The merits of this assertion, or rather lack thereof, are addressed in subsection (b) of this section.

[7] Mr. Ochoa previously declared that CI's "only purpose is to make and take payments in the United States as part of a tax and sales/purchase strategy, pursuant to mandate agreement between the two parties." [Dkt. 31-1: Ochoa's Second Declaration, 2.] Additionally, CI did not cite to __*anywhere in the record*__ where it previously objected to production on this basis, despite claiming to have done so "repeatedly." [Dkt. 106: Opposition, 12.]

production. [*Id.* at 4, 5-6, 7, 11-13.] Although Magistrate Judge Reid already resolved this dispute at the October Discovery Hearing, Peninsula must revisit this objection, given CI's false allegation that Peninsula "misrepresents to the Court" CI's counsel's concession that such documents are within CI's control. [Dkt. 106: Opposition, 6.] A close review of the Hearing Transcript affirms Peninsula's representations:

> Ms. Dilican:   We have been working diligently to provide documents, but you will find that a lot of the documents being requested are directly related to nonparty CI Fuels SAS in Colombia and they are directly related to the ongoing proceedings before the Superintendency of Societies.
>
> The Court:     I understand that, Miss Dilican and thank you for explaining that the process is working out in Colombia, but here is how our court works in terms of the federal rules. As long as the documents are in the care, custody, and control of this Defendant, CI, I am not saying they have to be only in their hands exclusively even if they are by an affiliate company as them as well, that's fine, but they are asking for documents. And the documents are in the care, custody, and control of the individual who runs the Defendant company. <u>Is that correct or is that not?</u>
>
> Ms. Dilican:   Well, part of the problem is, as I have explained, CI LLC, the Defendant in this case, doesn't really do much of anything. Okay. It is really CI SAS who is not being sued here and the documents. And the production that they seek are all directly related to those Colombian proceedings. This is –
>
> The Court:     <u>But are they not in the care, custody, and control of this (inaudible)? That's the question.</u>
>
> Ms. Dilican:   I believe to be fair to the Court, I mean, when you say control, I am thinking you mean that in the broadest sense **<u>my client should be able to authorize even if a third party has them, the production, and he should</u>**.
> . . .
> The Court:     Right. Here's the problem I think ***the Defendant should know that if he doesn't turn over these documents and months are passing, he is now going to be facing contempt in the United States courts*** . . . I can certainly enter an order with a deadline and sanctions if the order isn't complied with. What else can I do at this point? <u>Because if these documents are sincerely –what you are telling me is they seem to be within their control. These companies are affiliates and perhaps it is the same individual in charge of controlling both companies, correct?</u>
>
> Ms. Dilican: **<u>Yes</u>**.
> . . .

[Ex. A: October Hearing Transcript: 8:11-11:2.] As seen above, CI, through counsel, acknowledged in open Court that Mr. Ochoa oversees and controls both entities. He should be able to authorize production.

Mr. Ochoa also made clear on several occasions that he is the sole controlling individual with respect to both CI and SAS:

(i)       he is the "***sole manager*** of [CI] and its affiliate entity [SAS]" [Dkt. 26-2: Ochoa's First Declaration, 1];

(ii)      he is "***the only person with authority to take or respond to legal authority*** on behalf of [CI] and its affiliate entity [SAS]" [*Id.*], indicating he has the practical ability, and in fact the ***sole ability***, to obtain production of these documents; and

(iii)     when asked to "identify all officers, directors, managers, members, or shareholders of each of [CI] and [SAS]," he is the ***only*** individual listed in relation to [SAS] as its CEO. [Ex. B: Response to Plaintiff's First Set of Interrogatories, 3.]

In its Opposition, CI makes other assertions – many for the very first time – to diminish the appearance of its possession, custody, or control over the requested documents. For example, CI claims it is not only an "affiliate" of SAS, but now a "subordinate" or subsidiary of SAS, rendering it powerless to obtain the requested documents from SAS. [Dkt. 106: Opposition, 4, 5.] This distinction is a significant departure from prior statements made by CI on the record, asserting that CI is an "affiliate" of SAS. [Dkt. 26-2: First Ochoa Declaration, 1; Dkt. 31-1: Second Ochoa Declaration, 1.] Later, CI claims that SAS "is governed by a board of directors," [*Id.* at 11], a clear departure from the previously cited interrogatory responses. [Ex. B: Response to Plaintiff's First Set of Interrogatories, 3.] But neither of these distinctions make any difference because Mr. Ochoa remains *the only person* able to act on behalf of either CI or SAS.

CI's attempt to downplay Mr. Ochoa's authority to access the requested documents is irrelevant, and in any event, long overdue. Even if timely and applicable, it is only relevant to a

small subset of documents (namely, those in response to Second Request No. 11), and not the whole of Peninsula's requests, as CI would have the Court believe.

### III. CI's explanations for why it did not produce documents responsive to Peninsula's Second Requests and the 10-30-23 Order are meritless.

#### (a) Second Request No. 8 (*disposition of assets*)

CI concedes that upon its purchase, it then on sold the fuel to vessels in Colombia. [Dkt. 106: Opposition, 2]. Accordingly, CI should have produced contracts for the fuel's onward sale. Nonetheless, in defending its failure to produce such contracts, CI asserts that "[a]ny contracts, *if they exist* would have been negotiated by SAS and are not provided in the normal course of business to the LLC." [*Id.* at 14-15.]

First, CI's objection is untimely – *if true*, it should have been raised in any one of CI's numerous responses to this request. Second, this is the first instance in which CI indicates that *there may not even be* any contract(s) for the onward sale of the fuel. Third, it is incomprehensible that CI would not have custody, possession, or control over a contract to which it is a party simply because the terms were negotiated by an affiliate. Accordingly, CI's failure to produce such contracts is a violation of the 10-30-23 Order.

#### (b) Second Request No. 9 (*flow of assets*)

CI claims in its Opposition that it produced every document responsive to this request in its custody or control. [Dkt. 106: Opposition, 15.] CI then attempts to explain away any remaining deficiencies, asserting that Peninsula "did not establish that LLC has a legal right to any documents that may be in nonparty SAS' control." [*Id.*] This is incorrect. At the very least, Peninsula established – and CI does not deny – the existence of several comprehensive deficiencies in CI's production of its financial records, as discussed previously in Section (I)(a): *First Request No. 18 (financial records)*. Further, CI's blanket opposition to production of documents related to or in

the possession of SAS is irrelevant here, where this request only seeks financial records *of CI Fuels*. CI's failure to adequately produce or otherwise respond to this deficiency evidences another violation of the Court's 10-30-23 Order.

**(c) Second Request No. 10 (*all transfers*)**

CI never raised any objection to Second Request No. 10 until its Opposition. Its permitted time to object has long since passed. To the extent CI's untimely objection is based on its contention that none of its transfers were fraudulent, this is a deliberate misinterpretation of the request. [Dkt. 106: Opposition, 15.] The request, when read in its entirety, merely uses the UFTA to provide a *definition* of the term "transfer."[8] Irrespective of whether CI actually committed fraud, CI is still obligated to produce records responsive to this request, and its failure to produce sufficient financial records (as discussed previously in Section (I)(a): *First Request No.* 18) is a violation of the Court's 10-30-23 Order.

**(d) Second Request No. 11 (*solvency*)**

As more fully discussed in Section II of this Reply, any objection to production of records responsive to documents regarding solvency on the basis that they are not in CI's possession, custody, or control is baseless, and CI's failure to produce such documents is a direct violation of the Court's 10-30-23 Order.

**(i)      Contracts**

CI has not produced a single contract, save for the one at issue, relating to either CI or SAS. CI takes inconsistent positions about the existence of any contracts to which CI is a party. First it claims that "[a]ny contracts, if they exist would have been negotiated by SAS and are not provided

---

[8] Under the UFTA, "transfer" means "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Fla. Stat. §726.102(14).

in the normal course of business to [CI]." [Dkt. 106: Opposition at 14-15.] But right after, CI conclusively asserts that it "has only ever entered into one contract, and that is the contract at issue in this dispute." [*Id.* at 15.] To add to the confusion, CI states earlier in the Opposition that it and SAS cooperate pursuant to the parties' "mandate agreement" [*Id.* at 2], yet another contract that CI did not produce. Finally, CI did not produce a single contract into which SAS has entered.

**(ii)     Banking records**

Peninsula already established CI's substantial failure to produce requested financial records (*See* Section (I)(a): *First Request No. 18 (financial records)*). CI claims in defense here that it has "at the very least [] substantially complied in good faith." [*Id.* at 15.] The standard for production, pursuant to FRCP 34(a)(1), is that a party must produce all documents in its ***possession, custody, or control***; there is no mention in the Rules of "good faith" compliance. Furthermore, CI did not produce any financial records belonging to or related to SAS in response to this request.

**(iii)    Accounts payable**

CI did not produce any accounts payable records. In its Opposition, CI does not deny this assertion, but claims that it produced "information *related to* accounts payable." [*Id.* at 16.] But providing information "related to" this request does not relieve CI of its burden to *actually* comply with this request.

**(iv)    Accounts receivable**

CI also did not produce any accounts receivable records. CI claims it "provided all of the invoices relevant to Plaintiff's claims related to monies Plaintiff alleges that the Defendant owes for fuel, *which is in the proportional scope of this litigation*. . . " [*Id.* at 16.] CI's production of *some* invoices related to the underlying transaction does not cure deficiencies in its complete failure to produce accounts receivable. Furthermore, CI now asserts that its production is limited

to what is "proportional" to this litigation, notwithstanding the fact that this is the first instance it claims such limitation. CI should not be permitted to unilaterally determine what it must produce.

      **(v)**     **Financial statements**

Finally, CI only produced three years of financial statements, rather than the full scope of those requested (2018-2023). CI does not even attempt to explain why statements covering the full scope of Peninsula's requests were not provided; this is, yet again, sanctionable.

**IV.**    **Peninsula is entitled to sanctions under FRCP 37(c)(1) because CI's failures are neither substantially justified nor harmless.**

CI asserts that sanctions would be unjust under the circumstances, because it alleges such violations are "meritless or harmless." [*Id.* at 16-17.] The merits of CI's ongoing violations are clearly shown both in the Motion and this Reply.

Moreover, Peninsula is clearly harmed by CI's repeated noncompliance with discovery rules and the orders of this Court. Peninsula has now been pursuing the requested discovery going on *one year* from when it served its initial requests. The delay suffered by Peninsula in pursuing its claims has been especially harmful considering that this is a liquidated claim, where Defendant's underlying liability is not in dispute. CI's dilatory conduct directly impedes the efficient resolution of what should have been a straightforward matter. Such delays also harmed Peninsula in causing it to incur fees and expenses associated with pursuing CI's compliance. For that reason, an award of Peninsula's attorneys' fees is particularly appropriate under the circumstances, and consistent with the 10-30-23 Order as a consequence of CI's noncompliance.

<u>**CONCLUSION**</u>

For all the aforementioned reasons, Peninsula's Motion should be granted and sanctions should be imposed as well as any other relief the Court deems just and proper.

Dated: April 2, 2024

Respectfully submitted,

By: /s/ Evan S. Gutwein
HAMILTON, MILLER, & BIRTHISEL LLP
Jerry D. Hamilton (FBN 970700)
jhamilton@hamiltonmillerlaw.com
Evan S. Gutwein (FBN 58741)
egutwein@hamiltonmillerlaw.com
150 S.E. Second Avenue, Suite 1200
Miami, Florida 33131
(305) 379-3686 (telephone)
(305) 279-3690 (facsimile)
***Attorneys for Plaintiff***

    -and-

ZEILER FLOYD ZADKOVICH (US) LLP
Luke Zadkovich, Esq.
luke.zadkovich@zeilerfloydzad.com
(Admitted *Pro Hac Vice*)
Joseph Johnson, Esq.
joe.johnson@zeilerfloydzad.com
(Admitted *Pro Hac Vice*)
33 East 33rd Street, Suite 905
New York, NY 10016

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 2, 2024 I electronically filed this document using the

Court's CM/ECF system, which will automatically serve a copy on all counsel of record.

By: __/s/__ Evan S. Gutwein

| | |
|---|---|
| DILICAN LAW FIRM, P.A.<br>Lori Dilican<br>ldilican@dilicanlaw.com<br>8050 SW 72nd Ave. Apt. No. 2307<br>Miami, FL 33143<br>Tel. No. (561) 951-9612<br>***Attorneys for Defendant*** | HAMILTON, MILLER, & BIRTHISEL LLP<br>Evan S. Gutwein (FBN 58741)<br>egutwein@hamiltonmillerlaw.com<br>150 S.E. Second Avenue, Suite 1200<br>Miami, Florida 33131<br>(305) 379-3686 (telephone)<br>(305) 279-3690 (facsimile)<br><br>and<br><br>ZEILER FLOYD ZADKOVICH (US) LLP<br>Luke Zadkovich, Esq.<br>Luke.zadkovich@zeilerfloydzad.com<br>(Admitted *Pro Hac Vice*)<br>Joseph Johnson, Esq.<br>joe.johnson@zeilerfloydzad.com<br>(Admitted *Pro Hac Vice*)<br>215 Park Avenue, 11th Floor<br>New York, NY 100003<br>(917) 375-9511<br>*Attorneys for Plaintiff* |